

Dr. Howard M. Knoff
President, Project ACHIEVE Educational Solutions
11600 Court of Palms, Unit 703
Fort Myers, FL 33908

Office phone: 813-495-3318
E-mail: howieknoff1@projectachieve.info
Website: www.knoffexpertwitness.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 25-cv-80544-REINHART

### Second Amended Complaint, Filed December 17, 2025

C.M.-1 and C.M.-2, by and through their next friend TINISHA TOLBERT, *Plaintiffs,*

vs.

SCHOOL BOARD OF PALM BEACH COUNTY, *Defendant*

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

# Expert Opinion on Behalf of the Plaintiffs

## Howard M. Knoff, Ph.D.

Licensed Psychologist (Florida PY-11912)
(Previously Licensed as a Psychologist in NY, AR)

Nationally Certified School Psychologist
(Previous School Psychology Certifications in MA, NY, FL)

President, Project ACHIEVE Educational Services

Submitted: April 30, 2026

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-80544-REINHART**

**Second Amended Complaint, Filed December 17, 2025**

C.M.-1 and C.M.-2, by and through their next friend TINISHA TOLBERT,
*Plaintiffs,*

vs.

SCHOOL BOARD OF PALM BEACH COUNTY, *Defendant*

Submitted:  April 30, 2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-80544-REINHART**

Second Amended Complaint, Filed December 17, 2025

C.M.-1 and C.M.-2, by and through their next friend TINISHA TOLBERT, *Plaintiffs,*
vs.
SCHOOL BOARD OF PALM BEACH COUNTY, *Defendant*

## Table of Contents

| Section | | Page |
|---|---|---|
| I. | Statement of Purpose | 1 |
| II. | Review/Sources of Facts and Information Used to Form Opinion | 2 |
| | Critical Individuals Involved in this Case | 4 |
| III. | Qualifications of the Expert | 6 |
| IV. | Expert's Involvement as an Expert Witness in Cases Since 2010  (Trial or Deposition) | 6 |
| V. | Compensation to be Paid for Analysis and/or Testimony in the Case | 6 |
| VI. | Overview of School District of Palm Beach County—2022–23 through 2024–25 | 6 |
| | District Profile and Organizational Structure | 6 |
| | Three-Year Student Enrollment and Demographics Overview | 6 |
| | Overview of Students with Disabilities: Exceptional Student Education (IDEA-Eligible) | 7 |
| | Students Experiencing Homelessness (McKinney-Vento) | 8 |
| | Economically Disadvantaged Students | 9 |
| | District Accountability Grades from the Florida Department of Education | 10 |
| | Summary | 10 |
| VII. | Case Overview and Chronological Details | 11 |
| | Case Overview | 11 |
| | A Comprehensive Chronology of Specific Factual Events and Details | 13 |
| VIII. | The Litigation Counts | 21 |
| | Introduction—Typographical or Citation Errors in the Second Amended Complaint | 21 |
| | Summarizing the Counts | 22 |
| IX. | Summary of the Relevant Laws and their Applications to this Case | 26 |
| | Section 504 of the Rehabilitation Act of 1973 (Counts I and II) | 27 |
| | Title II of the Americans with Disabilities Act (Counts III and IV) | 31 |
| | McKinney-Vento Homeless Assistance Act (Count V) | 33 |
| | Expert Analysis: Standard of Care (SOC) | 38 |

| Section | | Page |
|---|---|---|
| X. | Plaintiffs' Educational and Disability Histories: Documentation and Descriptions | 40 |
| | C.M.-1 Schools and School-Years of Attendance: Academic and Attendance Information | 40 |
| | C.M.-2 Schools and School-Years of Attendance: Academic and Attendance Information | 47 |
| | Aligning C.M.-1 and C.M.-2's Medical Histories with School Events and the Litigation | 56 |
| | Adolescent ADHD and Generalized Anxiety Disorder | 60 |
| | Adolescents and Generalized Anxiety Disorder (GAD) | 65 |
| | The Compounding Effects of ADHD and GAD When Present Together | 70 |
| XI. | Analyzing and Applying C.M.-1's Deposition to the Litigation Counts | 73 |
| | Preliminary Observations | 73 |
| | The Denial of Extended Time Accommodation | 74 |
| | Denial of Short Breaks Accommodation | 74 |
| | Hostile Environment: Miss Oliver | 75 |
| | Hostile Environment: Mr. Wagstaffe's Public Disclosure of IEP | 76 |
| | Parental Notice and District Non-Response | 76 |
| | Mental Health Impact and School Withdrawal | 77 |
| | C.M.-1's Current Year Status Provides Contrasting Evidence | 77 |
| | Behavioral Issues and Rule Compliance | 78 |
| | Two-Month School Absence | 78 |
| | The "Water as Break" Proxy System | 79 |
| | Miss Oliver's Reduced Classroom Presence as the District's "Response" | 79 |
| | Grade Promotion Despite Failing Grades | 79 |
| | Escort Requirement During Breaks | 80 |
| | Therapy Services Currently Delivered at School | 80 |
| | Expert Analysis | 80 |
| XII. | Analyzing and Applying C.M.-2's Deposition to the Litigation Counts | 82 |
| | Preliminary Observations | 82 |
| | Housing and Transportation History | 83 |
| | 504 Plan—Documented Accommodations | 85 |
| | Accommodation Implementation—Palm Beach Central (2022–2023) | 86 |
| | Accommodation Implementation—Suncoast (2024–202 through 2025–2026) | 86 |
| | The E-mail Workaround Pattern | 87 |
| | Anxiety—Onset, Precipitating Event, and Functional Impact | 87 |
| | Mental Health Treatment | 88 |
| | Expert Analysis | 88 |
| XIII. | Aligning the Discovery Documentation with Depositions | 97 |
| | Analyzing C.M.-1's Relevant Discovery Documents | 97 |
| | Expert Analysis: Corroboration of C.M.-1's Deposition Testimony by Discovery Document | 112 |
| | Summary of Corroboration Findings | 119 |
| | Analyzing C.M.-2's Relevant Discovery Documents | 120 |
| | Expert Analysis: Corroboration of C.M.-2's Deposition Testimony by Discovery Documents | 130 |
| | Summary of Corroboration Findings | 131 |
| XIV. | Why Middle and High School General Education Teachers Demonstrate Resistance and Bias Against Students with Disabilities | 137 |
| | Introduction: The Scope and Significance of the Problem | 137 |
| | Summary: A Predictable and Documented Pattern | 145 |

| Section | | Page |
|---|---|---|
| XV. | Summary: Demonstrating How the Case Facts Support the Litigation Complaints | 146 |
| | Brief Case Overview | 146 |
| | Summarizing the Counts | 147 |
| | Disability Discrimination and the Standard of Care | 150 |
| | C.M.-1. Counts I and III—Section 504 (Count I) and Title II ADA (Count III) | 151 |
| | C.M.-2. Counts II and IV—Section 504 (Count II) and Title II ADA (Count IV — Discrimination and Retaliation) | 159 |
| | C.M.-2: Count V—McKinney-Vento Homeless Assistance Act (42 U.S.C. §11431 et seq.) | 163 |
| | Cross-Cutting Systemic Findings | 166 |
| | Integrated Expert Conclusions | 167 |
| | Limitations of this Analysis | 171 |
| | Final Statement | 172 |

Tables

| Table 1a. | Background and Timeline Table for C.M.-1 (Fact Allegations ¶¶ 8–21) | 14 |
|---|---|---|
| Table 1b. | Background and Timeline Table for C.M.-1 (Fact Allegations ¶¶ 22–47) | 16 |
| Table 2. | Identified Typographical and Citation Errors in the Second Amended Complaint | 21 |
| Table 3. | Summary of the Five Counts in this Litigation | 26 |
| Table 4. | The Separate, but Overlapping, Features of Section 504 and Title II (ADA) | 32 |
| Table 5. | C.M.-1's School History, Attendance, and Transitions | 40 |
| Table 6. | C.M.-1's Grade 5 and 6 Florida Assessment of Student Thinking Fall Through Spring Reading and Math Achievement Scores [CBM268] | 42 |
| Table 7. | Documented Accommodations Across C.M.-1's Section 504 Plans and Individualized Education Program (IEP) | 44 |
| Table 8. | C.M.-2's School History and Attendance | 49 |
| Table 9. | C.M.-2's Middle School and High School Academic Grades | 50 |
| Table 10. | Documented Accommodations Across C.M.-2's Section 504 Plans | 52 |
| Table 11. | Summary of C.M.-1's Deposition Testimony Mapped to Counts I and III | 80 |
| Table 12. | Summary of C.M.-2's Deposition Testimony Mapped to Counts II, IV, and V | 89 |
| Table 13. | Summary of Important Documents in C.M.-1's Discovery Packet | 109 |
| Table 14. | Summary of Important Documents in C.M.-2's Discovery Packet | 114 |
| Table 15. | Summary of Important Documents in C.M.-2's Discovery Packet | 129 |
| Table 16. | Consistencies Between the C.M.-2's Discovery Entries and Her Deposition | 132 |

_ _ _ _ _

| Section | Page |
|---|---|
| References | 174 |
| Appendices | 179 |
| A. Outlined List of Discovery Documents Reviewed for this Report | 180 |
| B. Expert's Brief Biography/Vita (Including All Publications from the Past 12 Years) | 183 |
| C. Expert's Experience as an Expert Witness in Federal or State Court Cases (Trial or Deposition) Since 2010 | 194 |

**<u>Section I</u>. Statement of Purpose**

I, Dr. Howard M. Knoff, residing in Fort Myers, FL, am a Licensed Psychologist in Florida, a Nationally Certified School Psychologist, and an experienced Expert Witness who has been retained in the past (since 1993) to testify as an Expert Witness in federal and state courts on, for example, school law and disability rights (e.g., IDEA, Section 504, ADA), civil rights and discrimination (e.g., 14th Amendment, Title VI), and bullying, harassment, and sexual abuse (e.g., Title IX). I was retained in this case by Roberto Cruz at Southern Legal Counsel, Inc. in Gainesville, FL to serve as an Expert Witness supporting the Plaintiffs in this case against the School Board of the Palm Beach County School District headquartered in West Palm Beach, FL.

<u>Allegations</u>. This matter is a civil action filed on behalf of two minor students, C.M.-1 and C.M.-2, by and through their next friend, Tinisha Tolbert, against the School Board of Palm Beach County in the United States District Court for the Southern District of Florida (Case No. 25-cv-80544-REINHART). The Second Amended Complaint (filed on December 17, 2025) alleges disability discrimination and failures to implement disability-related educational accommodations under Section 504 and Title II of the ADA, and a denial of transportation (and related barrier-removal/dispute resolution obligations as alleged) under The McKinney-Vento Homeless Assistance Act for C.M.-2.

As pled, C.M.-1 is a Black middle school student (now in Grade 8) receiving ESE services through an IEP under the Other Health Impairment category based on diagnoses of ADHD and Generalized Anxiety Disorder. The Complaint alleges that during the 2024–2025 school year (7th grade) at Emerald Cove Middle School, general education teachers denied IEP accommodations (including short breaks and extended time), applied grading practices that negated extended time (e.g., "F" placeholder grades), and engaged in conduct alleged to create a hostile environment (including public discussion of IEP/accommodations). The Complaint further alleges that C.M.-1's mother sought meetings and alternative arrangements, and that the school's response included threats regarding attendance when a class change was requested.

As pled, C.M.-2 is a Black high school student (now in Grade 11) with a Section 504 Plan (based on ADHD and Generalized Anxiety Disorder) and is also documented to be a homeless student under McKinney-Vento. The Complaint alleges that during the 2023–2024 school year (9th grade) at Palm Beach Central High School, a teacher failed to implement accommodations (extended time and hard copy of notes) and made statements/engaged in conduct alleged to be demeaning and stigmatizing, contributing to emotional distress and academic harm. Separately, the Complaint alleges that the School Board denied (for 2024–2025) McKinney-Vento transportation to C.M.-2's choice school, revoked a previously customized bus stop, required use of a stop that required crossing a highly trafficked road, and did not conduct a "best interests" analysis or provide appropriate dispute resolution.

The opinions stated in this report are wholly mine. They are based on my (a) reading of the pleadings, Discovery and other support documents, and depositions in this case that are relevant to the questions I was asked to answer; (b) review of the relevant federal and state laws and regulations, letters of counsel and opinion, and other relevant information; and (c) more than 40 years of experience as a licensed psychologist and nationally certified school psychologist specializing in (c1) federal and state education school law or regulations; (c2) disability rights and special education/504 service delivery systems; and (c3) school psychology and its applications to students with accommodation and other educational needs. This experience has come from work at the state department of education, university, national, and district/school levels.

Relative to my involvement in this Case, I was asked to provide independent, objective, and expert opinions—and this Report—on the validity of the Counts and claims in this Case. In preparing this

Report, in addition to the above-listed materials, I also reviewed documents from the (a) the Florida Department of Education, U.S. Department of Education, and other relevant websites and sources; (b) additional web-based information on the Counts below; and (c) published psychological and educational assessment and intervention research as related to this case.

I was also asked to potentially be available as an Expert Witness for testimony should this Case go to trial. My opinions are based on the information available to me at this time, and are expressed to a reasonable degree of psychoeducational probability and certainty. I reserve the right to supplement this report if further information becomes available.

– – – – – – – –

**Section II. Review/Sources of Facts and Information Used to Form Opinion**

Below is a general list of the filings, documents, information, and reports read, analyzed, and considered in forming the opinions in this report.

Documents Received from Defendant through Discovery

C.M.-1. Discovery documents (Pages 1- 558), including:

| Beg. Bates No. | Date | Page #s | Description |
|---|---|---|---|
| CBM001 | 2/21/2024 | 1-3 | PB Legal Aid req. for records w/ parent auth |
| CBM004 | 4/2/2024 | 4 | complaint e-mail from T. Tolbert to Office of Inspector General - attachment of 80+ pages follows-docs described below CBM005-086 |
| CBM005 | 2/16/2024 | 5 | staff corresp. re: dress code, housing |
| CBM006 | 2/19/2024 | 6 | staff corresp. re: SHQ, no clothing assistance req. |
| CBM007 | 12/12/2018 | 7-9 | Pleadings index- prog. Rept, tardy notice |
| CBM010 | 7/7/2020 | 10-12 | index- grade 2 rept card |
| CBM013 | 1/30/2023 | 13-19 | index-504 plan doc-parent report |
| CBM020 | 2/27/2024 | 20 | index-multiple docs |
| CBM021 | 10/4/2023 | 21-27 | 504 plan |
| CBM028 | 10/4/2023 | 28 | staffing record and notes |
| CBM029 | 2/21/2024 | 29 | Q2 rept card |
| CBM030 | 2/8/2024 | 30 | phone conf notes |
| CBM031 | 2/9/2024 | 31-33 | parent-sch e-mails re math |
| CBM034 | 2/19/2024 | 34-35 | parent e-mails w King |
| CBM036 | 2/16/2024 | 36 | staff corresp. re: dress code, housing- DUPE OF CBM005 |
| CBM037 | 2/19/2024 | 37 | DUPE OF CBM006 |
| CBM038 | 2/19/2024 | 38 | Student Housing Questionnaire |
| CBM039 | 2/20/2024 | 39 | parent-teacher e-mails-math |
| CBM040 | undated | 40-48 | database info incl attendance |
| CBM049 | 10/4/2023 | 49 | counselor notes |
| CBM050 | undated | 50-52 | contact notes sept 2019-jan 2024 |
| CBM053 | undated | 53 | referrals page from database (none shown) |

| Beg. Bates No. | Date | Page #s | Description |
|---|---|---|---|
| CBM054 | undated | 54-70 | testing records |
| CBM071 | 2/21/2024 | 71-72 | attendance 23-24 |
| CBM073 | 2/21/2024 | 73-75 | transcript |
| CBM076 | 2/21/2024 | 76 | Q3 rpt card |
| CBM077 | 2/27/2024 | 77-80 | mtg notification for 4.1.24 |
| CBM081 | 2/16/2024 | 81 | e-mail from King re conf needed |
| CBM082 | 3/28/2024 | 82 | dress code violation e-mail |
| CBM083 | 2/20/2024 | 83 | dress code violation e-mail |
| CBM084 | 10/16/2023 | 84 | dress code violation e-mail |
| CBM085 | 8/30/2023 | 85 | dress code violation e-mail |
| CBM086 | 9/6/2023 | 86 | dress code violation e-mail |
| CBM087 | 4/24/2025 | 87-90 | e-mail thread re parent discrim. Complaint |
| CBM091 | 4/21/2024 | 91-96 | parent e-mail w/ complaint |
| CBM097 | 4/24/2025 | 97-110 | e-mail thread re parent discrim. Complaint-complaint incl. |
| CBM111 | 6/25/2025 | 111-115 | parent req for records |
| CBM116 | 5/5/2025 | 116-119 | Complaint - S.D. |

C.M.-2. Discovery documents (Pages 1- 1012), including:

| Beg. Bates No. | Date | Page #s | Description |
|---|---|---|---|
| NOTE-THIS SET OF RECORDS APPEARS TO BE MOSTLY DUPLICATIVE OF C.M.-1 RECORDS | | | |
| | | | |
| CIM0086 | 2025.05.26 | 86-87 | Release auth-unsigned and signed copies |
| CIM0088 | 2025.06.11 | 88-119 | Courtesy copies of summonses issued and complaint to all defs |
| CIM0120 | 2024.09.04 | 120 | Formal complaint against CIM teacher Chacon |
| CIM121 | 2025.06.17 | 121-122 | parent e-mail req for records |

‒ ‒ ‒ ‒ ‒

Legal Case Filings

0 Second Amended Complaint CM1 and 2 v Palm Beach, December 17, 2025

‒ ‒ ‒ ‒ ‒

Depositions and Deposition Exhibits

C.M. vs. PBCSB: C.M.-1 Deposition (02.18.26)-FT
C.M. vs. PBCSB: C.M.-2 Deposition (02.18.26)-FT
Errata Sheet Signed CM-1 (March 25, 2026)
Errata Sheet Signed CM-2 (March 24, 2026)

‒ ‒ ‒ ‒ ‒

Federal or State Laws/Regulatory Documents Reviewed

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504")
Title II of the Americans with Disabilities Act, 42 U.S.C. §1331 *et seq.* ("ADA")
McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11301 *et seq*. ("McKinney-Vento").
Elementary and Secondary Education Act (ESEA, 2015)
Individuals with Disabilities Education Act (IDEA, 2004)

Florida State Chapter 1003.57: Standards for Exceptional Student Education (ESE) and Student Safety
Florida State Chapter 119: Public Records Act (Standard for Administrative Transparency and Record Retention)

_ _ _ _ _

School Board of Palm Beach County (PBCSB) Policies

Policy 5.50: Compliance with Section 504 and ADA (Role of 504 Designees; Mandatory Investigation of Harassment)
Policy 5.002: Anti-Bullying and Harassment (Standards for Prompt Investigation and Remediation).
Policy 5.07: McKinney-Vento Homeless Assistance (Standard for Safety and Removal of Financial Barriers)
Policy 5.1812 / 5.1813: Student Code of Conduct (Mandate for "Corrective Feedback" vs. Punitive Removal for Manifest Behaviors)
Policy 5.01 / 5.011 / 5.015: Professional Standards and Pupil Personnel Standards of Conduct (Civility, Dignity, and Confidentiality)

_ _ _ _ _

Critical Individuals Involved in this Case

As a backdrop to the descriptions and analyses related to this Case and the Plaintiff's pleadings and claims, below is a list of individuals (with their titles or positions) who may be referenced.

Plaintiffs and Friend

| Name | Role/Title | Job/Function | Schools Attended |
|------|-----------|--------------|------------------|
| C.M.-1 | Plaintiff (Minor Student) | Middle school student receiving IEP-based special education services (Other Health Impaired—ADHD, Generalized Anxiety Disorder) | Emerald Cove Middle School (2024-2025; Grade 7) |
| C.M.-2 | Plaintiff (Minor Student) | High school student receiving Section 504 accommodations; McKinney-Vento eligible | Palm Beach Central High School (2023-2024; Grade 9) Suncoast High School (2024-present; now in Grade 11) |
| Tinisha Tolbert | Next Friend/ Parent | Legal representative of minor plaintiffs; parent advocating for services | N/A |

Mental Health Providers

| Name | Role / Title |
|---|---|
| Dr. Lorena Frontado | Physician or Mental Health Provider |
| Ruthie Bunkelmann | Mental Health Provider |

— — — — —

Defense: Personnel from the Palm Beach County School District

| Name | Role/Title | Workplace |
|---|---|---|
| Miss Troche | Grade 6 Language Arts Teacher | Emerald Cove Middle School |
| Miss Rodenbo | Grade 6 Math Teacher | Emerald Cove Middle School |
| Miss Baughman | Grade 6 Science Teacher | Emerald Cove Middle School |
| Miss Pagalilauan | Grade 6 PE Teacher | Emerald Cove Middle School |
| Mrs. Shuhaiber | Grade 6 Technology Teacher | Emerald Cove Middle School |
| | | |
| Matthew Klein | Grade 7 Science Teacher | Emerald Cove Middle School |
| Sean Wagstaffe | Grade 7 Civics Teacher | Emerald Cove Middle School |
| Mr. Frost | Grade 7 Language Arts Teacher | Emerald Cove Middle School |
| Miss Haynes | Grade 7 Math Teacher | Emerald Cove Middle School |
| Miss Hayden | Grade 7 Gym Teacher | Emerald Cove Middle School |
| Miss Lejulus | Grade 7 Digital Discoveries Teacher | Emerald Cove Middle School |
| Mrs. Berliant | Accommodation Support | Emerald Cove Middle School |
| Miss Oliver | Accommodation Support | Emerald Cove Middle School |
| | | |
| Miss Hessler | Reading / Language Arts Teacher | Emerald Cove Middle School |
| Miss White | Pre-Algebra (Math) Teacher | Emerald Cove Middle School |
| Mr. Jackson | Science Teacher | Emerald Cove Middle School |
| Miss Julian | Advanced IT Teacher | Emerald Cove Middle School |
| Miss Gammon | Intensive Reading Teacher | Emerald Cove Middle School |
| Miss Ahmed | Teacher/Intern Period Monitor | Emerald Cove Middle School |
| Miss Solernou | In-Class Support Staff (Science, Reading, and Intern Period) | Emerald Cove Middle School |
| Mrs. Johnson | Accommodation Support Person | Emerald Cove Middle School |
| Miss Glee | Cheer Coach | Emerald Cove Middle School |
| Miss Martinez | Language Arts Teacher (Suggested by Counsel; Denied by C.M.-1) | Emerald Cove Middle School |
| | | |
| Ms. Vernette | ESE Support Person | Emerald Cove Middle School |
| Marellius King | Assistant Principal | Emerald Cove Middle School |
| Eugene Feaman | Principal | Emerald Cove Middle School |
| | | |
| Gabrielle Chacon | Spanish Teacher | Palm Beach Central High School |
| Samantha Butler | Assistant Principal | Palm Beach Central High School |
| Unnamed Principal | Principal | Palm Beach Central High School |
| Miss Clemons | Algebra II / Math Teacher | Suncoast High School |
| | | |
| Ed Tierney | Deputy Superintendent/Chief of Schools | School District of Palm Beach County (SDPBC) |
| Karen Whetsell | Instructional Superintendent | SDPBC |
| Kevin McCormick | ESE Director | SDPBC |
| Kim Doyle | 504 Program Planner | SDPBC |

— — — — — — — — — —

**Section III. Qualifications of the Expert**

A brief biography and vita regarding Dr. Howard M. Knoff are available in Appendix B. The vita lists all of Dr. Knoff's journal, book chapter, or book publications from the previous 12 years.

− − − − − − − − −

**Section IV. Expert's Involvement as an Expert Witness in Cases Since 2010 (Trial or Deposition)**

A list of all of the cases (at trial or by deposition) that Dr. Howard M. Knoff has been involved in since 2010 is available in Appendix C.

− − − − − − − − − −

**Section V. Compensation to be Paid for Analysis and/or Testimony in the Case**

Compensation has been agreed to at an off-site (home location) rate of $500 per hour plus reasonable costs for materials or supplies. Off-site deposition-related preparation and participation will be charged at $750 per hour. The agreed-upon rate for all work performed away from Consultant's home location (e.g., on-site preparation and in-court appearances) has been set at $7,500 per day (for any portion of an eight-hour day)—plus reimbursement for travel days, as well as out-of-pocket travel to the airport, air, rental car and gas, hotel, and other meal and per diem expenses. Compensation is not contingent on the outcomes of the case.

− − − − − − − − − −

**Section VI. Overview of School District of Palm Beach County—2022–23 through 2024–25**

District Profile and Organizational Structure

The School District of Palm Beach County (SDPBC) is located in southeastern Florida and is one of the largest public school systems in the state. The District operates 183 schools spanning Prekindergarten through Grade 12, and serves a geographically and demographically diverse student population of over 165,000 students across urban, suburban, and rural communities in Palm Beach County.

The District is governed by the School Board of Palm Beach County, which is the named Defendant in this litigation. The Superintendent of Schools serves as the Chief Executive Officer of the District. In addition to District-operated schools, approximately 21,527 students attended public charter schools within Palm Beach County during the 2024–25 school year, and an estimated 24,579 students used state-funded vouchers to attend private schools—a figure that has grown substantially from 4,523 voucher students in 2020–21.

Three-Year Student Enrollment and Demographics Overview

All enrollment figures below are derived from the District's official October FTE Enrollment Reports for the respective school years, which represent the state-mandated student count used for funding and accountability purposes.

District-operated enrollment grew modestly across all three years, adding a total of 1,528 PK–12 students (0.9%) over the period. This stability is notable given significant pressures including:

- Rapid growth in state-funded voucher usage (from 4,523 in 2020–21 to an estimated 24,579 in 2024–25)
- Rising cost of living in Palm Beach County

- Demographic shifts including migration patterns and immigration-related concerns
- Charter school enrollment of approximately 20,000–21,500 students annually

Demographically, across the available data, the District's student body is majority-minority, with approximately 70% or more of students identifying as non-White. Key trends include:

- Hispanic/Latino enrollment is the largest and fastest-growing subgroup, increasing from approximately 35.9% in 2020–21 to 38.3% in 2024–25, consistent with the broader population growth in Palm Beach County (the county's Hispanic population grew approximately 45% between 2010 and 2023)

- White enrollment is declining as a proportion of total enrollment (28.2% in 2022–23 to 27.2% in 2024–25)

- Black/African-American enrollment remains substantial at approximately 27–28% of the student body

- Multiracial identification is increasing (2.8% in 2022–23 to 3.1% in 2024–25)

<u>Student Enrollment</u>—District-Operated Traditional Schools

| School Year | October FTE Count Date | PK–12 Enrollment | K–12 Enrollment |
|---|---|---|---|
| 2022–23 | October 12, 2022 | 166,768 | 163,233 |
| 2023–24 | October 13, 2023 | 167,915 | 164,348 |
| 2024–25 | October 11, 2024 | 168,296 | 164,635 |

<u>Student Demographics</u> (Race/Ethnicity and Gender)

| Category | 2022–23 | 2024–25 |
|---|---|---|
| Hispanic/Latino | 37.9% | 38.3% |
| White | 28.2% | 27.2% |
| Black/African American | 27.5% | 28.1% |
| Asian | 3.0% | 2.7% |
| Multiracial | 2.8% | 3.1% |
| American Indian/Alaska Native | 0.6% | 0.6% |
| Native Hawaiian/Pacific Islander | 0.1% | 0.1% |
| | | |
| Female | 49% | 49% |
| Male | 51% | 51% |

<u>Overview of Students with Disabilities</u>: Exceptional Student Education (IDEA-Eligible)

The District's current public ESE webpage reports approximately 39,683 students eligible for Exceptional Student Education services, including 6,299 gifted students. Florida classifies gifted students under the ESE umbrella which inflates the figure relative to the IDEA disability-only counts used in other states. The counts in the Table below represent IDEA-eligible students with disabilities only (excluding gifted), which is the appropriate metric for this Case.

Relative to multi-year trends, the number of IDEA-eligible students with disabilities in SDPBC increased steadily across all three of the reported years—growing by a total of 910 students (+2.9%) from 2022–23 to 2024–25. This growth outpaced the District's overall enrollment growth (0.9%), meaning that the proportion of students with disabilities is increasing—from 18.6% to 19.0% of the PK–12 student body.

At 19.0% in School Year 2024–25, SDPBC's disability identification rate substantially exceeds the national average of approximately 15.2% under IDEA (2022–23, U.S. Department of Education). This elevated rate means the District bears a proportionally greater obligation to ensure adequate staffing, training, and systemic compliance with IEP and accommodation implementation across all 183 schools.

SDPBC Three-Year IDEA-Eligible Student Data*

| Category | 2022–23 | 2023–24 | 2024–25 |
|---|---|---|---|
| Students with Disabilities (IDEA-eligible Count) | 31,095 | 31,499 | 32,005 |
| Students with Disabilities—% of PK–12 Enrollment | 18.6% | 18.8% | 19.0% |
| | | | |
| Year-over-Year Change (Count) | — | +404 students (+1.3%) | +506 students (+1.6%) |
| Year-over-Year Change (%) | — | +0.2 % | +0.2% |

* <u>Percentages calculated against district-operated PK–12 enrollment</u>: 166,768 (2022–23); 167,915 (2023–24); 168,296 (2024–25). PK–12 is used because Florida's ESE count includes early childhood special education students beginning at age 3.

<u>Students Experiencing Homelessness</u> (McKinney-Vento)

Relative to counting the number of school-aged homeless students, two different County approaches are used: the District's census-day count (where the number of homeless students attending District schools are tallied on three specific days across the school year), and the cumulative annual count from the Palm Beach County Homeless Advisory Board. This latter count capture all students identified as homeless at any point during the full school year. This is the standard McKinney-Vento reporting methodology used for the federal data-base.

While discussed further below, McKinney-Vento is a federal law that establishes educational rights and services to children and youth experiencing homelessness, ensuring that they have access to an appropriate education regardless of their housing situation.

The snapshot data show a 12.0% increase in the SDPBC's identified homeless students from 2022–23 to 2023–24 (2,852 → 3,195), followed by a 15.3% decrease in 2024–25 (3,195 → 2,706). The decline in 2024–25 should be interpreted cautiously, and should not be interpreted as a reduction in need without further analysis. Indeed, the reduction may reflect a combination of:

- Actual decreases in student homelessness
- Changes in identification practices or outreach capacity
- Departure of homeless families from the District due to the rising costs of living
- Increased voucher use by families seeking alternative schooling options

Separately, the Palm Beach County Homeless Advisory Board received a report indicating a cumulative annual count of 6,133 homeless students for 2023–24 (revised upward from an initial estimate of approximately 5,500). That cumulative figure is nearly double the snapshot count of 3,195 for the same school year. Using the cumulative 2023–24 count, SDPBC ranked as the third-highest district in Florida for student homelessness, behind Miami-Dade County (10,874) and Orange County (8,683).

Below are the snapshot numbers from one of the single reporting dates in the school years identified.

SDPBC Three-Year Homeless Student Data*

| Category | 2022–23 | 2023–24 | 2024–25 |
|---|---|---|---|
| Homeless Students—Count | 2,852 | 3,195 | 2,706 |
| Homeless Students—% of PK–12 Enrollment | 1.7% | 1.9% | 1.6% |
| | | | |
| Year-over-Year Change (Count) | — | +343 (+12.0%) | −489 (−15.3%) |

* Percentages calculated against district-operated PK–12 enrollment: 166,768 (2022–23); 167,915 (2023–24); 168,296 (2024–25).

Economically Disadvantaged Students

A majority of SDPBC students qualified as economically disadvantaged in 2022–23 and 2023–24, peaking at 55.8% in 2023–24. The sharp decline in 2024–25 is notable: the count dropped by 7,756 students (−8.3%), while total enrollment increased slightly. This produced a 4.7 percentage-point decrease (from 55.8% → 51.1%).

Possible explanations for this decline include: (a) Changes in eligibility criteria or reporting methodology (e.g., transitions in certification processes, changes to Community Eligibility Provision participation, or shifts in how families report economic status); (b) Student attrition to voucher-funded private schools, which may disproportionately include economically disadvantaged families eligible for state vouchers; and/or (c) Actual changes in family economic circumstances in Palm Beach County.

SDPBC Three-Year Economic Disadvantage Data*

| Category | 2022–23 | 2023–24 | 2024–25 |
|---|---|---|---|
| Economically Disadvantaged—Count | 92,421 | 93,674 | 85,918 |
| Economically Disadvantaged—% of PK–12 Enrollment | 55.4% | 55.8% | 51.1% |
| | | | |
| Year-over-Year Change (Count) | — | +1,253 (+1.4%) | −7,756 (−8.3%) |
| Year-over-Year Change (%) | — | +0.4 percentage points | −4.7 percentage points |

* Percentages calculated against district-operated PK–12 enrollment: 166,768 (2022–23); 167,915 (2023–24); 168,296 (2024–25).

District Accountability Grades from the Florida Department of Education

| School Year | District Grade |
|---|---|
| 2022–23 | B |
| 2023–24 | A |
| 2024–25 | A |

Relative to the state's district accountability "Report Card," the District improved from a B to consecutive A ratings. This reflects strong aggregate performance on Florida's education accountability measures, which include state assessment proficiency and learning gains, graduation rates, and acceleration metrics (AP, IB, dual enrollment, industry certifications).

Aggregate district grades, however, can mask significant disparities in outcomes for specific schools and subgroups. A district that earns an "A" overall may still have substantial compliance failures in specific schools or for certain student groups—particularly for students with disabilities, students experiencing homelessness, and economically disadvantaged students. As such, the claims in this Complaint illustrate exactly this phenomenon: alleged systemic failures in the implementation of accommodations for specific students with disabilities, and compliance with the McKinney-Vento Act— even within a district that is performing well on aggregate accountability measures.

Summary

Across the 2022–23 through 2024–25 school-year timeframe, the School District of Palm Beach County demonstrated:

- Stable and modestly growing enrollment, from 166,768 to 168,296 PK–12 students (+0.9%)

- A diverse, majority-minority student body, with approximately 70% or more non-White enrollment

- Strong aggregate accountability performance, improving from a B to consecutive A ratings

- A substantial and growing population of students with disabilities, increasing from 31,095 to 32,005 IDEA-eligible students (18.6% → 19.0% of PK–12 enrollment)—well above the national average

- Thousands of students experiencing homelessness, with snapshot counts ranging from 2,706 to 3,195, and a cumulative annual count of 6,133 in 2023–24 (third-highest in Florida)

- A majority-economically-disadvantaged student population, with 51–56% qualifying across the time period

- A large English learner population, with approximately 29,780 ELL students in 2022–23 (17.9% of enrollment) speaking over 150 languages

These figures establish SDPBC as a large, diverse, and complex school system serving substantial populations of students with heightened legal entitlements under IDEA, Section 504, the ADA, and the McKinney-Vento Homeless Assistance Act. The District's obligation to maintain robust systems for identifying, serving, and protecting these students is significant—and the adequacy of those systems is the central issue in this litigation.

**Section VII**. **Case Overview and Chronological Details**

Case Overview

This matter is a civil action filed on behalf of two minor students, C.M.-1 and C.M.-2, by and through their next friend, Tinisha Tolbert, against the School Board of Palm Beach County in the United States District Court for the Southern District of Florida (Case No. 25-cv-80544-REINHART). The Second Amended Complaint (filed on December 17, 2025) asserts five counts: Count I (Section 504—C.M.-1), Count II (Section 504—C.M.-2), Count III (ADA Title II—C.M.-1), Count IV (ADA Title II—C.M.-2), and Count V (McKinney-Vento Homeless Assistance Act—C.M.-2). Taken together, the Complaint alleges disability discrimination and systemic failures to implement disability-related educational accommodations under Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act, and a denial of transportation—along with related failures to conduct a best-interests analysis and provide dispute resolution—under the McKinney-Vento Homeless Assistance Act.

The events giving rise to these claims span two district-operated schools within the School District of Palm Beach County, one of the largest public school systems in Florida, serving approximately 168,296 students (PK–12) across 183 schools as of October 2024, including over 32,000 IDEA-eligible students with disabilities.

C.M.-1: Background and Disability. As pled, C.M.-1 is a Black female middle school student receiving Exceptional Student Education (ESE) services through an Individualized Education Program (IEP) under the eligibility category of Other Health Impairment (OHI), based on diagnoses of ADHD and Generalized Anxiety Disorder (¶8). Her IEP documents educational deficits in reading comprehension and math, and provides for specific accommodations and services including Short Breaks—intended to allow her to calm down when struggling, upset, or anxious—and Extended Time for Assignments, including 100% additional time beyond standard deadlines (¶8; ¶11). During the 2024–2025 school year, C.M.-1 was enrolled in the 7th grade at Emerald Cove Middle School, a district-operated school supervised by Principal Eugene Feaman (¶17).

C.M.-1: Alleged Accommodation Failures and Hostile Environment. The Complaint alleges that from the beginning of the 2024–2025 school year, two general education teachers—science teacher Matthew Klein and civics teacher Sean Wagstaffe—systematically denied C.M.-1's IEP accommodations (¶¶10–11). Specifically, both teachers allegedly refused to allow Short Breaks, or they said she could have a break but only if she was escorted—which was not provided in her IEP. Mr. Wagstaffe allegedly denied breaks so consistently that C.M.-1 stopped asking (¶¶10, 15). Neither teacher allegedly provided Extended Time, and they implemented a grading process that assigned an automatic "F" placeholder grade if work was not submitted by the original due date. They also enforced a written policy asserting that the initial deadline already incorporated extended time—a practice the Complaint alleges negated the purpose of the accommodation entirely. This resulted in at least five to ten "F" placeholders for C.M.-1, creating a high degree of unnecessary anxiety (¶11). The Complaint alleges that these failures directly resulted in low grades, including a D in Science and a D in Civics (¶¶9, 16).

The Complaint also alleges that C.M.-1's ESE Support Person, Ms. Vernette, attempted to advocate for accommodation implementation but was overruled by the general education teachers (¶13). In March 2025, Mr. Klein allegedly denied a Short Break request, told C.M.-1 to "drink from the sink in the classroom" (a laboratory sink) when she asked for water, harassed her when she refused to drink from the sink, and also discussed her IEP accommodations in front of the class (¶14).

C.M.-1's mother requested a meeting on or about April 17, 2025, and on May 1, 2025, contacted Karen Whetsell (Central Region Instructional Superintendent) and Kevin McCormick (ESE Director) to request

alternative educational arrangements, alleging C.M.-1 was afraid or unwilling to return to certain classes (¶¶18–19). The Complaint alleges that when a class change was requested to avoid further harassment, the school threatened C.M.-1 with attendance violations (¶20).

C.M.-2: Background and Disability. As pled, C.M.-2 is a Black male high school student with a Section 504 Plan based on diagnoses of ADHD and Generalized Anxiety Disorder (¶22). His 504 Plan provides for accommodations including Extended Time and a Hard Copy of Notes (¶23). During the 2023–2024 school year, C.M.-2 was enrolled in the 9th grade at Palm Beach Central High School, a district-operated school. The Complaint further alleges that C.M.-2's family became homeless while he was a student at Palm Beach Central, and that he has been continuously identified as a homeless student under the McKinney-Vento Homeless Assistance Act since approximately October 2022 (¶38; ¶83).

C.M.-2: Alleged Accommodation Failures and Stigmatizing Conduct. The Complaint alleges that throughout Fall 2023, C.M.-2's Spanish teacher, Gabrielle Chacon, knew of his 504 Plan but often failed (a) to provide accommodations, (b) complained about the effort involved and the need to change grades, (c) told the class that students "must be accountable and do not need extra time," (d) told C.M.-2 he "had enough time," and (e) stated she never had (to provide) accommodations and "did fine" (¶25). The Complaint alleges these reactions caused C.M.-2 to feel "dummer," worsened his anxiety, and caused him to stop requesting accommodations—including hard copies of notes—because Ms. Chacon made it clear the effort was burdensome (¶26).

After C.M.-2's mother contacted the school's 504 coordinator in approximately February 2024 (¶28), Ms. Chacon allegedly began providing some accommodations but continued making demeaning comments, including telling C.M.-2 that it was not good that boys "stayed under the control of their mothers," and that he would "stay on his mother's couch" because she was "enabling him" (¶29).

Following a separate April 2024 incident in which C.M.-2 and a female student were jointly horseplaying—for which Assistant Principal Samantha Butler referred him to therapy, claiming he should stop "committing acts of violence against women" (¶30)—Ms. Chacon allegedly told a female student to "be careful" because C.M.-2 "likes to put his hands on girls and hit them." She separately told student monitors to "make sure C.M.-2 was not cheating" (¶31). The school principal allegedly told C.M.-2 that Ms. Chacon was "concerned he would grow up to be a woman beater" (¶32).

The Complaint alleges these false and stigmatizing statements caused embarrassment, humiliation, and severe emotional distress to C.M.-2, and that his grades suffered due to both the accommodation failures and the hostile environment (¶33).

ESE Director Kevin McCormick is alleged to have been aware of numerous grievances and detailed complaints from C.M.-2's mother starting in Fall 2024, but failed to ensure accountability or compliance (¶¶34–35).

C.M.-2: McKinney-Vento Transportation Denial. For safety and emotional stability, C.M.-2 enrolled in Suncoast High School—a public choice school—for the 2024–2025 school year (¶37). During a prior school year, the District's McKinney-Vento Coordinator had helped C.M.-2's mother obtain a customized bus stop at Skees Road and Okeechobee Boulevard, so that he would not have to cross Okeechobee Boulevard's eight lanes of traffic (¶39). When C.M.-2's mother requested McKinney-Vento transportation for the 2024–2025 school year, the District denied the request, stating C.M.-2 was ineligible because he was attending a Choice school and that the District would only provide McKinney-Vento transportation to his school of origin, Palm Beach Central High School (¶41). The District simultaneously revoked the customized bus stop and required C.M.-2 to use a standard stop designated for choice students, which required crossing eight lanes of Okeechobee Boulevard without a safe school zone light (¶41).

The Complaint alleges that C.M.-2 attempted to walk to the new stop, was honked at, and was nearly hit by a vehicle, causing his anxiety to worsen significantly. It further alleges his disabilities (ADHD and anxiety) made him particularly vulnerable to this hazard (¶43). The Complaint alleges the District applied a blanket policy denying McKinney-Vento transportation to choice schools (¶47), did not conduct a best-interests analysis before rejecting the request (¶44), and did not offer dispute resolution to remove barriers to enrollment and retention (¶45). As a result, C.M.-2's mother was forced to pay for alternative transportation (Lyft or neighbors) and ultimately quit one of her work-from-home jobs to manage morning drop-off, resulting in direct financial and emotional damages to the family (¶46).

District Context. The allegations in this Complaint arise within a school district serving over 168,000 students, including more than 32,000 IDEA-eligible students with disabilities (19.0% of enrollment— substantially above the national average of approximately 15.2%), thousands of additional students with Section 504 Plans, nearly 30,000 English Language Learners, and between 2,700 and 6,100 students experiencing homelessness depending on counting methodology and school year. More than half of the District's students qualified as economically disadvantaged during the period at issue. The District earned an A accountability grade in both 2023–24 and 2024–25—yet the Complaint alleges that these aggregate performance indicators masked significant compliance failures at the individual-student level. The factual allegations, if proven, describe a pattern in which general education teachers at two separate schools denied or undermined legally-mandated accommodations, engaged in stigmatizing conduct, and were not held accountable by school or district-level administrators—despite parental complaints and ESE staff advocacy—while the District simultaneously denied a homeless student the transportation services required to access his school safely.

A Comprehensive Chronology of Specific Factual Events and Details

Table 1a (for C.M.-1) and Table 1b (for C.M.-2) put the events and allegations above—along with corollary events and allegation—into tabular form. These tables include the (a) school year involved; (b) the school and grade level where the respective Plaintiff was attending; (c) specific event or allegation descriptions; (d) where the event/allegation is found in the Amended Complaint; and (e) the specific Count(s) relevant to the event or allegation.

Table 1a. Background and Timeline Table for C.M.-1 (Fact Allegations ¶¶ 8–21)

| School Year/ Grade Attending | School | Description of the Event | Complaint Paragraph/ Related Litigation Count |
|---|---|---|---|
| 2024–2025; 7th grade | Emerald Cove Middle School | C.M.-1 is a female student with disabilities receiving ESE services under the category of "Other Health Impairment" for ADHD and anxiety. She has educational deficits including reading comprehension and math. Her IEP includes accommodations/services including *Short Breaks* and *Extended Time for Assignments*. (¶8) | ¶8; Count I (Section 504—C.M.-1); Count III (ADA Title II—C.M.-1) |
| 2024–2025; 7th grade | Emerald Cove Middle School | The Complaint alleges the School Board's systemic failure to implement accommodations occurred consistently throughout the 2024–2025 school year, and that this directly resulted in low grades in classes where accommodations were denied, including a D in Science and a D in Civics. (¶9) | ¶9; Count I; Count III |
| 2024–2025 (beginning of school year); 7th grade | Emerald Cove Middle School | The Complaint alleges C.M.-1's science teacher (Matthew Klein) and civics teacher (Sean Wagstaffe) would not allow use of the *Short Breaks* accommodation (intended to help her calm down when struggling/upset/anxious). She allegedly requested a short break about once a week and was denied. The Complaint alleges the teachers later stated she could go on a break only if escorted, which is not provided for in her IEP. (¶10) | ¶10; Count I; Count III |
| 2024–2025 (beginning of school year); 7th grade | Emerald Cove Middle School | The Complaint alleges neither teacher provided *Extended Time* and instead implemented a policy assigning a placeholder grade of "F" if work was not submitted by the original due date, despite an IEP accommodation of "100% additional time." It alleges the teachers enforced a written policy that the initial deadline already included extended time, and that this practice negated the purpose of the accommodation. The Complaint alleges C.M.-1 received at least five to ten "F" placeholders due to this practice and/or policy. (¶11) | ¶11; Count I; Count III |
| 2024–2025; 7th grade | Emerald Cove Middle School | The Complaint alleges neither teacher modified instruction to provide specialized instruction as required in her IEP. (¶12) | ¶12; Count I; Count III |

| School Year/ Grade Attending | School | Description of the Event | Complaint Paragraph/ Related Litigation Count |
|---|---|---|---|
| 2024–2025; 7th grade | Emerald Cove Middle School | The Complaint alleges C.M.-1's ESE Support Person (Ms. Vernette) attempted to advocate for her accommodations but was overruled by the general education teachers. (¶13) | ¶13; Count I; Count III |
| March 2025; 7th grade | Emerald Cove Middle School | The Complaint alleges C.M.-1 requested a *Short Break* in science class, was denied, asked for water, and Mr. Klein told her to "drink from the sink in the classroom" (a lab sink). It alleges she was harassed by her science teacher for refusing. It further alleges that following this incident, the teacher increased disciplinary scrutiny and talked about her accommodations and IEP in front of the class. (¶14) | ¶14; Count I; Count III |
| 2024–2025; 7th grade | Emerald Cove Middle School | The Complaint alleges C.M.-1's civics teacher regularly denied short breaks, and she stopped asking after he continually said no. (¶15) | ¶15; Count I; Count III |
| 2024–2025; 7th grade | Emerald Cove Middle School | The Complaint alleges failure to receive needed accommodations and improper reactions from the two teachers caused increased anxiety and her grades suffered. (¶16) | ¶16; Count I; Count III |
| 2024–2025; 7th grade | Emerald Cove Middle School | The Complaint alleges the science and civics teachers were supervised by Eugene Feaman, Principal of Emerald Cove Middle School. (¶17) | ¶17; Count I; Count III |
| On or about April 17, 2025; 7th grade | Emerald Cove Middle School | The Complaint alleges C.M.-1's mother requested a meeting to assess current placement, prevent retaliation, and ensure consistent accommodations following the harassment. (¶18) | ¶18; Count I; Count III |
| May 1, 2025; 7th grade | District-level contacts (School Board) | The Complaint alleges C.M.-1's mother contacted Karen Whetsell (Central Region Instructional Superintendent) and Kevin McCormick (ESE Director) to request alternative educational arrangements because C.M.-1 was unwilling to return to school because of the hostile environment. It alleges C.M.-1 was afraid or unwilling to go to certain classes due to constant public discussions and denials of her accommodations. (¶19) | ¶19; Count I; Count III |

| School Year/ Grade Attending | School | Description of the Event | Complaint Paragraph/ Related Litigation Count |
|---|---|---|---|
| 2024–2025; 7th grade (date not specified) | Emerald Cove Middle School | The Complaint alleges that when C.M.-1 requested a class change to avoid harassment, the school threatened her with attendance violations. (¶20) | ¶20; Count I; Count III |
| 2024–2025; 7th grade (date not specified) | Emerald Cove Middle School | The Complaint alleges the school's response was discriminatory and harassing. (¶21) | ¶21; Count I; Count III |

Table 1b. Background and Timeline Table for C.M.-2 (Fact Allegations ¶¶ 22–47)

| School Year/ Grade Attending | School | Description of the Event | Complaint Paragraph/ Related Litigation Count |
|---|---|---|---|
| 2023–2024; 9th grade | Palm Beach Central High School | C.M.-2 is a male student with disabilities with a Section 504 Plan for ADHD. The Complaint alleges accommodations include *Extended Time* and a *Hard Copy of Notes*. (¶22; ¶23) | ¶¶22–23; Count II (Section 504—C.M.-2); Count IV (ADA Title II—C.M.-2) |
| Fall 2023; 9th grade (2023–2024 school year) | Palm Beach Central High School | The Complaint alleges that throughout Fall 2023, C.M.-2 asked for accommodations (extra time and hard copy of notes) from his Spanish teacher, Gabrielle Chacon. (¶24) | ¶24; Count II; Count IV |
| Fall 2023; 9th grade (2023–2024 school year) | Palm Beach Central High School | The Complaint alleges Ms. Chacon knew he had a 504 Plan but often did not provide accommodations; complained about the effort and needing to change grades; told the class students must be accountable and do not need extra time; told C.M.-2 he had enough time; and told the class she never had accommodations and did fine. (¶25) | ¶25; Count II; Count IV |

| School Year/ Grade Attending | School | Description of the Event | Complaint Paragraph/ Related Litigation Count |
|---|---|---|---|
| Fall 2023; 9th grade (2023–2024 school year) | Palm Beach Central High School | The Complaint alleges Ms. Chacon's reactions/statements made C.M.-2 feel bad and worsened his anxiety; he "felt dumber"; sometimes did not ask for accommodations due to her treatment; and was scared to ask for hard copies of notes because it was too much effort for Ms. Chacon. (¶26) | ¶26; Count II; Count IV |
| Fall 2023; 9th grade (2023–2024 school year) | Palm Beach Central High School | The Complaint alleges C.M.-2 missed information in class because he could not have the notes. (¶27) | ¶27; Count II; Count IV |
| About February 2024; 9th grade (2023–2024 school year) | Palm Beach Central High School | The Complaint alleges C.M.-2's mother contacted the school's 504 coordinator and asked that accommodations be provided. (¶28) | ¶28; Count II; Count IV |
| After February 2024 meeting (date not specified); 9th grade (2023–2024 school year) | Palm Beach Central High School | The Complaint alleges Ms. Chacon began providing accommodations but continued making comments about his disability and need for accommodations to him and other students; it provides an example where she allegedly demeaned his mother's advocacy by stating it was not good boys stayed under the control of their mothers and that he would stay on his mother's couch as she was enabling him. (¶29) | ¶29; Count II; Count IV |
| April 2024; 9th grade (2023–2024 school year) | Palm Beach Central High School | The Complaint alleges C.M.-2 and a female student were joking/horseplaying by imitating a TV show; the female student pushed him; both fell down; and both body-slammed each other in front of a resource officer. It alleges Assistant Principal Samantha Butler referred him to therapy, claiming he should stop committing acts of violence against women. (¶30) | ¶30; Count II; Count IV |

| School Year/ Grade Attending | School | Description of the Event | Complaint Paragraph/ Related Litigation Count |
|---|---|---|---|
| After suspension for April 2024 incident (date not specified); 9th grade (2023–2024 school year) | Palm Beach Central High School | The Complaint alleges that when making up a Spanish quiz, Ms. Chacon told a female student to be careful because C.M.-2 likes to put his hands on girls and hit them. It also alleges that on another test monitored by older students, Ms. Chacon told them to make sure C.M.-2 was not cheating. (¶31) | ¶31; Count II; Count IV |
| 2023–2024; 9th grade (date not specified) | Palm Beach Central High School | The Complaint alleges the Principal told C.M.-2 that Ms. Chacon was concerned he would grow up to be a woman beater. (¶32) | ¶32; Count II; Count IV |
| 2023–2024; 9th grade (date not specified) | Palm Beach Central High School | The Complaint alleges false comments about the incident caused embarrassment, humiliation, and severe emotional distress; and that grades suffered due to Ms. Chacon's comments and failure to provide accommodations. (¶33) | ¶33; Count II; Count IV |
| Starting Fall 2024; grade not specified | District-level ESE (School Board) | The Complaint alleges Kevin McCormick (ESE Director) was aware of numerous grievances and detailed complaints made by C.M.-2's mother starting in Fall 2024. (¶34) | ¶34; Count II; Count IV |
| Starting Fall 2024; grade not specified | District-level ESE (School Board) | The Complaint alleges that despite this actual knowledge, Mr. McCormick failed to ensure accountability or compliance within the ESE department. (¶35) | ¶35; Count II; Count IV |
| 2023–2024; 9th grade | Palm Beach Central High School | The Complaint alleges the School Board's failure to implement accommodations and toleration of a hostile environment occurred throughout 9th grade during the 2023–2024 school year at Palm Beach Central High School. (¶36) | ¶36; Count II; Count IV |
| 2024–2025; grade not specified | Suncoast High (choice public school) | The Complaint alleges that for reasons of safety and emotional stability, C.M.-2 enrolled in Suncoast High for the 2024–2025 school year. (¶37) | ¶37; Count V (McKinney-Vento—C.M.-2) |

| School Year/ Grade Attending | School | Description of the Event | Complaint Paragraph/ Related Litigation Count |
|---|---|---|---|
| While student at Palm Beach Central High School (no date) | Palm Beach Central High School | The Complaint alleges the family became homeless while he was a student at Palm Beach Central High School and he continues to be a homeless student under McKinney-Vento. (¶38) | ¶38; Count V |
| 2023–2024; grade not specified | Palm Beach Central High School | The Complaint alleges C.M.-2's mother requested transportation from the District's McKinney-Vento Coordinator, who helped obtain a specialized bus stop to the choice school for the 2023–2024 school year; it identifies the stop as Skees Road at Okeechobee Boulevard, so he did not have to cross Okeechobee's eight lanes of traffic. (¶39) | ¶39; Count V |
| 2024–2025; grade not specified | Suncoast High (choice public school) | The Complaint alleges C.M.-2's mother requested transportation services under McKinney-Vento for C.M.-2 to the choice school for the 2024–2025 school year. (¶40) | ¶40; Count V |
| 2024–2025; grade not specified | Suncoast High (choice public school) | The Complaint alleges the School Board denied the request for transportation for 2024–2025, stating C.M.-2 is ineligible because he participates in a choice school and that it would only provide transportation under McKinney-Vento to the school of origin (Palm Beach Central High School). The Complaint alleges the School Board revoked the customized stop and required use of a standard bus stop for choice students requiring him to cross highly trafficked eight-lane Okeechobee Boulevard without a safe school zone light. (¶41) | ¶41; Count V |
| 2024–2025 (after stop change; date not specified); grade not specified | [Route to bus stop requiring crossing Okeechobee Boulevard] | The Complaint alleges C.M.-2 tried to walk to the new stop; was honked at; once almost hit; his anxiety worsened; and he did not want to walk to this bus stop again. It alleges his disabilities (ADHD/anxiety) make him particularly vulnerable to this hazard, resulting in severe anxiety. (¶43) | ¶43; Count V |

| School Year/ Grade Attending | School | Description of the Event | Complaint Paragraph/ Related Litigation Count |
|---|---|---|---|
| 2024–2025 (date not specified); grade not specified | School Board (district-level determination) | The Complaint alleges the School Board did not engage in a best interests analysis before rejecting the transportation request, and that such an analysis could have considered his concerns for safety and emotional stability. (¶44) | ¶44; Count V |
| 2024–2025 (date not specified); grade not specified | School Board (district-level determination) | The Complaint alleges Defendant did not offer dispute resolution to remove barriers to enrollment and retention of homeless children, and alleges transportation is a barrier to his attendance and full participation. (¶45) | ¶45; Count V |
| 2024–2025 (date not specified); grade not specified | [Family transportation arrangements] | The Complaint alleges that due to the denial, C.M.-2's mother paid for transportation (Lyft or neighbors) and ultimately quit one work-from-home job to manage morning drop-off, resulting in direct financial and emotional damages. (¶46) | ¶46; Count V |
| 2024–2025 (date not specified); grade not specified | School Board (policy alleged) | The Complaint alleges the School Board's blanket policy to deny transportation to choice schools is a barrier to attendance and full participation at the choice school. (¶47) | ¶47; Count V |
| [School year not specified]; grade not specified | [Not specified] | The Complaint alleges C.M.-2 has documented disabilities of ADHD and anxiety and requires consistent transportation to ensure attendance and full participation in his educational program. (¶42) | ¶42; Count V |

_ _ _ _ _ _ _ _ _ _

**Section VIII. The Litigation Counts**

Introduction—Typographical or Citation Errors in the Second Amended Complaint

This section provides a comprehensive description of the five Counts asserted in the Second Amended Complaint. There were, however, some areas that had typographical or organizational errors that need to be identified so that other discussions in this Report—involving these areas—are completely clear.

Indeed, a review of the Second Amended Complaint identified seven apparent typographical, citation, and/or internal-consistency errors across the five Counts (see Table 2 below). These errors include incorrect regulatory and statutory citations (e.g., "34 C.F.R. §401.33" where §104.33 was intended; "42 U.S.C. §1331 et seq." where §12131 et seq. was intended), a duplicate paragraph-numbering sequence that cascades through the final two Counts, an incorrect subsection reference in the McKinney-Vento Act, and an internal inconsistency in the physical description of a roadway. None of these errors alters the legal assertions or factual allegations of the Complaints as each one is apparently a drafting error.

Table 2. Identified Typographical and Citation Errors in the Second Amended Complaint

| Location | Text as Filed | Correct Citation/ Text | Nature of Error |
|---|---|---|---|
| ¶23 (C.M.-2)<br><br>¶36 (C.M.-2) | "During the 2023-24 school year, C.M.-2 was in tenth grade at Palm Beach Central High School." | "During the 2023-24 school year, C.M.-2 was in ninth grade at Palm Beach Central High School." | C.M.-2's Enrollments:<br><br>2025-2026: Suncoast High School<br>2024-2025: Suncoast High School<br>2023-2024: Palm Beach High School<br>2022-2023: Emerald Cove Middle School |
| ¶55 (Count I) | "34 C.F.R. § 401.33" | 34 C.F.R. § 104.33 | Transposed digits. Part 401 does not exist in the relevant regulatory context. The Section 504 implementing regulations applicable to recipients of federal financial assistance are codified at 34 C.F.R. Part 104. The provision cited—§104.33—addresses the obligation to provide a free appropriate public education. |
| ¶64 (Count II) | "34 C.F.R. § 401.33" | 34 C.F.R. § 104.33 | Same error as ¶55. |
| ¶68 (Count III) | "42 U.S.C. § 1331 et seq." | 42 U.S.C. § 12131 et seq. | Incorrect section number. 42 U.S.C. §1331 does not exist; the reference may conflate 28 U.S.C. §1331 (the federal question jurisdiction statute) with the correct Title II ADA citation at 42 U.S.C. §12131 et seq. |
| ¶72 (Count IV) | "42 U.S.C. § 1331 et seq." | 42 U.S.C. § 12131 et seq. | Same error as ¶68. |

| Location | Text as Filed | Correct Citation/ Text | Nature of Error |
|---|---|---|---|
| Count IV, ¶71 onward | Count IV begins at ¶71; Count III ends at ¶73 | Count IV should begin at ¶74 | Duplicate paragraph numbers. Count III concludes at ¶73. Count IV then begins at ¶71 rather than ¶74, creating duplicate ¶¶71, 72, and 73 within the same Complaint.<br><br>This three-paragraph offset cascades through the remainder of the Complaint: every paragraph number in Count IV (as filed: ¶¶71–76) and Count V (as filed: ¶¶77–90) is three fewer than the correct sequential number (which should be ¶¶74–79 for Count IV and ¶¶80–93 for Count V). |
| ¶82 (Count V) | "42 U.S.C. § 11432(e)(3)(E)(i)(III)" | 42 U.S.C. § 11432(g)(3)(E)(i) | Two errors in a single citation. First, the subsection letter is incorrect: Subsection (e) of §11432 addresses state plans and grants to states; subsection (g) addresses the duties of local educational agencies, including transportation obligations.<br><br>Second, the terminal subclause "(III)" does not exist: §11432(g)(3)(E)(i) contains only subclauses (I) and (II), which address intra-district and inter-district transportation responsibilities, respectively. |
| ¶87 (Count V) | "three-lane Okeechobee Boulevard" | "Eight-lane Okeechobee Boulevard" | Internal inconsistency within the Complaint. ¶41 describes Okeechobee Boulevard as an "eight-lane" road, and ¶43 again references "eight lanes of traffic." The reference to "three-lane" in ¶87 is inconsistent with both prior allegations in the same Complaint and with the physical characteristics of Okeechobee Boulevard (U.S. Route 441/SR 15) in western Palm Beach County, which is a divided, multi-lane highway. |

Summarizing the Counts

Below are the details for each of the five Counts as pled in the Second Amended Complaint (see also Table 3). All of the factual assertions are drawn from the Complaint and are described as allegations. When a Complaint contains an apparent typographical or citation errors (as identified in Table 2 above), the correct citation is provided in this summary with a bracketed notation.

Count I—Violation of Section 504 of the Rehabilitation Act (C.M.-1). Count I (¶¶49–57) alleges that the School Board of Palm Beach County violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and its implementing regulation at 34 C.F.R. §104.33 [cited in the Complaint as "§401.33"], with respect to C.M.-1. The Count establishes two threshold facts: that the School Board receives federal financial assistance and is therefore subject to Section 504, and that C.M.-1 is a qualified individual with

a disability based on her diagnoses of ADHD and Generalized Anxiety Disorder and her receipt of special education services under an IEP through Florida's Exceptional Student Education program (¶¶51–52).

The Count alleges that, despite C.M.-1's documented need for accommodations—specifically including Short Breaks and Extended Time—the School Board, through its employees and agents, systematically failed to implement these accommodations in violation of her Section 504 rights (¶53). The Count characterizes the denial not as an isolated event, but as a pattern of deliberate indifference, identifying five categories of conduct: (a) refusing to allow C.M.-1 to take short breaks as specified in her IEP; (b) imposing conditions on breaks—such as requiring an escort—that were not part of the IEP and that effectively nullified the accommodation; (c) failing to provide extended time for assignments and instead entering "F" placeholder grades that penalized C.M.-1 for using her accommodation; (d) making demeaning and humiliating statements related to C.M.-1's disability and IEP status in front of other students; and (e) retaliating against C.M.-1 for asserting her right (including through her mother) to accommodations by increasing scrutiny, issuing threats related to attendance, and creating a hostile educational environment (¶54(a)–(e)).

The Count further alleges that the School Board violated 34 C.F.R. §104.33 by failing to provide C.M.-1 with a free appropriate public education (FAPE)—defined under the regulation as the provision of regular or special education and related aids and services designed to meet her individual educational needs as adequately as the needs of nondisabled students are met (¶55).

As damages, Count I alleges that C.M.-1 suffered (a) academic harm, including lower grades directly attributable to the denial of accommodations; (b) emotional distress, including increased anxiety, fear of attending certain classes, and loss of confidence; and (c) denial of meaningful access to educational opportunities and benefits (¶56(a)–(c)).

Count II—Violation of Section 504 of the Rehabilitation Act (C.M.-2). Count II (¶¶58–66) alleges that the School Board violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and 34 C.F.R. §104.33 [cited in the Complaint as "§401.33"], with respect to C.M.-2. The Count alleges that C.M.-2 is a qualified individual with a disability based on his diagnoses of ADHD and Generalized Anxiety Disorder and his entitlement to specified accommodations under a Section 504 Plan—specifically including Extended Time and Hard Copy of Notes (¶¶59–60).

The Count alleges that the School Board's employees and agents systematically failed to implement these accommodations and, beyond the failure to accommodate, engaged in hostile, demeaning, and stigmatizing conduct that compounded the discrimination (¶¶60–61). The Count identifies six specific categories of such conduct: (a) publicly complaining about having to provide accommodations; (b) telling the class that students "must be accountable and do not need extra time"; (c) telling C.M.-2 that he "had enough time" and that the teacher never had accommodations and "did fine;" (d) making demeaning personal comments to C.M.-2 about his relationship with his mother; (e) falsely telling other students that C.M.-2 "likes to put his hands on girls and hit them"; and (f) directing student monitors to "make sure C.M.-2 was not cheating" (¶61(a)–(f)).

The Count alleges that this conduct created a hostile educational environment that denied C.M.-2 equal access to educational opportunities on the basis of his disability (¶62). Critically, and distinguishing this Count from Count I, the Count alleges that the School Board had actual or constructive notice of the hostile environment and discrimination—through complaints made by C.M.-2's mother to school officials and the ESE Director—and failed to take prompt and effective action to remedy the situation (¶63). The Count further alleges a violation of 34 C.F.R. §104.33 for failure to provide FAPE on the same grounds as Count I: the failure to provide regular or special education and related aids and services designed to meet C.M.-2's individual educational needs as adequately as the needs of nondisabled students (¶64).

As damages, Count II alleges that C.M.-2 suffered (a) academic harm, including lower grades directly attributable to both the denial of accommodations and the hostile environment; (b) emotional distress, including feelings of humiliation, embarrassment, increased anxiety, and damage to his reputation among peers; and (c) denial of meaningful access to educational opportunities and benefits (¶65(a)–(c)).

Count III—Violation of Title II of the Americans with Disabilities Act (C.M.-1). Count III (¶¶67–73) alleges that the School Board violated Title II of the Americans with Disabilities Act, 42 U.S.C. §12131 et seq. [cited in the Complaint as "§1331 et seq."], with respect to C.M.-1. The Count establishes that the School Board is a public entity within the meaning of Title II and that C.M.-1 is a qualified individual with a disability under the ADA (¶¶69–70).

The Count alleges five categories of Title II violations: (a) excluding C.M.-1 from participation in and denying her the benefits of the District's educational programs, services, and activities; (b) failing to make reasonable modifications to its policies, practices, and procedures to ensure C.M.-1 could access her education on an equal basis with nondisabled students; (c) failing to implement her IEP accommodations, including short breaks and extended time; (d) subjecting C.M.-1 to a hostile educational environment based on her disability, including public discussion of her IEP and demeaning treatment; and (e) retaliating against C.M.-1 for asserting her rights to accommodations (¶71(a)–(e)).

Count III functions as a parallel claim to Count I. Both Counts address the same student (C.M.-1) and arise from the same underlying conduct at Emerald Cove Middle School during the 2024–2025 school year. Count I is brought under Section 504 (applicable to recipients of federal financial assistance), while Count III is brought under Title II of the ADA (applicable to all public entities regardless of federal funding status). The separate count preserves the Title II claim independently and invokes the ADA's reasonable-modifications framework, which provides an additional layer of protection not expressly stated in Section 504.

Count IV—Violation of Title II of the Americans with Disabilities Act (C.M.-2). Count IV (¶¶71–76 as filed [misnumbered—should begin at ¶74, as ¶¶71–73 duplicate Count III's paragraph numbers]) alleges that the School Board violated Title II of the Americans with Disabilities Act, 42 U.S.C. §12131 et seq. [cited in the Complaint as "§1331 et seq."], with respect to C.M.-2. The Count identifies C.M.-2 as a qualified individual with a disability under the ADA (¶73 as filed).

The Count alleges five categories of Title II violations: (a) excluding C.M.-2 from participation in and denying him the benefits of the District's educational programs, services, and activities; (b) failing to implement his Section 504 Plan accommodations, including Extended Time and Hard Copy of Notes; (c) subjecting C.M.-2 to a hostile educational environment based on his disability, including demeaning statements, false accusations, and stigmatizing conduct by the School Board's employees; (d) failing to take prompt and effective action to address the hostile environment despite notice from C.M.-2's mother; and (e) failing to make reasonable modifications to its policies, practices, and procedures to ensure C.M.-2 could access his education on an equal basis with nondisabled students (¶74(a)–(e) as filed).

Count IV functions as a parallel claim to Count II. Both Counts address the same student (C.M.-2) and arise from the same underlying conduct at Palm Beach Central High School during the 2023–2024 school year. As with the Count I/Count III pairing, the parallel structure preserves claims under both Section 504 and Title II. Count IV places particular emphasis on two elements also present in Count II—the district's failure to take prompt and effective action despite parental notice, and the failure to make reasonable modifications—using language that tracks the Title II regulatory framework at 28 C.F.R. §35.130(b)(7).

As damages, the Count alleges that C.M.-2 suffered academic harm, emotional distress, humiliation, damage to his reputation, and denial of equal access to educational opportunities (¶75 as filed).

24

Count V—Violation of the McKinney-Vento Homeless Assistance Act (C.M.-2). Count V (¶¶77–90 as filed) alleges that the School Board violated the McKinney-Vento Homeless Assistance Act, 42 U.S.C. §§11431–11435, with respect to C.M.-2. This is the only Count in the Complaint that is not grounded in disability discrimination law; it addresses the District's obligations to C.M.-2 as a homeless student, though the overlap of his disability status and his homeless status is central to the alleged harms.

The Count begins by establishing C.M.-2's eligibility under the Act. It alleges that C.M.-2 meets the statutory definition of a "homeless child" at 42 U.S.C. §11434a(2)—meaning that he and his family lacked a fixed, regular, and adequate nighttime residence—and that he was continuously identified as homeless by the School District beginning approximately October 2022 (¶79 as filed). The Count further

alleges that C.M.-2 was continuously enrolled in schools within the School District of Palm Beach County since becoming homeless, and that he attended Suncoast High School, a public choice school within the District (¶83 as filed).

The Count then identifies four specific obligations under the McKinney-Vento Act that the School Board is alleged to have violated:

- The transportation mandate. The Count alleges that the School Board violated 42 U.S.C. §11432(g)(3)(E)(i) [cited in one instance in the Complaint as "§11432(e)(3)(E)(i)(III)"—a typographical error involving both an incorrect subsection letter and a nonexistent subclause].

  For the 2024–2025 school year, the School Board denied McKinney-Vento transportation to C.M.-2, asserting that he was ineligible because he attends a choice school rather than his school of origin (¶84 as filed). The Count characterizes this denial as a blanket policy that categorically excludes homeless students attending choice schools from McKinney-Vento transportation services, in violation of the Act's mandatory requirement that the LEA "provide or arrange" transportation to the school of enrollment (¶85 as filed).

  _ _ _ _ _

- Best-interest determination. The Count alleges that the School Board violated 42 U.S.C. §11432(g)(3)(A), which requires that school placement decisions for homeless students be based on the best interest of the child. The School Board failed to conduct any individualized best-interest determination before denying C.M.-2's transportation request, instead applying the categorical exclusion policy without analysis (¶86 as filed).

  _ _ _ _ _

- Dispute resolution. The Count alleges that the School Board violated the dispute resolution requirements at 42 U.S.C. §11432(g)(3)(E). Rather than providing dispute resolution procedures when the transportation request was denied, the District took the affirmative step of revoking C.M.-2's previously approved customized bus stop—forcing him to cross a dangerous eight-lane [sic; see ¶¶41 and 43 of the same Complaint] Okeechobee Boulevard without a safe school zone signal, in conditions that exacerbated his disabilities (ADHD and anxiety) and placed his physical safety at risk (¶87 as filed).

  _ _ _ _ _

- Liaison duties. The Count alleges that the School Board violated 42 U.S.C. §11432(g)(1)(J)(iii), which requires the LEA's designated local liaison to ensure, among other duties, that parents of homeless students are fully informed of all available transportation services and assisted in accessing them. The Count alleges that the District failed to ensure its liaison fulfilled these duties with respect to C.M.-2's mother (¶88 as filed).

Count V alleges five categories of harm to C.M.-2 and his family: (a) denial of legally mandated transportation services; (b) physical danger caused by the requirement to cross a busy, multi-lane road without safe crossing infrastructure; (c) exacerbation of C.M.-2's disabilities, including increased anxiety; (d) financial harm, including costs of alternative transportation (Lyft, neighbors) and loss of income when C.M.-2's mother was forced to quit a job to manage transportation; and (e) barriers to school enrollment, attendance, and success (¶89(a)–(e) as filed).

Table 3. Summary of the Five Counts in this Litigation

| Count | Plaintiff | Statute | School Involved | School Year(s) | Complaint Summary |
|---|---|---|---|---|---|
| I | C.M.-1 | Section 504 (29 U.S.C. §794) | Emerald Cove Middle School | 2024–25 | Denial of FAPE; failure to implement IEP accommodations; hostile environment; retaliation; deliberate indifference |
| II | C.M.-2 | Section 504 (29 U.S.C. §794) | Palm Beach Central High School | 2023–24 | Denial of FAPE; failure to implement 504 Plan accommodations; hostile environment; notice and failure to act; deliberate indifference |
| III | C.M.-1 | Title II ADA (42 U.S.C. §12131 et seq.) | Emerald Cove Middle School | 2024–25 | Exclusion from programs; failure to make reasonable modifications; hostile environment; retaliation |
| IV | C.M.-2 | Title II ADA (42 U.S.C. §12131 et seq.) | Palm Beach Central High School | 2023–24 | Exclusion from programs; failure to make reasonable modifications; hostile environment; notice and failure to act |
| V | C.M.-2 | McKinney-Vento Act (42 U.S.C. §§11431–11435) | Suncoast High School (choice school) | 2024–25 | Denial of transportation; blanket exclusion of choice school students; failure to conduct best-interest analysis; failure to provide dispute resolution; failure of liaison duties |

**Section IX. Summary of the Relevant Laws and their Applications to this Case**

This section analyzes the three federal statutes and their relevant regulations across the five Counts in this Case: Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794), Title II of the Americans with Disabilities Act (42 U.S.C. §12131 et seq.), and the McKinney-Vento Homeless Assistance Act (42 U.S.C. §§11431–11435). The discussion focuses on school districts' obligations in these statutes to students with disabilities or homeless students, respectively, and what the Plaintiffs must demonstrate to validate the allegations in each Count.

It is important to emphasize that this is not a legal analysis, nor does this Report provide legal opinions or conclusions. My qualifications and the basis for my opinions in this matter are anchored by more than 40 years of professional experience in education administration, policy, and compliance, including 13 years of work in the Arkansas Department of Education's Special Education Division, and Expert Witness work in innumerable Federal special education/504 cases since 1993. Throughout my career, I have been responsible for understanding, facilitating, and validating institutions' compliance with the federal statutes and regulations discussed below.

The regulatory standards described in this section, therefore, are those that school officials are expected to know, implement, and monitor in the day-to-day operation of their schools or school districts. Thus, the descriptions below are not legal interpretations, but needed areas of compliance—the regulatory requirements, federal agency expectations, and professional benchmarks against which school districts' policies, practices, and conduct are measured. Where statutory or regulatory text is quoted, then, it is to establish the specific obligations required of the School District of Palm Beach County. Where federal agency guidance documents are referenced, it is to describe what the U.S. Department of Education and the U.S. Department of Justice expect school districts to do. And by clearly setting forth these standards, this section establishes the criteria against which the factual allegations in this Case will be assessed in the sections that follow.

Section 504 of the Rehabilitation Act of 1973 (Counts I and II)

A. Statutory Authority: 29 U.S.C. §794

Counts I and II are brought under Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. §794. Section 504 is one of the foundational federal statutes governing the rights of individuals with disabilities in education, and it is a statute that every public school administrator is expected to understand and implement.

The core requirement appears at §794(a):

"No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

Litigation Standard of Care. For this Case, the legal requirement above (and those related to its implementation) represents the Standard of Care (SOC).

Section 504 applies to the School Board of Palm Beach County because it is a recipient of federal financial assistance (¶51). The statute's protections extend to any "qualified individual with a disability," which in the public elementary and secondary education context—as defined at 34 C.F.R. §104.3—encompasses a student who (a) is of an age at which nondisabled students are provided educational services, (b) is of an age at which it is mandatory under state law to provide educational services to disabled students, or (c) is a student to whom the state is required to provide a free appropriate public education under the Individuals with Disabilities Education Act (IDEA).

The Complaint alleges that both C.M.-1 (¶52) and C.M.-2 (¶59) are qualified individuals with disabilities under Section 504 as each is diagnosed with ADHD and Generalized Anxiety Disorder. C.M.-1 receives services through an IEP under Florida's Exceptional Student Education (ESE) program, while C.M.-2 has a Section 504 Plan.

— — — — —

B. Implementing Regulations: 34 C.F.R. Part 104. The Section 504 implementing regulations for recipients of federal financial assistance are codified at 34 C.F.R. Part 104. Counts I and II in the Complaint specifically invoke the (Second Amended Complaint-corrected) 34 C.F.R. §104.33 provisions addressing (B1) Anti-Discrimination, (B2) FAPE, (B3) Hostile Environments, and (B4) Deliberate Indifference discussed below.

- **B1: Anti-Discrimination.** Both Counts allege that the District's employees denied accommodations and subjected the students to demeaning, stigmatizing conduct—affording them educational opportunities that were not equal to those afforded nondisabled students.

  34 C.F.R. §104.4—General Anti-Discrimination Prohibition

  "(a) No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance."

  "(b)(1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:

  (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;

  (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

  (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

  (iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others…"

  _ _ _ _ _

- **B2. Free and Appropriate Public Education.** The FAPE obligation under Section 504 requires a school district to do two things: First, develop an individualized plan (whether an IEP or a Section 504 Plan) that identifies the accommodations and services needed to meet the student's educational needs; and Second, actually implement the accommodations and services specified in that plan. A plan that exists on paper but is not carried out in the classroom does not satisfy the FAPE obligation. Indeed, relative to disability-related compliance, the accommodation plan is only as effective as its implementation.

  34 C.F.R. §104.33—Free Appropriate Public Education (FAPE)

  This is the regulation expressly cited in both Count I (¶55) and Count II (¶64). It establishes the District's core obligation to students with disabilities:

  "(a) A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."

  "(b) For the purpose of this subpart, the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§104.34, 104.35, and 104.36."

  The implementation mechanism referenced above is the IEP developed under IDEA (for C.M.-1), and the Section 504 Plan (for C.M.-2). For either plan, the systematic failure to implement the accommodations specified in those respective plans represents a departure from the standard established in §104.33—because the student's individual educational needs are not being met as

28

adequately as those of nondisabled students when the accommodations designed to achieve that adequacy are withheld.

Count I alleges that the District failed to implement C.M.-1's Short Breaks and Extended Time accommodations, instead assigning "F" placeholder grades and conditioning breaks on requirements not in the IEP (¶¶54–55). Count II alleges that the District failed to implement C.M.-2's Extended Time and Hard Copy of Notes accommodations while simultaneously creating a hostile environment through stigmatizing conduct (¶¶61–64).

─ ─ ─ ─ ─

While the Complaint does not expressly cite §104.36, the allegations regarding the District's failure to respond to parental complaints (¶¶18–19, 34–35, 63) and the alleged threat of attendance violations when a class change was requested (¶20) raise questions about the adequacy of the District's procedural safeguards for resolving disputes about accommodation implementation.

34 C.F.R. §104.36—Procedural Safeguards

"A recipient that operates a public elementary or secondary education program or activity shall establish and implement, with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services, a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure."

─ ─ ─ ─ ─

- B3. Hostile Environment: Federal Compliance Standards. While the term "hostile environment" does not appear in the text of Section 504 or its implementing regulations, the U.S. Department of Education, Office for Civil Rights (OCR), has issued authoritative guidance establishing that disability-based harassment that is sufficiently severe, pervasive, or persistent to limit or deny a student's ability to participate in or benefit from the District's educational programs constitutes a form of discrimination prohibited by Section 504 (and Title II).

The two principal guidance documents are:

Dear Colleague Letter: Prohibited Disability Harassment (July 25, 2000), jointly issued by the U.S. Department of Education and the U.S. Department of Justice. This letter defines disability harassment in the school context:

"Disability harassment under Section 504 and Title II is intimidation or abusive behavior toward a student based on disability that creates a hostile environment by interfering with or denying a student's participation in or receipt of benefits, services, or opportunities in the institution's program."

─ ─ ─ ─ ─

Dear Colleague Letter: Harassment and Bullying (October 26, 2010), issued by the U.S. Department of Education, Office for Civil Rights. This letter addresses the intersection of bullying and federally prohibited harassment, reminding districts that conduct which constitutes disability-based harassment triggers federal compliance obligations even if the school characterizes the conduct as mere bullying, teasing, or interpersonal conflict.

Under these compliance standards, when a school district knows or should know about disability-based harassment, it is expected to take prompt and effective action reasonably calculated to end the harassment, eliminate the hostile environment, and prevent its recurrence. A district that has

notice of such conduct and fails to act—or acts inadequately—has departed from the compliance standard established by OCR.

Count II specifically alleges notice and failure to act: C.M.-2's mother complained to school officials and the ESE Director, and the District "failed to take prompt and effective action to remedy the situation" (¶63). Count I alleges analogous retaliatory conduct—threats of attendance violations when a class change was requested—that contributed to a hostile environment (¶54(e)).

– – – – –

- B4. Deliberate Indifference as a Compliance Standard. The concept of deliberate indifference appears expressly in the Complaint (¶54, Count I: "a pattern of deliberate indifference"; ¶63, Count II: "actual or constructive notice…and failed to take prompt and effective action"). This is a concept that school officials responsible for disability compliance are expected to understand, because it represents the threshold where a district's failure to meet its obligations moves from a compliance gap to an institutional failure reflecting a conscious disregard of known responsibilities.

  Relative to compliance, deliberate indifference describes a situation in which two conditions are present simultaneously:

  1. The school district had knowledge that a student's federally-protected rights were being violated— whether through direct observation, parental complaints, staff reports, or other means that placed the district on actual or constructive notice; and

  2. The school district failed to respond adequately—meaning it either took no action, took action that was clearly unreasonable in light of the known circumstances, or took action that was so insufficient as to be effectively non-responsive.

  Deliberate indifference does not require proof of malicious intent. It does, however, require more than negligence or a mere failure to follow best practices. It describes a pattern in which the district knew that its students' rights were being violated and chose not to act—or chose to act in ways that were plainly inadequate to address the known problem.

  OCR's enforcement framework reflects this standard. When OCR investigates a complaint of disability discrimination or harassment, it examines not only whether the discrimination or harassment occurred, but whether the district had notice and what steps it (or its officials or agents) took—or failed to take—in response.

  A district that receives complaints from a parent about accommodation denials and hostile conduct, but fails to investigate, intervene, or ensure that the accommodations are actually delivered, has failed to meet the compliance standard that OCR expects of recipients of federal financial assistance. Moreover, it is especially egregious when a district stops an investigation of a parent's complaints—mid-stream—because that parent has filed, for example, the same complaint with a state department of education or as part of a lawsuit. When this occurs, the district has moved from deliberate indifference to deliberate negligence and a conscious disregard of the parent's (and student's) legal protection rights.

  The factual allegations in this Case, if proven, describe precisely this pattern. Both C.M.-1 and C.M.-2's mother is believed to have complained to school-level and district-level administrators— including school principals, the ESE Support Person, the Central Region Instructional Superintendent, and the ESE Director— about the events in the Complaints, and alleges that effective, corrective actions did not occur. The evaluation of deliberate indifference in this Report

does not represent a legal conclusion, but an act of District <u>compliance or non-compliance</u> with the standard described above.

— — — — —

<u>Title II of the Americans with Disabilities Act</u> (Counts III and IV)

A. <u>Statutory Authority: 42 U.S.C. §12131 et seq</u>.

Counts III and IV are brought under <u>Title II of the Americans with Disabilities Act of 1990</u>, as amended, codified at 42 U.S.C. §§12131–12165. The Complaint cites "42 U.S.C. §1331 et seq." in ¶¶68 and 72 as filed—a typographical error; the correct citation is <u>42 U.S.C. §12131 et seq.</u>

The core requirement appears at <u>42 U.S.C. §12132</u>:

"Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

<u>Litigation Standard of Care</u>. For this Case, the legal requirement above (and those related to its implementation) represents the Standard of Care (SOC).

Title II applies to the <u>School Board of Palm Beach County</u> because it is a "<u>public entity</u>" within the meaning of 42 U.S.C. §12131(1), which defines "public entity" to include:

"(A) any State or local government;
 (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government…"

A public school district is a public entity subject to Title II. Unlike Section 504, which applies only to recipients of federal financial assistance, Title II applies to <u>all</u> public entities regardless of whether they receive federal funding.

— — — — —

B. <u>Implementing Regulations: 28 C.F.R. Part 35</u>

The Title II implementing regulations, promulgated by the U.S. Department of Justice, are codified at <u>28 C.F.R. Part 35</u>. The following provisions establish the compliance standards directly implicated by Counts III and IV.

<u>28 C.F.R. §35.130—General Prohibitions Against Discrimination</u>

"(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

"(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as

effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others…"

"(b)(7) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."

The "reasonable modifications" requirement at §35.130(b)(7) is of particular relevance to this Case. Both Counts III and IV allege that the District failed to make "reasonable modifications to its policies, practices, and procedures to ensure [C.M.-1/C.M.-2] could access [his/her] education on an equal basis with nondisabled students" (¶71(b); ¶74(e) as filed).

In a school compliance context, the accommodations specified in a student's IEP or Section 504 Plan are the reasonable modifications that the district has already determined are necessary. The failure to implement those accommodations represents a failure to deliver instructional modifications that have already been identified, documented, and agreed upon—which is a more straightforward compliance failure than a dispute over whether a particular modification is reasonable in the first instance.

While the Complaint does not expressly cite §35.160, the allegation that the District failed to provide "hard copy of notes" to C.M.-2 (¶60; ¶74(b) as filed) implicates its obligation to ensure effective communication and the provision of appropriate auxiliary aids in instructional settings.

This provision within the ADA states:

28 C.F.R. §35.160—Communications

"(a)(1) A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."

"(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities…an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."

_ _ _ _ _

C. Relationship Between Title II and Section 504 Relative to School Compliance

From a school administration and compliance perspective, the requirements within Title II of the ADA and Section 504 of the Rehabilitation Act overlap substantially relative to services to students with disabilities in public education settings. School administrators are expected to comply with both statutes simultaneously and, in practice, compliance is implemented in a complementary way. At the same time, however, the two statutes differ in their scope and regulatory structure (see Table 4) , and these differences explain why the Complaint asserts claims under both.

Table 4. The Separate, but Overlapping, Features of Section 504 and Title II (ADA)

| Feature | Section 504 (Counts I & II) | Title II ADA (Counts III & IV) |
|---|---|---|
| Statutory basis | 29 U.S.C. §794 | 42 U.S.C. §12132 |

32

| Feature | Section 504 (Counts I & II) | Title II ADA (Counts III & IV) |
|---|---|---|
| Applicable to | Recipients of federal financial assistance | All public entities (regardless of federal funding) |
| Implementing regulations | 34 C.F.R. Part 104 (U.S. Dep't of Education) | 28 C.F.R. Part 35 (U.S. Dep't of Justice) |
| FAPE obligation | Express (34 C.F.R. §104.33) | Incorporated by reference; the FAPE standard from Section 504 is applied in the Title II education context |
| Reasonable modifications language | Implied through the FAPE and equal-access requirements | Express (28 C.F.R. §35.130(b)(7)) |
| Hostile environment standard | Established by OCR guidance (2000, 2010) | Established by OCR/DOJ guidance (2000, 2010) |
| Federal enforcement agency | U.S. Department of Education, Office for Civil Rights | U.S. Department of Justice, Civil Rights Division (with OCR coordination) |

In practical terms, a school district that fails to implement the accommodations in a student's IEP or 504 Plan, respectively, or that permits disability-based harassment to persist without effective response, has likely departed from the compliance standards under <u>both</u> statutes. The Complaint pairs each Section 504 count with a parallel Title II count: Counts I (§504) and III (Title II) both address C.M.-1; Counts II (§504) and IV (Title II) both address C.M.-2.

— — — — —

D. <u>Hostile Environments Under Title II</u>

The OCR/DOJ compliance standards for a disability-based hostile environment, described in Section 504—Section B3 above, apply equally to Title II. The jointly issued <u>Dear Colleague Letter: Prohibited Disability Harassment</u> (July 25, 2000) expressly addresses both Section 504 and Title II:

"Disability harassment under Section 504 and Title II is intimidation or abusive behavior toward a student based on disability that creates a hostile environment by interfering with or denying a student's participation in or receipt of benefits, services, or opportunities in the institution's program. Harassing conduct may take many forms, including verbal acts and name-calling, as well as nonverbal behavior, such as graphic and written statements, or conduct that is physically threatening, harmful, or humiliating."

Critically, then, the hostile environment theory is central to both Counts III (¶71(d)) and IV (¶74(c)–(d) as filed). Count IV specifically alleges that the hostile environment (for C.M.-2) included "demeaning statements, false accusations, and stigmatizing conduct," and that the District had notice and "failed to take prompt and effective action" (¶74(c)–(d) as filed; ¶75 as filed).

— — — — —

McKinney-Vento Homeless Assistance Act (Count V)

A. <u>Statutory Authority: 42 U.S.C. §§11431–11435</u>

Count V is brought under the <u>McKinney-Vento Homeless Assistance Act</u>, as amended by the Every Student Succeeds Act of 2015 (ESSA), codified at 42 U.S.C. §§11431–11435. This subtitle—formally titled "Education for Homeless Children and Youths"—establishes a comprehensive framework of rights and obligations designed to ensure that children and youth experiencing homelessness have equal access to public education, including enrollment stability, transportation, and the removal of barriers to

attendance and success. Like Section 504 and Title II, the McKinney-Vento Act imposes obligations that school officials are expected to understand and implement as a matter of standard professional practice.

B. Congressional Policy: 42 U.S.C. §11431

The Act opens with a statement of congressional policy that frames the compliance expectations for all provisions that follow:

"(1) Each State educational agency shall ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, including a public preschool education, as provided to other children and youths."

"(2) In any State that has a compulsory residency requirement as a component of the State's compulsory school attendance laws or other laws, regulations, practices, or policies that may act as a barrier to the identification of, or the enrollment, attendance, or success in school of, homeless children and youths, the State will review and undertake steps to revise such laws, regulations, practices, or policies to ensure that homeless children and youths are afforded the same free, appropriate public education as provided to other children and youths."

This policy statement is significant because it establishes the barrier-removal principle that runs throughout the Act. The Act does not simply require districts to treat homeless students the same as other students in a formal sense; it requires districts to identify and remove barriers that prevent homeless students from accessing education on an equal basis. Count V alleges that the district's denial of transportation and its blanket policy regarding choice schools constitute precisely such a barrier.

Litigation Standard of Care. For this Case, the legal requirement above (and those related to its implementation) represents the Standard of Care (SOC).

─ ─ ─ ─ ─

C. Definition of "Homeless Children and Youths": 42 U.S.C. §11434a(2)

The Complaint alleges (¶79 as filed) that C.M.-2 qualifies as a "homeless child" under the Act's definition at 42 U.S.C. §11434a(2):

"(A) The term 'homeless children and youths'—

(i) means individuals who lack a fixed, regular, and adequate nighttime residence…; and
(ii) includes—

(I) children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason; are living in motels, hotels, trailer parks, or camping grounds due to the lack of alternative adequate accommodations; are living in emergency or transitional shelters; or are abandoned in hospitals…

(II) children and youths who have a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings…

(III) children and youths who are living in cars, parks, public spaces, abandoned buildings, substandard housing, bus or train stations, or similar settings…"

─ ─ ─ ─ ─

The Complaint alleges that C.M.-2 and his family "lack a fixed, regular, and adequate nighttime residence" and that he has been identified as homeless by the School District since approximately October 2022 (¶79 as filed; ¶38). Notably, the Complaint alleges that the District itself identified and

─────{ 34 }─────

acknowledged C.M.-2's homeless status—and had previously provided McKinney-Vento transportation services to him, including a customized bus stop—before subsequently denying transportation and revoking that accommodation.

_ _ _ _ _

D. Best-Interest Determination: 42 U.S.C. §11432(g)(3)(A)

The Act requires local educational agencies to make school placement decisions for homeless students based on the child's best interest. The Complaint expressly invokes this requirement at ¶80 as filed and alleges its violation at ¶86 as filed.

The statute provides:

"(A) In general.—In determining the best interest of the child or youth under subparagraph (B)(i), the local educational agency shall—

(i) to the extent feasible, keep a homeless child or youth in the school of origin, except when doing so is contrary to the wishes of the child's or youth's parent or guardian, or (in the case of an unaccompanied youth) the youth;

(ii) provide a written explanation, including a statement regarding the right to appeal under subparagraph

(E)(iii), to the homeless child's or youth's parent or guardian, if the local educational agency sends such child or youth to a school other than the school of origin or a school requested by the parent or guardian…"

The best-interest determination is not optional. It is a mandatory, individualized process that a district must undertake whenever making decisions about a school placement—and, by extension, the transportation—of a homeless student.

The Complaint alleges that the District denied C.M.-2's transportation request without conducting any such determination (¶86 as filed), instead applying a categorical policy that excluded choice school students from McKinney-Vento transportation. From a compliance standpoint, the application of a blanket policy in place of an individualized determination is a significant departure from the Act's requirements, because the Act specifically mandates case-by-case analysis.

_ _ _ _ _

E. Transportation: 42 U.S.C. §11432(g)(3)(E)

The transportation obligation is the central compliance requirement at issue in Count V. The Complaint cites it at ¶81 as filed, and alleges its violation at ¶85. The Act's transportation provisions, addressed across multiple subsections of §11432(g), establish that when a homeless child or youth continues to be enrolled in a school within the same local educational agency, the LEA shall provide or arrange for adequate transportation to and from the school of origin or the school of enrollment, at the request of the parent or guardian.

Several features of this obligation are important for relative to district compliance. First, the obligation is mandatory: the statute uses "shall provide or arrange," not "may." Second, the obligation covers transportation to the "school of origin or the school of enrollment"—it is not limited to the school of origin alone. Third, the obligation is triggered by a parental request. Fourth, the transportation must be "adequate"—a standard that, as described in the U.S. Department of Education's Non-Regulatory Guidance (discussed below), encompasses attention to the safety and accessibility of the transportation provided.

The Complaint alleges that the District categorically denied McKinney-Vento transportation to choice schools (¶85 as filed), asserting that transportation would only be provided to C.M.-2's school of origin (Palm Beach Central High School; ¶84 as filed). The statute's text does not contain such a limitation. The reference to students "enrolled in any school in the same local educational agency" is broad and does not exclude public choice schools operated by the same LEA.

The U.S. Department of Education's Education for Homeless Children and Youths Program, Non-Regulatory Guidance (originally issued July 2016; updated August 2018) addresses the transportation obligation in detail. The guidance makes clear that the Act requires LEAs to provide transportation services for homeless students that are comparable to those provided for other students, and that—at the request of a parent or guardian—an LEA must provide transportation for a homeless student to and from the school of origin or school of enrollment. The guidance further addresses intra-district transportation obligations and emphasizes that the Act's transportation provisions are intended to remove barriers to enrollment and attendance—not to create new barriers by limiting transportation to only certain categories of schools.

_ _ _ _ _

F. School Stability and Enrollment Pending Dispute: 42 U.S.C. §11432(g)(3)(E)(ii)–(iii)

The Act includes dispute resolution and enrollment stability provisions that are among the most protective in federal education law:

"(ii) In the case of an unaccompanied youth or a dispute regarding the enrollment of a homeless child or youth, the child or youth shall be immediately enrolled in the school in which enrollment is sought, pending final resolution of the dispute, including all available appeals."

"(iii) If a dispute arises over eligibility, or school selection or enrollment in a school—

(I) the child or youth shall be immediately enrolled in the school in which enrollment is sought, pending final resolution of the dispute, including all available appeals;

(II) the parent or guardian of the child or youth or (in the case of an unaccompanied youth) the youth shall be provided with a written explanation of any decisions related to school selection or enrollment made by the school, the local educational agency, or the State educational agency involved, including the rights of the parent, guardian, or youth to appeal such decisions;

(III) the parent, guardian, or unaccompanied youth shall be referred to the local educational agency liaison designated under paragraph (1)(J)(ii), who shall carry out the dispute resolution process as described in paragraph (1)(C) as expeditiously as possible after receiving notice of the dispute…"

_ _ _ _ _

These provisions establish a clear status quo requirement: when a dispute arises, the student remains enrolled and the district must maintain services—including transportation—pending resolution. The district must also provide a written explanation of its decision, inform the parent of appeal rights, and refer the matter to the McKinney-Vento liaison for expedited dispute resolution. Each of these steps is mandatory ("shall").

Count V alleges that the District failed to provide appropriate dispute resolution (¶87 as filed) and instead unilaterally revoked C.M.-2's previously approved customized bus stop—creating a new and dangerous transportation barrier rather than maintaining services pending resolution. If this allegation is accurate, the District's conduct would represent a departure from the Act's status quo protections in a

particularly concerning way: not merely failing to maintain existing services, but affirmatively <u>removing</u> a previously provided safety accommodation.

The U.S. Department of Education's <u>Non-Regulatory Guidance</u> confirms this status quo obligation, stating that while a dispute is pending, the child or youth must be immediately enrolled in and provided transportation to the school selected by the parent, guardian, or unaccompanied youth. This means that even if the district believed it had grounds to deny McKinney-Vento transportation to a choice school, the Act required the district to <u>continue providing transportation</u> while the dispute was resolved through the mandatory dispute resolution process. The Complaint alleges the opposite occurred.

_ _ _ _ _

G. <u>Liaison Duties: 42 U.S.C. §11432(g)(1)(J)(iii)</u>

The Act requires each LEA to designate a local educational agency liaison for homeless children and youths, and specifies that the liaison must carry out certain duties. The Complaint invokes this requirement at ¶88 as filed.

The statute provides:

"(iii) [The local educational agency liaison for homeless children and youths shall] ensure that—

(I) homeless children and youths are identified by school personnel through outreach and coordination activities with other entities and agencies;

(II) homeless children and youths are enrolled in, and have a full and equal opportunity to succeed in, schools of that local educational agency;

(III) homeless families and homeless children and youths have access to and receive educational services for which such families, children, and youths are eligible, including services through Head Start programs…referrals to health care services, dental services, mental health and substance abuse services, housing services, and other appropriate services;

(IV) the parents or guardians of homeless children and youths are informed of the educational and related opportunities available to their children and are provided with meaningful opportunities to participate in the education of their children;

(V) public notice of the educational rights of homeless children and youths is disseminated in locations frequented by parents or guardians of such children and youths, and unaccompanied youths, including schools, shelters, public libraries, and soup kitchens, in a manner and form understandable to the parents and guardians of homeless children and youths, and unaccompanied youths;

(VI) enrollment disputes are mediated in accordance with paragraph (3)(E);

(VII) the parent or guardian of a homeless child or youth, and any unaccompanied youth, is fully informed of all transportation services, including transportation to the school of origin…and is assisted in accessing transportation to the school that is selected…"

_ _ _ _ _

Count V specifically alleges that the District "failed to ensure that its local liaison fulfilled the duties required under 42 U.S.C. §11432(g)(1)(J)(iii), including ensuring that C.M.-2's mother was fully informed of all available transportation services and assisted in accessing transportation" (¶88 as filed). This allegation implicates Subclauses (VI) and (VII) above—the Liaison's duties to mediate enrollment disputes and to fully inform parents of all transportation services and assist in accessing them.

The Liaison obligation is not discretionary. The statute uses the mandatory "shall ensure" throughout, imposing a duty on the LEA—through its designated liaison—to take proactive steps. From a compliance standpoint, the Liaison function is a critical safeguard—ensuring that homeless families, who often face significant barriers to navigating school bureaucracies, have a designated point of contact who is responsible for ensuring they understand their rights and receive the services to which they are entitled.

The Complaint alleges that, rather than fulfilling these duties, the District unilaterally denied transportation and revoked a previously-approved accommodation without informing C.M.-2's mother of her dispute resolution rights or assisting her in accessing alternative transportation services (¶¶87–88 as filed).

_ _ _ _ _

H. Comparable Services: 42 U.S.C. §11432(g)(4)

Although not expressly cited in the Complaint, the Act's comparable services provision provides additional compliance context for Count V:

"(A) The services described in this paragraph shall be provided to each homeless child or youth, including each homeless child or youth who meets the relevant eligibility criteria, including—

(i) services under title I of the Elementary and Secondary Education Act of 1965…;
(ii) programs for children with disabilities and programs for English learners;
(iii) programs in career and technical education;
(iv) programs for gifted and talented students; and
(v) school nutrition programs."

_ _ _ _ _

This provision reinforces the Act's core barrier-removal principle: Homeless students must receive the same services available to non-homeless students—including, by extension, transportation services—without categorical exclusions based on school type or enrollment pathway.

_ _ _ _ _

Expert Analysis: Standard of Care (SOC)

Across both Plaintiffs, the five Counts collectively involve allegations spanning two students, three schools, multiple school years, and three federal statutes. The three statutes—Section 504, Title II of the ADA, and The McKinney-Vento Act—address distinct, but overlapping, aspects of the School District's failed compliance obligations with respect to C.M.-1 (Counts I and III) and C.M.-2 (Counts II, IV, and V). Critically, text from these statutes define the Standard of Care (SOC) for this Case. The text were identified earlier in this Section, but they can be summarized as follows:

- "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" (Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794);

- "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" (Title II of the Americans with Disabilities Act, 42 U.S.C. §12132); and

- "(Each School District or Local Educational Agency) shall ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, including a public preschool education, as provided to other children and youths" (McKinney-Vento Homeless Assistance Act, 42 U.S.C. §11431).

Applying these statutes to the implementation of the psychoeducational practices that are needed specifically by C.M.-1 and C.M.-2 in this Case, the Standard of Care also includes:

- "The right accommodations. . .
- Implemented consistently every time at the right time. . .
- Under the right conditions. . .
- With the right methods and implementation fidelity and intensity. . .
- And the right evaluations. . . to maximize success."

_ _ _ _ _ _

While both Plaintiffs' complaints are represented within the first two statutes, C.M.-2's litigation concerns involve protections embedded in all three statutes. Indeed, he is simultaneously a student with a disability entitled to accommodations under Section 504 and Title II (Counts II and IV), and a homeless student entitled to transportation, enrollment stability, and barrier removal under The McKinney-Vento Act (Count V).

This three-Count overlap is relevant from a compliance perspective because the District's obligations under each statute cannot operate in isolation. A school district that provides transportation services generally—and McKinney-Vento transportation specifically—is expected to ensure that those services are accessible to students with disabilities.

The allegations in Count V describe a situation where the District has revoked a safety-related transportation accommodation (the customized bus stop) for a student with documented disabilities (ADHD and anxiety), establishing a new pick-up arrangement—that requires crossing an eight-lane highway without a safe crossing signal—that creates a dangerous situation given his disabilities—attention and anxiety (¶43; ¶87 as filed; ¶89(c) as filed).

From a compliance standpoint, this transportation must be evaluated not only against the McKinney-Vento transportation mandate, but also in light of the District's concurrent obligation under Section 504 and Title II. In all, the District needs to ensure that its programs and services—including transportation—are accessible to and do not discriminate against students with disabilities.

The litigation Complaints, then, layer their claims to capture this intersection: Counts II and IV address the accommodation failures and hostile environments at Palm Beach Central High School during the 2023–2024 school year and at Suncoast High School during the 2024-2025 school year, while Count V addresses the need to continue C.M.-2's customized bus stop when he transitioned to Suncoast High School at the beginning of the 2024–2025 school year.

For both students, the allegations in this litigation reinforce the District's pattern of repeatedly failing to comply with its agreed-upon obligations to two vulnerable students despite two signed Plans (i.e., an IEP and 504 Plan), parental advocacy, and administrative notice.

_ _ _ _ _ _ _ _

**Section X. Plaintiffs' Educational and Disability Histories: Documentation and Descriptions**

Largely through the Discovery received, this Section will briefly provide the school/educational and disability-related histories of C.M.-1 and C.M.-2. This will include: (a) Schools and school-years of attendance; (b) Academic and attendance information; (c) Disability and 504/IDEA documentation; and (d) Descriptions of adolescent ADHD and Generalized Anxiety Disorder.

C.M.-1 Schools and School-Years of Attendance: Academic and Attendance Information

Overview. Born on June 28, 2012, C.M.-1 is a Black middle school adolescent girl (now in Grade 8) receiving ESE services through an IEP under the Other Health Impairment category based on diagnoses of ADHD and Generalized Anxiety Disorder. The Complaint alleges that during the 2024–2025 school year (7th grade) at Emerald Cove Middle School, general education teachers denied IEP accommodations (including short breaks and extended time), applied grading practices that negated extended time (e.g., "F" placeholder grades), and engaged in conduct alleged to create a hostile environment (including public discussion of IEP/accommodations). The Complaint further alleges that C.M.-1's mother sought meetings and alternative arrangements, and that the school's response included threats regarding attendance when a class change was requested.

School History and Attendance. Table 5 provides the School Year, School Attended, School Transitions, and Attendance data for C.M.-1's school history—all in the Palm Beach County School District (Source: Discovery CBM266; some information missing). Overall, C.M.-1 attended four schools from Kindergarten through Grade 8, with three school transitions. The transition to Emerald Cove Middle School in Grade 6 (2023–2024) is the most significant for this litigation, as all of the events described in C.M.-1's deposition occurred at Emerald Cove in Grades 6, 7, and 8.

Table 5. C.M.-1's School History, Attendance, and Transitions

| School Year | Grade | School | Days Present | Days Absent |
|---|---|---|---|---|
| 2025–2026 | 08 | Emerald Cove Middle School (3371-M) | — | — |
| 2024–2025 | 07 | Emerald Cove Middle School (3371-M) | — | — |
| 2023–2024 | 06 | Emerald Cove Middle School (3371-M) | 169 | 11 |
| 2022–2023 | 05 | Grassy Waters Elementary (3351-E) | 166 | 9 |
| 2021–2022 | 04 | Grassy Waters Elementary (3351-E) | 175 | 5 |
| 2020–2021 | 03 | Gardens School of Technology (3961-EM) | 178 | — |
| 2019–2020 | 02 | Gardens School of Technology (3961-EM) | 162 | 9 |
| 2018–2019 | 01 | Westward Elementary (0351-E) | 172 | 6 |
| 2017–2018 | KG | Westward Elementary (0351-E) | 164 | 5 |

School Transitions:

| School Transition | Grade Change | From | To |
|---|---|---|---|
| #1 | Grade 1 → Grade 2 | Westward Elementary | Gardens School of Technology |
| #2 | Grade 3 → Grade 4 | Gardens School of Technology | Grassy Waters Elementary |
| #3 | Grade 5 → Grade 6 | Grassy Waters Elementary | Emerald Cove Middle School |

Academic Performance. C.M.-1's academic performance during her elementary and early middle school years was summarized by District School Psychologist, Dr. Sheresa Hollomon, in her Psychoeducational Evaluation Report completed on May 14, 2024 as part of the assessments to determine C.M.-1's eligibility for special education services in Grade 6. Dr. Hollomon also validated, through her mother, C.M.-1's history of anxiety and ADHD diagnosis.

Relative to C.M.-1's academic history, Dr. Holloman noted [CBM Discovery, Pages 393-399]:

C.M.-1's academic performance has been inconsistent and her mother requested the completion of this psycho-educational evaluation to determine whether C.M.-1 meets the school district criteria for Exceptional Student Education (ESE) services in the area of Other Health Impaired (OHI).

BACKGROUND INFORMATION:

C.M.-1 is an 11-year-old student in sixth grade at Emerald Cove Middle School. She indicated that she lives with her mother, 15-year-old brother, and 10-year-old sister. School assignment history indicates that C.M.-1 attended Westward Elementary School for Kindergarten and first grade. She transferred to Gardens School of Technology where she attended second and third grade. C.M.-1 transferred to Grassy Waters Elementary School where she completed fourth and fifth grade before transitioning to Emerald Cove Middle School for sixth grade.

Academically, C.M.-1's grades have fluctuated over the years. Her mother related that C.M.-1 received extra help for math when she was in elementary school. Additionally, she received outside tutoring for C.M.-1 from the Early Literacy Coalition for support in reading. In fourth grade C.M.-1's report card codes went from Approaching (AP) to Proficient (PR) in Language Arts. Her report card codes in Math went from AP to Needs Development (ND). In fifth grade C.M.-1 maintained report card codes of PR in Language Arts, Science, and Social Studies for the duration of the school year. In Math her report card codes dropped from PR the first and second trimesters to AP during the second trimester.

C.M.-1's mother related that although she will do well on classroom based assessments she does not do well on state tests. On the Spring 2023 Florida Assessment of Student Thinking (FAST) test that C.M.-1 took at the end of 5th grade she scored Level 2's in Reading and Math.

This school year C.M.-1 maintained an A/B average in her core classes during the first and second quarters. Her math grade dropped from a B to a C during the third quarter. At the time of this evaluation report, C.M.-1's fourth quarter grades indicate a decline. She currently has a D average in her IT and Math classes, a C average in her Language Arts and World History classes, and an A average in her Science class.

On the Diagnostic FAST she went from a Level 1 to a Level 2 in Math and she maintained at a Level 2 on the PM1 and PM2 assessments in Reading. C.M.-1's mother expressed concern stating, "C.M.-1 seems to have trouble processing the steps in math and doesn't always understand what she needs to do."

Table 6 below provides C.M.-1's Grade 5 and 6 FAST Fall (PM1), Winter (PM2), and Spring (PM3) scores in Reading and Math. The FAST is the state's official computer-adaptive progress-monitoring system, and the Fall and Winter tests are for progress monitoring, while the Spring test provides the clearest measure of a student's end-of-year performance—showing how well a student has mastered the each grade-level's academic standards at the end of the year. Because FAST is computer-adaptive, the difficulty of questions adjusts as students respond, giving a more precise picture of their skill level.

The FAST scoring system uses scale scores and five statewide Achievement Levels to describe how well a student is performing relative to Florida's grade-level academic standards. Levels range from Level 1 (Well Below Grade Expectations) to Level 5 (Highly Proficient), with Level 3 set as the benchmark for being on grade level. Although the numerical scale-score ranges differ by grade and subject, the meaning of each Achievement Level is the same statewide.

Table 6. C.M.-1's Grade 5 and 6 Florida Assessment of Student Thinking Fall Through Spring Reading and Math Achievement Scores [CBM268]

| FAST PM1 - Reading | | | | | | |
|---|---|---|---|---|---|---|
| Test Date | Grade Lvl | Test Lvl | Scale Score | Achiv Lvl | Pass/Fail | Percentile Rank |
| 2023-09-21 | 06 | 06 | 222 | 2 | | 53 |
| 2022-09-07 | 05 | 05 | 200 | 1 | | 31 |

| FAST PM2 - Reading | | | | | | |
|---|---|---|---|---|---|---|
| Test Date | Grade Lvl | Test Lvl | Scale Score | Achiv Lvl | Pass/Fail | Percentile Rank |
| 2023-12-04 | 06 | 06 | 224 | 2 | | 52 |
| 2022-12-07 | 05 | 05 | 197 | 1 | | 21 |

| FAST PM3 - Reading | | | | | | |
|---|---|---|---|---|---|---|
| Test Date | Grade Lvl | Test Lvl | Scale Score | Achiv Lvl | Pass/Fail | Percentile Rank |
| 2024-05-01 | 06 | 06 | 220 | 2 | | |
| 2023-05-15 | 05 | 05 | 215 | 2 | | 38 |

| FAST PM1 - Math | | | | | | |
|---|---|---|---|---|---|---|
| Test Date | Grade Lvl | Test Lvl | Scale Score | Achiv Lvl | Pass/Fail | Percentile Rank |
| 2023-09-22 | 06 | 06 | 202 | 1 | | 25 |
| 2022-09-08 | 05 | 05 | 190 | 1 | | 27 |

| FAST PM2 - Math | | | | | | |
|---|---|---|---|---|---|---|
| Test Date | Grade Lvl | Test Lvl | Scale Score | Achiv Lvl | Pass/Fail | Percentile Rank |
| 2023-12-05 | 06 | 06 | 223 | 2 | | 51 |
| 2022-12-08 | 05 | 05 | 210 | 2 | | 49 |

| FAST PM3 - Math | | | | | | |
|---|---|---|---|---|---|---|
| Test Date | Grade Lvl | Test Lvl | Scale Score | Achiv Lvl | Pass/Fail | Percentile Rank |
| 2024-05-02 | 06 | 06 | 227 | 2 | | |
| 2023-05-16 | 05 | 05 | 211 | 2 | | 31 |

Dr. Hollomon also completed, one-on-one with C.M.-1, the Kaufman Test of Educational Achievement – Third Edition: Form B (KTEA-3). The KTEA-3 is an individually-administered measure of academic achievement for grades pre-kindergarten through 12 or ages 4 through 25 years, measuring achievement in reading, mathematics, written language, and oral language.

C.M.-1's academic performance on the KTEA-3 is shown below. Note that—given its one-on-one format—beneficially especially for students with ADHD—this assessment is likely to provide one of the best general assessments of C.M.-1's reading and math functioning.

| Composite/Subtest | Standard Scores | 95% Confidence Interval | Percentile Rank | Descriptive Category |
|---|---|---|---|---|
| *Core Composites* | | | | |
| **Reading Composite** | **84** | **78 - 90** | **14** | **Below Average** |
| Letter & Word Recognition | 85 | 79 - 91 | 16 | Below Average |
| Reading Comprehension | 85 | 77 - 93 | 16 | Below Average |
| **Math Composite** | **83** | **78 - 88** | **13** | **Below Average** |
| Math Concepts & Applications | 77 | 71 - 83 | 6 | Low |
| Math Computation | 91 | 85 - 97 | 27 | Average |

As noted by Dr. Hollomon in her Report:

The Reading Composite is a measure of overall reading skills. C.M.-1 obtained a standard score of 84 on this composite, which is within the Below Average range and at the 14th percentile. This suggests that she performed the same as or higher than 14% of her same age peers in this area. The Reading Composite is comprised of the Letter and Word Recognition subtest and the Reading Comprehension subtest. The Letter and Word Recognition subtest required C.M.-1 to read a variety of real words in isolation. Her standard score of 85 on this subtest is within the Below Average range and suggests that she is not yet able to read grade level vocabulary words with ease. C.M.-1 occasionally mixed up short and long vowel sounds in words. It was also noted that she would rush and mumble when she encountered longer words to avoid having her errors noticed by this examiner. The Reading Comprehension subtest required C.M.-1 to read short stories and answer comprehension questions about the stories. She obtained a standard score of 85 on this subtest which is also within the Below Average range. She read grade level passages to herself silently but had difficulty when required to answer concrete and inferential questions presented. At times she automatically defaulted to "I don't know" but with prompting to "try and find an answer" C.M.-1 was at times able to respond correctly.

The Math Composite is a measure of global math skills and is comprised of the Math Computation subtest and the Math Concepts & Application subtest. C.M.-1 obtained a standard score of 83 on this composite, which is within the Below Average range and at the 13th percentile. This suggests that she performed the same as or higher than 13% of her same age peers in this area. The Math Computation subtest required C.M.-1 to complete pencil and paper math problems. Her standard score of 91 on this subtest is within the Average range. C.M.-1 skipped around when solving problems. She was able to add and subtract multi-digit numbers with regrouping and renaming and demonstrated knowledge of some multiplication and division facts. C.M.-1 used strategies such as repeated addition to solve multi-digit multiplication and division problems. She was able to solve one step algebraic expressions and her ability to work with positive and negative integers is emergent. C.M.-1 did not demonstrate the ability to work with fractions. The Math Concepts and Application subtest required her to apply mathematical principles to a variety of

word problems. Her standard score of 77 on this subtest is within the Low range. C.M.-1 was able to use whole numbers to solve problems and answered questions related to grids and graphs presented. She was not able to calculate elapsed time, did not demonstrate the ability to solve problems involving money or measurement, was unable to work with numbers less than a whole, and had difficulty solving multi-step word problems.

504 and Special Education Accommodation History. C.M.-1 was found eligible for a 504 Accommodation Plan in Grade 5 on October 4, 2022. Her first special education Individualized Education Plan (IEP) meeting was at the beginning of Grade 7 on August 22, 2024, and an Interim IEP was documented on November 20, 2024. Once found eligible, under the Other Health Impaired (OHI) disability designation, C.M.-1's 504 accommodations were integrated and extended into her IEP.

Table 7 below tracks the accommodations—and accommodation changes—that were agreed-upon by the District and C.M.-1's mother in Grades 5 and 6 (504 Plans) and 7 (IEP).

Table 7. Documented Accommodations Across C.M.-1's Section 504 Plans and Individualized Education Program (IEP)

Grade 5: Section 504 Accommodation Plan (10/4/2022)
    School: Grassy Waters Elementary (3351-E)

**General Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Lesson Presentation | Check for comprehension of lesson directions | All Classes, Daily |
| Lesson Presentation | Cue the student to stay on task | All Classes, Daily |
| Lesson Presentation | Teacher(s) to stand near student when giving directions | All Classes, Daily |
| Physical Arrangement | Place student in area of room with least distractions | All Classes, Daily |
| Physical Arrangement | Seat student near teacher(s) | All Classes, Daily |
| Physical Environment | Seat student in an area free from distractions | All Classes, Daily |
| Physical Environment | Seat student out of main traffic areas | All Classes, Daily |
| Behavior | Cue student to stay on task | All Classes, Daily; Frequent praise, positive reinforcement |
| Behavior | Reinforce desired behavior | All Classes, Daily; Frequent praise, positive reinforcement |
| Behavior | Short breaks between assignments | All Classes, Daily; Frequent praise, positive reinforcement |
| Home/School Partnership | Collaboration between parent/guardian(s) and teacher(s) | Weekly, All Classes |
| Home/School Partnership | Positive feedback to parent/guardian(s) | Weekly, All Classes |
| Assignments/Worksheets | Allow days — more time for regular assignments | All Classes, Daily |
| Assignments/Worksheets | Break large assignment into series of smaller assignments | All Classes, Daily |
| Assignments/Worksheets | Check comprehension of directions before beginning task | All Classes, Daily |

**Classroom/Standardized/Test Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Presentation | Read all allowable test items | All Classes, Daily |
| Setting | Small group | Daily, All Classes |
| Scheduling | 100% extended time | Daily, All Classes |
| Scheduling | Frequent Breaks | Daily, All Classes |

**Total Accommodations — Grade 5 504 Plan: 19**
(15 General Accommodations + 4 Classroom/Standardized/Test Accommodations)

---

<u>Grade 6: Section 504 Accommodation Plan</u> (10/4/2023)
School: Emerald Cove Middle (3371-M)

**General Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Physical Arrangement | Place student in area of room with least distractions | All Classes, Daily |
| Physical Arrangement | Seat student near teacher(s) | All Classes, Daily |
| Home/School Partnership | Collaboration between parent/guardian(s) and teacher(s) | Weekly, All Classes |
| Home/School Partnership | Positive feedback to parent/guardian(s) | Weekly, All Classes |
| Lesson Presentation | Check for comprehension of lesson directions | All Classes, Daily |
| Lesson Presentation | Cue the student to stay on task | All Classes, Daily |
| Lesson Presentation | Teacher(s) to stand near student when giving directions | All Classes, Daily |
| Lesson Presentation & Assignments | Allow days — more time for regular assignments | All Classes, Daily |
| Lesson Presentation & Assignments | Break large assignment into series of smaller assignments | All Classes, Daily |
| Lesson Presentation & Assignments | Check comprehension of directions before beginning task | All Classes, Daily |
| Lesson Presentation & Assignments | Provide outline or copy of notes | All Classes, Daily |
| Physical Environment | Seat student in an area free from distractions | All Classes, Daily |
| Physical Environment | Seat student out of main traffic areas | All Classes, Daily |
| Behavior | Cue student to stay on task | All Classes, Daily |
| Behavior | Reinforce desired behavior | All Classes, Daily |
| Behavior | Short breaks between assignments | All Classes, Daily |
| Behavior | Structured transitional time | All Classes, Daily |
| Behavior | Ignore behaviors not severe or disruptive to the class | All Classes, Daily |

**Classroom & Standardized Test Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Flexible Scheduling | 100% extended time | Daily, All Classes |
| Flexible Scheduling | Frequent Breaks | Daily, All Classes |
| Flexible Presentation | Provide Oral Presentation or Text-to-Speech for all directions and allowable items | All Classes, Daily |
| Flexible Setting | Small group | Daily, All Classes |

**Total Accommodations — Grade 6 504 Plan: 22**
(18 General Accommodations + 4 Classroom & Standardized Test Accommodations)

**Changes from Grade 5 to Grade 6** (Per Meeting Summary and Document Comparison):

| Change Type | Accommodation | Notes |
|---|---|---|
| ADDED | Provide outline or copy of notes (Lesson Presentation & Assignments) | Meeting summary: "Team agreed to add the accommodation of providing a copy of notes." |
| ADDED | Structured transitional time (Behavior) | Not present in Grade 5 504 Plan |
| ADDED | Ignore behaviors that are not severe / not disruptive to the class (Behavior) | Not present in Grade 5 504 Plan |
| ADDED | Provide Oral Presentation or Text-to-Speech for all directions and allowable items (Flexible Presentation) | Not present in Grade 5 504 Plan |
| REMOVED | "Frequent praise, positive reinforcement" (Behavior Implementation Specification) | Present in Grade 5 as an implementation specification; not carried forward to Grade 6 |
| RESTRUCTURED | Assignments/Worksheets area merged into "Lesson Presentation & Assignments" | Same accommodations carried forward under a combined area heading |
| MEETING NOTE | "Mom expressed that even though C.M.-1 is not displaying concerns with behavior this year, Mom would like to keep all accommodations in place since it is early in a new environment. Team agreed to remove accommodations relating to transitions." | |

Grade 7: Individualized Education Plan (IEP; 8/22/2024, 11/20/2024)
  School: Emerald Cove Middle (3371-M)
  Exceptionality: Other Health Impairment (OHI)

**Supplemental Aids and Services**

| Specific Accommodation / Service | Begin Date | Frequency | Location |
|---|---|---|---|
| Agenda Checks | 11/20/2024 | 1 times/day | All Classes |
| Allow chunking for large assignments and projects | 11/20/2024 | 1 times/day | All Classes |
| Flexible Presentation — Allowable Items Read Aloud | 08/22/2024 | 1 times/day | All Classes |
| Flexible Presentation — Chunking | 08/22/2024 | 1 times/day | All Classes |
| Flexible Presentation — Non-Verbal Encouragement | 08/22/2024 | 1 times/day | All Classes |
| Flexible Presentation — Repeat | 08/22/2024 | 1 times/day | All Classes |
| Flexible Presentation — Test directions may be repeated, clarified, or summarized as requested | 08/22/2024 | 1 times/day | All Classes |
| Flexible Presentation — Verbal Encouragement | 08/22/2024 | 1 times/day | All Classes |
| Flexible Scheduling — 100% Additional Time | 08/22/2024 | 1 times/day | All Classes |
| Flexible Setting — Small Group | 08/22/2024 | 1 times/day | All Classes |
| Give warning prior to being called on | 08/22/2024 | 1 times/day | All Classes |
| Home to school communication | 11/20/2024 | 1 times/day | All Classes |
| IXL assignments missing 5 answers in a row — student receives support on concept by communicating (i.e., e-mailing) the teacher | 11/20/2024 | 1 times/day | All Classes |
| Movement breaks / frequent breaks | 08/22/2024 | 1 times/day | All Classes |

| Specific Accommodation / Service | Begin Date | Frequency | Location |
|---|---|---|---|
| Nonverbal cue when student anxiety rises (inappropriate laugh/dancing) | 08/22/2024 | 1 times/day | All Classes |
| Preferential seating | 08/22/2024 | 1 times/day | All Classes |
| Private redirection verbal/nonverbal | 08/22/2024 | 1 times/day | All Classes |
| Reading Plus assignments to be modified to 3 comprehension and 2 vocabulary | 11/20/2024 | 1 times/wk | Language Arts |
| Reduce assignments / homework not to impact content or concept | 11/20/2024 | 1 times/day | All Classes |
| Student will repeat directions back to teacher for understanding | 08/22/2024 | 1 times/day | All Classes |
| Visual on paper-based assignments for due date based on extended time | 11/20/2024 | 1 times/day | All Classes |

**Special Education Services**

| Service | Begin Date | Frequency | Delivery Method | Location |
|---|---|---|---|---|
| Specialized Instruction in Math | 08/22/2024 | 1 times/day | Support Facilitation | General Education Class |
| Specialized Instruction in Social Studies | 08/22/2024 | 3 times/wk | Support Facilitation | General Education Class |
| Specialized Instruction in Language Arts | 08/22/2024 | 3 times/wk | Support Facilitation | General Education Class |

**State and District Assessment Accommodations**

| Accommodation Area | Specific Assessment Accommodation |
|---|---|
| Flexible Presentation | Oral Presentation / Text-to-Speech (TTS) for all directions and allowable items |
| Flexible Presentation | Student demonstrates understanding of directions (repeating, paraphrasing) |
| Flexible Presentation | Test directions may be repeated, clarified, or summarized as requested |
| Flexible Presentation | Verbal Encouragement |
| Flexible Scheduling | 100% Additional Time |
| Flexible Setting | Increased/decreased opportunity for movement |
| Flexible Setting | Small Group Setting |

Per IEP: "Student does not have an accommodation that cannot be provided on State and District Assessments."

**Total — Grade 7 IEP: 24 Supplemental Aids/Services and Special Education Services**
(21 Supplemental Aids and Services + 3 Special Education Services; plus 7 State/District Assessment Accommodations, the majority of which overlap with the Supplemental Aids and Services listed above)

— — — — —

C.M.-2 Schools and School-Years of Attendance: Academic and Attendance Information

Overview. C.M.-2 is a Black high school adolescent boy (now in Grade 11) with a Section 504 Plan (based on ADHD and Generalized Anxiety Disorder) who was also documented to be a homeless student under The McKinney-Vento Act. The Complaint alleges that during the 2023–2024 school year (9th grade) at Palm Beach Central High School, a teacher failed to implement accommodations (extended time and hard copy of notes) and made statements/engaged in conduct alleged to be demeaning and

47

stigmatizing, contributing to his emotional distress and academic harm. C.M.-2 was also diagnosed with a Generalized Anxiety Disorder in 2024.

Separately, the Complaint alleges that the School Board denied (for 2025–2026) McKinney-Vento transportation to C.M.-2's choice school, revoked a previously customized bus stop, required use of a stop that required crossing a highly trafficked road, and did not conduct a "best interests" analysis or provide appropriate dispute resolution.

School History and Attendance. Table 8 provides the School Year, School Attended, Enrollment and Drop Dates, and Attendance data for C.M.-2's school history—all in the Palm Beach County School District (Source: Discovery CIM243-244). Overall, C.M.-1 attended eight schools from Grade 3 through Grade 11 (including Home Instruction), with four school transitions. The transition from Palm Beach Central High School in Grade 9 (2023–2024) to Suncoast High School in Grade 10 (2024-2025) is the most significant for this litigation—especially relative to Count V.

Academic Performance. C.M.-2's academic performance during his middle and high school years is provided in Table 9. This data reflects his Grade 7 (2021-2022) attendance at Jeaga Middle School, Grade 8 (2022-2023) attendance at Emerald Cove Middle School, his Grade 9 (2023-2024) attendance at Palm Beach Central High School, and his Grade 10 (2024-2025) attendance (including coursework with the Florida Virtual School) at Suncoast Community High School.

Table 8. C.M.-2's School History and Attendance

| Year | School | Grade Level | Enrollment Date | Drop Date | Days Present | Days Absent |
|---|---|---|---|---|---|---|
| 2025-2026 | Suncoast High - 0151 - H | 11 | 08/11/2025 | — | — | — |
| 2024-2025 | Suncoast High - 0151 - H | 10 | 08/12/2024 | — | 164 | 11 |
| 2023-2024 | Palm Beach Central High - 2631 - H | 09 | 08/10/2023 | 05/30/2024 | 171 | 9 |
| | | | | | | |
| 2022-2023 | Emerald Cove Middle - 3371 - M | 08 | 08/10/2022 | 05/26/2023 | 167 | 8 |
| | | | | | | |
| 2021-2022 | Home Education - N998 - EMH | 07 | 04/18/2022 | 05/26/2022 | 29 | — |
| 2021-2022 | Jeaga Middle - 2701 - M | 07 | 01/10/2022 | 04/14/2022 | 54 | 7 |
| 2021-2022 | Gardens School Of Technology - 3961 - EM | 07 | 08/10/2021 | 01/07/2022 | 90 | — |
| | | | | | | |
| 2020-2021 | Gardens School Of Technology - 3961 - EM | 06 | 08/17/2020 | 06/04/2021 | 178 | — |
| | | | | | | |
| 2019-2020 | Gardens School Of Technology - 3961 - EM | 05 | 09/24/2019 | 05/29/2020 | 138 | 6 |
| 2019-2020 | Westward Elementary - 0351 - E | 05 | 08/12/2019 | 09/20/2019 | 25 | 2 |
| 2018-2019 | Westward Elementary - 0351 - E | 04 | 08/13/2018 | 05/31/2019 | 175 | 3 |
| 2017-2018 | Westward Elementary - 0351 - E | 03 | 08/28/2017 | 06/01/2018 | 157 | 8 |
| 2017-2018 | Seminole Trails Elementary - 1711 - E | 03 | 08/22/2017 | 08/25/2017 | 3 | 1 |
| | | | | | | |

Table 9. C.M.-2's Middle School and High School Academic Grades

| School Year | School | Course (Title) | Teacher | Q1 | Q2 | S1 Exam | S1 | Q3 | Q4 | S2 Exam | S2 | Credit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2024-2025 | Florida Virtual School Flex 9-12 | Digital Info Tech | N/A | B | B | — | — | — | — | — | — | 1.0 |
| 2024-2025 | Suncoast Community High School | Adv Pl Us Govt/Pol | Pardo, D | C | C | — | C | — | — | — | C | 0.5 |
| 2024-2025 | Suncoast Community High School | Vol Sch/Commu Serv | Pardo, D | B | B | — | C | — | — | — | B | 0.5 |
| 2024-2025 | Suncoast Community High School | Game & Sim Design | Lumley, K | B | B | — | B | B | A | — | A | 1.0 |
| 2024-2025 | Suncoast Community High School | Ib Myp Spanish 2 | Escandon, J | D | F | — | D | D | B | — | B | 1.0 |
| 2024-2025 | Suncoast Community High School | Chem 1 Hon | Dashiell, T | B | B | F | C | D | A | A | B | 1.0 |
| 2024-2025 | Suncoast Community High School | Adv Pl Eng Compo | Murphy, T | C | B | C | C | C | B | B | B | 1.0 |
| 2024-2025 | Suncoast Community High School | Alg 2 | Clemons, F | D | A | D | C | F | C | B | D | 1.0 |
| | | | | | | | | | | | | |
| 2023-2024 | Palm Beach Central High School | Music World | Miller, A | B | B | B | B | B | B | A | B | 1.0 |
| 2023-2024 | Palm Beach Central High School | Bio 1 Hon | McDonald, M | B | C | — | C | C | B | A | B | 1.0 |
| 2023-2024 | Palm Beach Central High School | Spanish 1 | Chacon, G | D | C | C | C | C | C | D | C | 1.0 |
| 2023-2024 | Palm Beach Central High School | Geo | Meredith, O | C | C | F | — | C | B | A | B | 1.0 |
| 2023-2024 | Palm Beach Central High School | Aice Eng Gen Paper 1 | Marino, D | C | C | C | C | C | C | A | C | 1.0 |
| 2023-2024 | Palm Beach Central High School | Latin Amer Hon | Nutovits, I | B | A | F | B | B | A | C | B | 1.0 |
| 2023-2024 | Palm Beach Central High School | Team Sprts 1 | Jenkins, C | C | — | — | C | — | — | — | B | 0.5 |
| 2023-2024 | Palm Beach Central High School | Team Sprts 2 | Jenkins, C | — | — | — | — | B | C | — | C | 0.5 |
| | | | | | | | | | | | | |
| 2022-2023 | Emerald Cove Middle School | M/J Compre Sci 3 Adv | Gamelin, D | B | B | — | B | B | — | — | B | 0.0 |
| 2022-2023 | Emerald Cove Middle School | Computer Fundamental | Shuhaiber, S | B | B | A | B | A | B | A | A | 1.0 |
| 2022-2023 | Emerald Cove Middle School | M/J Lang Arts 3, Adv | Gonzalez, D | C | B | — | B | B | — | — | B | 0.0 |
| 2022-2023 | Emerald Cove Middle School | M/J Wellness Ed Gr 8 | West, A | B | — | — | A | — | — | — | A | 0.0 |
| 2022-2023 | Emerald Cove Middle School | Alg 1 Hon | Accorto, M | D | D | D | D | B | B | — | C | 1.0 |
| 2022-2023 | Emerald Cove Middle School | M/J Ind/Dual Spt Gd8 | Tilley, B | A | — | — | A | — | — | — | A | 0.0 |
| 2022-2023 | Emerald Cove Middle School | M/J Us His Adv & C/P | Lovitt, C | C | B | — | B | C | — | — | B | 0.0 |
| | | | | | | | | | | | | |
| 2021-2022 | Jeaga Middle School | M/J Compre Sci 2 Adv | Font, M | C | — | — | — | — | — | — | — | 0.0 |
| 2021-2022 | Jeaga Middle School | M/J Civics Adv | Jean-Pierre, G | A | — | — | — | — | — | — | — | 0.0 |
| 2021-2022 | Jeaga Middle School | M/J Accelerated Math Gr 7 | Brown, R | B | — | — | — | — | — | — | — | 0.0 |
| 2021-2022 | Jeaga Middle School | M/J Lang Arts 2, Adv | Smith, R | A | — | — | — | — | — | — | — | 0.0 |
| 2021-2022 | Jeaga Middle School | M/J Compre Gde 7/8 | Fox, T | C | — | — | — | — | — | — | — | 0.0 |
| 2021-2022 | Jeaga Middle School | M/J Exploring 2d Art | Gerhard, B | A | — | — | — | — | — | — | — | 0.0 |

504 Accommodation History. C.M.-2 was found eligible for a 504 Accommodation Plan in Grade 8 on December 19, 2022 and—based on the Discovery packet—he has been on a 504 Plan at least through Grade 10.

The 504 Plan documents establish the following verified chronology:

| School Year | Grade | School | 504 Plan Meeting Date |
|---|---|---|---|
| 2022–2023 | 08 | Emerald Cove Middle (3371-M) | 12/19/2022 |
| 2023–2024 | 09 | Palm Beach Central High (2631-H) | 12/13/2023 |
| 2024–2025 | 10 | Suncoast High (0151-H) | 11/04/2024 |
| 2025–2026 | 11 | Suncoast High (current year) | — |

While all of these Plans have identified ADHD as C.M.-2's disability condition, a medical form from Dr. Lorena Frontado (dated May 21, 2024; CIM146) was in the 504 Committee's possession before the Grade 10 (November 4, 2024) renewal of the 504 Plan.

This document stated:

Please be advised that C.M.-2 is a patient of our practice and was diagnosed with Generalized Anxiety Disorder (F41.1) on May 15, 2024. C.M.-2 meets the DSM-5 diagnostic criteria for Generalized Anxiety Disorder (GAD).

According to the American Academy of Pediatrics' clinical guidelines, children and adolescents with anxiety may present with a range of symptoms. These may include difficulties with attentiveness, increased distractibility, challenges with self-regulation, social skills deficits, reduced cognitive flexibility, poor time management, and weaknesses in short-term and working memory, as well as difficulty with abstract thinking. Students with GAD commonly present with co-morbid conditions (co-existing diagnoses), which should be carefully considered when determining appropriate accommodations to support their academic performance.

Patients diagnosed with GAD may benefit from a variety of accommodations to optimize their educational experience and often require multiple supports to achieve academic success. It is recommended that C.M.-2 be provided with appropriate accommodations to support his/her educational efforts. These may include, but are not limited to, extended time for assignments and projects, additional time for testing, testing environments with reduced distractions, support for organizational and time management skills, access to social skills counseling, and a "hot pass" to use when feeling overwhelmed.

If you have any questions, please do not hesitate to contact our office.

While GAD was not identified on the 504 Plan as an additional disability, there is a plethora of McKinney-Vento documents and e-mails—sent to C.M.-2's administrators and teachers—such that the presence and impact of this disability should have been readily apparent.

Table 10 below tracks the accommodations—and accommodation changes—that were agreed-upon by the District and C.M.-2's mother in Grades 8 through 10.

Table 10. Documented Accommodations Across C.M.-2's Section 504 Plans

Grade 8: Section 504 Accommodation Plan (12/19/2022)
School: Emerald Cove Middle (3371-M)
Disability: ADHD

**General Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Physical Arrangement | Place student in area of room with least distractions | Classroom teacher, classroom, daily |
| Physical Arrangement | Seat student near teacher(s) | Classroom teacher, classroom, daily |
| Assignments/Worksheets | Break large assignment into series of smaller assignments | Classroom teacher, classroom, as needed. Allow one extra day for assignments as needed. |
| Assignments/Worksheets | Arrange for short breaks between assignments | Classroom teacher, classroom, as needed. Allow one extra day for assignments as needed. |
| Assignments/Worksheets | Allow days — more time for regular assignments | Classroom teacher, classroom, as needed. Allow one extra day for assignments as needed. |
| Lesson Presentation | Cue the student to stay on task | Classroom teacher, classroom, daily. Hard Copy of notes as needed. |
| Lesson Presentation | Teachers provide copies of notes when possible/applicable | Classroom teacher, classroom, daily. Hard Copy of notes as needed. |
| Behavior | Reinforce desired behavior | When needed to be redirected, student will be addressed individually, classroom, as needed. |

**Classroom/Standardized/Test Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Scheduling | 100% extended time | Test Proctor, Testing location, During Test |

**Total Accommodations — Grade 8 504 Plan: 9**
(8 General Accommodations + 1 Test Accommodation)

Grade 9: Section 504 Accommodation Plan (12/13/2023)
School: Palm Beach Central High (2631-H)
Disability: ADHD

**General Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Lesson Presentation | Cue the student to stay on task | Classroom teacher, classroom, daily. Hard Copy of notes as needed. |

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Lesson Presentation | Teachers provide copies of notes when possible/applicable | Classroom teacher, classroom, daily. Hard Copy of notes as needed. |
| Physical Arrangement | Place student in area of room with least distractions | Classroom teacher, classroom, daily |
| Physical Arrangement | Seat student near teacher(s) | Classroom teacher, classroom, daily |
| Lesson Presentation & Assignments | Break large assignment into series of smaller assignments | In all classes each day, allow 100% extended time for classwork and homework assignments. |
| Lesson Presentation & Assignments | Arrange for short breaks between assignments | In all classes each day, allow 100% extended time for classwork and homework assignments. |
| Lesson Presentation & Assignments | Allow 100% additional time for classroom assignments | In all classes each day, allow 100% extended time for classwork and homework assignments. |
| Lesson Presentation & Assignments | Allow 100% additional time for homework assignments | In all classes each day, allow 100% extended time for classwork and homework assignments. |
| Management | Student has a restroom pass to use as needed | In all classes allow student to use the restroom if requested. |

**Classroom & Standardized Test Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Flexible Scheduling | 100% extended time | Test Proctor, Testing location, During Test |

**Total Accommodations — Grade 9 504 Plan: 10**
(9 General Accommodations + 1 Test Accommodation)

---

**Changes from Grade 8 to Grade 9**

| Change Type | Accommodation | Notes |
|---|---|---|
| **MODIFIED** | "Allow days — more time for regular assignments" (Grade 8) → "Allow 100% additional time for classroom assignments" AND "Allow 100% additional time for homework assignments" (Grade 9) | One general accommodation replaced by two specific accommodations with defined percentage; extended time now explicitly applies to both classwork and homework |
| **RESTRUCTURED** | "Assignments/Worksheets" area (Grade 8) → "Lesson Presentation & Assignments" area (Grade 9) | Same core accommodations carried forward under a combined area heading; "Arrange for short breaks between assignments" and "Break large assignment into series of smaller assignments" retained |
| **ADDED** | Student has a restroom pass to use as needed (Management) | Not present in Grade 8 504 Plan |

| Change Type | Accommodation | Notes |
|---|---|---|
| **RETAINED** | Cue the student to stay on task (Lesson Presentation) | Identical wording carried forward |
| **RETAINED** | Teachers provide copies of notes when possible/applicable (Lesson Presentation) | Identical wording carried forward |
| **RETAINED** | Place student in area of room with least distractions (Physical Arrangement) | Identical wording carried forward |
| **RETAINED** | Seat student near teacher(s) (Physical Arrangement) | Identical wording carried forward |
| **REMOVED** | Reinforce desired behavior (Behavior) | Present in Grade 8; not carried forward to Grade 9 |
| **RETAINED** | 100% extended time (Test Accommodation) | Identical; area relabeled from "Scheduling" to "Flexible Scheduling" |
| **MEETING NOTE** | "All accommodations reviewed and several were changed. Copies of all documents sent to the parent." Only parents listed as meeting participants in the signature section—no teachers or school staff signatures appear on this 504 Plan. | |

— — — — — — — — — —

Grade 10: Section 504 Accommodation Plan (11/04/2024)
School: Palm Beach Central High (2631-H)
Disability: ADHD

**General Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Lesson Presentation & Assignments | Break large assignment into series of smaller assignments | All Teachers, All Classes, Daily |
| Lesson Presentation & Assignments | Arrange for short breaks between assignments | All Teachers, All Classes, Daily |
| Lesson Presentation & Assignments | Allow 100% additional time for classroom assignments | All Teachers, All Classes, Daily |
| Lesson Presentation & Assignments | Allow 100% additional time for homework assignments | All Teachers, All Classes, Daily |
| Lesson Presentation & Assignments | Cue student to stay on task | All Teachers, All Classes, Daily |
| Lesson Presentation & Assignments | Reduce the length of math assignments (not to compromise content, standards, or curriculum requirements) | Math teacher, math class, daily |
| Lesson Presentation & Assignments | Hard copy of notes/assistance with notes will be provided for guided notes after student has attempted to complete the notes | All Teachers, All Classes, Daily |

54

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Management | Student has a restroom pass to use as needed | In all classes allow student to use the restroom if requested. |
| Physical Arrangement | Place student in area of room with least distractions | All Teachers, All Classes, Daily |
| Physical Arrangement | Seat student near teacher(s) | All Teachers, All Classes, Daily |

**Classroom & Standardized Test Accommodations**

| Accommodation Area | Specific Accommodation | Frequency and Location |
|---|---|---|
| Flexible Scheduling | 100% extended time | All Teachers, All Classes, All Tests, Daily |

**Total Accommodations — Grade 10 504 Plan: 11**
(10 General Accommodations + 1 Test Accommodation)

**Changes from Grade 9 to Grade 10**

| Change Type | Accommodation | Notes |
|---|---|---|
| **CONSOLIDATED** | "Cue the student to stay on task" moved from Lesson Presentation (Grade 9) into Lesson Presentation & Assignments (Grade 10) | Was previously listed under a separate Lesson Presentation area; now consolidated into a single area |
| **MODIFIED** | "Teachers provide copies of notes when possible/applicable" (Grade 9)<br><br>→ "Hard copy of notes/assistance with notes will be provided for guided notes after student has attempted to complete the notes" (Grade 10) | Significantly restructured: notes provision now conditioned on student's prior attempt to complete guided notes; reflects team agreement from 11/04/2024 meeting |
| **ADDED** | Reduce the length of math assignments (not to compromise content, standards, or curriculum requirements) | New accommodation; math class only; per meeting notes, parent requested shortened assignments, team agreed to limit this to math only |
| **REMOVED** | Lesson Presentation as a separate area heading | "Cue the student to stay on task" and notes provision merged into Lesson Presentation & Assignments |
| **RETAINED** | Break large assignment into series of smaller assignments | Identical wording |
| **RETAINED** | Arrange for short breaks between assignments | Identical wording |

| Change Type | Accommodation | Notes |
|---|---|---|
| **RETAINED** | Allow 100% additional time for classroom assignments | Identical wording |
| **RETAINED** | Allow 100% additional time for homework assignments | Identical wording |
| **RETAINED** | Student has a restroom pass to use as needed (Management) | Identical wording |
| **RETAINED** | Place student in area of room with least distractions (Physical Arrangement) | Identical wording |
| **RETAINED** | Seat student near teacher(s) (Physical Arrangement) | Identical wording |
| **RETAINED** | 100% extended time (Flexible Scheduling—Test) | Implementation specification expanded from "Test Proctor, Testing location, During Test" to "All Teachers, All Classes, All Tests, Daily" |
| **MEETING NOTE** | Extensive discussion of notes provision, attendance concerns related to transportation for Block 2, schedule change proposed (math moved to B7, study hall to B2), student's vision issues (lost glasses), and private tutoring for math. | |

_ _ _ _ _

<u>Aligning C.M.-1 and C.M.-2's Medical Histories with School Events and the Litigation</u>

    <u>C.M.-1</u>. C.M.-1's <u>Pediatric Partners</u> medical records were reviewed for appointments that occurred prior to her enrollment at Emerald Cove Middle School to the present. These records establish that she was diagnosed with ADHD by neurologist Dr. Farzam on November 23, 2022, with documented findings of disorientation, underachievement in school, unspecified developmental delays, and attention and concentration deficit (Schechtman chart review, 02/03/2026). At her first behavioral health consultation at Pediatric Partners on April 16, 2024, Dr. Caron Sanua documented that C.M.-1 had "a h/o ongoing anxiety since young childhood and was in counseling in the past — mom did not think it helped," and that she was "currently also having lots of anxiety related to school" (Sanua, 04/16/2024). Dr. Sanua further documented that during the 2023–2024 school year (6th grade at Emerald Cove), C.M.-1 had "lots of impulsivity and behavior concerns in school with 3 suspensions due to fighting," and that while she was "academically doing ok," her mother was now considering medication because "last school year was terrible especially WRT behavior" (Sanua, 04/16/2024). At this encounter, Dr. Sanua diagnosed ADHD combined type (F90.2) and Conduct Disorder, childhood-onset type (F91.1), explicitly discussed with the family how "untreated ADHD may affect self-esteem and sometimes cause school anxiety or avoidance." Dr. Sanua signed the paper the mother needed for C.M.-1's IEP, and recommended counseling with therapist Karina Rodriguez while advising the mother to "seriously consider medication for Caylee if the accomodations/IEP in school don't work" (Sanua, 04/16/2024).

At the follow-up consult on June 6, 2024, Dr. Sanua confirmed C.M.-1 had a 504 plan and an IEP with an emphasis on behavior, diagnosed Adjustment Disorder with other symptoms (F43.29), and deferred medication pending the start of counseling and the first weeks of the upcoming school year. This clinical baseline is significant: as of June 2024, C.M.-1's ADHD was formally diagnosed, her anxiety was clinically recognized, and her treating physician had explicitly conditioned the decision to withhold medication on the expectation that the school's IEP accommodations would be implemented.

The medical records document a stark clinical deterioration during C.M.-1's 7th grade year at Emerald Cove Middle School. Counseling with Karina Rodriguez was attempted but was "not helpful"—C.M.-1 "did not make a connection" and was ultimately "discharged because no progress" (Sanua, 04/01/2025). At the April 1, 2025 med-check—occurring within weeks of the Complaint's allegation that C.M.-1 was told to "drink from the sink" when requesting a Short Break in science class (¶15) and that her teacher discussed her IEP accommodations in front of the class (¶16)—Dr. Sanua documented that C.M.-1's IEP accommodations were systematically not being implemented: "Has an IEP — school is not really giving accommodations—micromanage behavior rather than giving accommodations" (Sanua, 04/01/2025). C.M.-1 was "struggling and gets very agitated about school, has meltdowns about school and how the teachers treat her," her "grades are dropping," and C.M.-1 herself reported that "the teachers are constantly make comments" (Sanua, 04/01/2025). Her sleep had deteriorated to the point where she was "not sleeping at night due to anxiety and has to go to mom's bed"—a regression to co-sleeping driven by anxiety that Dr. Sanua linked directly to school distress and separation anxiety compounded by her father's incarceration (Sanua, 04/01/2025).

Dr. Sanua upgraded C.M.-1's diagnosis to Adjustment Disorder with Anxiety (F43.22) and added a new diagnosis of Other Insomnia (G47.09), prescribed Guanfacine ER 1 mg for sleep-related focus impairment, provided "a letter for a hot pass to leave the class if she is having panic," and recommended restarting therapy with CBT—a clinical response that independently corroborates the severity of the school-related distress. Within hours, the mother called back requesting ADHD medication instead, and Dr. Sanua switched the plan to Focalin XR 10 mg with melatonin or magnesium for sleep (Sanua Addendum, 04/01/2025).

One month later, at the May 6, 2025 med-check, Dr. Sanua documented that the crisis had escalated further: C.M.-1 had told her mother that "school impacting mental health" and that "teachers call her a snitch if she used accommodations and are targeting her specifically" (Sanua, 05/06/2025). The mother had removed C.M.-1 from school for three weeks because she believed C.M.-1 was being targeted, and C.M.-1 herself "states she does not receive accommodations and that teachers single her out" (Sanua, 05/06/2025). When Dr. Sanua offered to have her staff contact the school counselor for more information, both mother and patient refused—"C.M.-1 doesn't want attention brought to her" (Sanua, 05/06/2025)—a response reflecting fear of further retaliation that is directly corroborative of the complaint's allegations that teachers punished C.M.-1 for exercising her IEP rights. Despite both Focalin XR 10 mg and Guanfacine ER 1 mg having been filled on April 21, 2025, "C.M.-1 did not take either medication" (Sanua, 05/06/2025).

Following the summer of 2025—during which C.M.-1 reported sleeping through the night, and her mental status examination was normal (Nagy, 07/23/2025)—C.M.-1's return to school was accompanied by a clinically significant deterioration. At her most recent behavioral health encounter with Dr. Tommy Schechtman on February 3, 2026, C.M.-1's anxiety rating score showed a 175% increase from the score recorded just seven months earlier when school was not in session. This escalation suggests that C.M.-1's depressive symptomatology improves when removed from the school environment and worsens upon return, a pattern consistent with an educational environment as the primary driver of her psychiatric distress. During this appointment, C.M.-1 described in her own words the emotional impact of the prior school year at issue in Counts I and III: "Last yr teacher singling her out, talking about my IEP in class

and the kids say I am dumb"; "teacher would say 'she is going to go tell her mom'"; and "I would come home last yr crying on the floor, it was over stimulating, the work and the teachers" (Schechtman, 02/03/2026).

These statements—made to a treating physician nine months after the events—independently corroborate the Complaint's allegations that science teacher Matthew Klein discussed C.M.-1's IEP in front of her classmates (¶16) and that the accommodation denials "made C.M.-1 feel bad about herself and embarrassed in front of her peers" (¶17). Even in 8th grade (2025–2026), with what C.M.-1 described as improved accommodation implementation, the residual distress remained clinically significant: she reported that "teacher not give breaks" and that when denied a break she "puts head down and goes to sleep" to the point where "ESE coord has had to wake her" (Schechtman, 02/03/2026). Her sleep had deteriorated severely — "0:00pm bed time, I can not go to sleep so I go back on my phone"; "I fall asleep all the time in class, if the teacher talks too much I fall asleep" (Schechtman, 02/03/2026).

C.M.-1's mother reported to the doctor that the prior school year "was rough and had to sleep with me"—confirming the anxiety-driven co-sleeping regression documented by Dr. Sanua— and that "the resistance has taken a toll on her" (mother, per Schechtman, 02/03/2026). C.M.-1's anxiety was manifesting somatically: her mother described stimming behavior—"when she gets anxious, she stems and runs back and forth" (mother, per Schechtman, 02/03/2026)—and C.M.-1 described her anxiety response as "I just stop talking and want to leave" and "shuts down, or nervous laughter" (Schechtman, 02/03/2026). She reported appetite loss ("I lose my appetite fast, I do not eat breakfast"), had never taken any prescribed medication ("never took the medication, she refused to take meds, look it up and decided she did not want to do it"), and had not meaningfully engaged with therapy since Karina Rodriguez was unsuccessful ("Karina did not work out") (Schechtman, 02/03/2026).

Dr. Schechtman formally added Generalized Anxiety Disorder (F41.1) to C.M.-1's problem list — the first time GAD was coded as a standalone diagnosis—and concluded by sending a letter to the mother stating that "even though they only want accommodations both would benefit from medication trial" (Schechtman, 02/03/2026), an implicit clinical acknowledgment that the accommodations-only approach had failed to protect C.M.-1 from cumulative harm.

Viewed longitudinally from 2022 through 2026, C.M.-1's medical records document a trajectory in which a child with diagnosed ADHD and a history of anxiety "since young childhood" was placed on a clinical pathway that was dependent on her school's implementation of IEP accommodations. That pathway failed when the school did not fulfill its obligations. Dr. Sanua's April 16, 2024 plan was unambiguous: C.M.-1 would be monitored without medication so long as the IEP accommodations worked; if they did not, medication would be initiated (Sanua, 04/16/2024). Over the ensuing twelve months, the medical records document a progressive clinical unraveling—from anxiety with adequate sleep (April 2024) to anxiety-driven insomnia with co-sleeping regression and school meltdowns (April 2025) to a three-week school removal driven by targeting and retaliation (May 2025) that reinforced C.M.-1's chronic sleep disruption, classroom somnolence, appetite loss, stimming behavior, and shutdown responses (February 2026).

The longitudinal pattern is striking: C.M.-1's anxiety improved during the summer when school was not in session (Nagy, 07/23/2025) and escalated after returning to the school environment (Schechtman, 02/03/2026). Perhaps most telling for this litigation are C.M.-1's own words to Dr. Schechtman—words spoken not in a legal setting but to a treating physician: her "goal is just to get the accommodations on IEP and not have to go legal, get them when she ask for them and not get the retaliation from school" (Schechtman, 02/03/2026). This statement, documented in a clinical encounter, independently corroborates the central allegation of Counts I and III: that the Defendant's employees did not merely fail

to provide IEP accommodations, but they created a retaliatory environment that punished C.M.-1 for requesting them.

In the end, these independent medical records establish (a) C.M.-1's clinically-documented disabilities (ADHD and GAD) qualifying her as a protected individual under Section 504 and Title II of the ADA; (b) the explicit clinical plan whereby medication was deferred based on the successful implementation of C.M.-1's accommodations—a plan that was defeated by the Defendant's conduct; (c) the connection between the 2024–2025 school year at Emerald Cove and the onset of C.M.-1's formally diagnosed Adjustment Disorder with Anxiety, Insomnia, anxiety-driven co-sleeping regression, school meltdowns, a three-week school removal, and escalating anxiety; (d) C.M.-1's own clinician-documented statements that teachers singled her out, discussed her IEP in front of classmates who then called her "dumb," and retaliated against her for requesting accommodations; and (e) the cumulative toll — including chronic sleep disruption, classroom somnolence requiring ESE staff to wake her, appetite loss, stimming, shutdown responses, and a fear of retaliation so severe that she refused her own physician's offer to contact the school. This was an adolescent whose stated goal to her doctor was simply to receive the accommodations she was legally entitled to "without resentment."

C.M.-2. C.M.-2's Pediatric Partners medical records were reviewed for appointments that occurred prior to his enrollment at Emerald Cove Middle School (in Grade 8) to the present. Initially, C.M.-2 was clinically/medically diagnosed with Oppositional Defiant Disorder (onset 01/15/2022) and for being Overweight (onset 01/15/2022). Critically, there is no prior history of anxiety until the time period relevant to this litigation.

Following a neuropsychological evaluation by Dr. Farzan at Palm Beach Neuro (results entered 11/23/2022 by Dr. Flasterstein), C.M.-2 was formally diagnosed with ADHD, and the medical records confirm that he began receiving accommodation services through his 504 Plan at Emerald Cove Middle School in 8th grade.

Thereafter, the medical records document a marked escalation in C.M.-2's anxiety, school avoidance, and somatic distress during his enrollment at Palm Beach Central High School. On May 15, 2024, Dr. Lorena Frontado conducted a behavioral health consultation when C.M.-2 was suspended from school following a physical altercation. This was prompted by C.M.-2's mother who called the practice to report that C.M.-2 was "being bullied by teachers and having bad anxiety; not wanting to go to school and missing a lot of school" (Frontado, 05/15/2024).

At that time, Dr. Frontado formally diagnosed Generalized Anxiety Disorder and ADHD (combined type), prescribed Concerta 18 mg, and diagnosed School Avoidance (Z55.8) — identifying specific clinical barriers including emotional impulsivity, lack of structure, difficulty with academics, and declining school performance. Critically, Dr. Frontado documented that C.M.-2 was now "masking anxiety — he does it well — learned behavior." This represents a significant clinical evolution during these school years to a chronic, pervasive pattern of suppressed distress and anxiety.

Within weeks, C.M.-2 was working with therapist Karina Rodriguez, LCSW who noted, on June 6, 2024, that he presented with "a history of lack of socializing, isolation due to lack of trust," was "fearful [of] being judged by peers," and that his anxious tendencies manifested somatically as "stomach ache and head[ache], shut down." By June 20, 2024, Ms. Rodriguez documented an escalating pattern of aggression toward females "since middle school age." These clinical findings are directly aligned with the Complaint's allegations that Spanish teacher Gabrielle Chacon refused to provide C.M.-2's 504 accommodations, told the class students "do not need extra time," demeaned his mother's advocacy, told a female student to "be careful as C.M.-2 likes to put his hands on girls and hit them," and that the Principal

communicated to C.M.-2 that Ms. Chacon believed he would "grow up to be a woman beater" (Second Amended Complaint, ¶¶24–33).

Hence, the medical records corroborate the Complaint's allegation that these actions "made C.M.-2 feel bad and caused his anxiety to worsen" and that "he felt dumber" (¶26). Indeed, the clinical record documents the emergence during this exact period of being formally diagnosed with GAD, school avoidance, social withdrawal, somatic anxiety symptoms, and as a patient who had learned to mask his distress as a survival strategy.

When C.M.-2 enrolled in Suncoast High School for the 2024–2025 school year (¶37), the medical records confirm that, while C.M.-2 reported a somewhat more positive school experience at Suncoast, the underlying anxiety and school-related distress remained clinically significant and, in several domains, measurably worsened. At C.M.-2's most recent behavioral health encounter with Dr. Tommy Schechtman on February 3, 2026, the patient described in his own words a pattern of calling his mother from school during anxiety episodes "because I do not want to talk to people at school," during which "I would be shaking," and then going to the nurse reporting a stomach ache to exit the classroom. His sleep had deteriorated severely: he reported staying awake until "sometimes 2, 4 and 5 AM," driven in part by internet-triggered agitation and bruxism ("I clench my teeth, keeps me from sleeping"), and "I fall asleep sometimes at school" as a consequence.

C.M.-2 reported, in the medical records, that his 504 accommodations continued to be inconsistently honored even at Suncoast — "teachers not give the accommodations" — though he distinguished Suncoast from Palm Beach Central by noting the teachers "do not retaliate like Palm Beach Central" (Schechtman, 02/03/2026)—once again, a statement directly consistent with the hostile educational environment alleged in Counts II and IV.

With direct relevance to Count V, Dr. Schechtman's notes document that C.M.-2 stays at an extended relative's house with his father specifically because of school transportation logistics, and that the bus route from his mother's home requires crossing Okeechobee Boulevard, "which gave him anxiety at 6 AM." Thus, the medical records independently corroborate both the existence of the diagnosed anxiety disorder and its specific activation by the transportation barrier.

Viewed longitudinally through 2026, C.M.-2's Pediatric Partners medical records document a progressive trajectory to chronic, multi-domain distress — a trajectory whose most significant clinical inflection point coincides precisely with his enrollment at Palm Beach Central High School and the Defendant's alleged conduct. The record also documents that C.M.-2 had been prescribed Concerta 18 mg on May 15, 2024, but "never took it, I never tried it" (Schechtman, 02/03/2026). These records support the connection between (a) the Defendant's alleged conduct at Palm Beach Central and the onset and escalation of diagnosed anxiety, school avoidance, and somatic distress; (b) the specific anxiety triggered by the transportation barrier at Okeechobee Boulevard, independently corroborating the McKinney-Vento claim; and (c) the cumulative educational, emotional, and physiological toll on C.M.-2—including damaged academic performance, social withdrawal, chronic sleep disruption, and somatic complaints.

_ _ _ _ _

Adolescent ADHD and Generalized Anxiety Disorder

Both C.M.-1 and C.M.-2 are adolescents receiving accommodations for ADHD and Generalized Anxiety Disorders (GAD). While there is nothing in the Case Discovery documentation to suggest that the District provided any of their teachers systematic or comprehensive information and training on these two social, emotional, and behavioral disabilities, this information would have been essential to help them understand (a) how to maximize these adolescents' academic and behavioral engagement in school; (b)

how to understand their impact on attention and learning in the classroom; and (c) how to respond when they were disrupting their learning—to minimize their effects and to maximize a return to productivity.

This Section briefly describes these characteristics separately, and then discusses how these two conditions combine to further complicate learning and social interactions for students when both are present. These descriptions are critical as many of the behaviors that some of C.M.-1 and C.M.-2's teachers incorrectly attributed to student resistance, a lack of student motivation, or student apathy were actually manifestations of ADHD combined with GAD. This entire discussion reinforces the reason why these two students should have been consistently receiving—across teachers, subject areas, and semesters—the accommodations in the 504 plans or IEPs above in every one of their classrooms across every one of their academic years, as these accommodations were the best strategies and supports needed to help them learn and succeed in school.

Understanding and Supporting Adolescent Students with ADHD in the School Setting. Attention-Deficit/Hyperactivity Disorder (ADHD) is a neurodevelopmental disorder characterized by a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development (American Psychiatric Association, 2022). The Diagnostic and Statistical Manual of Mental Disorders (Fifth Edition, Text Revision; DSM-5-TR) identifies three ADHD presentations: Predominantly Inattentive, Predominantly Hyperactive-Impulsive, and Combined. A diagnosis requires that multiple symptoms be present prior to age 12, that symptoms occur in two or more settings (e.g., home and school), and that they produce clinically significant impairment in social, academic, or occupational functioning.

For children and adolescents under the age of 17, the diagnostic threshold requires at least six symptoms in either the inattention or the hyperactivity-impulsivity domain; for individuals 17 and older, at least five symptoms are required. Critically, ADHD is not a disorder that students choose to have, that they can overcome through willpower or effort, or that reflects a deficiency in intelligence or character. It is a neurobiological condition rooted in differences in brain development and function—particularly in the prefrontal cortex and frontal-striatal-thalamic circuits that govern attention, impulse control, and self-regulation (Barkley, 2015). Both C.M.-1 and C.M.-2 carry documented ADHD diagnoses: C.M.-1's is identified on her Individualized Education Program (IEP) under the eligibility category of Other Health Impairment; C.M.-2's is identified on his Section 504 Plan across three consecutive school years. In both cases, the Palm Beach County School District's own evaluation teams determined that the impact of these students' ADHD challenges were serious and persistent enough to require formal accommodation plans—determinations that carry legal and educational obligations the District is bound to honor.

Understanding the Impact of ADHD on Attention and Learning in the Classroom. The prevailing scientific understanding of ADHD (Barkley, 2012, 2015, 2022) reconceptualizes the disorder not as a deficit of attention per se, but as a deficit of executive function and self-regulation. Executive functions are the self-directed mental processes—including working memory, internalized speech, emotional self-regulation, planning, and behavioral inhibition—that allow individuals to organize their behavior across time, resist immediate impulses in favor of longer-term goals, and adapt flexibly to changing demands.

Barkley's model demonstrates that behavioral inhibition is the foundational executive function, and that when inhibition is impaired—as it is in ADHD—it disrupts all downstream executive capacities. The result is what Barkley terms "time blindness"—individuals with ADHD live disproportionately in the present moment, struggling to use anticipated future consequences (e.g., a failing grade, a missed deadline, a social consequence) to guide current behavior (Barkley, 2012). For adolescents in a classroom, this means that a student with ADHD is not simply "not paying attention." That student's brain is neurologically less able to sustain attention to non-preferred tasks, to hold multi-step instructions in working memory, to inhibit responses to distracting stimuli, to regulate the emotional frustration that

accompanies difficult work, and to organize behavior across the extended time horizons that secondary school demands—homework due in three days, projects due in three weeks, consequences that arrive on a report card months later.

Langberg and colleagues' research on academic impairment in adolescents with ADHD confirms this clinical picture: Time management and planning deficits are the most prevalent executive function impairments reported by both parents and teachers, and these deficits escalate sharply in middle and high school—precisely when the curriculum demands more independent self-management, more complex multi-step assignments, and more self-directed organization across multiple classes and teachers (Langberg et al., 2013; Langberg et al., 2018). Adolescents with ADHD submit approximately 20 percent fewer homework assignments than their peers—not because they do not care about their grades, but because the executive functions required to remember the assignment, organize the materials, initiate the task, sustain effort to completion, and return the finished product to school the next day represent a chain of self-regulatory demands that their neurological and behavioral development is not equipped to manage independently (Langberg et al., 2013).

Barkley's research further establishes that ADHD delays executive function maturation by approximately 25 to 40 percent, with an average delay of 30 percent (Barkley, 2012, 2015). This means that a 13-year-old student with ADHD—the approximate age of C.M.-1 during her 7th-grade year—may have the executive functioning capacity of a 9-year-old. A 15-year-old—the approximate age of C.M.-2 during his 10th-grade year—may have the executive functioning capacity of a 10- or 11-year-old. These are not students who are lazy, oppositional, or disrespectful when they fail to turn in homework. Instead, they lose track of materials, forget multi-step directions, or struggle to begin tasks that require sustained mental effort. These are students whose neurological development has not yet caught up to the executive functioning demands being placed on them—demands that their non-disabled peers can handle.

Equally important is Barkley's principle that support must be delivered at the "point of performance"—the specific time and place where the student is expected to perform the task—because students with ADHD cannot be expected to internalize instructions given at one point in time and independently retrieve and execute them at another (Barkley, 2015).

Thus, a teacher who explains an assignment on Monday and expects a student with ADHD to independently organize, initiate, sustain effort on, and submit that assignment on Friday without interim check-ins, written reminders, or structured breaking-down of the task is not effectively teaching to that student's disability. The teacher is relying on executive functions the student does not yet possess. The educational implication is profound: When schools expect students with ADHD to perform at the executive level of their same-age peers without providing the accommodations and supports that bridge the developmental gap, they are setting those students up to fail—not because the students lack intelligence or motivation, but because the school environment has not been adjusted to match their actual neurological capacity for self-regulation.

Maximizing Academic and Behavioral Engagement for Adolescents with ADHD. The research literature identifies a multi-component framework for supporting students with ADHD in school settings, emphasizing that effective support requires proactive environmental modifications, structured behavioral supports, and explicit skill instruction—not simply the expectation that students will independently manage their disability (DuPaul & Stoner, 2014; Evans et al., 2023; Sibley et al., 2022). DuPaul and Stoner's comprehensive model, recognized as the leading school-based intervention framework for ADHD, organizes evidence-based strategies into three categories: Behavioral interventions (e.g., daily behavior report cards, positive reinforcement systems, clear and consistent rules), Academic interventions (e.g., breaking tasks into smaller components, providing copies of notes, peer tutoring, computer-assisted

instruction), and Self-regulation interventions (e.g., self-monitoring checklists, goal-setting protocols, organizational skills training).

More recently, Harrison and colleagues have drawn an important distinction between accommodations—which alter the school environment to reduce the impact of ADHD on performance without changing academic standards—and interventions—which teach skills that promote independent functioning and address executive function deficits (Harrison et al., 2020; Harrison et al., 2022). Harrison et al.'s (2022) randomized controlled trial study with middle school students found that self-management—a skill-building intervention—produced large, statistically-significant improvements in academic engagement, reductions in disruptive behavior, and faster task initiation when compared to common accommodations such as breaks, prompting, and sensory tools. This finding does not mean that accommodations are unnecessary; it means that accommodations alone are insufficient. The most effective approach combines environmental accommodations (which remove barriers at the point of performance) with skill-building interventions (which develop the student's capacity for self-regulation over time). A school's multi-tiered system of supports (MTSS) when combined with a 504 Plan or an IEP is designed to deliver precisely the needed combination of accommodations and interventions needed by most ADHD students. But the research is clear: None of this will work if the documents are written and filed, but not implemented.

The specific accommodations written into C.M.-1's and C.M.-2's plans—extended time, copies of notes, breaking large assignments into smaller parts, preferential seating, short breaks between assignments, cueing to stay on task, agenda checks, and the presence of an ESE support facilitation teacher in the general education classroom (for C.M.-1)—are not discretionary courtesies or special privileges. They are the precise environmental modifications that the research identifies as necessary to bridge the executive function gap between what adolescents with ADHD can do independently and what the classroom demands:

- Extended time compensates for the processing delays and working memory limitations inherent in ADHD (Barkley, 2015).

- Copies of notes compensate for the inability to simultaneously listen, process, and transcribe—a multi-tasking demand that requires exactly the kind of sustained divided attention that ADHD undermines (DuPaul & Stoner, 2014).

- Breaking large assignments into smaller parts compensates for deficits in planning and task initiation—the executive functions that allow neurotypical students to look at a three-week project and independently decompose it into manageable steps (Langberg et al., 2013, 2018).

- Preferential seating reduces the environmental distractions that ADHD makes it neurologically harder to filter.

- Breaks compensate for the attentional fatigue that occurs when a student with ADHD is required to sustain focus beyond their neurological capacity.

- Agenda checks—added to C.M.-1's IEP at the November 2024 Interim meeting—externalize the organizational monitoring that neurotypical students perform internally, consistent with Barkley's principle of providing support at the point of performance.

- And the presence of an ESE support facilitation teacher—as specified in C.M.-1's IEP for Math, Language Arts, and Social Studies—provides the in-classroom scaffolding, redirection, and

instructional support that compensates for the self-regulation deficits the student cannot yet perform independently.

Evans et al.'s (2023) randomized trial of the Challenging Horizons Program demonstrated that this kind of structured, in-school support—delivered through individual coaching on organization, academics, and problem-solving—produces significant improvements in social skills, inattention symptoms, and emotion regulation for high school students with ADHD. Every one of these accommodations and services exists because the research demonstrates that without them, students with ADHD cannot access the general education curriculum on equal terms. When these accommodations are denied—as in C.M.-2's testimony across three schools and multiple years, or when the students are mocked and their need for accommodations are publicly disclosed—as testified by C.M.-1—the students are not merely inconvenienced. Their motivation and trust in the system that is supposed to deliver the accommodations is damaged.

Responding When ADHD Disrupts a Student's Academic Engagement and Learning. When a student with ADHD demonstrates off-task behavior, disengagement, incomplete work, or difficulty following classroom expectations, the research-based response is not punishment, shaming, or the withdrawal of supports. It is a functional assessment of what is driving the behavior, followed by an adjustment to the environment, the task, or the support structure (DuPaul & Stoner, 2014; Harrison et al., 2022). Sibley and colleagues' research on adolescent motivation and ADHD demonstrates that disengagement in the classroom is not a volitional choice—it is a predictable consequence of the interaction between executive function deficits and the motivational impairments that characterize the disorder (Sibley et al., 2020; Sibley et al., 2022). Adolescents with ADHD demonstrate significantly lower intrinsic motivation, lower extrinsic motivation, and higher amotivation than their peers—deficits that uniquely predict poorer homework performance, lower math fluency, and lower GPA in students with ADHD specifically (Langberg et al., 2013).

Sibley's Supporting Teens' Autonomy Daily (STAND) model demonstrates that effective interventions for adolescents with ADHD require addressing motivation directly—through motivational interviewing, goal-setting tied to the student's own values, and structured parent-teacher collaboration—rather than assuming that the student's failure to engage reflects willful defiance (Sibley et al., 2022). The appropriate classroom response when a student with ADHD appears disengaged is to identify where in the chain of executive demands the student is struggling—Is it task initiation? Organization? Sustained effort? Emotional regulation? Motivation?—and to provide the specific support that addresses the identified gap at the point of performance. The inappropriate response is to interpret the student's executive function failure as laziness, defiance, or evidence that accommodations are being exploited—and to deny, reduce, or condition future accommodations based on that misinterpretation.

This distinction is directly relevant to the experiences described by both C.M.-1 and C.M.-2. When a chemistry teacher at Suncoast High School characterized C.M.-2 as coming to class "turned out, headphones on, and cellphone in hand . . . not focus on the lesson, just waiting to get the notes" (Grade 10 504 Plan Meeting Notes, 11/04/2024), that teacher was describing textbook ADHD-related disengagement—exactly the kind of behavior that the student's 504 Plan exists to accommodate. When the teacher stated that C.M.-2 was exploiting the classroom notes accommodation, he was missing the underlying reason for its presence in the 504 Plan. The research-based response to C.M.-2's classroom entrance into chemistry was not to characterize him as "turned out" at a formal 504 meeting, it was to pair the notes accommodation with a self-management intervention, a structured cueing system, and agenda checks—supports that, notably, were not added to C.M.-2's 504 Plan until the November 2024 meeting.

But, it appears that the chemistry teacher either did not understand adolescent ADHD and how to address it, or did not care to ask why C.M.-2 was coming to class in the manner described.

When Ms. Chacon told C.M.-2 that his 504 Plan was "kind of like cheating the system" and that he "wouldn't get far in life" relying on accommodations (C.M.-2 Deposition, pp. 34–35), she was communicating her view that C.M.-2's legally-mandated and research-based supports were unearned advantages that he should be ashamed to use. This belief is not only unprofessional, it is antithetical to every research-to-practice principle on how to support students with ADHD.

And when Miss Oliver—the ESE support facilitation teacher who was specifically assigned to provide C.M.-1 the in-classroom scaffolding she needed to address her disability under the terms of her IEP—told other teachers that C.M.-1 "stinks," gestured to peers to stay away from her, made sarcastic comments when C.M.-1 returned from accommodation breaks, and followed her to the bathroom to rush her breaks, she was not merely failing to provide the specialized instruction and supports specified in C.M.-1's IEP. Miss Oliver was actively weaponizing C.M.-1's disability-related needs as instruments of social humiliation—transforming every accommodation into a source of stigma, rather than of support.

All of the interactions or responses above reflect a fundamental misunderstanding of ADHD that the research has addressed for decades—or a refusal to accept the obligations and responsibilities that ADHD brings to educators who are tasked with educating all students.

The research consensus across more than three decades of investigation—from Barkley's foundational executive function model, to DuPaul and Stoner's school-based intervention framework, to Langberg's organizational skills research, to Harrison's controlled comparisons of accommodations and interventions, to Evans's Challenging Horizons Program, to Sibley's motivational engagement work—converges on a single principle: Students with ADHD require consistent, proactive, structured environmental supports delivered at the point of performance by adults who understand the neurobiological basis of the disorder and who are committed to providing that support without judgment, without conditions tied to the student's perceived effort, and without withdrawal when the student's disability-related behaviors make the work of accommodation more demanding (Barkley, 2015; DuPaul & Stoner, 2014; Evans et al., 2023; Harrison et al., 2022; Langberg et al., 2018; Sibley et al., 2022).

C.M.-1 and C.M.-2 did not receive these opportunities—the opportunities that would make their instruction and education comparable to their non-disabled peers. What they received—across four schools, multiple grade levels, and numerous teachers and administrators within the Palm Beach County School District—were (a) accommodation plans that were written, but not implemented; (b) accommodations that were not taught, but were denied; (c) comments that framed their disability-related behaviors as character defects; and (d) adults who used their positions of authority to shame, stigmatize, and marginalize these students, rather than raise them up. This is what C.M.-1 and C.M.-2 described in their depositions (see Section below). The indifference represented by these interactions have taken the challenges inherent in adolescent ADHD, and magnified them.

Adolescents and Generalized Anxiety Disorder (GAD)

Both C.M.-1 and C.M.-2 are adolescents also diagnosed with Generalized Anxiety Disorders (GAD). While, once again, there is nothing in the Case Discovery documentation to suggest that the District provided any of their teachers systematic or comprehensive information and training on this mental health disorder, this information would have been essential to help them understand (a) how to maximize these adolescents' emotional safety and engagement in school; (b) how to understand their impact on attention and learning in the classroom; and (c) how to avoid emotional anxiety triggers and respond when they were affecting emotional stability and learning—to minimize their effects and to maximize a return to productivity.

This Section briefly describes why these two students should have been consistently receiving—across teachers, subject areas, and semesters—the accommodations in the 504 plans or IEPs above that were related to the prevention, early response, and de-escalation of C.M.-1 and C.M.-2's anxiety challenges.

Understanding and Supporting Adolescents with GAD in the School Setting. For adolescents, Generalized Anxiety Disorder (GAD) is characterized by excessive anxiety and worry about expected or actual events or activities—such as school performance, social interactions, or family circumstances—that occur on most days for at least six months (DSM-5-TR, American Psychiatric Association, 2022). To receive a DSM-5-TR diagnosis, adolescents need to have difficulty controlling their worries while exhibiting three or more of the following six symptoms: restlessness or feeling keyed up or on edge, being easily fatigued, difficulty concentrating or mind going blank, irritability, muscle tension, and sleep disturbance.

Middle and high school classroom teachers encounter these symptoms daily—but frequently misidentify them. The student who cannot sit still is labeled disruptive. The student who zones out during instruction is labeled disengaged. The student who snaps at a peer is labeled defiant. The student who puts her head down is labeled lazy. The student who cannot start an assignment is labeled unmotivated.

In each case, what the teacher is observing may be the visible part of a clinically-based anxiety disorder that is consuming the student's cognitive resources from the inside. And the potential that a student with an anxiety disorder is present in a typical middle or high school classroom is significant.

Indeed, the 2021–2023 Adolescent Brain Cognitive Development Study found that Anxiety disorders remain the most prevalent psychiatric condition among U.S. adolescents, with approximately 20–25% meeting the diagnostic criteria by early adolescence. Critically, Anxiety disorders were more common than depressive disorders (8.5%), behavior disorders (6.2%), or substance use disorders (2.5%), the rates increased with age, and girls had nearly double the prevalence of it than boys. Among those with any anxiety disorder, 8.3 percent experienced severe impairment, and prevalence was significantly higher in females (38.0 percent) than males (26.1%). Current diagnosed anxiety among adolescents ages 12 to 17 increased 61% between 2016 and 2023, with 20% of adolescents reporting anxiety symptoms in the preceding two weeks during the 2021–2023 reporting period (CDC, 2023; NIMH, 2023).

These numbers mean that in a typical middle or high school classroom of 25 to 30 students, a teacher can expect that between five and ten students are currently experiencing clinically meaningful anxiety—and that most of those students have never been diagnosed, have never received treatment, and have no IEP or 504 Plan identifying their condition. For the vast majority of anxious adolescents, then, the classroom teacher is the only adult in a professional position to notice that something is wrong—and the only adult whose daily conduct will either reduce the student's anxiety to a manageable level or amplify it beyond the student's capacity to cope.

Both C.M.-1 and C.M.-2, however, were different as District leaders knew of their GAD diagnoses. C.M.-1's IEP identifies that "records indicate a history of anxiety," and her IEP team wrote specific accommodations to address anxiety-driven behaviors—including a nonverbal cue from staff when her anxiety rises, manifested as inappropriate laughing or dancing (IEP, Item #15). C.M.-2 was diagnosed with Generalized Anxiety Disorder by Dr. Lorena Frontado on May 15, 2024. In both cases, the anxiety was documented, the accommodations were written, and the teachers responsible for delivering them were identified by name and class period. What happened next is what this section addresses.

Understanding GAD's Impact on Attention and Learning in the Classroom. A middle or high school teacher looking at a student with GAD will typically see one of two presentations, and both are misleading. The first is the student who appears physically present, but cognitively absent—staring at the

board without processing, failing to begin work, not responding when called on, appearing to daydream. The second is the student who appears to be functioning normally—completing assignments, participating when prompted, earning adequate grades—but who is doing so at an enormous and invisible internal cost.

Both presentations are explained by Attentional Control Theory (ACT), the most widely cited model of anxiety's effect on cognitive performance and the framework most extensively applied in U.S. educational research on anxious students (Eysenck et al., 2007). ACT establishes that every student's attention is regulated by two competing systems: A goal-directed system that keeps the student focused on the teacher's instruction, the assignment, or the academic task; and a stimulus-driven system that redirects attention toward anything the brain perceives as threatening or emotionally salient.

In a student without anxiety, the goal-directed system dominates during class—the student can listen to a lecture, hold information in working memory, ignore the conversation happening two rows behind her, and shift attention when the teacher moves from instruction to practice. In a student with GAD, the anxiety disrupts this balance. The stimulus-driven system is perpetually activated by worry: worry about whether the teacher will call on her, worry about whether a peer is judging her, worry about whether she studied enough for the test, worry about whether the answer she is about to give is wrong, worry about what will happen if she asks for help and the teacher reacts with irritation. Each of these strands of worry pulls the student's capacity to attend away from the academic task and toward the potential threat (Eysenck et al., 2007). What the teacher sees is a student who is "not paying attention." What is actually happening is that the student's brain is paying intense attention—to threats that the teacher cannot see. . . at the expense of content the teacher is trying to teach.

Silverman, Pina, and Viswesvaran's (2008) meta-analysis of 32 well-designed experimental studies confirmed that anxiety disorders in children and adolescents produce clinically significant impairment across both academic and social classroom interactions. Huberty (2008) describes this impairment as "chronic cognitive interference"—where the student is physically in the classroom, but functionally unavailable for learning because the worry system is consuming the cognitive bandwidth that learning requires. For a classroom teacher, the practical implication is critical: The GAD student is not choosing to disengage, and telling the student to "focus," "pay attention," or "try harder" does not address the problem. In fact, the teacher's displeasure adds another layer of threat and anxiety——to an emotional system that is already overwhelmed.

Teachers need to understand that GAD creates a specific and deceptive pattern of classroom performance that, if misread, leads directly to harmful responses. But with understanding and accommodations, students' anxieties can be moderated, students can learn compensatory strategies, and students can produce acceptable work. However, for students like C.M.-1 and C.M.-2—who demonstrate both GAD and ADHD—classroom teachers need to recognize that their ADHD impairs the executive functions that help them to organize, initiate, and sustain academic work, while their GAD consumes the attentional resources that help them to engage with academic content even when the work is initiated. When teachers do not understand ADHD, GAD, or how they interact, they will see a student who "can't do anything right"—that is, who can't start the work, can't stay focused on it, can't finish it, and can't perform on the test. If taught and trained, what the teachers are seeing is two neurobiological conditions operating simultaneously on the same limited pool of cognitive resources. . . and the appropriate response is not frustration with the student, but adjusting the demands and utilizing the accommodations.

Maximizing Emotional Safety and Academic Engagement for Adolescents with GAD. For a middle or high school classroom teacher, maximizing the emotional safety and academic engagement of a student with GAD does not require therapeutic training. It requires an understanding of what triggers anxiety in the classroom, what prevents or reduces it, and what the teacher's own behavior communicates to a student whose brain is perpetually scanning for threat. The research literature, spanning five decades of

studies with American youth, identifies the classroom teacher as the single most influential environmental variable in determining whether an anxious student's school experience reduces or amplifies the disorder (Kendall & Hedtke, 2006; Ginsburg et al., 2022; Higa-McMillan et al., 2016).

Higa-McMillan, Francis, Rith-Najarian, and Chorpita's (2016) landmark article—synthesizing 50 years of treatment research published in the Journal of Clinical Child and Adolescent Psychology—confirmed that cognitive-behavioral therapy (CBT) is the only treatment for child and adolescent anxiety reaching the highest level of empirical support, and they identified exposure—graduated guided support during anxiety-provoking situations—as the single most critical therapeutic component. While teachers are not trained to provide therapy, they have the greatest potential impact as guides to support students through anxiety-provoking classroom situations. Indeed, when a student encounters these anxiety-provoking situations—a test, a presentation, a group activity, being called on, receiving critical feedback—the teacher's response can communicate safety, rather than an additional threat.

The Child/Adolescent Anxiety Multimodal Study (CAMS)—the largest randomized-controlled trial of anxiety treatment in American youth, involving 488 children and adolescents aged 7 to 17 across six U.S. universities—found that the quality of the adult-student relationship was a significant predictor of anxiety treatment outcomes—with a collaborative, empathic interaction style, developmental appropriateness, and consistency among the best-success predictors (Walkup et al., 2008).

For classroom teachers, this translates into specific, observable behaviors (or accommodations):

- The teacher who previews upcoming assignments and test formats so that anxious students know what to expect is reducing threat.

- The teacher who provides written instructions in addition to verbal ones—so that students whose working memory is partially consumed by worry has a reference to return to—is reducing threat.

- The teacher who establishes predictable classroom routines and signals transitions in advance is reducing threat.

- The teacher who responds to a wrong answer with "That's a common mistake—let me show you why" rather than silence, a sigh, or "No, that's wrong" is reducing threat.

- The teacher who notices that a student has not started an assignment and walks over quietly to ask "What's getting in the way?" rather than announcing "Why haven't you started yet?" from across the room is reducing threat.

Each of these behavioral interactions costs the teacher nothing in instructional time. But each of them communicates to the anxious student's stimulus-driven attentional system that this classroom is a safe environment—and each one frees the student from a part of their anxiety that can be redirected to the cognitive reservoir that helps the student needs to pay attention, engage, and learn.

The "reality checks," here, involve (a) teachers' understanding and recognition of how and when GAD-related anxiety occurs in their classrooms; (b) their knowledge and skill of how to respond and, as appropriate, what interactions and accommodations are needed; and (c) how to support the student through the "event" and transition back to the status quo. Relative to the latter step, when students receive a break to use a coping strategy and then are warmly welcomed back to the classroom activity, they learn that anxiety is manageable and the classroom is safe. When students receive a break and then are greeted with sarcasm, surveillance, or a public comment about how long the break took, they learn that using the

accommodation carries a social cost—and that the safest course of action is to avoid using it, even when the anxiety is overwhelming.

This is precisely what happened to both C.M.-1 and C.M.-2. C.M.-1 described Miss Oliver making sarcastic comments when she returned from accommodation breaks—teaching C.M.-1 that every use of her IEP-allowed break would be met with ridicule from the very adult assigned to support her. C.M.-2 testified that he stopped asking for his 504 accommodations entirely because the experience of requesting them—after Ms. Chacon told him that the supports in his 504 Plan were "kind of like cheating the system" and that he "wouldn't get far in life" relying on accommodations (C.M.-2 Deposition, pp. 34–35). C.M.-2 learned that asking for or accepting the accommodations that he needed were more anxiety-provoking than the experience of going without them.

In both cases, the teachers' conduct did not merely fail to support the accommodation. It converted the accommodation from a source of relief into a source of threat—triggering additional anxiety by using the accommodation, rather than de-escalating the anxiety as intended in the 504 Plans.

Avoiding Anxiety Triggers and Responding When GAD Disrupts a Student's Emotional Stability and Learning. As noted earlier, every middle and high school classroom teacher needs to be able to do three things relative to a student with GAD: (a) Prevent unnecessary anxiety triggers through proactive classroom management; (b) Recognize the early warning signs that a student's anxiety is escalating; and (c) Respond effectively when an anxiety episode is affecting the student's ability to learn. Prevention is the most efficient of the three—and the most consistently neglected.

Huberty (2008) identifies the specific classroom conditions that elevate baseline anxiety in adolescents: Unpredictable changes to routine without advance notice, cold-calling on students without warning, timed tasks that create performance pressure, ambiguous grading criteria that leave students uncertain about expectations, public correction or criticism, and transitions between activities that are not clearly signaled. None of these conditions are necessary for effective instruction, and each of them can be modified without reducing academic rigor. Preventatively, the teacher who posts the day's agenda and schedule on the board at the start of class, who gives students a two-minute warning before transitions, who provides rubrics with clear criteria before assignments are due, who allows students to volunteer answers before cold-calling, and who delivers corrective feedback privately rather than publicly has eliminated five of the most common anxiety triggers in a secondary classroom—without any individualized accommodation plan, without any clinical training, and without any reduction in the quality or rigor of instruction.

Silverman, Pina, and Viswesvaran (2008) demonstrated that the evidence-based treatments producing the strongest recovery rates for anxious American youth share a common structural feature: They are delivered in environments where the relationship between the student and the supporting adult is characterized by safety, predictability, and consistency. The classroom teacher who builds these features into her daily instructional routine is not conducting therapy. She is creating the preventative conditions under which anxious students can allocate their cognitive resources to learning rather than to threat monitoring—the precise equation that Eysenck et al.'s (2007) Attentional Control Theory identifies as necessary for academic engagement.

The recognition of early warning signs is the second essential teacher competency, and it requires knowing what anxiety looks like in a middle or high school classroom. The student whose anxiety is escalating is not necessarily the student who is crying, shaking, or hyperventilating. Those are signs of acute panic, which is a different clinical presentation. The student with GAD whose anxiety is escalating in the classroom is more likely to display one or more of the following: (a) Increased fidgeting, restlessness, or inability to sit still; (b) repeated requests to use the bathroom or get water (attempts to

escape the anxiety-provoking environment); (c) withdrawal from participation—for example, a student who normally contributes going silent; (d) irritability or snapping at peers over minor provocations; (e) difficulty starting or completing work that the student is ordinarily capable of doing; (f) physical complaints—headache, stomachache, nausea—that appear suddenly and have no medical explanation; (g) appearing "frozen"—staring at a blank paper or screen without writing; and (h) as C.M.-1's IEP specifically documents, behavioral presentations that do not look like anxiety at all—inappropriate laughing or dancing (IEP, Item #15).

This third essential teacher competency is critically important. Anxiety in adolescents frequently presents as behaviors that teachers interpret as disrespect, silliness, or deliberate disruption—precisely because the student's nervous system is producing a stress response that the student lacks the self-regulation capacity to suppress or redirect into a socially conventional form. The teacher who responds to C.M.-1's anxiety-driven laughing by saying "This isn't funny—pay attention" or "Stop being disruptive" does not understand the disorder. And yet, their colleagues on C.M.-1's IEP team did understand the disorder because they wrote Accommodation #15 into the Plan directing staff to respond to these behaviors with a nonverbal cue—a quiet, private, non-stigmatizing signal to help C.M.-1 recognize that her anxiety is rising and to activate a coping response without public embarrassment.

This accommodation reflects sound research-to-practice at every level: It is low-demand, low-visibility, preserves the student's dignity, and supports self-regulation without adding an additional social threat that would exacerbate the already-existing anxiety. In fact, most—if not all—of the accommodations in C.M.-1 and C.M.-2's respective Plans are similar. They are simply specialized and targeted classroom management techniques or practices that any trained teacher can implement—and that every trained teacher is professionally obligated to implement when needed by a student with a disability.

And yet, one of the questions at the foundation of this litigation is: "Why did some of C.M.-1 and C.M.-2's respective teachers choose to deny accommodations to these two students? And why did they trigger these students' anxieties to the degree that these students chose to deny themselves their needed accommodations as a way to prevent further anxiety?

The teachers involved intensified these students' anxiety, deepened their avoidance, destroyed their willingness to self-advocate, and aided the progressive decline that both students in this Case have described and that the documentary record confirms.

The Compounding Effects of ADHD and GAD When Present Together

The co-occurrence of ADHD and anxiety disorders is one of the most common and well-documented comorbidity patterns in child and adolescent psychiatry—and one that every middle and high school classroom teacher should expect to encounter. Jarrett and Ollendick's (2008) comprehensive review of the research literature, published in Clinical Psychology Review, established that approximately 25% of children and adolescents with ADHD also meet the diagnostic criteria for a comorbid anxiety disorder. Indeed, data from the previously-cited Multimodal Treatment Study of Children with ADHD (MTA)—the largest federally-funded randomized controlled trial of ADHD treatment ever conducted in the United States—found that the comorbidity rate was even higher: approximately one-third of the children with ADHD in the MTA sample met criteria for a co-occurring anxiety disorder (March et al., 2000).

For classroom teachers, this means that, among the students in their classrooms who carry an ADHD diagnosis, roughly one in three also has clinically significant anxiety—whether that anxiety has been formally identified or not. Indeed, both C.M.-1 and C.M.-2 fall squarely within this comorbid profile. C.M.-1's IEP identifies her ADHD diagnosis alongside her documented history of anxiety with specific behavioral descriptions written into her accommodation plan. C.M.-2's 504 Plan identifies his ADHD

disability, along with the Generalized Anxiety Disorder diagnosis certified by Dr. Lorena Frontado on May 15, 2024. What the research makes clear—and what C.M.-1 and C.M.-2's teachers needed to understand—is that the ADHD-plus-anxiety presentation is not simply the sum of two separate conditions. It is a distinct clinical profile that produces cognitive and behavioral impairments that are qualitatively different from, and more significant than, either condition alone (Jarrett & Ollendick, 2008, 2012).

The mechanism by which ADHD and GAD compound each other's effects in the classroom can be understood by integrating the two cognitive frameworks described earlier in this Section: Barkley's (2015) executive function model of ADHD and Eysenck et al.'s (2007) Attentional Control Theory of anxiety.

Barkley's model establishes that ADHD impairs the executive function architecture—working memory, behavioral inhibition, planning, emotional self-regulation, and the capacity to organize behavior across time. These are the cognitive systems that allow a student to receive an assignment, hold the instructions in mind, organize materials, initiate the task, sustain effort to completion, and monitor performance along the way. For a student with ADHD, this architecture is developmentally delayed by approximately 30% (Barkley, 2015)—meaning that the student has fewer executive function resources available for academic demands than a same-age peer.

Eysenck et al.'s (2007) Attentional Control Theory establishes that anxiety hijacks attentional resources by shifting cognitive processing from the goal-directed system (which keeps the student focused on academic content) to the stimulus-driven system (which redirects attention toward perceived threats—a teacher's tone, a peer's reaction, the fear of failure, the worry about being called on). For students with GAD alone, this attentional hijacking degrades their processing efficiency, but compensatory efforts may still be able to maintain performance—at least temporarily.

In a student with both ADHD and GAD, the compounding effect is devastating: ADHD has already reduced the available pool of executive function resources, and then GAD consumes a significant portion of whatever attentional resources remain. Jarrett and Ollendick's (2012) controlled research confirmed this mechanism empirically, demonstrating that children and adolescents with comorbid ADHD and anxiety exhibit poorer working memory performance and greater deficits on continuous performance tasks measuring sustained attention than children with ADHD alone.

For a classroom teacher, this means that a student with both ADHD and GAD is not merely struggling with attention and organization—that student's cognitive system is being degraded from two directions simultaneously. The student cannot hold multi-step instructions in working memory (because ADHD has impaired it), and cannot allocate full attention to the teacher's instruction (because anxiety is diverting it toward threat monitoring). The result is a student who appears unable to do anything the classroom requires—unable to start work, unable to sustain focus, unable to complete assignments, unable to perform on tests. And this is not because of laziness or defiance; it is because two neurobiological conditions are operating simultaneously on the same limited and already-diminished pool of cognitive resources. This is precisely the profile that C.M.-1 and C.M.-2 presented in their classrooms, and it is precisely the profile that their accommodation plans were designed to address.

What makes the MTA's findings on anxiety so critical for this Case is the study's discovery that the type of support a student receives matters differently depending on whether anxiety is present alongside the ADHD. March and colleagues' (2000) analysis of anxiety as a moderator variable in the MTA trial—published in the Journal of Abnormal Child Psychology—revealed that children with ADHD who also had comorbid anxiety responded to intensive behavioral treatment (which included structured environmental accommodations, consistent routines, clear behavioral expectations, and proactive adult

support) as effectively as they responded to medication management alone. In contrast, for children with ADHD without comorbid anxiety, medication was significantly more effective than behavioral treatment.

The implication of this finding is profound and directly relevant to the classroom: For students with the ADHD-plus-anxiety profile—the exact profile shared by C.M.-1 and C.M.-2—the environmental and behavioral supports delivered by teachers, case managers, and support staff are not supplementary to treatment. They are a primary treatment mechanism. Thus, the classroom accommodations written into C.M.-1's IEP and C.M.-2's 504 Plan—extended time, copies of notes, breaks, cueing to stay on task, agenda checks, preferential seating, and the presence of an ESE support facilitation teacher—are precisely the kind of structured, predictable, proactive environmental supports that the MTA identified as particularly effective for this comorbid population. When teachers deliver these supports consistently, without judgment, and within a relationship characterized by a collaborative, empathic style (Walkup et al., 2008), the compounding effects of ADHD and GAD can be substantially mitigated because the executive function gap is bridged and the anxiety triggers are reduced due to the safe, non-threatening classroom climate.

Conversely, when teachers deny, stigmatize, or put contingencies on these classroom accommodations—for example, when Ms. Chacon tells C.M.-2 that his 504 Plan is "kind of like cheating the system," when Miss Oliver follows C.M.-1 to the bathroom to rush her accommodation breaks and then mocks her upon return, when a chemistry teacher characterizes C.M.-2 as "turned out" at a formal 504 meeting—they are withholding the strategies that the research has consistently pointed to as the most effective for students with this comorbid profile.

For C.M.-2, his ADHD and anxiety diagnoses came at separate times.

While C.M.-2's first 504 Plan—with his ADHD diagnosis—was signed in Grade 8 on November 19, 2023, his GAD diagnosis came later—certified by Dr. Frontado on May 15, 2024 when C.M.-2 was just completing Grade 9. Significantly, C.M-2's anxiety diagnosis followed an academic year where, according to the 2nd Amended Complaint, C.M.-2's Spanish teacher, Gabrielle Chacon, failed (a) to provide his 504 accommodations, (b) complained about the effort involved and the need to change grades, (c) told the class that students "must be accountable and do not need extra time," (d) told C.M.-2 he "had enough time," and (e) stated she never had (to provide) accommodations and "did fine" (¶25). The Complaint alleges these circumstances caused C.M.-2 to feel "dummer," worsened his anxiety, and caused him to stop requesting accommodations—including hard copies of notes—because Ms. Chacon made it clear the effort was burdensome (¶26).

The research on ADHD-anxiety comorbidity is consistent with this progression: Jarrett and Ollendick (2008) noted that school failure, repeated negative interactions with authority figures, and chronic experiences involving social and academic inadequacy are factors that can activate a predisposed anxiety condition in students with ADHD—transforming the initial ADHD presentation into the more impairing ADHD-anxiety comorbid profile. As such, it is likely that C.M.-2's school experiences—the accumulation of teacher hostility, accommodation denial, and public stigmatization over time within the District— triggered a predisposed anxiety vulnerability, resulting in the Generalized Anxiety Disorder that Dr. Frontado subsequently diagnosed. Once the GAD was established, it created the compounding cognitive burdens described above—and it produced C.M.-2's hesitancy to request his accommodation after they were denied (see the Section on C.M.-2's deposition below).

For C.M.-1, the comorbidity was present from the beginning of the time period covered in this litigation. C.M.-1's IEP documents both her ADHD and her anxiety history, and her IEP team wrote specific accommodations addressing both conditions—including the nonverbal cue for anxiety-driven behaviors (Item #15), and the assignment of an ESE support facilitation teacher for in-classroom

scaffolding (Items #22–24). And yet, while both conditions—with specific accommodations—were identified on paper, the accommodations were systematically undermined in practice by the conduct of the teachers and staff responsible for implementing them.

For students with comorbid ADHD and GAD, the research across Barkley's executive function model, Eysenck et al.'s Attentional Control Theory, Jarrett and Ollendick's comorbidity research, and the MTA's treatment findings results in a single, non-negotiable principle: These students require (a) more support, not less; (b) more patience, not more conditions; and (c) the accommodations planned, not punishment or resistance when they are predictably needed (Barkley, 2015; Eysenck et al., 2007; Jarrett & Ollendick, 2008, 2012; March et al., 2000; Walkup et al., 2008). What C.M.-1 and C.M.-2 received from the Palm Beach County School District were the latter responses immediately above, and not the former. And the compounding harm that followed was not unpredictable. It was, according to the research, inevitable.

_ _ _ _ _ _ _ _ _ _

**Section XI**. **Analyzing and Applying C.M.-1's Deposition to the Litigation Counts**

Preliminary Observations

Currently a 13-year-old 8th grader at Emerald Cove Middle School in the Palm Beach County Schools, C.M.-1 was deposed on February 18, 2026. The Counts relevant to C.M.-1 are Count I (Section 504—denial of FAPE and disability discrimination) and Count III (Title II ADA—denial of FAPE and disability discrimination). Both Counts allege: (a) failure to implement IEP accommodations, specifically Extended Time and Short Breaks; (b) a hostile educational environment created by staff conduct; (c) resulting academic harm and emotional distress; and (d) deliberate indifference by the District despite parental notice. This analysis examines C.M.-1's deposition testimony against each of these elements.

More specifically, the central allegations within Counts I and III are that C.M.-1's IEP-mandated accommodations and services were systematically denied, inconsistently implemented, or actively undermined across multiple classrooms, multiple teachers, and for at least the first two years of her enrollment at Emerald Cove—and that the adults assigned to provide her disability-related supports instead became sources of hostility, stigmatization, and harm.

The Complaints also allege that the District had actual knowledge of these failures through multiple channels—including IEP meetings, direct parental communications (including e-mails from C.M.-1's mother to school administrators), classroom-level observations by ESE support staff who were themselves contributing to the hostile environment, and the IEP itself—and that it responded with deliberate indifference, failing to train teachers and ESE staff on their obligations under the IEP, failing to monitor whether accommodations were being provided in the classroom, and failing to take meaningful corrective action when non-compliance and staff misconduct were reported.

The Complaint further alleges that the District's response to known accommodation failures was not to fix the system, but to create informal workarounds—most notably, an assistant principal's instruction to C.M.-1 to use the word "water" as a code word to request a break without identifying herself as a student with a disability—thereby shifting the burden of accommodation enforcement from the institution to the child. Moreover, C.M.-1 was subjected to a pervasively hostile environment by the very staff members assigned to support her. Specifically, the Complaint describes conduct by C.M.-1's ESE support teacher—Miss Oliver—who told other teachers that C.M.-1 "stinks," talked about C.M.-1 to the class in her absence, pointed at C.M.-1 and gestured to other students to stay away from her, made sarcastic comments when C.M.-1 returned from accommodation breaks, and followed C.M.-1 to the bathroom to rush her breaks. In addition, a civics teacher—Mr. Wagstaffe—disclosed C.M.-1's IEP status to the entire

class and denied her extended time by characterizing her work as "overdue," and a cheer coach—Miss Glee—who called C.M.-1 "ugly" in front of peers, causing her to abandon the activity.

These incidents were not isolated. They occurred across multiple classrooms, multiple school years, and multiple staff members, and they collectively created an environment in which C.M.-1's disability status was treated as a source of ridicule and social exclusion rather than as a legally-protected characteristic requiring institutional support. All of these incidents resulted in additional academic, behavioral, and emotional challenges that compounded the effects of C.M.-1's ADHD- and anxiety-related disabilities, further impairing her access the educational program to which she is entitled.

The Denial of Extended Time Accommodation

C.M.-1's testimony on this point was direct, specific, and unequivocal. When asked by the School Board's counsel whether she received extended time to complete her work during the prior school year (7th grade, 2024–2025), she answered "No" (p.39, l.21). When pressed further—acknowledging that she did receive it in some classes—she identified three specific teachers who did not provide extended time: Mr. Wagstaffe, Mr. Klein, and Mr. Frost (p.40, ll.1–3).

C.M.-1 then testified to the direct academic consequence of the accommodation denials: When assignments were not submitted on the due date, she was not permitted to complete them later (p.40, ll.5–8: "you never got to do it?"—"No"). She confirmed that this resulted in missing grades that were visible in her gradebook (p.40, ll.10–14), and that she failed those classes (p.40, ll.16–17).

This testimony directly supports the Complaint's allegation (¶54) that the District failed to implement C.M.-1's Extended Time accommodation and that the failure resulted in academic harm. The fact that this testimony was elicited by defense counsel—not Plaintiffs' counsel—makes it particularly significant. The School Board's own attorney established, through her own questioning, that three teachers denied an IEP accommodation, and that the student failed classes as a direct result.

Compliance significance: Under 34 C.F.R. §104.33, the District's FAPE obligation requires that accommodations specified in a student's IEP be actually implemented. Extended Time is not a discretionary benefit that individual teachers may choose to provide or withhold; it is a mandated accommodation documented in a binding educational plan. C.M.-1's testimony establishes that three teachers independently chose not to honor this accommodation—suggesting not an isolated lapse, but a pattern of non-implementation across multiple classrooms.

Denial of Short Breaks Accommodation

C.M.-1's testimony regarding breaks is detailed and reveals a more complex picture of accommodation denial than the Complaint's allegations alone suggest. She testified to multiple dimensions of the problem:

- Outright Denial: C.M.-1 was not allowed to ask for breaks in certain classes (p.46, ll.6–7: "Are you allowed to ask for breaks?"—"Not in that class."). She also identified other classes where breaks were unavailable or inconsistently permitted (p.46, ll.9–19), including references to Miss Haynes' class, interactions with Miss Oliver, and Mr. Frost's class.

- Circumvention through alternative arrangements: C.M.-1 described an arrangement in which the Assistant Principal told her to use a request for "water" as a proxy for requesting a break—"because I didn't want to say break" (p.45, ll.20–22). When she used this arrangement in science class, the teacher refused to let her leave the classroom and instead directed her to a water fountain within the

room (p.45, ll.23–25). This testimony reveals that the accommodation was being implemented through a workaround rather than directly—and that even the workaround was denied.

- Undermining through surveillance: C.M.-1 testified that during Mr. Frost's class, when she attempted to take a break, a teacher followed her to the bathroom and rushed her, telling her to "hurry up" (p.47, ll.15–18: "the teacher followed me around like the whole—she would follow me to the bathroom, tell me to hurry up. Rushing me on my break."). This testimony describes conduct that renders the break accommodation functionally useless: a break that is monitored, hurried, and closely supervised does not serve its purpose of allowing the student to de-escalate from overstimulation and anxiety.

C.M.-1 confirmed the purpose of the breaks when asked directly: "Because I get overstimulated and my anxieties" (p.46, ll.23–24). She also confirmed that when she asked for water, she was not actually thirsty—"I need time" (p.47, ll.4–6).

Compliance significance: C.M.-1's testimony describes not a single incident of accommodation denial but a systemic pattern in which the Short Breaks accommodation was denied outright in some classrooms, circumvented through substitute arrangements in others, and undermined through staff conduct even when nominally permitted. This pattern is directly relevant to the FAPE analysis under §104.33. The question is not merely whether the word "breaks" appears in the IEP, but whether the student was actually afforded the functional benefit that the accommodation was designed to provide.

Hostile Environment: Miss Oliver

C.M.-1's testimony regarding Miss Oliver is among the most significant in the deposition, because Miss Oliver was not a general education teacher, but the individual C.M.-1 described as "my accommodation person" (p.31, ll.20–21)—someone specifically involved in facilitating C.M.-1's disability-related accommodations. [Note: C.M.-1 separately identified Mrs. Berliant as the person who assisted with her accommodations "last year" at p.23, ll.17–18. The precise distinction between Mrs. Berliant's role and Miss Oliver's role is not fully delineated in this testimony, but C.M.-1's descriptions of Miss Oliver's conduct—following her during breaks, appearing in classrooms, accompanying her to testing—are consistent with an in-class support provider or paraprofessional role.]

The testimony describes conduct by this staff member that constitutes disability-based harassment by the very individual involved in ensuring the student's access to education:

- Told teachers that C.M.-1 "stinks" (p.31, l.25: "She would tell teachers I would stink.")

- Talked about C.M.-1 to the class when she was absent (p.32, ll.1–2: "She would talk about me to the class when I was gone.")

- Pointed at C.M.-1 and told students to stay away from her (p.32, ll.3–4: "She would just point at me to other students and tell them to stay away from me.")

- Made a gesture indicating C.M.-1 smelled bad while walking behind her (p.48, l.24 – p.49, ll.1–2: "she pointed to the teacher and I was behind her, she said—she was pointing at me and she did this (indicating) that I stink.")

- Made a sarcastic remark upon C.M.-1's return from a break (p.49, ll.7–10: "when I finally came back from the break, she was like, oh, my gosh, you're back. Like she would be like... she was like saying that.")

C.M.-1 identified this conduct as <u>discriminatory</u> when asked directly by defense counsel (p.31, ll.17–25). She reported it to her mother, who e-mailed the assistant principal (p.32, ll.5–10).

<u>Compliance significance</u>: The OCR <u>Dear Colleague Letter on Prohibited Disability Harassment</u> (2000) defines disability harassment as "intimidation or abusive behavior toward a student based on disability that creates a hostile environment by interfering with or denying a student's participation in or receipt of benefits, services, or opportunities in the institution's program."

Conduct by <u>the accommodation support person herself</u>—publicly humiliating the student, signaling to peers to avoid her, making derogatory comments about her hygiene, and sarcastically commenting on her use of accommodations—directly relates to this standard. The staff member most involved in facilitating equal access became, according to this testimony, a primary source of stigmatization.

<u>Hostile Environment</u>: Mr. Wagstaffe's Public Disclosure of IEP

During cross-examination by Plaintiffs' counsel, C.M.-1 volunteered—without prompting on this specific topic—testimony about her civics teacher, Mr. Wagstaffe:

> "When I asked for a time from Mr. Wagstaffe, he would go on about my IEP to the class and I used to have to tell my accommodation... he would go on about my IEP to the class and he would—so I would just go tell my accommodation teacher to talk to him or he won't give me the extra time because he would say it was overdue." (p.50, ll.1–8)

This testimony describes two distinct compliance failures occurring simultaneously in a single interaction: (a) the denial of the Extended Time accommodation (claiming the work was "overdue" rather than recognizing the accommodation's applicability); and (b) the public disclosure of the student's IEP status to her classmates. The second element is particularly significant from a hostile environment perspective, because the public identification of a student's disability status in front of peers—in the context of denying an accommodation request—is precisely the kind of stigmatizing conduct that the OCR guidance identifies as creating a hostile environment.

C.M.-1 testified that she attempted to address this by asking her accommodation teacher to intervene with Mr. Wagstaffe. This detail is significant for the deliberate indifference analysis: It shows that the student herself attempted to use the system the school had established (the accommodation provider), and the problem persisted.

<u>Parental Notice and District Non-Response</u>

C.M.-1's testimony establishes a pattern of parental notice that is directly relevant to the deliberate indifference analysis:

- She <u>told her mother</u> about Miss Oliver's conduct (p.32, ll.5–7)

- Her mother <u>e-mailed the assistant principal</u> (p.32, ll.8–10)

- She <u>told her mother</u> about being denied and rushed during breaks (p.47, ll.23–24)

- After her mother's complaints about Miss Oliver's teasing, her mother <u>contacted the school about accommodations</u> (p.49, ll.15–18)

- After her mother's contact, Miss Oliver's classroom presence decreased—she "stopped coming to the class like she used to" and "only used to come when it's testing" (p.48, ll.2–7)

The last point is notable: The District's apparent response to complaints about Miss Oliver's hostile conduct was not to investigate, discipline, or retrain the accommodation provider, but to <u>reduce her presence in the classroom</u>. While this may have reduced C.M.-1's direct exposure to Miss Oliver's conduct, it also meant that the accommodation support person was less available to facilitate the very accommodations she was involved in reinforcing—potentially exacerbating the accommodation denial problem, rather than resolving it.

<u>Mental Health Impact and School Withdrawal</u>

C.M.-1 testified that she stopped attending school for approximately two months during the prior school year (p.41, l.12: "Probably like a good two months") because school "was impacting my mental health" (p.37, ll.11–12). She described her anxiety as involving a rapid heart rate and heavy breathing (p.43, ll.24–25: "My heart, like my heart just keep going fast and then I just start breathing hard"), particularly when facing time-pressured assignments (p.43, ll.15–17: "like when I have to do this assignment and it's due that day and I would just be in a rush"). She also described emotional breakdowns while doing work (p.43, ll.12–13: "I would have bad anxiety or I would just break down while I'm doing my work and stuff").

This testimony establishes the emotional and educational harm alleged in the Complaint. The two-month withdrawal from school—during which she received <u>no educational services</u> (p.41, ll.6–9: "were you doing any education at that time?"—"No.")—represents a concrete, measurable deprivation of educational access that is directly traceable to the conditions she describes.

<u>C.M.-1's Current Year Status Provides Contrasting Evidence</u>

C.M.-1's testimony about her current (8th grade) school year provides powerful contrast evidence that strengthens the claims regarding the prior year. She testified that:

- She is currently getting her work done on time (p.39, ll.8–10)

- She currently receives extended time from her teachers (p.39, ll.11–13)

- She is doing better academically this year than last year (p.39, ll.14–17)

- She has a different accommodation support person this year—Mrs. Johnson (p.23, ll.7–14), replacing Mrs. Berliant from the prior year (p.23, ll.17–18)

- She has been separated from students who contributed to behavioral conflicts (p.30, ll.16–24: "She puts—she took me away from those kids")

- She tested out of intensive reading (p.20, ll.12–14)

- She finds math easy (p.19, ll.3–5)

- Reading has replaced science as her favorite subject based on her current teacher (p.16, ll.19–24)

This contrast is significant because it demonstrates that <u>when the accommodations are actually implemented, the student succeeds</u>. The District's own current-year practices validate the efficacy of the accommodations that were denied the prior year. If the Extended Time and Short Breaks accommodations were unnecessary or ineffective, one would not expect to see the dramatic improvement that C.M.-1 describes upon their implementation. The current year thus functions as a natural control condition, supporting the conclusion that the prior year's failures were causally connected to the accommodation denials.

Behavioral Issues and Rule Compliance

C.M.-1 acknowledged that, during 7th grade, she was written up for discipline issues in selected classes (p.29, ll.11–13: "How often did he write you up in his class?"—"A lot."), that she "used to argue with the class" (p.30, ll.9–10), and that she has become "more compliant with the rules" over time (p.36, ll.3–8). She initially stated—before correcting herself—that there should not be rules in school (p.36, ll.11–16: "Do you understand why there are rules in middle school?"—"No."—"There shouldn't be any rules?"— "Huh-uh. Oh, wait, wait, yes, yes, yes, yes, yes.").

<u>Compliance Significance</u>: This testimony does not negate the accommodation denial claims. A student may have behavioral challenges and simultaneously be denied legally-mandated accommodations. Indeed, the failure to implement accommodations designed to address disability-related needs (such as breaks to manage overstimulation) is likely to exacerbate behavioral issues rather than mitigate them. The fact that C.M.-1's behavioral issues have diminished in the current year—when accommodations are being implemented and she has been separated from triggering peers—supports this interpretation. The question for compliance purposes is not whether C.M.-1 was a well-behaved student, but whether the District implemented the accommodations it was legally required to provide.

Two-Month School Absence

C.M.-1 testified that no doctor directed her to remain home (p.42, ll.21–23), that the decision was her mother's (p.42, l.24 – p.43, l.1), that she spent the time watching TikTok and FaceTiming friends (p.41, ll.17–19; p.42, ll.1–4; ll.13–14), and that she did not miss school (p.42, ll.18–20: "Did you miss going to school during that time?"—"Not really."). She did not receive any educational services during this period (p.41, ll.6–9)—nor does it appear that anyone from her school reached out to question her absences.

<u>Compliance Significance</u>: Thile this absence could be construed as a voluntary parental decision unrelated to the District's IEP and accommodation responsibilities, this must be weighed against C.M.-1's testimony that the absence was precipitated by anxiety, emotional breakdowns during schoolwork, and the cumulative impact of the school environment on her mental health (p.37, ll.11–12; p.43, ll.5–6; p.43, ll.12–13). A 13-year-old who reports that school "was impacting my mental health" through anxiety attacks and breakdowns, and who—once removed from that environment—experiences relief, is describing a pattern consistent with a student fleeing a hostile educational environment. The absence of a doctor's note does not negate the mental health impact; it may instead reflect the family's limited access to outside mental health services at that time (C.M.-1 confirmed she was not seeing a therapist during that period at p.37, ll.13–15). This is consistent with the socioeconomic circumstances alleged in the Complaint.

Notably, the fact that C.M.-1 currently receives therapy—delivered at school by a provider who comes specifically to meet with her (p.38, ll.9–11)—suggests that the family's access to mental health services has since improved through school-based, not private, resources. This further supports the inference that outside services were not available during her absence.

The "Water as Break" Proxy System

The testimony that the assistant principal instructed C.M.-1 to request "water" as a coded substitute for requesting a break (p.45, ll.20–22; p.46, l.25 – p.47, ll.1–2) reveals an ad hoc workaround system that was not part of the formal IEP. This detail raises compliance questions on multiple levels.

- First, if the student needed breaks as an accommodation—and the IEP documents that need—why was the accommodation not communicated to all teachers in a manner that ensured consistent implementation?

- Second, if the student was uncomfortable requesting breaks by name (as her testimony suggests: "because I didn't want to say break"), that discomfort itself may reflect the stigmatizing environment she describes—an environment in which openly invoking her accommodations exposed her to negative responses from teachers and peers.

- Third, the existence of the workaround suggests that school administrators were aware that the formal accommodation system was not functioning in practice and attempted to create an informal substitute rather than addressing the systemic failure. From a compliance standpoint, this is significant: The District's response to an implementation breakdown was not to correct the implementation, but to create a parallel, informal, undocumented system that was even more vulnerable to denial—as the science class incident demonstrates.

Miss Oliver's Reduced Classroom Presence as the District's "Response"

C.M.-1 testified that after her mother complained, Miss Oliver "stopped coming to the class like she used to" and "only used to come when it's testing" (p.48, ll.2–7). She confirmed that "she" referred to "the accommodation lady... Miss Oliver" (p.48, ll.8–13). This suggests that the District's response to complaints about the reported hostility around C.M.-1's accommodations was to withdraw accommodation support rather than address the underlying problem. This ignificantly strengthens the deliberate indifference analysis: The District's corrective action made the accommodation situation worse, not better.

The implications here are compounding. If Miss Oliver was the in-class support person responsible for facilitating breaks, monitoring accommodation compliance, and serving as a bridge between C.M.-1 and her teachers, then reducing her classroom presence meant that C.M.-1 lost her primary mechanism for accessing accommodations—precisely because that mechanism had become a source of harm.

Thus, the District effectively placed C.M.-1 in a position where the person assigned to help her was hurting her, and the District's response to that problem was to remove the help without replacing it. This left C.M.-1 to navigate accommodation requests on her own, directly with teachers who—as her testimony establishes—were not consistently honoring those accommodations. The result was predictable: Continued accommodation denial, continued academic failure, continued anxiety, and the eventual withdrawal from school.

Grade Promotion Despite Failing Grades

C.M.-1 testified that she failed selected 7th grade classes, but was promoted to 8th grade without summer school, and she could not explain how (p.40, ll.16–24; p.40, l.25 – p.41, ll.1–4). This detail raises questions about the District's academic response to the accommodation failures that are relevant both to this litigation's damages analysis and to the broader pattern of institutional conduct. A district that denies accommodations, allows a student to fail as a result, and then promotes the student without remediation

has not merely failed to implement accommodations—it has failed to address the academic consequences of that failure. The absence of any remedial intervention (summer school, tutoring, credit recovery) suggests that the District either did not recognize the connection between the accommodation denials and the failing grades, or recognized it and chose not to act. Either interpretation supports the deliberate indifference analysis.

## Escort Requirement During Breaks

C.M.-1 testified that she "did not go to breaks without an escort" (p.49, ll.12–14). This detail is not alleged in the Complaint, but it is significant because it reveals an additional layer of restriction on the Short Breaks accommodation. If C.M.-1 could only take breaks when accompanied by an escort—and if the designated escort was Miss Oliver, whose conduct during those breaks included rushing, surveillance, and sarcastic commentary—then the break accommodation was functionally conditioned on the student's willingness to endure hostile treatment from the escort.

This is not what the IEP contemplated. The Short Breaks accommodation was designed to allow C.M.-1 to step away from overstimulating situations and regulate her anxiety. Providing the accommodation contingent on the presence of a person who made the breaks themselves anxiety-inducing undermines the expected purpose of the accommodation.

## Therapy Services Currently Delivered at School

C.M.-1's testimony about her current therapy is somewhat confused—she initially said she was not seeing a therapist, then said "at school," then clarified that—now, in 8th grade—someone comes to the school specifically to meet with her (p.37, ll.16–18; p.38, ll.6–11). This confusion likely reflects a 13-year-old's imprecise understanding of the distinction between school-based counseling and externally provided therapy delivered in the school setting. Regardless of the precise service delivery model, the testimony establishes that C.M.-1 is currently receiving mental health services that she was not receiving during last year's period of accommodation denial and school withdrawal. This supports the Complaint's narrative arc: The District's failures contributed to a mental health crisis, and services were eventually put in place—but only after the harm had occurred.

— — — — —

## Expert Analysis

C.M.-1's deposition testimony provides substantial support for the core allegations in Counts I and III. These are summarized in Table 11.

Table 11. Summary of C.M.-1's Deposition Testimony Mapped to Counts I and III

| Complaint | Level of Testimony Support | Key Evidence |
|---|---|---|
| Extended Time denial | Strongly supported | Named three teachers (p.40, ll.1–3); described assignments never completed (p.40, ll.5–8); confirmed failing grades (p.40, ll.16–17) |
| Short Breaks denial | Strongly supported | Multiple incidents across classrooms; water proxy system (p.45–47); surveillance/rushing during breaks (p.47, ll.15–18); escort requirement (p.49, ll.12–14) |

| Complaint | Level of Testimony Support | Key Evidence |
|---|---|---|
| Hostile environment (Miss Oliver) | Strongly supported | Hygiene comments (p.31, l.25; p.48, l.24–p.49, l.2); peer signaling (p.32, ll.3–4); sarcastic remarks (p.49, ll.7–10); conduct by accommodation support person specifically |
| Hostile environment (Mr. Wagstaffe) | Strongly supported | Public IEP disclosure to class (p.50, ll.1–8); simultaneous denial of extended time by claiming work was "overdue" (p.50, ll.6–8) |
| Academic harm | Strongly supported | Failed classes (p.40, ll.16–17); two-month withdrawal (p.41, l.12); no educational services during absence (p.41, ll.6–9); missing assignments due to accommodation denial (p.40, ll.5–8) |
| Mental health impact | Supported | Anxiety symptoms—rapid heartbeat, heavy breathing (p.43, ll.24–25); emotional breakdowns (p.43, ll.12–13); school avoidance (p.37, ll.10–12) |
| Parental notice | Supported | Mother e-mailed assistant principal about Oliver (p.32, ll.8–10); student reported break denial to mother (p.47, ll.23–24); mother contacted school after Oliver teasing (p.49, ll.15–18) |
| Deliberate indifference | Supported | Notice given through multiple channels; response was to reduce Oliver's presence—worsening support (p.48, ll.2–7); no evidence of investigation, discipline, or systemic corrective action; accommodation denials continued across multiple teachers |
| Current-year contrast | Strongly supports causation | Accommodations now implemented (p.39, ll.11–13); academic improvement (p.39, ll.14–17); behavioral improvement (p.36, ll.3–8); tested out of intensive reading (p.20, ll.12–14); different accommodation support person (p.23, ll.7–14) |
| Discriminatory intent (Mr. Klein) | Partially supported | Differential discipline—only C.M.-1 written up, not friend (p.31, ll.9–14); Klein identified as Extended Time denier (p.40, ll.1–3) |

To expand, C.M.-1's deposition testimony is especially notable relative to three points:

- First, the denial of accommodations is confirmed by the Plaintiff under questioning by defense counsel. The Extended Time denial, the identification of three specific teachers, the resulting failing grades, and the inability to complete assignments are all established through the School Board's own examination—not through leading questions by Plaintiffs' counsel. This is testimony elicited by the defense—testimony that cannot easily be characterized as coached or exaggerated.

- Second, the accommodation provider was a primary source of hostile conduct. The fact that Miss Oliver—the person C.M.-1 identified as "my accommodation person" (p.31, ll.20–21)—is identified as the staff member who publicly humiliated her, made derogatory comments about her hygiene, signaled to peers to avoid her, and sarcastically commented on her use of breaks, transforms this from a case about individual teacher failings into a case about systemic breakdown of the accommodation support structure. The very mechanism the District established to ensure compliance became a vehicle for stigmatization. And when the District was notified, its response— reducing Miss Oliver's classroom presence without providing an alternative support—compounded the problem rather than resolving it.

- Third, the current-year contrast demonstrates causation. C.M.-1's academic and behavioral improvements in the current school year—when accommodations are being implemented by different staff, when she has a new accommodation support person (Mrs. Johnson), and when she has been separated from triggering peers—provides powerful evidence that the prior year's academic failure and emotional distress were caused by the accommodation denials and hostile environment, not by the student's inherent limitations or behavioral choices. The key variable that changed here is the integrity of the implementation of C.M.-1's accommodations.

C.M.-1 is an identified student with a disability (Other Health Impaired: ADHD and Generalized Anxiety Disorder) who is supposed to be receiving accommodations in all of her classes because of the pervasive, multi-setting impact of her disability conditions. When her legally-mandated are accommodations systematically withheld (Short Breaks and Extended Time) her academic proficiency and her behavioral attention, interactions, and work completion are directly impacted. Moreover, when this is exacerbated by explicit and implicit publicly humiliation, the District—through its educational caretakers—has failed her.

From a compliance standpoint, C.M.-1's deposition testimony, considered alongside the Complaint's allegations and the compliance standards set forth earlier in this Report, describes (a) a school environment in which her IEP accommodations were systematically denied across multiple classrooms; (b) where the staff member identified as her accommodation support person instead became a source of disability-based harassment; (c) where the District had notice—through parental complaints and through the student's own attempts to use the accommodation system—and responded inadequately; (d) where the District's corrective action (reducing the accommodation provider's presence) made the accommodation support worse rather than better; and (e) where the student suffered measurable academic harm (failing grades, two months of lost instruction, promotion without remediation), and reported emotional harm (anxiety attacks, emotional breakdowns, school avoidance) as a direct result.

As such, C.M.-1's testimony establishes—with the directness and credibility that only a firsthand witness can provide—what it was like to be a 13-year-old student with ADHD and anxiety in a school where her accommodations were denied, her accommodation provider humiliated her, her teacher disclosed her IEP to the class, and her attempts to use the system the school had created to help her were met with surveillance, sarcasm, and indifference. This testimony describes an educational environment that falls well below the compliance standards established by Section 504 and Title II of the ADA.

– – – – – – – – – –

**Section XII. Analyzing and Applying C.M.-2's Deposition to the Litigation Counts**

Preliminary Observations

C.M.-2 is a Black male adolescent currently attending the 11th Grade at Suncoast High School, a magnet school in the Palm Beach County School District. He previously attended Palm Beach Central High School during the 2023–2024 school year (9th grade). He receives 504 services due to documented diagnoses of ADHD and Generalized Anxiety Disorder—the ADHD predating high school, and the anxiety formally diagnosed in 2024, toward the end of his first year at Palm Beach Central. C.M.-2 has also been documented as a homeless student under McKinney-Vento since approximately October 2022.

Relative to this litigation, C.M.-2's claims are represented in Count II (Section 504 of the Rehabilitation Act), Count IV (Title II of the Americans with Disabilities Act), and Count V (The McKinney-Vento Homeless Assistance Act). The central allegations within Counts II and IV are that the following accommodations were systematically denied or not implemented across his two high schools in

Grades 9 and 10: Extended time (100% additional time on assignments and assessments), providing hard-copies of classroom presentation notes, breaking large assignments down into smaller parts, preferential seating near the teacher, breaks, and restroom passes. These were the accommodations that the District's 504 Team determined were necessary for C.M.-2 to access the general education curriculum on terms comparable to his non-disabled peers.

The Complaint also alleges that the District had actual knowledge of these failures through multiple channels—including 504 meetings, direct parental communications, e-mail correspondence documenting accommodation requests that should not have been necessary, and the 504 Plan itself—and that it responded with deliberate indifference, failing to train teachers on accommodation obligations, failing to monitor classroom-level implementation, and failing to take corrective action when non-compliance was reported or otherwise apparent.

The Complaint further alleges, through Counts II and IV, that C.M.-2 was subjected to a hostile classroom environment relative to providing his disability accommodations—including a teacher's characterization of his 504 Plan as "cheating the system" and her statement that he "wouldn't get far in life" relying on accommodations. These statements caused C.M.-2 to internalize shame about his disability-related needs, become afraid to exercise his accommodation rights (except through e-mails), and to trigger enough anxiety that he was eventually diagnosed with Generalized Anxiety Disorder. The Complaint also describes how school personnel contributed to the onset or worsening of his anxiety disorder through the handling of a behavioral incident at Palm Beach Central where C.M.-2 was stigmatized in front of peers by being labeled a "woman beater" and someone that other students should avoid. All of these incidents resulted in additional academic and behavioral challenges that compounded the effects of his disabilities.

Finally, Count V described how C.M.-2's McKinney-Vento Act-arranged transportation during his 9th Grade year—to his "Home" Palm Beach Central School (set at Skees Road and Okeechobee Boulevard so he would not have to cross Okeechobee Boulevard's eight lanes of traffic)—was rescinded the next year when he went to a "Choice" school, Palm Beach Central High School. Originally, the customized bus stop was arranged to mitigate C.M.-2's anxiety and ensure his safety. When this bus stop was denied the next year, it (a) directly impacted C.M.-2's disabilities by triggering his anxiety and impacting his physical and emotional security; (b) resulted in financial harm, including the costs of alternative transportation (Lyft, neighbors) and the loss of income when C.M.-2's mother was forced to quit a job to manage C.M.-2's transportation; and (c) magnified other barriers to school enrollment, attendance, and success.

During his deposition, C.M.-2 validated a number of the facts, events, and/or issues above—as described below.

Housing and Transportation History

C.M.-2's testimony validates his significant housing instability across the relevant periods:

- Before and during 9th grade: Lived in an Airbnb at the beginning of 9th grade; prior to that, stayed in a shelter during the Palm Beach Central period (p. 17–18)

- Mid-9th grade onward: Moved to 7110 Okeechobee Boulevard, where he lived with his mother through at least the beginning of his time at Suncoast (p. 16–17)

- Late January/early February 2026: Moved to his father's house on 7th Street, where he now lives with his father, grandmother, and two cousins (p.15)

This Transportation testimony is significant to the Count IV:

Q. [MR. CRUZ:] So let's talk a bit about transportation. Do you remember having to get to a bus stop before you moved to Okeechobee Boulevard?
A. No.

Q. So after living in Okeechobee Boulevard, were there any incidents where you had to take the bus?
A. Yes.

Q. Can you tell us about your experience taking the bus?
A. When I was attending Palm Beach Central, the bus stop was on a dark road and that gave me anxiety, like what if I get kidnapped. It was early in the morning, and the bus driver was rude about going to that stop. She said she didn't understand why I couldn't just cross the street. That gave me a lot of anxiety because I felt looked down upon.

Q. Did your mom tell the school that crossing the road made you feel that way?
A. No, that was during Palm Beach Central when I had a custom bus stop. Later, when I had to cross the street, yes, my mother told the school.

Q. How did you feel about crossing Okeechobee Boulevard?
A. It gave me anxiety because of the traffic. It's a big road. I almost got hit multiple times and had to walk around cars. I felt drivers looking down on me.

Q. What did you do on days you didn't get to the bus?
A. My father would take me to school.

Q. Were there any other means of transportation?
A. Yes. My mother would Uber me to school, especially when my father couldn't. I also took the city bus.

Q. This was transportation to Suncoast?
A. Yes.

Q. Who is Dr. Lorena Frontado?
A. A doctor I believe that diagnosed me with anxiety.

Q. Has your doctor talked to you about your feelings?
A. Yes.

Q. And who is Ruthie Bunkelmann?
A. Another doctor that saw me.

Q. Did you have discussions with her about your feelings?
A. Yes.

Q. Do your parents discuss financial arrangements about your living situation with you?
A. Yes.

Q. Do they discuss rent?
A. Yes.

Q. Do they discuss the rental agreement with you?
A. No.

Q. Does your father own the home where you are living?
A. No.

Q. Is there a reason that your father is providing transportation from where you live to your school?
A. Yes, because to walk to my school is another big road.

Q. Okay, thank you.

_ _ _ _ _

Thus:

- At Palm Beach Central, his bus stop was on a dark road in early morning, producing anxiety about safety ("what if I get kidnapped") (p. 40)

- The bus driver was openly hostile about the stop, telling him she didn't understand why he couldn't just cross the street, which gave him anxiety because he "felt looked down upon" (p. 40)

- Crossing Okeechobee Boulevard to reach the Suncoast bus stop caused severe anxiety—heavy traffic, near-miss vehicle incidents on multiple occasions, and a persistent sense of being judged by drivers (p. 41)

- He intentionally avoided the bus as an avoidance behavior, including sleeping in to miss it (p. 42)

- Alternative transportation: father drives, mother arranged Uber, or he took the city bus (p. 42)

- At current residence, father provides transportation because walking to school requires crossing another major road (p. 44)

- C.M.-2 testified that his mother told the school about his anxiety related to crossing the street, though he clarified this pertained to the Suncoast period, not the Palm Beach Central custom bus stop (p. 41)

504 Plan—Documented Accommodations

C.M.-2 confirmed the following accommodations were included in his 504 Plan at both Palm Beach Central and Suncoast High Schools (p. 10, p. 32):

| Accommodation | Confirmed by Witness |
|---|---|
| Extended time (100% additional time) | Yes |
| Provision of notes / hard copies | Yes |
| Breaks | Yes (added later) |
| Preferential seating (near teacher) | Yes |
| Breaking down large assignments | Yes |
| Restroom passes | Yes |

He also confirmed that his Plan included a condition that he attempt to take notes before receiving copies. He agreed with the concept in principle, but stated unequivocally that he is not capable of taking notes independently because of ADHD-related distractibility—not handwriting difficulty. He explained: "Because I'm easily distracted by simple little things that can go around the classroom or just my mind will wander off to different places" (p. 11).

Accommodation Implementation—Palm Beach Central (2022–2023)

C.M.-2 testified to the following accommodation denials during his 9th-grade year at Palm Beach Central:

- Extended Time: Ms. Chacon (Spanish teacher) denied extended time requests, characterizing work as "classwork" to which extended time did not apply (p. 32).

- Provision of Notes: C.M.-2 testified that his math teacher "would not allow" notes, and then broadened the statement: "actually, all my teachers—they wouldn't give me notes at all. If I asked for notes, they would say that you should have taken the notes in the class and you should have been paying attention" (p. 33).

- Ms. Chacon's Discouraging Statements: Ms. Chacon told C.M.-2 that providing notes was "kind of like cheating the system" and that he "wouldn't get far in life by using the accommodations on my 504 plan" (p. 34–35). C.M.-2 testified this made him "feel bad about myself," made him "not want to use my accommodations," and made him "nervous to ask for my accommodations" (p. 35).

- Breaking Down Assignments: When asked whether the required modification to math assignments—breaking them into smaller parts—was ever implemented, C.M.-2 testified: "It didn't happen at all" (p. 35).

Accommodation Implementation—Suncoast (2024–202 through 2025–2026)

Provision of Notes: C.M.-2 testified that notes were not meaningfully provided until "the end of the school year in 2025," when Ms. Clemons (math teacher) "started giving me a hard copy of the notes" (p. 34). Based on the corrected timeline, this means the provision-of-notes accommodation went substantially unimplemented for approximately two full school years at Palm Beach (2023-2024) and Suncoast (most of 2024–2025) before a single teacher began providing it near the end of the 2024–2025 school year.

Extended Time: C.M.-2 testified that he was "sometimes marked down for late work" even when he wrote "extra time" on his paper, and that points were "constantly taken off" (p. 36). This indicates that teachers either did not recognize the extended time accommodation or chose to override it, penalizing C.M.-2 for exercising a documented accommodation right.

Preferential Seating: After a 504 meeting, his math teacher and history teacher moved him to preferential seating, but "the rest of my teachers, they left me where I was" (p. 36–37). This indicates only partial implementation, and that this accommodation—written into his 504 Plan—needed to be triggered by a formal meeting, and then was limited to the teachers who attended that specific meeting.

Breaking Down Assignments: C.M.-2's testimony that "it didn't happen at all" was given in the context of discussing his math teacher's obligations. The Q&A does not establish a separate timeline for this accommodation at Suncoast, but the breadth of the statement suggests it was not implemented at either school.

Restroom Passes: C.M.-2 testified he was not denied or questioned when requesting restroom access (p. 36). This is the one accommodation that functioned consistently.

<u>Verbal Denials vs. E-mail Compliance</u>: C.M.-2 identified a critical pattern distinguishing in-person requests from e-mail requests. At Palm Beach Central, he identified Ms. Chacon and his AICE general papers teacher as teachers who denied accommodations when asked for them, but who complied when sent an e-mail that was copied to his mother (p. 27–28). At Suncoast, he identified his Spanish teacher as exhibiting the same pattern (p. 28).

<u>The E-mail Workaround Pattern</u>

C.M.-2's testimony about why he relied on e-mail to self-advocate is among the most significant passages in the deposition:

"I used e-mail because it would be denied in person and I used e-mail because my mother was able to be there and like it would be on record." (p. 37)

He further testified that teachers accommodated, "only when my mother is cc'd on the e-mail" (p. 26). He clarified the sequence: After being denied in person, he would "go back and e-mail and cc my mother on the e-mail and ask for extra time" (p. 26).

When asked whether any teacher had denied an accommodation request via e-mail, C.M.-2 answered: "No" (p. 25). When defense counsel characterized the e-mail record as showing teachers being "quite accommodating," C.M.-2 agreed—but qualified: "Yes, over the e-mail" (p. 21–25).

This pattern—in-person denial followed by e-mail compliance when the mother was copied—is structurally parallel to the "water" proxy system identified in C.M.-1's deposition testimony. In both cases, the student developed an alternative mechanism to obtain legally-required accommodations because the District's formal accommodation delivery system did not function. In both cases, the workaround's existence is itself evidence that the District's official system was failing.

<u>Anxiety—Onset, Precipitating Event, and Functional Impact</u>

C.M.-2 described the onset of his anxiety as connected to a specific incident at Palm Beach Central: He was play-fighting with a female student, an administrator observed it, and both received behavioral referrals. During the referral process, C.M.-2 testified that he was "being taken around the school and being called a woman beater" (p. 37–39). He confirmed that these comments occurred in front of peers by Miss Chacon—"the whole class" (p. 38).

Q. So when did your anxiety start? Can you pinpoint it? Or when was it diagnosed?
A. It was diagnosed around the end of my first new year and it started after administration and teachers at Palm Beach Central were—not verbally—but like attacking me about a situation that happened.

Q. Can you expand on your answer? What situation are we talking about?
A. Where I was play fighting with a female student and administration rode by and gave both of us a behavioral referral. And after that, during the time I was in the process of getting that behavior referral, I was being taken around the school and being called a woman beater.

Q. Okay. When the comment was made about being a woman beater, were there other students around to hear it?
A. Yes, the whole class.

Q. After the comments were made, do you feel like you could focus on your Spanish work?
A. No.

Q. So how did you feel?

A. I felt like I wanted to disappear because it was embarrassing, especially since the incident—it wasn't out of aggression; it was a playful thing that was amplified by administration. So it made me feel like I couldn't talk to anyone. It added on top of my already anxiety.

— — — — —

The functional impact of C.M.-2's anxiety also was described during his deposition (p. 21–25):

- Does not want to talk to people; second-guesses every response

- Doesn't feel like going outside; wants to stay inside

- Afraid to use his 504 Plan

- Does not socialize at school

- Eats lunch alone in the "back-up cafeteria" due to anxiety

- Anxiety causes him to not advocate for himself after initial denials—"when I asked for them the first time and you're denied, I would be afraid to advocate for myself"

- Anxiety affects grades because he avoids using accommodations

- Anxiety about shopping malls and public spaces

Mental Health Treatment

C.M.-2 identified two providers (p. 42–43):

- <u>Dr. Lorena Frontado</u>—diagnosed his anxiety

- <u>Ruthie Bunkelmann</u>—another provider who treated him; C.M.-2 did not recall her specific credential

He confirmed discussions about his feelings with both providers.

— — — — —

Expert Analysis

C.M.-2's deposition testimony provides substantial support for the core allegations in Counts II, IV, and V. These are summarized in Table 12.

Table 12. Summary of C.M.-2's Deposition Testimony Mapped to Counts II, IV, and V

| Complaint Allegation | Count(s) | Level of Support | Key Deposition Evidence |
|---|---|---|---|
| Extended time denied or penalized | II, IV | Strongly Supported | Ms. Chacon denied extended time by characterizing work as "classwork" at PBC (p. 32); at Suncoast, C.M.-2 was "sometimes marked down for late work" even when he wrote "extra time" on his paper—points "constantly taken off" (p. 36); pattern spans both schools across multiple school years |
| Provision of notes denied | II, IV | Strongly Supported | Math teacher at PBC denied notes; "actually, all my teachers—they wouldn't give me notes at all. If I asked for notes, they would say that you should have taken the notes in the class and you should have been paying attention" (p. 33); at Suncoast, notes not provided until end of 2024–2025 school year, when Ms. Clemons alone began providing hard copies (p. 34)—approximately two full school years without implementation of this accommodation at Suncoast |
| Breaking down large assignments not implemented | II, IV | Strongly Supported | "It didn't happen at all" (p. 35); testimony given in context of math teacher obligations but breadth of statement suggests non-implementation at both schools |
| Preferential seating—partial implementation only | II, IV | Supported | Math and history teachers moved C.M.-2 after a 504 meeting; "the rest of my teachers, they left me where I was" (p. 36–37); implementation triggered only by a formal meeting and limited to teachers who attended it—not proactive or systemic |
| Restroom passes | II, IV | Not at Issue | C.M.-2 testified he was not denied or questioned when requesting restroom access (p. 36); this is the one accommodation that functioned consistently |
| Breaks | II, IV | Insufficient Testimony | Accommodation confirmed as added to 504 Plan (p. 10); no specific testimony regarding denial or implementation of breaks at either school in the provided deposition text |

| Complaint Allegation | Count(s) | Level of Support | Key Deposition Evidence |
|---|---|---|---|
| Hostile environment—Ms. Chacon's statements | II, IV | Strongly Supported | Told C.M.-2 his 504 Plan was "kind of like cheating the system" and that he "wouldn't get far in life by using the accommodations on my 504 plan" (p. 34–35); C.M.-2 testified this made him "feel bad about myself," "not want to use my accommodations," and "nervous to ask for my accommodations" (p. 35) |
| Stigmatization—"woman beater" incident | II, IV (see also Count V re: attendance impact) | Strongly Supported | During behavioral referral process at PBC, C.M.-2 was "being taken around the school and being called a woman beater" (p. 37–38); occurred in front of "the whole class" (p. 38); described as "amplified by administration" (p. 39); C.M.-2 "wanted to disappear" and "couldn't talk to anyone" (p. 39); contributed to onset of anxiety disorder |
| E-mail workaround / knowing non-compliance | II, IV | Strongly Supported | Used e-mail because "it would be denied in person" and "my mother was able to be there" and "on record" (p. 37); teachers accommodated "only when my mother is cc'd on the e-mail" (p. 26); no teacher ever denied an accommodation via e-mail (p. 25); agreed teachers were "quite accommodating" but qualified: "Yes, over the e-mail" (p. 21–25); pattern identified at both schools—Ms. Chacon and AICE teacher at PBC, Spanish teacher at Suncoast (p. 27–28  ) |
| Chilling effect on self-advocacy | II, IV | Strongly Supported | "When I asked for them the first time and you're denied, I would be afraid to advocate for myself" (p. 24); afraid to use his 504 Plan (p. 23); does not socialize at school; eats lunch alone in "back-up cafeteria" (p. 23); anxiety affects grades because he avoids using accommodations (p. 24); direct causal chain: denial → fear → non-use → academic harm |
| Academic harm from accommodation denial | II, IV | Supported | Points "constantly taken off" for work submitted under extended time (p. 36); notes not provided for approximately two years at Palm Beach Central and  Suncoast (p. 34); assignments never broken down (p. 35); anxiety-driven avoidance of accommodations further reduced academic performance (p. 24); denials span four of six documented accommodations across multiple school years |

| Complaint Allegation | Count(s) | Level of Support | Key Deposition Evidence |
|---|---|---|---|
| Mental health impact/ anxiety onset and worsening | II, IV | Strongly Supported | Anxiety diagnosed approximately 2024 by Dr. Lorena Frontado (p. 42–43); onset linked to "woman beater" stigmatization (p. 37–39) and Ms. Chacon's discouraging statements (p. 34–35); functional impacts include not wanting to talk to people, second-guessing every response, avoiding going outside, eating alone, being afraid to use 504 Plan, avoiding public spaces (p. 21–25); treated by Ruthie Bunkelmann (p. 43); described wanting to "disappear" (p. 39) |
| District knowledge / parental notice | II, IV, V | Supported | Mother discussed 504 Plan with teachers (p. 31–32); mother cc'd on accommodation e-mails—compliance occurred only when she was included (p. 26, p. 37); mother informed school about anxiety related to crossing Okeechobee Boulevard (p. 41); 504 meetings held at which accommodation issues were raised (p. 36–37) |
| Deliberate indifference | II, IV | Supported | Cross-school persistence: same pattern of accommodation denial at PBC and Suncoast, both within same district; e-mail pattern demonstrates teachers knew obligations but complied only under documentation pressure and parental oversight; preferential seating adjusted only after 504 meeting and only by attending teachers—no systemic follow-through; no evidence in testimony of training, monitoring, investigation, or corrective action at either school |
| Housing instability / McKinney-Vento eligibility | V | Strongly Supported | Shelter prior to 9th grade; Airbnb at beginning of 9th grade; apartment at 7110 Okeechobee Boulevard mid-9th grade onward; father's house on 7th Street as of late January 2026 (p. 15–18); multiple housing transitions across the relevant period; consistent with McKinney-Vento eligibility since approximately October 2022 (per Complaint) |
| Transportation barriers / denial of customized bus stop | IV, V | Strongly Supported | Custom bus stop at PBC on dark road with hostile bus driver who told C.M.-2 she didn't understand why he couldn't cross the street (p. 40); crossing Okeechobee Boulevard to Suncoast bus stop caused severe anxiety—near-miss vehicle incidents, felt "looked down upon" by drivers (p. 41); intentionally avoided bus as avoidance behavior (p. 42); required alternative transportation: father driving, mother arranging Uber, city bus (p. 42); mother informed school about crossing anxiety (p. 41); at current address, father must drive because walking requires crossing another major road (p. 44) |

| Complaint Allegation | Count(s) | Level of Support | Key Deposition Evidence |
|---|---|---|---|
| Financial harm from transportation denial | V | Partially Supported | C.M.-2 confirmed use of Uber and father's driving as alternative transportation (p. 42); confirmed parents discuss financial arrangements with him (p. 43); confirmed father does not own the home (p. 44); the Complaint's specific allegations regarding Lyft costs, neighbor transportation costs, and mother's lost income from quitting a job are not directly corroborated by C.M.-2's deposition testimony—these allegations will require corroboration through the mother's testimony and financial records |

C.M.-2's deposition testimony provides substantial support for the core allegations in Counts II, IV, and V. The testimony is especially notable relative to five points:

- First, C.M.-2's need to send e-mails—copied to his mother—as a "workaround" when teachers refused his 504-consistent classroom accommodation requests provides concrete evidence that administrators and teachers in C.M.-2's High School knew that his 504 Plan was not being correctly and automatically implemented in his classes.

  C.M.-2 testified that he used e-mails to request accommodations because they "would be denied in person" because his "mother was able to be there" and because it would be "on record" (p. 37). He further testified that teachers provided his accommodations "only when my mother is cc'd on the e-mail" (p. 26), and that no teacher ever denied an accommodation request via e-mail (p. 25). When defense counsel characterized the e-mail record as showing teachers being "quite accommodating," C.M.-2 agreed—but qualified: "Yes, over the e-mail" (p. 21–25).

  This pattern is not merely evidence that C.M.-2's accommodations were being denied (in person); it is evidence that teachers understood their obligations and chose to comply only when there was a written record with parental oversight. These same teachers denied C.M.-2 his accommodations when requested verbally—when there was no documentation—yet provided them when the request was e-mailed, on record, and teachers knew that C.M.-2's mother was "in the loop." This differential response demonstrates that teachers' choice to differentially avoid providing accommodations was not due to their poor understanding of the 504 Plan's requirements. Instead, they were consciously choosing to deny accommodations when there was no external accountability, and to comply when there was.

  This pattern is structurally parallel to the "water" proxy system identified in C.M.-1's deposition testimony. In both cases, the student with the disability was forced to develop an alternative approach so that the accommodations in their respective 504 Plans were honored—because the District's formal accommodation delivery system was not functioning.

  – – – – –

- Second, C.M.-2's denial of accommodation <u>across two different High Schools</u> demonstrates a systemic institutional failure rather than isolated individual errors. C.M.-2 attended two different schools within the Palm Beach County School District—Palm Beach Central High School (9th grade) and Suncoast High School (10th and 11th grades), and he was denied accommodations across both schools. Extended time was denied at both schools. Notes were denied at both schools. Breaking down assignments "didn't happen at all" (C.M.-2 Deposition, p. 35) at either school. And preferential seating required a formal 504 meeting to trigger even partial implementation at Suncoast.

  The same District maintained C.M.-2's 504 Plan across both schools, conducted 504 meetings at both schools, and failed to ensure implementation at both schools. This cross-school persistence eliminates any argument that the problem was due to individual teachers' intransigence, to a single building's service-delivery culture, or to a single principal's oversight.

  When the same pattern of denying a student's explicit accommodation occurs across two schools within the same district, the conclusion cannot be that C.M.-2 was unlucky twice. The conclusion must be that the District lacks the training, monitoring, supervision, and enforcement infrastructure needed to ensure that 504 Plans are honored and implemented at every classroom level in every school. This problem is institutional, and its presence reflects deliberate indifference.

  – – – – –

- Third, Ms. Chacon's hostile statements and their chilling effect on C.M.-2 transform this from a Case largely about the denial of accommodation services into a Case where a students' specific disability (i.e., Generalized Anxiety Disorder) was used against him. Ms. Chacon did not merely fail to provide classroom presentation notes. She told C.M.-2 that providing these notes was "kind of like cheating the system," and that he "wouldn't get far in life by using the accommodations on my 504 plan" (p. 34–35).

  These statements go beyond Ms. Chacon's conscious and opinionated refusal to provide C.M.-2 accommodations. They are expressions of hostility meant to demean and hurt C.M.-2, and to communicate an explicit bias against students with disabilities—or, perhaps, Black students with disabilities. Ms. Chacon statements to C.M.-2 that his legally-mandated supports are illegitimate, that his reliance on them is a character defect, and that her refusal to provide them is justified are egregious violations of the law, teacher ethics, and personal conscience. C.M.-2 testified that these statements made him "feel bad about myself," made him "not want to use my accommodations," and made him "nervous to ask for my accommodations" (p. 35). Hence, the outcome was a chilling effect on C.M.-2's self-confidence and self-advocacy—an effect that generalized and impacted beyond Ms. Chacon's classroom and beyond Palm Beach Central High School. As C.M.-2 testified: "When I asked for them the first time and you're denied, I would be afraid to advocate for myself" (p. 24).

  Ms. Chacon's statements also triggered C.M.-2's anxiety at such a level that C.M.-2 was formally diagnosed with this additional mental health disability. As such, an anxiety/accommodation loop was established. Because C.M.-2 worried about being denied his accommodations, it inhibited his requests for them. This created a self-reinforcing cycle where each denial produced more fear, which produced fewer requests, which produced fewer accommodations, which produced more academic harm, which produced more anxiety.

  An accommodation that a student is too afraid to request—because prior requests were met with hostility and shaming—makes them functionally unavailable to that student, regardless of their written presence on a 504 Plan.

– – – – –

- Fourth, the District's handling of a routine behavioral incident—play-fighting between C.M.-2 and a female peer—contributed even more directly to the onset of C.M.-2's Generalized Anxiety Disorder, and the District took no documented steps to address the harm created by its own staff members.

  C.M.-2 testified that during his 9th-grade year at Palm Beach Central, he was play-fighting with a female student when an administrator observed the interaction and issued behavioral referrals to both students. What followed was not a proportionate disciplinary response. C.M.-2 testified that during the behavioral referral process, he was "being taken around the school and being called a woman beater" (p. 37–38), that this label was repeated in front of "the whole class" in Ms. Chacon's Spanish classroom (p. 38), and that the incident was "amplified by administration" (p. 39). A female student in the same class then stated publicly that C.M.-2 "like[s] to put my hands on women" before a test (p. 38). C.M.-2 testified that he "wanted to disappear because it was embarrassing, especially since the incident—it wasn't out of aggression; it was a playful thing that was amplified by administration" (p. 39), and that the experience left him feeling like he "couldn't talk to anyone" (p. 39).

This incident is significant to the litigation for three reasons. First, it was not a peer-to-peer event that the school merely failed to prevent. It was an event that school personnel themselves created and amplified. C.M.-2's testimony does not describe being called a "woman beater" by classmates who independently learned of the referral. He describes being "taken around the school" during the referral process and labeled in that context—a process controlled by school personnel. The stigmatization was institutional in origin, not incidental.

Second, C.M.-2 identified this incident as the ultimate precipitating event for his anxiety disorder. When asked when his anxiety started, he testified: "It started after administration and teachers at Palm Beach Central were—not verbally—but like attacking me about a situation that happened" (p. 37). His anxiety was subsequently formally diagnosed by Dr. Lorena Frontado (p. 42–43). Thus, C.M.-2 draws a direct causal line from the District's handling of this incident to the onset of a clinically-diagnosed disability condition—a condition that then compounded his pre-existing ADHD and further impaired his ability to access the educational program. The District did not merely fail to accommodate a pre-existing condition. Through the actions of its own personnel, the District impacted a new condition that then interacted with and worsened the effects of C.M.-2's existing disability, and magnified the anxiety when he needed to request his accommodations, his social withdrawal, and the academic challenges described by C.M.-2 throughout his deposition.

Third, there is no evidence in C.M.-2's testimony—or in any record produced to date—that the District recognized the harm caused by its staff members' handling of this incident, investigated the circumstances, counseled or disciplined the staff involved, offered C.M.-2 any form of support or remediation, or took any steps to prevent the continued social stigmatization that followed. C.M.-2 was left to absorb the reputational damage, the social isolation, and the anxiety without any recognition or intervention by the District.

For a student already receiving 504 services for ADHD—a student that the District knew had a disability—this failure to respond to the foreseeable outcomes of its staff members' conduct— which created a hostile environment for C.R.-2—is also directly relevant to the deliberate indifference analysis under Counts II and IV. A district that knows a student has a disability, that causes or contributes to additional psychological harm through the actions of its own staff, and that then fails to address either the harm or its impact on the student's educational access, has not merely been indifferent to the student's needs. It has been indifferent to the consequences of its own conduct.

_ _ _ _ _

- Fifth, the District's withdrawal of C.M.-2's customized bus stop when he transferred from his "Home/Assigned" school (Palm Beach Central) to a "Choice" school (Suncoast) directly impacted his disabilities by creating concrete barriers to school attendance. It also resulted in measurable financial harm to C.M.-2's family—in violation of the McKinney-Vento Homeless Assistance Act's requirement that transportation barriers not impede the enrollment, attendance, and success of students experiencing homelessness.

C.M.-2 has been a McKinney-Vento-eligible student since approximately October 2022, having lived in a shelter, an Airbnb, and an apartment on a major commercial boulevard during the relevant period (p. 15–18). During his 9th-grade year at Palm Beach Central, the District arranged a customized bus stop—set at Skees Road and Okeechobee Boulevard—specifically so that C.M.-2 would not have to cross Okeechobee Boulevard's eight lanes of traffic. Even this arrangement was imperfect: C.M.-2 testified that the stop was "on a dark road" in the early morning, that it "gave me anxiety, like what if I get kidnapped," and that the bus driver assigned to the route was "rude about

going to that stop," telling him "she didn't understand why I couldn't just cross the street"—which "gave me a lot of anxiety because I felt looked down upon" (p. 40).

When C.M.-2 transferred to Suncoast High School for 10th grade, the customized bus stop was not continued due to an internal District rule that somehow superseded the federal accommodations due to him (per Counts II and IV). Instead, C.M.-2 was assigned to a bus stop that required him to cross Okeechobee Boulevard—the very crossing that the original accommodation had been designed to avoid. C.M.-2 testified that this crossing "gave me anxiety because of the traffic. It's a big road. I almost got hit multiple times and had to walk around cars. I felt drivers looking down on me" (p. 41). He testified that his mother informed the school about his anxiety related to the crossing (p. 41). The District's response to this notification is not reflected in C.M.-2's testimony—there is no indication that the District reinstated the customized stop, provided an alternative transportation arrangement, or took any other action to mitigate the barrier.

The result of this transportation denial were concrete and cascading. C.M.-2 testified that he intentionally avoided the bus as an anxiety-driven avoidance behavior, including sleeping in to miss it (p. 42). When he did not take the bus, his family was forced to arrange alternatives: his father would drive him, his mother would arrange Uber transportation, or he would take the city bus (p. 42). Each of these alternatives imposed costs—direct financial costs for ride-share services, opportunity costs for parental time and employment, and the practical burden on a family already experiencing housing instability. The Complaint specifically alleges that C.M.-2's mother was forced to quit a job to manage his transportation, and that the family incurred costs for Lyft, Uber, and neighbor-provided rides. While C.M.-2's deposition does not directly corroborate the lost employment allegation, he did confirm the use of Uber and his father's daily driving, and he also confirmed that his parents discuss financial arrangements with him (p. 43), establishing his awareness of the family's financial strain.

The McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11432(g)(1)(J)(iii), requires that local educational agencies ensure that "transportation is provided, at the request of the parent or guardian (or in the case of an unaccompanied youth, the liaison), to and from the school of origin." The Act's implementing guidance makes clear that transportation barriers must not impede the enrollment, attendance, or success of students experiencing homelessness, and that disputes over transportation are subject to the Act's dispute resolution provisions pending resolution. The District's decision to withdraw C.M.-2's customized bus stop upon his transfer to a Choice school raises a direct question under Count V: Whether the District's transportation obligations to a McKinney-Vento-eligible student are diminished when the student exercises school choice, and whether a student with a disability's federal right to reasonable accommodations supersede a local interpretation.

C.M.-2's testimony establishes that the withdrawal of this accommodation (a) directly triggered his anxiety—a documented disability condition—each school morning; (b) resulted in a pattern of bus avoidance that impacted his attendance and punctuality; (c) forced his family to bear the financial burden of alternative transportation arrangements during a period of housing instability; and (d) compounded the educational access barriers already created by the in-school accommodation failures described in the preceding sections of this analysis.

The transportation denial did not occur in isolation. It occurred in the context of a student who was already experiencing the systematic denial of his agreed-upon 504 classroom accommodations, who had already been stigmatized by school personnel, who had already developed an anxiety disorder connected to school-based events, and who was already living in unstable housing. For this student, the morning commute was not a neutral logistical exercise. It was a daily confrontation with an eight-lane highway that the District knew triggered his anxiety, that the District had previously

accommodated, and that the District chose to withdraw when C.M.-2 exercised his right to attend a different school. The cumulative effect—accommodation denial in the classroom, stigmatization by school personnel, anxiety onset connected to institutional conduct, and now a daily transportation barrier that the District had the power to prevent—represent an educational system that was consciously indifferent to C.M.-2's needs; a system that became a source of harm rather than support.

C.M.-2's testimony reinforces and/or establishes—with the directness and specificity that only a firsthand witness can provide—what it was like to be a Black adolescent male with ADHD and anxiety, living in unstable housing, attending two different schools within the same district that systematically denied him his agreed-upon accommodations, and that triggered and then fed into his Generalize Anxiety Disorder. C.M.-2's testimony describes an educational environment that falls well below the compliance standards established by Section 504, Title II of the ADA, and the McKinney-Vento Homeless Assistance Act—and a student whose experience across three school years and two schools within the same District reflects not isolated failures by individual teachers, but the systemic absence of the training, monitoring, and accountability infrastructure necessary to ensure that similar students with disabilities and similar students experiencing homelessness receive the protections to which they are legally entitled.

_ _ _ _ _ _ _ _ _

**Section XIII. Aligning the Discovery Documentation with the Depositions**

A number of crucial documents were received through Discovery that validate or corroborate the testimony provided by the Plaintiffs during their respective depositions. These documents not only validate the facts in this Case, but they also provide a more concrete timeline—which is essential to demonstrating how early and how intensively the District was aware of the concerns detailed in this litigation's Complaints and their indifference toward investigating, evaluating, and changing the service-delivery system such that the Plaintiffs received an appropriate education similar to their peers.

Below, the most relevant documents in C.M.-1's and C.M.-2's respective Discovery packets are discussed. When the same documents were placed in both packets, they will be addressed in the C.M.-1 discussion. The C.M.-1 and C.M.-2 discussions will each end with a summary table. The conclusion will detail how and where the documents validate or corroborate testimony in the Plaintiffs' respective depositions.

Analyzing C.M.-1's Relevant Discovery Documents

Ten documents, or "Entries" from C.M.-1's Discovery documents are reviewed below.

Entry 1. Part 1. Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CBM-47
Date: August 3, 2023
People Involved: District records personnel (name not identified on document)
C.M.-1: Entering Grade 6 at Emerald Cove Middle School

Entry 1. Part 2: Summary of Concerns

This document is a screen capture from C.M.-1's electronic cumulative record confirming that she was officially designated as Homeless under The McKinney-Vento Homeless Assistance Act on August 3,

2023—the start of her 6th-grade year at Emerald Cove Middle School. This document establishes that the Palm Beach County School District was formally aware, at the system level, that C.M.-1's family was experiencing homelessness at the beginning of the 2023–2024 school year. Under the McKinney-Vento Act (42 U.S.C. § 11431 et seq.), this designation triggers specific federal protections including immediate enrollment, transportation services, access to free meals and school supplies, and the right to remain in the school of origin. It also requires that the District's McKinney-Vento liaison ensure that homeless students are identified, enrolled, and provided with the support services necessary to succeed academically.

Entry 1. Part 3: Implications to the Case and Litigation Counts / Validation of Deposition Responses

This document is foundational to the McKinney-Vento claims in this Case because it establishes that C.M.-1's homeless status was formally recorded in the District's own electronic student information system at the start of the school year. Every action the District subsequently took that penalized C.M.-1 for circumstances arising from her homelessness—including dress code violations for clothing she could not afford, threats to revoke bus transportation, and the requirement that she publicly disclose her homeless status to a PE coach to receive a uniform—occurred with this designation already on file. The document dismisses any District objections that it was unaware of the family's housing status during the 2023–2024 school year and beyond.

Entry 2. Part 1: Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CIM-0080
Date: February 16, 2024
People Involved: Marellius King (Assistant Principal, Emerald Cove Middle School); Tinisha Tolbert (C.M.-1's mother); Mrs. Gray (Guidance Counselor, Emerald Cove, referenced); C.M.-1's teachers (unnamed, referenced)
C.M.-1: Grade 6 at Emerald Cove Middle School

Entry 2.  Part 2: Summary of Concerns

In this e-mail, Assistant Principal King contacts C.M.-1's mother to report that he has been receiving frequent reports of misbehavior and dress code violations from C.M.-1's teachers over the preceding weeks. He acknowledges awareness that the family is experiencing hardships and directs the mother to Mrs. Gray in the school's guidance department for resource assistance—while simultaneously stating that C.M.-1 is still expected to comply with school dress code rules. He characterizes C.M.-1's social interactions with two peers as involving "drama" and "bits of trouble," frames the situation as requiring immediate behavioral correction, and proposes a parent-teacher conference to develop a monitoring plan.

Notably absent from the e-mail is any reference to C.M.-1's existing 504 Plan (in effect since 5th grade), any consideration of whether the reported behaviors may be related to her documented disability, or any acknowledgment that the dress code violations may be directly caused by the family's documented homelessness rather than by student noncompliance.

Entry 2. Part 3: Implications to the Case and Litigation Counts / Validation of Deposition Responses

This e-mail documents the school's awareness of the family's "hardship" (homelessness) as of February 2024—corroborating the August 2023 McKinney-Vento designation on CBM-47—while revealing that

the school's primary response to a homeless student's dress code violations was to demand compliance rather than provide the clothing resources that McKinney-Vento requires. It also establishes that C.M.-1 was accumulating behavioral referrals that the school attributed to student misconduct without any documented consideration of whether those behaviors were manifestations of her ADHD or anxiety—disabilities already identified on her 504 Plan. The absence of any reference to C.M.-1's 504 Plan in this communication—from the administrator responsible for her grade level's discipline—raises the question of whether administrators were consulting the 504 Plan before imposing disciplinary consequences, as required under Section 504.

Entry 3. Part 1: Discovery Page, Date, People Involved, Current Grade/School

    Discovery Page: CBM-04
    Date: April 2, 2024
    People Involved: Tinisha Tolbert (C.M.-1's mother, complainant); Hannah Harlow (Senior Consumer Service Analyst, Office of Inspector General, Florida Department of Education, recipient); unnamed Emerald Cove Middle School staff (PE coach, assistant principal, bus drivers, teachers issuing dress code and discipline referrals); unnamed Grassy Waters Elementary School staff (referenced regarding 2019 enrollment incident)
    C.M.-1: Grade 6 at Emerald Cove Middle School
    C.M.-2: Grade 9 at Palm Beach High School

Entry 3. Part 2. Summary of Concerns

    This entry is a formal complaint e-mail sent by C.M.-1's mother to Hannah Harlow, a Senior Consumer Service Analyst in the Florida Department of Education's Office of Inspector General. The complaint alleges that the Palm Beach County School District—across two separate periods of family homelessness—failed to provide the support and resources required under The McKinney-Vento Homeless Assistance Act and instead penalized C.M.-1 for circumstances beyond her control.

    The complaint describes two distinct periods of homelessness and the District's response to each:

2019 (Grassy Waters Elementary). After losing her job, the mother completed a housing questionnaire and was aggressively interrogated by a School District case manager who was a former coworker. The mother—herself a social service worker—describes the experience of having to disclose her family's homelessness to a former colleague as humiliating and emotionally traumatic. The situation escalated when the school principal refused to enroll her child because the case manager did not believe the family was homeless, despite visible signs of distress and exhaustion. Staff subsequently placed baseless assumptions about the mother's honesty regarding the family's housing status into the children's records.

2024 (Emerald Cove Middle School). After the family again became homeless due to rising living costs, school staff focused on dress code enforcement and penalization, rather than providing support. The mother describes the following specific incidents:

- The PE coach required C.M.-1 to disclose her homelessness in order to receive a uniform. To avoid the embarrassment of disclosing in front of peers, C.M.-1 borrowed her brother's clothing, which was mistakenly taken to the boys' locker room. She was then given zeros for not dressing out.
- A bus driver refused to drop C.M.-1 at her designated stop, leaving her stranded for approximately 1.5 hours in an unfamiliar location.

- On a separate occasion, when C.M.-1 needed to exit the bus at a different stop due to a medical issue, the bus driver threatened to call the police.
- An assistant principal threatened to revoke C.M.-1's bus privileges, stating that "riding the bus is a privilege and not a right."
- When the mother requested resources from school staff, they either failed to follow up or provided inadequate assistance.

The mother notes that C.M.-1 "already experiences anxiety and would not feel comfortable disclosing her homelessness in front of peers." She also describes the logistical burden of homelessness on the family's school access: during peak hotel season, the family was required to drive 45 minutes to an hour to reach the school, only to be met with what the mother characterizes as "inconsiderate and hostile treatment." The mother's overarching concern is that the housing questionnaire—designed to identify and support students experiencing homelessness—has instead been used as a mechanism for investigation and penalization rather than resource provision and support.

---

Entry 3.  Part 3: Implications to the Case and Litigation Counts / Validation of Deposition Responses

This complaint is one of the earliest formal state-level filings in what became a sustained pattern of parental advocacy met with District inaction or inadequate response. It is relevant to multiple claims in this Case:

McKinney-Vento Act Violations: The Complaint documents a pattern of conduct that is the direct opposite of what the McKinney-Vento Act (42 U.S.C. § 11431 et seq.) requires. Rather than identifying C.M.-1 as a student in need of support and removing barriers to her educational participation, the District's staff penalized her for circumstances arising from her homelessness. The dress code referrals—issued against a student whose McKinney-Vento designation was formally recorded in the District's electronic student information system as of August 3, 2023 (see Entry 1, CBM-47)—treated a poverty-related inability to afford compliant clothing as a behavioral infraction. The PE uniform incident—requiring C.M.-1 to publicly disclose her homeless status to a coach in front of peers as a condition of receiving basic athletic clothing—inverts the statutory framework: the Act is designed to protect homeless students from stigmatization, not to make basic services contingent on a public disclosure of a housing status that the District already had on file.

The assistant principal's statement that "riding the bus is a privilege and not a right" directly contradicts the McKinney-Vento Act's transportation provisions, which establish transportation as a federally-protected right for students experiencing homelessness—not a privilege subject to discretionary revocation by building-level administrators.

Intersection of Homelessness and Disability. The mother's statement that C.M.-1 "already experiences anxiety and would not feel comfortable disclosing her homelessness in front of peers" is significant because it connects the McKinney-Vento violations to C.M.-1's documented disability. As of the date of this Complaint, Dr. Caron Sanua had completed the District Medical Evaluation form (CBM-294/295, dated April 1, 2024—one day prior) documenting C.M.-1's ADHD and "history of anxiety." Requiring a student with documented anxiety to publicly disclose a stigmatizing personal circumstance as a condition of receiving basic school services is not merely a McKinney-Vento failure—it is the type of environmental stressor that the Generalized Anxiety Disorder research identifies as activating the threat-monitoring system (Eysenck et al., 2007), compounding the cognitive burden already imposed by C.M.-1's ADHD.

The PE uniform incident thus sits at the intersection of two legal frameworks: the McKinney-Vento Act's prohibition on barriers to participation for homeless students, and Section 504's prohibition on discrimination against students with disabilities in the provision of educational services.

Transportation Incidents and Duty of Care. The two bus incidents described in the complaint—stranding a middle school student for approximately 1.5 hours in an unfamiliar location and threatening to call the police when the student needed to exit the bus due to a medical issue—raise serious duty of care concerns. A school district that leaves an 11- or 12-year-old child stranded in an unfamiliar location for 90 minutes has failed a basic safety obligation. A bus driver who responds to a child's medical need by threatening police involvement has prioritized route compliance over student welfare. These incidents, combined with the assistant principal's threat to revoke bus privileges entirely, created a transportation environment that was punitive rather than supportive—the opposite of the McKinney-Vento Act's intent.

Pattern of Penalization Across Schools and Years. The Complaint is notable for documenting that the District's failure to support the family during periods of homelessness is not an isolated incident confined to one school or one school year. The mother describes a substantially similar pattern at Grassy Waters Elementary in 2019—aggressive interrogation, disbelief, enrollment refusal, and negative documentation in student records—that was repeated at Emerald Cove Middle School in 2024. This recurrence across two different schools, two different grade levels, two different sets of staff, and a five-year interval suggests a systemic failure in how the District's schools respond to McKinney-Vento-designated families (including the presence of racial mixed with disability discrimination), rather than an anomaly attributable to individual staff members at a single site.

Triggering the CARES Investigation: This Cwas received by the Florida Department of Education's Office of Inspector General and subsequently referred to the District, where Deputy Superintendent Edward Tierney directed a CARES investigation on April 18, 2024 (see Entry 7, CIM-480). The filing thus established a documented chain of notice that extends from the state level to the highest operational leadership levels of the District. From this date forward, the District's treatment of C.M.-1 occurred under conditions of documented, actual knowledge—at both the state and District leadership levels—that the mother had raised formal allegations of McKinney-Vento noncompliance, penalization, hostile treatment, and inadequate service delivery.

---

Entry 4. Part 1: Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CBM-238
Date: April 1, 2024
People Involved: Emerald Cove Middle School ESE and 504 Team members (names not specified on summary document); Tinisha Tolbert (C.M.-1's mother); Ms. Cantelmo (Attorney, attending with parent)
C.M.-1: Grade 6 at Emerald Cove Middle School

---

Entry 4. Part 2: Summary of Concerns

This document is the Meeting Report from an Emerald Cove Middle School team meeting convened to discuss the need to assess C.M.-1 for eligibility for Exceptional Student Education (ESE/Special Education) services. The team—including C.M.-1's mother—agreed to proceed with the assessments, which ultimately resulted in C.M.-1 qualifying as a student with Other Health Impairments (OHI) and receiving an Individualized Education Program (IEP). The most notable feature of this document is the presence of Ms. Cantelmo, an attorney, who attended the meeting with the parent. The fact that C.M.-1's

mother retained legal counsel and brought that counsel to a school-based eligibility meeting indicates that by April 2024, the mother's concerns about how the school was handling C.M.-1's disability-related needs and school discipline referrals and treatment had escalated to the point where she believed legal representation was necessary to protect her daughter's rights.

Entry 4. Part 3: Implications to the Case and Litigation Counts / Validation of Deposition Responses

Parents do not typically retain counsel for routine school eligibility meetings unless they believe the school has failed to meet its legal obligations. By April 1, 2024, C.M.-1 had been on a 504 Plan since 5th grade, had accumulated numerous discipline referrals during 6th grade (see CBM-242 through CBM-265, documenting 15 offenses from 2/27/24 through 5/24/24), had been penalized for dress code violations tied to her family's homelessness, and her mother had already begun raising concerns about accommodation denial and discriminatory treatment.

The attorney's presence documents that the District was on notice, as of this date, that the family had legal representation—making any subsequent failures to implement accommodations, conduct appropriate manifestation determinations, or provide McKinney-Vento services all the more significant. The assessments agreed to at this meeting ultimately resulted in C.M.-1's IEP—the same IEP whose accommodations were subsequently denied or undermined by Miss Oliver and other staff, as documented in C.M.-1's deposition testimony and throughout this Report.

---

Entry 5. Part 1: Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CBM-294 to CBM-295
Date: April 1, 2024
People Involved: Dr. Caron Sanua (C.M.-1's Pediatrician); Emerald Cove Middle School ESE Team (recipients of form)
C.M.-1: Grade 6 at Emerald Cove Middle School

---

Entry 5. Part 2: Summary of Concerns

This document is the completed District's Medical Evaluation for Physically Impaired form, completed by Dr. Caron Sanua, C.M.-1's pediatrician. Dr. Sanua documented that C.M.-1 has an "Other Health Impairment" that includes ADD/ADHD.

Dr. Sanua typed onto the form:

"ADHD — this affects patient's ability to focus, affects executive functioning and organizational skills. She is not on medication but will benefit from accommodations. In addition, she has a history of anxiety and will benefit from behavioral health interventions/counseling."

The form contains two distinct medical recommendations: (1) educational accommodations for ADHD-related executive function and attentional deficits, and (2) behavioral health interventions and counseling for anxiety. The first recommendation was addressed—at least on paper—through C.M.-1's subsequent IEP accommodations. The second recommendation—behavioral health interventions and counseling for anxiety—does not appear to have been considered or acted upon in any of the 504 or IEP/ESE meeting documentation received during Discovery.

---

<u>Entry 5</u>. <u>Part 3: Implications to the Case and Litigation Counts / Validation of Deposition Responses</u>

This document is significant for two reasons. First, it provides independent medical confirmation from C.M.-1's own physician that her ADHD affects her ability to focus, affects her executive functioning and organizational skills, and that she requires accommodations—a medical opinion entirely consistent with the expert analysis presented earlier in this Report (Barkley, 2015; Langberg et al., 2013, 2018).

Second, Dr. Sanua's explicit recommendation that C.M.-1 "has a history of anxiety and will benefit from behavioral health interventions/counseling" constitutes a medical directive that the District appears to have disregarded entirely. No evidence in the Discovery record indicates that this recommendation was discussed at any subsequent 504 or IEP meeting, that counseling services were ever considered or offered, or that behavioral health interventions for anxiety were incorporated into C.M.-1's programming.

This omission is directly relevant to the FAPE claims under IDEA and Section 504. Given that C.M.-1's anxiety subsequently manifested in classroom behaviors that her teachers misidentified as misconduct—and that her IEP team later wrote Accommodation #15 specifically to address anxiety-driven behaviors—the failure to provide the counseling or other directly-related cognitive-behavioral interventions that Dr. Sanua recommended represents a missed intervention opportunity that allowed C.M.-1's anxiety to go unaddressed throughout the relevant period.

---

<u>Entry 6</u>. <u>Part 1: Discovery Page, Date, People Involved, Current Grade/School</u>

<u>Discovery Page:</u> CBM-04 / CIM-284
<u>Date:</u> April 2, 2024
<u>People Involved:</u> Tinisha Tolbert (C.M.-1's mother, complainant); Hannah Harlow (Senior Consumer Service Analyst, Office of Inspector General, Florida Department of Education, recipient)
<u>C.M.-1:</u> Grade 6 at Emerald Cove Middle School
<u>C.M.-2:</u> Grade 9 at Palm Beach High School

---

<u>Entry 6</u>. <u>Part 2: Summary of Concerns</u>

C.M.-1's mother filed a formal Complaint with the <u>Office of the Inspector General</u> at the Florida Department of Education alleging that the Palm Beach County School District failed to provide the support and resources required under the McKinney-Vento Act and instead subjected C.M.-1 to penalization and hostile treatment.

The Complaint documents the following specific concerns:

- <u>2019:</u> When the family first became homeless, the mother completed a housing questionnaire and was aggressively interrogated by a former coworker serving as case manager. The school principal refused to enroll her child because the case manager did not believe the family was homeless—despite visible signs of distress.

- <u>2024:</u> After the family again became homeless, school staff focused on dress code enforcement rather than providing support. C.M.-1 was required to disclose her homelessness to a PE coach in front of peers in order to receive a uniform. To avoid embarrassment, she borrowed her brother's clothing, which was taken to the boys' locker room, and she then received zeros for not dressing out.

- Transcription: A bus driver refused to drop C.M.-1 at her designated stop, stranding her for approximately 1.5 hours in an unfamiliar location. On a separate occasion, a bus driver threatened to call the police when C.M.-1 needed to exit at a different stop due to a medical issue. An assistant principal threatened to revoke C.M.-1's bus privileges, stating that <u>"riding the bus is a privilege and not a right</u>."

- <u>Resource failures:</u> Requests for resources were either ignored or inadequately addressed by school staff.

---

<u>Entry 6</u>. <u>Part 3: Implications to the Case and Litigation Counts/Validation of Deposition Responses</u>

This Complaint is one of the earliest formal filings in what became a sustained pattern of parent advocacy met with District inaction. It is directly relevant to the McKinney-Vento claims: the PE uniform incident—requiring C.M.-1 to disclose her homelessness in front of peers—is independently significant for a student already documented with anxiety (Dr. Sanua, CBM-294/295, same date). The assistant principal's statement that "riding the bus is a privilege and not a right" directly contradicts the McKinney-Vento Act, which establishes transportation as a protected right for homeless students. The bus incidents—stranding a middle school student for 1.5 hours and threatening police involvement for a medical-related stop request—are relevant to the duty of care and hostile environment claims. This complaint triggered the District's CARES investigation process (see Entry 7), establishing that District leadership was placed on formal notice of these allegations.

---

<u>Entry 7</u>.  <u>Part 1: Discovery Page, Date, People Involved, Current Grade/School</u>

<u>Discovery Page:</u> CIM-480
<u>Date:</u> April 18, 2024
<u>People Involved:</u> Edward Tierney (Deputy Superintendent/Chief of Schools, Palm Beach County School District); Vivian Green (recipient/investigator); Valerie Zuloaga-Haines (cc'd); Kelly Cox (cc'd); Jessica Sills (cc'd)
<u>C.M.-1:</u> Grade 6 at Emerald Cove Middle School
<u>C.M.-2:</u> Grade 9 at Palm Beach High School

---

<u>Entry 7</u>.  <u>Part 2: Summary of Concerns</u>

This e-mail from Deputy Superintendent Tierney directs Vivian Green to investigate a referral received from the Florida Department of Education's Inspector General's Office—the referral generated by the mother's April 2, 2024 complaint (Entry 6). Tierney instructs Green to investigate the allegations, take action as deemed necessary, and complete a CARES Notice of Action form by April 26, 2024. The communication establishes that the Inspector General's complaint was received by the District's highest operational leadership and was formally routed through the District's internal CARES complaint and investigation process within 16 days of the mother's filing.

---

<u>Entry 7</u>. <u>Part 3: Implications to the Case and Litigation Counts / Validation of Deposition Responses</u>

This document establishes the chain of notice from the state level (Inspector General) to the highest level of District operational leadership (Deputy Superintendent). As of April 18, 2024, the District could not claim that the mother's concerns were isolated complaints known only to building-level staff. The

Deputy Superintendent personally directed the investigation with a specific deadline. The document identifies the individuals placed on notice—Tierney, Green, Zuloaga-Haines, Cox, and Sills—all of whom had actual knowledge of the allegations from this date forward. Any subsequent failures by the District to address the concerns raised in the Inspector General complaint occurred with this documented chain of notice in place.

---

Entry 8: Part 1: Discovery Page, Date, People Involved, Current Grade/School

Cross-Reference Entry: ADA/Section 504 Investigation Report

Discovery Page: CBM-154 to CBM-162 (Investigation Report); CBM-163 to CBM-165 (Mother's supporting documentation)
Date: December 16, 2024 (Investigation Report issued); complaint filed by parent on same date
People Involved:
- Investigator: Kim Doyle, MSW (ADA/Section 504 Coordinator for Students)
- Recipient: Valerie Haines (Central Regional Superintendent)
- Complainant: Tinisha Tolbert (C.M.-1's mother)
- School staff interviewed/referenced: Christine Rodenbo (Math Teacher); Brian Tilley (PE Coach); Marellius King (6th-Grade Assistant Principal); Eugina Smith Feaman, Ed.D. (Principal)
- Copied on report: Edward Tierney (Deputy Superintendent); Glenda Sheffield, Ed.D. (Chief Academic Officer); Shawntoyia Bernard (General Counsel); Laura E. Pincus (Assistant General Counsel); Kevin McCormick (Executive Director, ESE); Joanne Thornton (Manager, ESE Compliance); Karen Whetsell (Instructional Superintendent); Lisa Robol (Central Region ESE Coordinator)
C.M.-1: Investigation covers Grade 6 (2023–2024 school year) at Emerald Cove Middle School

---

Entry 8. Part 2: Summary of Concerns

This is the District's formal ADA/Section 504 Investigation Report responding to the mother's complaint that C.M.-1's 504 Plan accommodations were not consistently provided during the 2023–2024 school year and that the mother experienced retaliation when advocating for those accommodations.

The investigation examined eight specific complaints:

1. C.M.-1 was not permitted to take breaks unless accompanied by another student
2. Notes or outlines were not provided in math class
3. Extended time was only provided upon request, and the gradebook display of zeros/Fs discouraged C.M.-1 from completing work
4. Large assignments were not broken into smaller parts in math class
5. C.M.-1 received disciplinary consequences (lunch detention) for laughing during a teasing incident that the mother attributes to anxiety-related behavior
6. A school employee gave the mother's phone number to another parent without permission
7. The assistant principal provided inadequate responses to the mother's e-mails
8. The school interpreted C.M.-1's ADHD and anxiety symptoms as behavioral issues rather than disability-related needs

The investigator found no disability discrimination on any of the eight complaints. Key findings included: Breaks were provided but conditioned on escort due to the student's behavior during unsupervised breaks; notes were provided through interactive notebooks, guided notes, and Google

Classroom; extended time was consistently provided with no late-submission penalty; assignment chunking was implemented through verbal directions and circled problems; the lunch detention for laughing was permissible because students with disabilities can receive disciplinary consequences when the Manifestation Determination threshold (10+ cumulative days of placement change) is not triggered; the phone number allegation could not be substantiated; the mother's own e-mails limiting school communication undermined the inadequate communication complaint; and disciplining disability-related behaviors does not constitute discrimination absent a Manifestation Determination triggering event.

---

Entry 8.  Part 3: Implications to the Case and Litigation Counts / Validation of Deposition Responses

This report is significant for what it reveals about the District's internal investigative framework and conclusions.

Scope limitations. The investigation was limited to the 2023–2024 school year and the specific complaints raised. It did not examine the broader pattern of discipline referrals, the intersection of C.M.-1's homelessness with her disability-related needs, or whether the 504 team should have convened earlier in response to escalating behavioral and academic difficulties and utilized the District's MTSS process. The investigator interviewed school staff, but did not interview C.M.-1.

Complaint #5 (laughing/detention). The finding that students with disabilities can receive disciplinary consequences "even when the behavior is associated with, or results from, their disability" as long as the Manifestation Determination threshold is not triggered is a legally narrow reading. It does not address whether disciplining a student for a behavior that her own physician (Dr. Sanua, CBM-294/295) and later her IEP team (Accommodation #15) identified as an anxiety manifestation constitutes a failure to provide appropriate accommodations. The IEP team's subsequent decision to write a specific accommodation directing staff to respond to anxiety-driven laughing with a nonverbal cue rather than discipline is simplistic, and was generated without any functional assessment of the behavior and its different contexts.

Complaint #8 (interpreting symptoms as behavioral issues): The conclusion that there was no discrimination in the school's interpretation of disability-related behaviors as behavioral issues is the central contested question in this Case. The cumulative discipline record (CBM-242 through CBM-265, documenting 15 offenses from 2/27/24 through 5/24/24) raises the question of why, once again, the 504 team did not convene to conduct a functional assessment, involve the MTSS team, or consider whether the behaviors were manifestations of C.M.-1's documented ADHD and anxiety.

Distribution and subsequent suspension: The Report was distributed to every level of District leadership. Regardless of the findings, there is no indication that the IEP Team—including the mother—was reconvened to still determine if additional assessments, strategies, or interventions were needed. It does not appear that any effort was made to re-establish communication and a positive working relationship between school staff, C.M.-1's mother, and C.M.-1 herself.

---

Entry 9. Part 1: Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CBM-449 to CBM-464
Date: April 8, 2025 through May 7, 2025
People Involved: Tinisha Tolbert (C.M.-1's mother); Eugina Smith Feaman, Ed.D. (Principal, Emerald Cove Middle School); Miss Oliver (ESE Teacher, Emerald Cove Middle School); April Morphesis (staff, Emerald Cove Middle School); Karen Whetsell (Instructional Superintendent); Lisa Robol (Central Region ESE Coordinator); Kevin McCormick (Executive Director, Exceptional Student

Education); Laura E. Pincus, Esq. (Assistant General Counsel, District Legal Services); Anna Morales (District staff); Jon Bell (District staff); Rae Jensen (ESE Contact, Emerald Cove); Bridget Eichmiller (Attendance Clerk); Kimberly Doyle (ADA/Section 504 Coordinator)

C.M.-1: Grade 7 at Emerald Cove Middle School

---

Entry 9. Part 2: Summary of Concerns

This extensive e-mail chain documents a crisis sequence spanning approximately one month, during which C.M.-1 was held out of school by her mother from April 21, 2025 through May 6, 2025 due to stated concerns about C.M.-1's anxiety, emotional distress, and hostile and retaliatory treatment from school staff. The chain begins with an April 8, 2025 report from the mother that C.M.-1 was slapped by another student in Mr. Frost's classroom and that, rather than addressing the assault, the school assigned C.M.-1 detention. The mother further reports that Miss Oliver (the ESE support facilitation teacher assigned to C.M.-1 under her IEP) told students upon C.M.-1's return to class, "We don't deal with snitches"—a statement the mother characterizes as directly targeting C.M.-1 for reporting the incident. Miss Oliver denies making this specific statement in a subsequent e-mail but acknowledges frequently correcting students for using slang and profanity in class.

On April 17, 2025, the mother requests a written plan of action to ensure C.M.-1 receives her IEP accommodations and is no longer subjected to retaliation. Principal Feaman responds with a four-step plan: IEP copy distribution to teachers, a teacher meeting with the ESE Contact, teacher data collection on accommodation use, and semester-end administrative check-ins. The mother responds that this plan does not address the underlying concerns about retaliation, inconsistent application of the Student Code of Conduct, or the emotional impact on C.M.-1, and informs the school that C.M.-1 will remain home "until it is in her best interest to return to school" due to overwhelming anxiety and emotional distress. She requests that all assignments with IEP accommodations be sent by e-mail.

The school responds with compulsory attendance warnings and Hospital/Homebound requirements without addressing the accommodation or retaliation concerns. Instructional Superintendent Karen Whetsell provides a formal response citing attendance policies, defining chronic absence and habitual truancy thresholds, and listing alternative placement options—including McKinney-Vento transfers, Home Education, Hospital/Homebound, and the Family Empowerment Scholarship—all of which the mother characterizes as deflections from the school's obligation to support C.M.-1 in her current placement.

On May 1, 2025, the mother files a formal amendment to her existing grievance (through Kim Doyle) alleging the District's failure to provide IEP-based supports during disability-related absences, failure to convene an IEP meeting, and continued denial of services. C.M.-1 returned to school on May 7, 2025. In her return notification, the mother states: "It is my expectation C.M.-1 will return to a safe, supportive environment free from hostility, retaliation, or discrimination of any kind. C.M.-1 is aware that if at any time she feels uncomfortable or unsafe, she is to notify me immediately."

District General Counsel Laura Pincus forwarded the return notification to Jon Bell with the comment: "Student returning to school. My guess is that we will never be served."

---

Entry 9. Part 3: Implications to the Case and Litigation Counts/Validation of Deposition Responses

The "snitches" allegation. Whether or not Miss Oliver made this specific statement (she denies it), the allegation is consistent with the pattern documented throughout C.M.-1's deposition: An ESE support

facilitation teacher who used her position to publicly stigmatize and undermine the student she was assigned to support. The mother's statement that she had previously addressed inappropriate comments from Miss Oliver—"both in person and by e-mail"—establishes a documented pattern of escalating concerns about Miss Oliver's conduct that predates this incident.

The school's response to disability-related absence: The school's and District's responses to C.M.-1's absence are dominated by attendance policy citations, compulsory attendance warnings, and alternative placement suggestions—with no documented effort to address the accommodation implementation failures and staff conduct that the mother identified as the cause of C.M.-1's anxiety-driven absence. The mother explicitly framed the absences as directly related to the anxiety and emotional distress caused by staff behavior—a framing that invokes both Section 504 and IDEA protections requiring schools to consider whether absences are disability-related before imposing punitive attendance consequences.

Karen Whetsell's response—listing McKinney-Vento transfers, Home Education, Hospital/ Homebound, and the Family Empowerment Scholarship—reads as a catalog of ways to remove C.M.-1 from Emerald Cove rather than a plan to make Emerald Cove safe for C.M.-1. This is directly relevant to the FAPE and hostile environment claims.

Principal Feaman's four-step plan: The plan proposed on April 17, 2025—distributing IEP copies to teachers, meeting with the ESE Contact, tracking accommodation use, and semester-end check-ins—is a prospective compliance monitoring plan. It does not address the retrospective failures (months of accommodation denial and staff misconduct that had already occurred), does not identify or hold accountable the specific staff whose conduct caused the harm, and does not provide any compensatory services for the instruction and accommodations C.M.-1 had already been denied. The mother's objection—that the plan "does not appear to directly address the underlying concerns I've raised regarding retaliation, inconsistent application of the Student Code of Conduct/IEP, and the emotional impact these issues have had on C.M.-1"—is substantively accurate.

General Counsel Pincus's comment: Laura Pincus's forwarded comment—"Student returning to school. My guess is that we will never be served"—is a contemporaneous statement by the District's own legal counsel. It indicates that the legal department was monitoring the situation and assessing litigation probability—yet there is no evidence in this e-mail chain that the legal department directed any remedial action to address the substantive concerns the mother had raised. The District's legal response to the mother's escalating complaints was to assess the probability of being sued—not to direct compliance with C.M.-1's IEP or investigate the staff conduct the mother had documented. The federal complaint was filed on May 5, 2025 (CBM-116 to CBM-119), within days of C.M.-1's return—proving Pincus's assessment incorrect.

Cumulative notice: By May 7, 2025, the following individuals at the District level had documented, actual knowledge of the mother's complaints: Deputy Superintendent Tierney (CIM-480, April 2024), Instructional Superintendent Whetsell, Central Region ESE Coordinator Robol, Executive Director of ESE McCormick, ADA/504 Coordinator Doyle, and General Counsel Pincus. The breadth of this notice chain invalidates any suggestion that the failures documented in C.M.-1's record were isolated building-level oversights unknown to District leadership.

---

Entry 10. Part 1: Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CBM-087 to CBM-096
Date: April 21, 2025
People Involved: Tinisha Tolbert (C.M.-1's mother, complainant); District CARES system recipients

C.M.-1: Grade 7 at Emerald Cove Middle School
C.M.-2: Grade 10 at Suncoast High School

Entry 10. Part 2: Summary of Concerns

This document is a Formal Grievance and Demand for Educational Compensation filed by C.M.-1's mother through the District's CARES complaint system. The grievance describes virtually all of the claims contained in the current Second Amended Complaint that is being litigated in this Case—including disability discrimination under Section 504 and the ADA, IDEA violations related to IEP implementation and FAPE denial, retaliation against C.M.-1 and her mother for disability advocacy, McKinney-Vento Act violations, hostile educational environment, and the failure to provide accommodations, related services, and appropriate disciplinary protections. The filing represents the culmination of the mother's advocacy efforts spanning two school years—from the initial Inspector General complaint in April 2024 through the ADA/504 Investigation in December 2024—and signals that the family had concluded that internal District processes were insufficient to resolve the ongoing violations.

Entry 10. Part 3: Implications to the Case and Litigation Counts / Validation of Deposition Responses

This grievance is directly relevant as a pre-litigation notice document. It establishes that the District was provided with a comprehensive written description of the claims now being litigated—and was given an explicit opportunity to investigate, remediate, and provide compensatory relief—before the federal complaint was filed. The fact that the mother filed this grievance on April 21, 2025, and then filed the U.S. Federal District Court Complaint on May 5, 2025 (CBM-116 to CBM-119)—only 14 days later— suggests either that the District's response was inadequate or that no substantive response was received in that interval. This timeline is further corroborated by the fact that, on the same day the federal complaint was filed (May 5, 2025), an additional CARES complaint was also filed within the District.

The May 15, 2025 e-mail from Kim Doyle (CBM-434), the District's ADA/Section 504 Coordinator, notifying Principal Feaman and Executive Director McCormick that she would not be moving forward with the 504 investigation due to the pending federal lawsuit, demonstrates that the District's response to the mother's escalating advocacy was to suspend its own internal investigation rather than to accelerate the provision of services to C.M.-1. This decision left C.M.-1 without the outcome of the very investigation that the mother had requested months earlier—while the District simultaneously continued to require C.M.-1's attendance and compliance with school rules.

Table 13 below summarizes the 10 Entries of notable documents in C.M.-1's Discovery packet discussed above.

Table 13. Summary of Important Documents in C.M.-1's Discovery Packet

| Entry/ Discovery Page | Date | Summary of Concerns | Implications to Case |
|---|---|---|---|
| Entry 1 / CBM-47 | 8/3/2023 | Screen capture from C.M.-1's electronic cumulative record confirming official Homeless designation under the McKinney-Vento Act at the start of Grade | Foundational to McKinney-Vento claims. Forecloses District defense of unawareness. All subsequent penalization of C.M.-1 for |

| Entry/ Discovery Page | Date | Summary of Concerns | Implications to Case |
|---|---|---|---|
| | | 6. Establishes District-level awareness of family's homelessness from the beginning of the 2023–2024 school year. | homelessness-related circumstances (dress code, transportation, forced public disclosure) occurred with this designation on file. |
| Entry 2 / CIM-0080 | 2/16/2024 | E-mail from AP King to mother reporting misbehavior and dress code violations. Acknowledges family "hardship" but demands dress code compliance.<br><br>Characterizes C.M.-1's peer interactions as "drama." No reference to existing 504 Plan or disability. | Documents school's awareness of homelessness while prioritizing compliance over McKinney-Vento supports. Establishes that behavioral referrals were issued without consulting C.M.-1's 504 Plan. Relevant to Section 504 claims and pattern of treating disability-related behaviors as misconduct. |
| Entry 3 / CBM-04 / | 4/2/2024 | Formal complaint e-mail from C.M.-1's mother to Hannah Harlow at the Florida Department of Education's Office of Inspector General. Alleges McKinney-Vento failures across two periods of family homelessness (2019 at Grassy Waters Elementary and 2024 at Emerald Cove Middle School).<br><br>Documents: PE coach requiring public disclosure of homelessness to receive uniform, resulting in zeros for not dressing out; bus driver stranding C.M.-1 for 1.5 hours in unfamiliar location; bus driver threatening police when C.M.-1 needed to exit for medical issue; AP stating "riding the bus is a privilege and not a right"; ignored or inadequate resource requests; and 45-minute to one-hour commutes during peak hotel season. Mother notes C.M.-1 "already experiences anxiety and would not feel comfortable disclosing her homelessness in front of peers." | Earliest formal state-level filing. Directly relevant to McKinney-Vento claims: penalization for homelessness-related circumstances despite documented Homeless designation on file (CBM-47). AP's "privilege not right" statement contradicts McKinney-Vento transportation provisions establishing transportation as a federally protected right. PE uniform incident sits at intersection of McKinney-Vento (barrier to participation) and Section 504 (environmental stressor for student with documented anxiety, per Dr. Sanua's evaluation completed one day prior on CBM-294/295).<br><br>Pattern across two schools and five years (2019, 2024) suggests systemic District failure rather than isolated staff conduct. Triggered CARES investigation directed by Deputy Superintendent Tierney on 4/18/2024 (CIM-480), establishing documented chain of notice from state level to highest District operational leadership. |
| Entry 4 / CBM-238 | 4/1/2024 | Meeting Report for ESE eligibility assessment. Mother attended with attorney (Ms. Cantelmo). Team agreed to proceed with assessments that ultimately resulted in OHI eligibility and IEP. Attorney presence indicates mother's concerns had escalated | Establishes District on notice of legal representation. Parent's retention of counsel corroborates severity of concerns about 504 implementation and disciplinary treatment. |

| Entry/ Discovery Page | Date | Summary of Concerns | Implications to Case |
|---|---|---|---|
| | | to the level of requiring legal representation. | Assessments led to IEP whose accommodations were subsequently denied or undermined by staff (per C.M.-1 deposition). |
| Entry 5 / CBM-294–295 | 4/1/2024 | Dr. Sanua's completed medical evaluation form documenting OHI/ADHD diagnosis and its impact on focus, executive functioning, and organizational skills. Includes explicit recommendation for behavioral health interventions/counseling for anxiety history. | Medical confirmation consistent with expert ADHD analysis in this Report. Counseling recommendation for anxiety appears to have been disregarded entirely—no evidence of discussion at any subsequent 504 or IEP meeting. Directly relevant to FAPE claims; represents missed intervention for anxiety that later manifested as misidentified classroom behaviors. |
| Entry 6 / CBM-04 (CIM-284) | 4/2/2024 | Mother's formal complaint to FL Inspector General alleging McKinney-Vento failures: penalization instead of support, forced public disclosure of homelessness for PE uniform, bus stranding (1.5 hours), police threats on bus, AP stating bus is "privilege not right," and ignored resource requests. Covers both 2019 and 2024 incidents. | Earliest formal state-level filing. PE uniform incident significant for student with documented anxiety. AP's "privilege not right" statement directly contradicts McKinney-Vento (transportation is a right for homeless students). Bus incidents relevant to duty of care and hostile environment claims. Triggered CARES investigation (Entry 7). |
| Entry 7 / CIM-480 | 4/18/2024 | Deputy Superintendent Tierney directs Vivian Green to investigate Inspector General referral through CARES process. Sets April 26, 2024 deadline. Copies Zuloaga-Haines, Cox, and Sills. | Establishes chain of notice from state level to highest District operational leadership. Five named District officials had actual knowledge of allegations from this date forward. Forecloses defense that concerns were isolated building-level complaints unknown to leadership. |
| Entry 8 / Cross-Ref / CBM-154–162 | 12/16/2024 | District ADA/504 Investigation examining 8 complaints about Grade 6 accommodation implementation and retaliation. Investigated by Kim Doyle. Found no disability discrimination on any complaint. Key findings: breaks conditioned on escort; notes provided via alternative means; detention for anxiety-driven laughing permissible below Manifestation Determination threshold. | Investigation's scope excluded broader discipline pattern, homelessness intersection, and MTSS considerations. Finding on laughing/detention is in direct tension with IEP team's later Accommodation #15 (nonverbal cue for anxiety-driven laughing). Investigation distributed to all District leadership levels but suspended on 5/15/2025 (CBM-434) due to pending federal lawsuit, leaving 2025 complaints unresolved. |

| Entry/ Discovery Page | Date | Summary of Concerns | Implications to Case |
|---|---|---|---|
| Entry 9 / CBM-449–464 | 4/8/2025–5/7/2025 | Month-long crisis: C.M.-1 slapped in class, given detention; mother reports Miss Oliver said "We don't deal with snitches" (Oliver denies); mother requests IEP action plan; Principal offers prospective 4-step plan; mother holds C.M.-1 home 4/21–5/6 due to anxiety; District responds with attendance warnings and alternative placement options; mother files grievance amendment; C.M.-1 returns 5/7; General Counsel Pincus comments "My guess is that we will never be served." | "Snitches" allegation consistent with C.M.-1's deposition pattern re: Miss Oliver. District responses to disability-related absence focused on attendance policy, not accommodation remediation.<br><br>Whetsell's alternative placement list reads as removal options, not safety plan. Feaman's 4-step plan is prospective only—no retrospective accountability or compensatory services.<br><br>Pincus comment shows legal monitoring without remedial action. Federal complaint filed 5/5/2025. Notice chain by this date includes Deputy Superintendent, Instructional Superintendent, ESE Executive Director, 504 Coordinator, and General Counsel. |
| Entry 10 / CBM-087–096 | 4/21/2025 | Formal Grievance and Demand for Educational Compensation filed through District CARES system. Describes virtually all claims in current Second Amended Complaint: Section 504/ADA discrimination, IDEA/FAPE violations, retaliation, McKinney-Vento violations, hostile environment, accommodation denial. Culmination of two years of advocacy. | Pre-litigation notice document. District received comprehensive description of all claims and opportunity to remediate before federal filing. Federal complaint filed 14 days later (5/5/2025, CBM-116–119). Kim Doyle suspended 504 investigation on 5/15/2025 (CBM-434) due to pending lawsuit—leaving C.M.-1 without internal resolution while still requiring her attendance and compliance. |

Expert Analysis: Corroboration of C.M.-1's Deposition Testimony by Discovery Documents

    Introduction and Purpose. It is essential to systematically identify the consistencies between C.M.-1's deposition testimony of February 18, 2026 and the Discovery documents cataloged in the preceding section. C.M.-1 was 13 years old and in the 8th grade at Emerald Cove Middle School at the time of her deposition. She was examined for approximately one hour by Defense counsel (Laura Pincus) and Plaintiff's counsel (Roberto Cruz). Despite her age and the inherent limitations of a deposition format with a minor with two disabilities, C.M.-1's testimony is remarkably consistent with the documentary record produced during Discovery. The consistencies identified below are significant because they demonstrate that C.M.-1's account of accommodation denial, hostile treatment by staff, anxiety and overstimulation, break denial, extended time denial, retaliatory conduct by her ESE support facilitation teacher, and the resulting impact on her mental health and academic performance is not based on

retrospective characterization alone—it is corroborated, point by point, by e-mails, school records, medical documentation, investigation reports, and formal complaints generated at or near the time the events occurred.

These corroborations (see Table 14 below) are directly relevant to Counts I and III that pertain directly to C.M.-1. Where a Discovery document does not have a direct corresponding passage in the deposition, this is noted. The absence of direct testimony on a particular document does not diminish the document's value—it reflects only that the specific topic was not raised during the one-hour deposition of a 13-year-old minor.

Table 14. Consistencies Between the C.M.-1's Discovery Entries and Her Deposition

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| Entry 1 / CBM-47 / 8/3/2023 | Screen capture from C.M.-1's electronic cumulative record confirming her official designation as Homeless under the McKinney-Vento Act at the start of Grade 6 at Emerald Cove Middle School. | No direct testimony. C.M.-1 provides her current address as 7110 Okeechobee Boulevard, Apartment 643 (p. 12) and confirms she has lived there the entire time she has been in middle school (pp. 12–13). She identifies her household as her mother, sister, and aunt (p. 13), and states her brother lived with the family until approximately five months before the deposition (pp. 13–14). The deposition did not explore C.M.-1's housing status or homelessness history. |
| Entry 2 / CIM-0080 / 2/16/2024 | E-mail from Assistant Principal King to C.M.-1's mother reporting frequent behavioral and dress code violations in 6th grade. Acknowledges family "hardship" but demands compliance. No reference to C.M.-1's existing 504 Plan. | C.M.-1 testifies about her 6th-grade science teacher (Miss Baughman) that "she was just too much for me" and "she would keep writing me up for... like not knowing the full story, where she would just go take my call" (pp. 35–36). C.M.-1 also acknowledges that she is "more compliant with the rules" now than she was in 6th grade (p. 36) and that she has "matured some" (p. 36). This testimony is consistent with the February 2024 behavioral reports cited by AP King, while also reflecting C.M.-1's perspective that the referrals were issued without full understanding of the circumstances—a perspective consistent with the mother's subsequent complaints that disability-related behaviors were being interpreted as misconduct. |
| Entry 3 / CBM-04 / 4/2/2024 | Formal complaint e-mail from C.M.-1's mother to Hannah Harlow at the Florida Department of Education's Office of Inspector General alleging McKinney-Vento failures across two periods of family homelessness (2019 at Grassy Waters Elementary and 2024 at Emerald Cove Middle School).<br><br>Documents: PE coach requiring C.M.-1 to publicly disclose her homelessness to receive a uniform, resulting in zeros for not dressing out; bus driver stranding C.M.-1 for approximately 1.5 hours in an unfamiliar location; bus driver threatening to call police when C.M.-1 needed to exit the bus for a medical issue; assistant principal stating "riding the bus is a privilege and not a right"; ignored or inadequate resource requests; and 45-minute to | No direct testimony on the specific McKinney-Vento incidents described in this complaint (PE uniform disclosure, bus stranding, bus threats, dress code enforcement, or the assistant principal's "privilege not right" statement). The deposition did not explore homelessness, transportation, or dress code topics with C.M.-1. However, C.M.-1's testimony about her anxiety is directly consistent with the mother's characterization in this complaint that C.M.-1 "already experiences anxiety." C.M.-1 testifies: "I would have bad anxiety" (p. 43); describes anxiety symptoms as "my heart just keep going fast and then I just start breathing hard" (pp. 43–44); describes becoming "overstimulated" in class (p. 45); and testifies that she needs breaks "because I get overstimulated and my anxieties" (p. 46).<br><br>She further testifies that these experiences were "impacting my mental health" (p. 37) and "affecting my mental health" (p. 43), and that her mother ultimately kept her home from school as a result (p. 43). The mother's statement in this complaint—that C.M.-1 "already experiences anxiety and would not feel comfortable disclosing her homelessness in front of peers"—is thus corroborated by C.M.-1's own testimony describing the nature and severity of the anxiety that the PE uniform incident and |

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| | one-hour commutes during peak hotel season. Mother states that C.M.-1 "already experiences anxiety and would not feel comfortable disclosing her homelessness in front of peers." | other McKinney-Vento failures would have exacerbated. The absence of direct testimony on the specific incidents is attributable to the fact that neither counsel raised McKinney-Vento or homelessness-related topics during the one-hour deposition of this 13-year-old minor. |
| Entry 4 / CBM-238 / 4/1/2024 | Meeting Report for ESE eligibility assessment at which C.M.-1's mother attended with an attorney (Ms. Cantelmo). Team agreed to proceed with assessments that ultimately resulted in C.M.-1 qualifying for OHI/IEP services. | C.M.-1 consistently references her accommodations and the staff assigned to support them throughout the deposition. She identifies Miss Oliver as "my accommodation person" (p. 31) and "the accommodation lady" (p. 48), identifies Mrs. Berliant as the person who assisted with accommodations in 7th grade (p. 23), and identifies Mrs. Johnson as the current (8th-grade) accommodation support (p. 23). C.M.-1's testimony confirms that she received ESE support facilitation services in both 7th and 8th grade—services that originated from the eligibility assessments agreed to at this April 1, 2024 meeting. Her testimony that Mrs. Johnson "helps me with my accommodations" and that this support is "just this year" with "somebody different last year" (p. 23) confirms awareness of and reliance on the IEP-based support structure. |
| Entry 5 / CBM-294–295 / 4/1/2024 | Dr. Sanua's medical evaluation documenting ADHD affecting focus, executive functioning, and organizational skills, and recommending accommodations. Dr. Sanua also documented a history of anxiety and recommended behavioral health interventions/counseling. | C.M.-1 provides testimony that closely mirrors Dr. Sanua's clinical description. She describes becoming "overstimulated" in the classroom (p. 45), needing breaks "because I get overstimulated and my anxieties" (p. 46), and experiencing anxiety that manifests as "my heart just keep going fast and then I just start breathing hard" (pp. 43–44). She describes anxiety triggered by assignment deadlines: "like when I have to do this assignment and it's due that day and I would just be in a rush" (p. 43)—a description consistent with Dr. Sanua's notation that ADHD "affects executive functioning and organizational skills." C.M.-1 confirms she currently sees a behavioral health professional who comes to the school specifically to meet with her for therapy (pp. 37–38)—a service consistent with Dr. Sanua's recommendation for "behavioral health interventions/counseling," though this service was not implemented until the 2025–2026 school year, more than 18 months after the recommendation was made. |

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| Entry 6 / CBM-04 (CIM-284) / 4/2/2024 | Mother's formal complaint to the Florida Inspector General alleging McKinney-Vento failures including: penalization instead of support; forced public disclosure of homelessness for PE uniform; bus stranding for 1.5 hours; police threats on bus; AP stating bus is "privilege not right"; and ignored resource requests. | No direct testimony on the specific incidents described in the Inspector General complaint (PE uniform, bus stranding, bus threats). However, C.M.-1's testimony about the impact of school experiences on her mental health is consistent with the mother's complaint that C.M.-1 "already experiences anxiety" and that the school's treatment was exacerbating rather than alleviating that anxiety. C.M.-1 testifies: "it was impacting my mental health" (p. 37) and "it was affecting my mental health" (p. 43), and describes anxiety symptoms of rapid heartbeat and difficulty breathing (pp. 43–44). The deposition did not explore the specific McKinney-Vento violations described in the complaint. |
| Entry 7 / CIM-480 / 4/18/2024 | Deputy Superintendent Tierney directs Vivian Green to investigate the Inspector General referral through the District's CARES process, with an April 26, 2024 deadline. Establishes that five named District officials had actual knowledge of the allegations. | No direct testimony. This is an internal District administrative communication. However, C.M.-1's testimony that when problems occurred she "used to tell my mom" (p. 47) and that her mother "e-mailed the assistant principal" (p. 32) is consistent with the pattern of parental advocacy that generated this referral chain— beginning with C.M.-1 reporting problems to her mother, her mother escalating to school administration, and her mother ultimately filing the Inspector General complaint that produced Tierney's directive. |
| Entry 8 / Cross-Reference CBM-154–162 / 12/16/2024 | District ADA/Section 504 Investigation Report examining eight complaints about 6th-grade accommodation implementation. Investigated breaks conditioned on escort, notes in math, extended time, assignment chunking, detention for anxiety-driven laughing, phone number disclosure, inadequate communication, and interpretation of disability symptoms as behavioral issues. Found no disability discrimination on any complaint. | C.M.-1's testimony corroborates the underlying factual basis of multiple complaints examined in this investigation, while extending the pattern into 7th grade. Breaks conditioned on escort (Complaint #1): C.M.-1 testifies "I did not go to breaks without an escort" (p. 49) and describes Miss Oliver following her to the bathroom and rushing her during breaks: "the teacher followed me around like the whole — she would follow me to the bathroom, tell me to hurry up. Rushing me on my break" (pp. 47–48). Extended time denial (Complaint #3): C.M.-1 testifies that in 7th grade, three teachers did not provide extended time: "Mr. Wagstaffe, Mr. Klein and Mr. Frost" (p. 40).

She testifies that Mr. Wagstaffe specifically refused extended time by characterizing work as "overdue" (p. 50). She testifies that she failed her classes as a result: "Did you pass those classes? A. Last year, no" (p. 40). Interpreting disability symptoms as behavioral issues (Complaint #8): C.M.-1 describes being "overstimulated" in class (p. 45), needing breaks for anxiety (p. 46), and being denied those breaks in specific |

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| | | classrooms (p. 46)—then being written up when her behavior escalated. Her testimony that teachers "would just go take my call" rather than understanding the situation (p. 36) and that Mr. Klein wrote referrals "a lot" rather than having "a talk" (pp. 29–30) reflects a student whose disability-related behaviors were consistently met with punitive responses rather than accommodations. |
| Entry 9 / CBM-449–464 / 4/8/2025–5/7/2025 | Month-long e-mail chain documenting: C.M.-1 slapped in class and given detention; mother reports Miss Oliver said, "We don't deal with snitches" (Oliver denies); mother holds C.M.-1 home 4/21–5/6 due to anxiety; District responds with attendance warnings and alternative placement options rather than addressing accommodation concerns; General Counsel Pincus comments "My guess is that we will never be served." | C.M.-1's deposition testimony about Miss Oliver is extensive and directly corroborates the mother's documented complaints in this e-mail chain. C.M.-1 testifies that Miss Oliver "would tell teachers I would stink" (p. 31), "would talk about me to the class when I was gone" (pp. 31–32), and "would just point at me to other students and tell them to stay away from me" (p. 32). She provides specific detail: "she pointed to the teacher and I was behind her... she was pointing at me and she did this (indicating) that I stink" (pp. 48–49). She describes Miss Oliver's reaction when she returned from breaks: "when I finally came back from the break, she was like, oh, my gosh, you're back" (p. 49). She testifies that after her mother complained, Miss Oliver "stopped coming to the class" (p. 48)—reduced contact that C.M.-1 describes as Miss Oliver "only used to come when it's testing" (p. 48). C.M.-1 also testifies that she stopped going to school because "it was impacting my mental health" (p. 37) and "it was affecting my mental health" (p. 43), that it was her "mom's" choice to keep her home (p. 43), and that she was out for "probably like a good two months" (p. 41)—consistent with the April 21–May 6 absence documented in the e-mail chain, though C.M.-1's estimate of duration is longer than the 15 days documented in this specific chain, suggesting additional absences may have occurred. She confirms she was not doing any schoolwork during the absence (p. 41) and describes spending the time "on my phone... watching TikTok" (pp. 41–42). |
| Entry 9 (continued) — Mr. Wagstaffe IEP disclosure | The e-mail chain documents the mother's concerns about IEP-related retaliation and hostile treatment by staff. | In testimony volunteered at the end of the deposition—unprompted by either counsel's question line—C.M.-1 describes Mr. Wagstaffe disclosing her IEP status to the class: "When I asked for a time from Mr. Wagstaffe, he would go on about my IEP to the class" (p. 50). She describes having to involve her "accommodation teacher" to intervene and states Wagstaffe "won't give me the extra time because he would say it was overdue" (pp. 50). This testimony—offered spontaneously by C.M.-1 as something she specifically "want[ed] to share for the purpose of this deposition" (p. 49)—corroborates the pattern of hostile treatment and accommodation denial |

117

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| | | documented in the e-mail chain and is independently significant as evidence that a teacher publicly discussed C.M.-1's IEP in front of her peers, potentially violating her privacy rights under FERPA and creating the type of stigmatizing environment that the accommodation framework is designed to prevent. |
| Entry 10 / CBM-087–096 / 4/21/2025 | Formal Grievance and Demand for Educational Compensation filed through the District CARES system. Describes virtually all claims in the current Second Amended Complaint: disability discrimination, IDEA/FAPE violations, retaliation, McKinney-Vento violations, hostile environment, and accommodation denial. | C.M.-1's cumulative deposition testimony corroborates the core categories of harm alleged in this grievance. <u>Disability discrimination:</u> C.M.-1 identifies Miss Oliver and Mr. Klein as individuals who discriminated against her (pp. 31, 31), describing Oliver's stigmatizing conduct (pp. 31–32, 48–49) and Klein's selective discipline (pp. 31, line 10–14: "it was me and my friend doing it and he only wrote me up for it").<br><br><u>Accommodation denial:</u> She testifies that three 7th-grade teachers denied extended time (p. 40), that breaks were denied or restricted in multiple classrooms (pp. 46–47), and that her ESE support teacher reduced contact after the mother complained (p. 48).<br><br><u>Hostile environment:</u> She describes being publicly humiliated by Miss Oliver (pp. 48–49), having her IEP status disclosed to peers by Mr. Wagstaffe (p. 50), and being called "ugly" by the cheer coach (p. 45).<br><br><u>Mental health impact:</u> She testifies to anxiety symptoms including rapid heartbeat and difficulty breathing (pp. 43–44), overstimulation in the classroom (p. 45), and an extended school absence driven by the impact on her mental health (pp. 37, 41, 43).<br><br><u>Academic harm:</u> She testifies she failed her 7th-grade classes (p. 40) and did not receive education during her absence from school (p. 41). |

<u>Summary of Corroboration Findings</u>

Of the ten cataloged Discovery entries, including the Cross-Reference entry (ADA/Section 504 Investigation Report), C.M.-1's deposition testimony provides direct corroboration for seven entries and indirect or contextual corroboration for three additional entries.

The strongest corroborations—and those most directly relevant to Counts I and III—fall into four categories:

- <u>Miss Oliver's hostile and stigmatizing conduct (Counts I and III)</u>. C.M.-1's testimony about Miss Oliver telling teachers she "stinks," gesturing to that effect in front of peers, talking about her to the class in her absence, pointing at her and telling students to stay away, sarcastically commenting "oh, my gosh, you're back" upon her return from breaks, and reducing classroom support after the mother complained (pp. 31–32, 47–49) is directly corroborated by the mother's contemporaneous e-mails in the CBM-449–464 chain and the pattern of complaints documented across the Inspector General filing, the 504 Investigation, and the Formal Grievance. The consistency between a 13-year-old's deposition testimony and the documentary record produced over two school years is significant.

- <u>Accommodation denial—extended time and breaks (Count I)</u>. C.M.-1's testimony that three 7th-grade teachers (Wagstaffe, Klein, Frost) did not provide extended time (p. 40), that Wagstaffe characterized IEP-required extended time as "overdue" work (p. 50), and that breaks were denied or restricted in multiple classrooms (pp. 46–47) is consistent with the mother's complaints examined in the 504 Investigation (CBM-154–162) and the April 2025 e-mail chain (CBM-449–464). The 504 Investigation found "no discrimination" on the extended time complaint for 6th grade; C.M.-1's testimony establishes that the same pattern continued into 7th grade with different teachers.

  Critically, the District—in its First Interrogatory response on January 29, 2026—noted [Response #2, Page 1] that <u>Teacher Observation</u> was "the specific method used to verify the provision of 'movement breaks/frequent breaks' for C.M.-1 as referenced in paragraph 10 of your Answer (Docket 48)."

  Significantly, the District produced no logs, data, diaries, or audits of any kind to <u>objectively</u> validate any claims by any District staff person that C.M.-1 received any—much less any consistent when student-requested—frequent/movement breaks for the three years in question under either his 504 or IEP plan. As such, any claims to the contrary are simply words without documentation.

- <u>Anxiety and overstimulation as disability manifestations (Count I)</u>. C.M.-1's descriptions of overstimulation (p. 45), anxiety-driven need for breaks (p. 46), rapid heartbeat and difficulty breathing (pp. 43–44), and emotional breakdowns during classwork (p. 43) are clinically consistent with Dr. Sanua's April 1, 2024 medical evaluation documenting ADHD-related executive function deficits and a history of anxiety (CBM-294–295). The deposition testimony provides the student's own account of the same symptoms that the physician documented—and that the school treated as behavioral infractions rather than disability manifestations.

- <u>Academic harm resulting from accommodation denial (Counts I and III)</u>: C.M.-1's testimony that she failed her 7th-grade classes (p. 40), that she was absent from school for an extended period due to the impact on her mental health (pp. 37, 41, 43), and that she received no education during the absence (p. 41) documents the concrete academic harm that resulted from the accommodation denial and hostile treatment documented across the Discovery entries. The fact that C.M.-1 was

nonetheless promoted to 8th grade—a fact she herself cannot explain ("I don't know," p. 41)—raises additional questions about whether the District provided the compensatory services or remedial instruction necessary to address the academic harm its own failures caused.

— — — — —

Analyzing C.M.-2's Relevant Discovery Documents

Below are discussions for the most relevant documents in C.M.-2's Discovery packet. A conclusion at the end will detail how and where the documents validate or corroborate testimony in the Plaintiffs' respective depositions. Seven documents, or "Entries," are reviewed.

Entry 1. Part 1. Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CIM-357
Date: May 1, 2024
People Involved: Tinisha Tolbert (C.M.-2's mother, complainant); Valerie Zuloaga-Haines (recipient, District administrator); Samantha Butler (Assistant Principal, Palm Beach Central High School, referenced); unnamed school principal (Palm Beach Central, referenced); Ms. Cantelmo (Attorney, referenced)
C.M.-1: Grade 6 at Emerald Cove Middle School
C.M.-2: Grade 9 at Palm Beach Central High School

Entry 1. Part 2. Summary of Concerns

This e-mail from C.M.-2's mother to Valerie Zuloaga-Haines constitutes a formal complaint about a 10-day out-of-school suspension imposed on C.M.-2 at Palm Beach Central High School. The mother alleges that the suspension was excessive and discriminatory rather than corrective, noting that the incident did not disrupt the school environment and was only C.M.-2's second referral of the school year. She reports that she attempted to resolve the matter at the school level, but that the principal upheld the suspension without fully understanding the facts, as evidenced by student statements that were submitted after his decision had already been made.

The mother raises a separate and distinct concern about Assistant Principal Samantha Butler's conduct. She reports that Butler publicly shamed C.M.-2 over an incident involving a girl and made derogatory remarks suggesting that C.M.-2 needs behavioral health services to prevent him from "beating on women." The mother characterizes Butler's statements as unfounded, noting that Butler lacks the credentials to diagnose or recommend treatment, and states that the insinuation that C.M.-2 may become an abuser is based on cultural biases or Butler's own personal experiences with domestic violence rather than on any factual basis. The mother requests that Butler be directed to refrain from further interaction with C.M.-2.

The e-mail also references a FERPA violation at Emerald Cove Middle School (C.M.-1's school), where staff shared the family's contact information with another parent after the mother reported an incident. The mother states that she is abiding by the chain of command and offering the District an opportunity to address the issues, as advised by her attorney.

Entry 1. Part 3. Implications to the Case and Litigation Counts / Validation of Deposition Responses

This e-mail is the earliest formal complaint in the Discovery record specific to C.M.-2 and establishes several foundational elements relevant to the litigation.

Excessive discipline. A 10-day out-of-school suspension is the maximum duration that can be imposed before triggering Manifestation Determination Review obligations under Section 504 and IDEA. The mother's characterization of the suspension as "discriminatory rather than corrective"—imposed for an incident that did not disrupt the school environment and representing only C.M.-2's second referral of the year—raises the question of whether the severity of the consequence was proportionate to the conduct, and whether C.M.-2's disability (ADHD, later supplemented by a GAD diagnosis) was considered in the disciplinary determination. The fact that student statements were submitted after the principal's decision had already been made suggests that the decision was made without complete information—a procedural concern relevant to the disability discrimination claims under Count I.

AP Butler's conduct. Butler's reported statements—publicly shaming C.M.-2 and suggesting he needs behavioral health services to prevent him from "beating on women"—constitute the type of stigmatizing, stereotype-driven treatment by school administrators that is relevant to the hostile educational environment claims. An assistant principal who publicly characterizes a 14- or 15-year-old male student as a potential domestic abuser based on a single disciplinary incident has imposed a behavioral label that exceeds both her authority and her qualifications—a point the mother makes explicitly. This conduct is independently significant because it occurred at the same school where Ms. Chacon subsequently retaliated against C.M.-2 for asserting his 504 accommodations (see Entry 4), establishing a pattern at Palm Beach Central in which staff responses to C.M.-2 were punitive and stigmatizing rather than supportive.

Notice of legal representation. As with C.M.-1's records, the mother's reference to her attorney places the District on notice that the family had retained legal counsel by May 2024. The FERPA cross-reference to Emerald Cove also establishes that the District's conduct toward both children was generating concurrent complaints—a factor relevant to the retaliation claims under Count III, as the District's awareness of the family's advocacy across both schools creates the context in which subsequent adverse actions against either child should be evaluated.

---

Entry 2. Part 1. Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CIM-146
Date: May 21, 2024 (letter date); May 15, 2024 (date of diagnosis)
People Involved: Lorena Frontado, MD (Pediatric Partners, diagnosing physician); Paola Herrera (Head of Behavioral Health Department, Pediatric Partners, referenced as contact)
C.M.-1: Grade 6 at Emerald Cove Middle School
C.M.-2: Grade 9 at Palm Beach Central High School

---

Entry 2. Part 2. Summary of Concerns

This document is a medical letter from Dr. Lorena Frontado of Pediatric Partners confirming that C.M.-2 was diagnosed with Generalized Anxiety Disorder (GAD) (F41.1) on May 15, 2024, and that he meets the DSM-5 diagnostic criteria for the condition.

Dr. Frontado describes the clinical presentation of GAD in children and adolescents, noting that symptoms may include difficulties with attentiveness, increased distractibility, challenges with self-regulation, social skills deficits, reduced cognitive flexibility, poor time management, and weaknesses in short-term and working memory, as well as difficulty with abstract thinking. She notes that students with GAD commonly present with co-morbidities that should be considered when determining appropriate accommodations.

Dr. Frontado recommends that C.M.-2 be provided with accommodations including extended time to complete assignments or projects, additional time for testing, testing environments with minimized distractions, support for organizational and time management skills, access to social skills counseling, and a "hot pass" to use when he is feeling overwhelmed. She directs any questions about the diagnosis or accommodations to the head of Pediatric Partners' Behavioral Health Department.

---

Entry 2. Part 3. Implications to the Case and Litigation Counts / Validation of Deposition Responses

This medical letter is significant for three reasons.

Timing of diagnosis relative to school events. C.M.-2's GAD diagnosis was rendered on May 15, 2024—two weeks after his mother filed the complaint about the 10-day suspension and AP Butler's stigmatizing conduct (Entry 1, CIM-357, May 1, 2024), and during the same period in which C.M.-2 was experiencing the hostile treatment from Ms. Chacon that his mother would later describe in her September 4, 2024 complaint (Entry 4, CIM-365). The mother's complaint about Chacon explicitly states that she "delayed this complaint due to C.M.-2's subsequent anxiety diagnosis, which arose from the humiliation he faced and his reluctance to return to school." This timeline suggests a direct causal link—as reported by the mother and corroborated by the chronology of medical treatment—between the hostile school environment at Palm Beach Central and C.M.-2's clinical anxiety diagnosis.

Establishment of a second qualifying disability. The GAD diagnosis supplements C.M.-2's existing ADHD diagnosis, establishing two distinct but interacting disabilities that require accommodations. Dr. Frontado's description of GAD's impact on attentiveness, distractibility, self-regulation, cognitive flexibility, time management, and working memory overlaps substantially with the cognitive demands already compromised by ADHD—meaning the two conditions compound each other's impact on C.M.-2's ability to access education without appropriate support. This is directly relevant to the disability discrimination claims under Count I. From this date forward, any failure to accommodate C.M.-2 must be evaluated against two documented disabilities, not one.

Specific accommodation recommendations disregarded. Dr. Frontado's recommendation for a "hot pass" to use when C.M.-2 is feeling overwhelmed and access to social skills counseling are specific clinical recommendations that parallel Dr. Sanua's unaddressed counseling recommendation for C.M.-1 (Entry 5, CBM-294/295). The Discovery record should be evaluated for evidence of whether these specific recommendations were incorporated into C.M.-2's 504 Plan at either Palm Beach Central or Suncoast, and whether social skills counseling was ever provided.

---

Entry 3. Part 1. Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CIM-472 to CIM-474
Date: August 19, 2024 (mother's e-mail); August 21, 2024 (Armaly's response with bus route); September 18, 2024 (Betancourt's McKinney-Vento notification to staff)
People Involved: Tinisha Tolbert (C.M.-2's mother); Tamara Armaly (McKinney-Vento Case Manager); G. Horacio Ochoa (Eligibility and Transportation Case Manager, McKinney-Vento Program); Clarinda Shabazz (recipient); Aleshia Coleman (recipient); Joseph Lee (recipient); Guadalupe Betancourt (School Counselor, Suncoast Community High School); Galina Chira (Suncoast staff); Lisa Rodrigues (Suncoast staff); James Evans (Suncoast staff); Sherrie Knob (Suncoast staff); Getro (McKinney-Vento Case Manager, referenced, last name not provided)
C.M.-1: Grade 7 at Emerald Cove Middle School
C.M.-2: Grade 10 at Suncoast Community High School

Entry 3. Part 2. Summary of Concerns

This entry consists of three related e-mails documenting the barriers C.M.-2 faced in obtaining McKinney-Vento transportation services at the start of the 2024–2025 school year.

CIM-474 (August 19, 2024). C.M.-2's mother e-mails five District staff members to escalate a transportation request she originally submitted on July 15, 2024—more than one month earlier. She reports that the District did not have C.M.-2 listed as a registered student due to a data entry error, and that despite multiple follow-up contacts on August 9, 10, 12, and 15, 2024, the transportation had not been arranged. She was told that transportation had been set for Palm Beach Central (C.M.-2's former school) rather than Suncoast (his current school), and was then directed to contact a case manager who told her that only the original case manager could view the request. The mother describes the situation as "a significant barrier to my son's ability to attend school."

CIM-472 (August 21, 2024). Case Manager Tamara Armaly confirms that a bus route has been assigned for C.M.-2 with a start date of August 19, 2024. The resolution came 37 days after the mother's original July 15 request and after multiple follow-up contacts.

CIM-473 (September 18, 2024). School Counselor Guadalupe Betancourt at Suncoast High School e-mails staff identifying C.M.-2 as a McKinney-Vento student in 10th grade and noting that a new School-Based Team (SBT) mandatory referral is needed for the school year. She requests that staff e-mail her the services C.M.-2 is or will be receiving.

---

Entry 3. Part 3. Implications to the Case and Litigation Counts / Validation of Deposition Responses

McKinney-Vento transportation delay. The McKinney-Vento Act requires districts to provide transportation services to homeless students to eliminate barriers to school attendance. C.M.-2's mother submitted a transportation request on July 15, 2024—more than a month before the school year began—and the transportation was not resolved until August 21, 2024, two days after the school year started.

During the intervening 37 days, the request was misrouted to the wrong school due to a District data entry error, the mother was redirected between case managers who could not access each other's systems, and C.M.-2 was left without the transportation necessary to attend his new school. The mother's characterization of this as "a significant barrier to my son's ability to attend school" is substantively accurate: a student who has no way to get to school cannot attend school. This delay is directly relevant to the McKinney-Vento claims and parallels the transportation barriers documented for C.M.-1 (see C.M.-1 Entry 3/CBM-04 and Entry 6/CIM-284).

Systemic failure across both children. The District's failure to timely arrange McKinney-Vento transportation for C.M.-2 occurred in the same period that C.M.-1 was experiencing McKinney-Vento-related transportation threats and barriers at Emerald Cove. The parallel failures across two different schools, two different grade levels, and two different sets of District staff reinforce the mother's position—articulated in her Inspector General complaint—that the District's McKinney-Vento failures are systemic rather than attributable to individual staff at a single site.

The September 18 notification. Betancourt's e-mail identifying C.M.-2 as McKinney-Vento and requesting a new SBT referral was sent one month into the school year—indicating that the support framework that should have been in place at enrollment was still being assembled in mid-September. The e-mail also confirms C.M.-2's McKinney-Vento designation at Suncoast, establishing that the school was on notice of his homeless status from at least this date forward.

<u>Entry 4</u>. <u>Part 1. Discovery Page, Date, People Involved, Current Grade/School</u>

<u>Discovery Page:</u> CIM-365
<u>Date:</u> September 4, 2024
<u>People Involved:</u> Tinisha Tolbert (C.M.-2's mother, complainant); Kimberly Doyle (ADA/Section 504 Coordinator, recipient); Gabriela Chacon (Teacher, Palm Beach Central High School, subject of complaint)
<u>C.M.-1:</u> Grade 7 at Emerald Cove Middle School
<u>C.M.-2:</u> Grade 10 at Suncoast Community High School (complaint references events during Grade 9 at Palm Beach Central High School)

---

<u>Entry 4</u>. <u>Part 2. Summary of Concerns</u>

This e-mail is a formal complaint filed by C.M.-2's mother with ADA/Section 504 Coordinator Kim Doyle alleging that Ms. Gabriela Chacon, a teacher at Palm Beach Central High School, created a hostile learning environment and retaliated against C.M.-2 for advocating for his 504 Plan accommodations during the 2023–2024 school year (Grade 9).

The mother reports that C.M.-2 requested extended time—an accommodation specified in his 504 Plan—and that Ms. Chacon questioned the need for the extension based on her own classroom observations of C.M.-2. Despite the mother's reminder that extended time is "a right, not a privilege," and her suggestion that Chacon consult the 504 Plan coordinator for clarification, Chacon's conduct toward C.M.-2 deteriorated into retaliation and hostility. The mother reports that Chacon made inappropriate comments about students contacting their parents and those with 504 Plans, publicly humiliated C.M.-2 by calling him a cheater, and instructed other students to avoid him.

The mother states that she delayed filing the complaint due to C.M.-2's subsequent anxiety diagnosis, which she attributes to the humiliation he experienced and his reluctance to return to school. She describes C.M.-2 as having been "not only discriminated against but also retaliated against for seeking assistance through his 504 Plan." She requests an investigation, enforcement of 504 accommodations without prejudice or retaliation, a safe and supportive learning environment, and enhanced staff training on 504 Plan compliance.

Based on Discovery document CIM-298, the District did conduct an investigation in response to this complaint, producing an Investigation Report dated December 16, 2024 (the same date as the C.M.-1 ADA/504 Investigation Report). However, the mother did not participate in the investigation process despite having requested it.

---

<u>Entry 4</u>. <u>Part 3. Implications to the Case and Litigation Counts / Validation of Deposition Responses</u>

This complaint is central to the disability discrimination and retaliation claims (Counts II and IV) as they pertain to C.M.-2.

<u>504 accommodation denial and retaliation.</u> The sequence described by the mother—C.M.-2 requests a legally mandated accommodation, the teacher questions the need for it, the mother intervenes, and the teacher's conduct toward C.M.-2 subsequently deteriorates into hostility and public humiliation—is a textbook retaliation pattern. A student exercises a right under Section 504, and the teacher's response is to punish the student for having exercised that right. Calling C.M.-2 a cheater, making targeted comments about students with 504 Plans, and instructing other students to avoid him are actions that a reasonable

student would perceive as retaliatory—and that would deter a reasonable student from requesting accommodations in the future. This is precisely the chilling effect that the anti-retaliation provisions of Section 504 and the ADA are designed to prevent.

Causal link to GAD diagnosis. The mother explicitly connects Chacon's conduct to C.M.-2's subsequent anxiety diagnosis (see Entry 2, CIM-146, May 21, 2024), stating that the complaint was delayed because of "C.M.-2's subsequent anxiety diagnosis, which arose from the humiliation he faced and his reluctance to return to school." This establishes the mother's belief—documented in a formal complaint to the District's ADA/504 Coordinator—that the hostile school environment directly caused C.M.-2's clinical anxiety. The temporal sequence supports this: Chacon's conduct occurred during the 2023–2024 school year, and C.M.-2 was diagnosed with GAD on May 15, 2024, during the same school year.

Investigation without parent participation. The fact that the District conducted an investigation (CIM-298) but the mother did not participate in the process raises questions about whether the investigation adequately captured the student's and family's perspective. This parallels the C.M.-1 ADA/504 Investigation (CBM-154–162), which similarly did not include an interview of the student. Both investigations were completed on the same date (December 16, 2024) and were conducted by the same investigator (Kim Doyle)—the same individual who subsequently suspended both investigations on May 15, 2025 due to the pending federal lawsuit.

---

Entry 5. Part 1. Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CIM-917
Date: September 10, 2024
People Involved: Thomas Dashiell (Teacher, Suncoast Community High School); Ernestine Hall-Sweets (ESE Coordinator & 504 Designee, Suncoast Community High School)
C.M.-1: Grade 7 at Emerald Cove Middle School
C.M.-2: Grade 10 at Suncoast Community High School

---

Entry 5. Part 2. Summary of Concerns

This e-mail exchange consists of two messages. Teacher Thomas Dashiell e-mails ESE Coordinator Ernestine Hall-Sweets to ask whether a plan of accommodations exists for C.M.-2, stating, "I do not see him on your list." Dashiell then characterizes C.M.-2's accommodation request in dismissive terms: "This student is asking me to give him all my notes while he sits in class and does nothing." Hall-Sweets responds that C.M.-2 does have a plan and that she has updated the Google Sheet.

---

Entry 5. Part 3. Implications to the Case and Litigation Counts / Validation of Deposition Responses

This e-mail exchange is significant for two independent reasons.

504 Plan not distributed to teachers. Dashiell's statement that he does not see C.M.-2 "on your list" establishes that, as of September 10, 2024—approximately one month into the school year—C.M.-2's 504 Plan had not been made available to at least one of his classroom teachers. Hall-Sweets's response confirming that she "updated the Google Sheet" indicates that the omission was on the school's end, not the student's. For a student with documented ADHD and GAD who transferred to Suncoast as a new student at the beginning of the 2024–2025 school year, the failure to ensure that all teachers had access to

the 504 Plan from the first day of classes meant that C.M.-2 spent the first month of school in at least one classroom where the teacher was unaware that accommodations were legally required. This is directly relevant to the disability discrimination claims under Count II: accommodations that are not communicated to the teachers responsible for implementing them are accommodations that do not exist in practice.

Dashiell's characterization of accommodation requests. Dashiell's description of C.M.-2 as a student who is "asking me to give him all my notes while he sits in class and does nothing" reflects the same pattern documented across C.M.-1's records: a teacher who interprets a disability accommodation as student laziness or manipulation, rather than as a legally-mandated support. The provision of notes or outlines is a standard 504/IEP accommodation for students with ADHD, designed to reduce the executive function burden of simultaneous listening, processing, and note-taking. A teacher who characterizes this accommodation as a student "doing nothing" has fundamentally misunderstood the purpose of the accommodation—and a student who encounters this attitude when requesting a legally-required support is in the same position as C.M.-2 was in Ms. Chacon's classroom at Palm Beach Central—penalized for asserting a right. This e-mail is relevant to both Count II (discrimination) and Count IV (retaliation), as it documents a teacher's hostile framing of a student's accommodation request.

---

Entry 6. Part 1. Discovery Page, Date, People Involved, Current Grade/School

Discovery Page: CIM-277
Date: September 18, 2024
People Involved: Aaron Keevey (Assistant Principal, Suncoast Community High School); Ernestine Hall-Sweets (ESE Coordinator & 504 Designee, Suncoast, cc'd); Felecia Clemons (bcc'd); all of C.M.-2's classroom teachers (recipients); Tinisha Tolbert (C.M.-2's mother, quoted)
C.M.-1: Grade 7 at Emerald Cove Middle School
C.M.-2: Grade 10 at Suncoast Community High School

---

Entry 6. Part 2. Summary of Concerns

This e-mail from Assistant Principal Aaron Keevey to all of C.M.-2's classroom teachers reminds them that C.M.-2 has a 504 Plan and directs them to familiarize themselves with its contents. Keevey shares a portion of an e-mail from C.M.-2's mother, in which she states that C.M.-2's teachers must be "fully informed of his accommodations" so that "when C.M.-2 advocates for himself, he isn't met with resistance." The mother states that she has instructed C.M.-2 to keep her informed if accommodations are not being provided, and notes that based on her review of a recent score, she suspects C.M.-2 did not receive necessary testing accommodations. She writes, "I can tell anytime my son is not receiving his accommodations. He was either distracted or did not have extended time (which he needs before the test to focus)."

---

Entry 6. Part 3. Implications to the Case and Litigation Counts / Validation of Deposition Responses

This e-mail is significant because it was sent on September 18, 2024—approximately one month into the school year—and its content indicates that the administrative reminder was prompted by the mother's report that accommodations were not being provided. The fact that an assistant principal needed to send a reminder to all of C.M.-2's teachers to familiarize themselves with his 504 Plan one month into the school year—after the mother identified specific evidence that testing accommodations had not been implemented—corroborates the pattern documented in Entry 5 (CIM-917, September 10, 2024), where

teacher Dashiell was unaware that C.M.-2 was on the 504 accommodation list. Together, Entries 5 and 6 establish that during the first month of C.M.-2's enrollment at Suncoast High School, at least one teacher did not know C.M.-2 had a 504 Plan, the mother identified evidence of the denial of C.M.-2's accommodations, and the assistant principal had to intervene to direct all teachers to review the Plan.

The mother's statement that she has instructed C.M.-2 to "keep me in the loop if his accommodations are not being provided" also documents the ongoing burden placed on the family to monitor and enforce accommodation compliance—a burden that Section 504 places on the school, not on the student or parent. This self-monitoring dynamic is directly relevant to the retaliation claims under Count IV: a student who must repeatedly advocate for his own accommodations—and whose parent must escalate communications to the administrative level in order to secure basic compliance. This adds up to a student is being met with institutional resistance—rather than institutional support—when he has to remind teachers to provide him the accommodations that (a) they should have known about <u>before</u> the beginning of the school year, and (b) they should be providing without student reminders.

---

<u>Entry 7</u>. <u>Part 1. Discovery Page, Date, People Involved, Current Grade/School</u>

<u>Discovery Page:</u> CIM-831 to CIM-837
<u>Date:</u> November 5, 2024 through December 5, 2024
<u>People Involved:</u> Ernestine Hall-Sweets (ESE Coordinator & 504 Designee, Suncoast Community High School); Tinisha Tolbert (C.M.-2's mother); C.M.-2 (copied on final e-mail); Guadalupe Betancourt (School Counselor, Suncoast, referenced)
<u>C.M.-1:</u> Grade 7 at Emerald Cove Middle School
<u>C.M.-2:</u> Grade 10 at Suncoast Community High School

---

<u>Entry 7</u>. <u>Part 2. Summary of Concerns</u>

This e-mail chain spanning approximately one month documents a protracted negotiation between C.M.-2's mother and ESE Coordinator Ernestine Hall-Sweets over the language of C.M.-2's updated 504 Plan at Suncoast High School. The chain begins on November 5, 2024, when Hall-Sweets forwards the 504 Plan documents and requests the mother's signature. The mother responds on December 4, 2024, stating that she cannot agree to the Plan as written because accommodations contain the qualifying phrases "as needed" and "when available," and that a previously included accommodation has been modified without justification. She writes, "These accommodations are in place to support his needs, not for the convenience of others. The vague wording suggests that the accommodations are optional or subject to change, which is unacceptable."

Hall-Sweets responds with updates including "Shorten Math Assignments (As Needed)" and "Hard Copy of Notes (When Available), student will attempt to complete the guided notes first before requesting a hard copy." The mother objects to both formulations: she requests that the language read "Reduce assignments/homework without impacting content or concepts" rather than "Shortened math assignments," explaining that accommodations should not be subject-specific but rather general to meet the student's needs across all areas. She adds: "While I appreciate the substantial support and resources available to students at Suncoast, if C.M.-2 decides to return to his home school, this 504 Plan will need to remain applicable." Hall-Sweets makes the requested changes and provides the final updated Plan on December 5, 2024.

---

Entry 7. Part 3. Implications to the Case and Litigation Counts / Validation of Deposition Responses

This e-mail chain is relevant to the disability discrimination claims under Count II for several reasons.

Conditional accommodation language. The inclusion of "as needed" and "when available" as qualifiers on 504 Plan accommodations effectively transforms mandatory supports into discretionary ones. A 504 accommodation that is available only "when available" is an accommodation that staff can decline to provide whenever implementation is inconvenient. The mother's objection—that "the vague wording suggests that the accommodations are optional or subject to change"—is legally sound. Section 504 requires that accommodations be implemented consistently; language that conditions implementation on availability or subjective need assessments by individual teachers undermines the mandatory nature of the Plan. This is the same dynamic documented in C.M.-1's records, where teachers exercised discretion over whether and how to implement accommodations that were supposed to be non-negotiable.

Subject-specific narrowing. The mother's objection to "Shortened math assignments" rather than a general reduced-assignment accommodation reflects an understanding that 504 Plans must be written to address the student's disability-related needs across all educational settings—not tailored to the convenience of a specific school's staffing or scheduling structure. A subject-specific accommodation that is lost when the student changes schools or schedules is an accommodation that has been designed for institutional convenience rather than student need.

Modification without justification. The mother's statement that "an accommodation that was previously included in his 504 Plan before attending Suncoast has been modified without justification" raises the question of whether the 504 team at Suncoast High School conducted a proper review before altering accommodations that had been in place at Palm Beach Central. A 504 Plan that is weakened at the point of school transfer—without documented justification and without parental consent—raises compliance concerns under Section 504.

Persistent parental burden. The one-month duration of this e-mail chain—from November 5 through December 5, 2024—documents the sustained effort required by the mother to ensure that C.M.-2's 504 Plan contained enforceable, properly worded accommodations. This is advocacy time that the mother should not have needed to invest if the school had written the Plan correctly in the first instance. The pattern—parent identifies a deficiency, school provides an inadequate correction, parent objects again, school eventually complies—mirrors the dynamic documented throughout both C.M.-1's and C.M.-2's records and is relevant to the retaliation claims under Counts III and IV: the family's need to engage in continuous, escalating advocacy to secure basic compliance creates the very conditions under which retaliation becomes both possible and likely.

---

Table 15 below summarizes the 7 Entries of notable documents in C.M.-2's Discovery packet discussed above.

Table 15. Summary of Important Documents in C.M.-2's Discovery Packet

| Entry / Discovery Page / Date | Summary of Concerns | Implications to Case |
|---|---|---|
| Entry 1 / CIM-357 / 5/1/2024 | Mother's e-mail to Zuloaga-Haines complaining about C.M.-2's 10-day suspension from Palm Beach Central. Alleges suspension was excessive and discriminatory; only second referral of the year; incident did not disrupt school environment; principal decided before student statements were submitted. Reports AP Butler publicly shamed C.M.-2, suggesting he needs behavioral health services to prevent "beating on women." References FERPA violation at Emerald Cove and attorney involvement. | Earliest formal complaint specific to C.M.-2. 10-day suspension at maximum pre-Manifestation Determination threshold raises question of proportionality and disability consideration. Butler's stigmatizing statements relevant to hostile environment claims. Attorney reference places District on notice of legal representation. FERPA cross-reference to Emerald Cove links concurrent complaints across both children, relevant to retaliation (Count IV). |
| Entry 2 / CIM-146 / 5/21/2024 | Medical letter from Dr. Lorena Frontado confirming C.M.-2's diagnosis of Generalized Anxiety Disorder (GAD) on 5/15/2024, meeting DSM-5 criteria. Describes GAD symptoms including attentiveness difficulties, distractibility, self-regulation challenges, reduced cognitive flexibility, poor time management, and working memory weaknesses. Recommends extended time, distraction-minimized testing, organizational support, social skills counseling, and a "hot pass" for overwhelm. | GAD diagnosis supplements existing ADHD, establishing two compounding disabilities. Temporal proximity to Chacon's hostile treatment and Butler's stigmatizing conduct establishes causal link between school environment and clinical anxiety—corroborated by mother's later statement (CIM-365) that diagnosis "arose from the humiliation he faced." Specific recommendations (hot pass, social skills counseling) parallel Dr. Sanua's unaddressed counseling recommendation for C.M.-1. Discovery record should be evaluated for implementation. |
| Entry 3 / CIM-472–474 / 8/19/2024– 9/18/2024 | Three e-mails documenting McKinney-Vento transportation barriers. Mother's July 15 request was unresolved for 37 days due to District data entry error (C.M.-2 not listed as registered student) and misrouting to wrong school. Bus route assigned 8/21/2024, two days after school year started. Counselor Betancourt identifies C.M.-2 as McKinney-Vento on 9/18/2024 and requests new SBT referral. | Transportation delay directly relevant to McKinney-Vento claims. 37-day delay caused by District errors, not family inaction. Parallels C.M.-1's transportation barriers. Betancourt's September notification—one month into school year—shows support framework still being assembled after enrollment. Systemic parallel failures across both children and multiple schools reinforce mother's position that McKinney-Vento noncompliance is District-wide. |
| Entry 4 / CIM-365 / 9/4/2024 | Mother's formal complaint to Kim Doyle alleging teacher Gabriela Chacon (Palm Beach Central) created hostile environment and retaliated against C.M.-2 for requesting 504 extended time accommodation. Chacon questioned need for extension, made targeted comments about 504 students, called C.M.-2 a cheater, instructed peers to avoid him. | Central to Counts II and IV. Request-retaliation sequence is textbook 504 violation: student asserts right, teacher punishes assertion. Mother's causal link between Chacon's conduct and GAD diagnosis corroborated by chronology. |

| Entry / Discovery Page / Date | Summary of Concerns | Implications to Case |
|---|---|---|
|  | Mother attributes C.M.-2's subsequent GAD diagnosis to this treatment. District investigation conducted (CIM-298, report dated 12/16/2024) but mother did not participate. | Investigation conducted without parent participation; completed same date as C.M.-1 investigation by same investigator (Doyle); both subsequently suspended 5/15/2025 due to federal lawsuit. |
| Entry 5 / CIM-917 / 9/10/2024 | Teacher Dashiell e-mails Hall-Sweets asking if C.M.-2 has accommodation plan, stating "I do not see him on your list." Characterizes C.M.-2's accommodation request as: "This student is asking me to give him all my notes while he sits in class and does nothing." Hall-Sweets confirms plan exists and updates Google Sheet. | Establishes that C.M.-2's 504 Plan was not distributed to at least one teacher one month into the school year. Hall-Sweets's Google Sheet update confirms omission was school-side. Dashiell's dismissive characterization of accommodation request reflects same pattern as Chacon: teacher interprets legally mandated support as student laziness. Relevant to Counts II (discrimination) and IV (retaliation). |
| Entry 6 / CIM-277 / 9/18/2024 | AP Keevey e-mails all of C.M.-2's teachers reminding them of his 504 Plan and sharing mother's e-mail reporting that accommodations are not being provided, including suspected testing accommodation denial. Mother states: "I can tell anytime my son is not receiving his accommodations." | Sent one month into school year, corroborating Entry 5 that teachers were not informed of 504 Plan. Administrative intervention required by mother's report of accommodation denial. Documents ongoing burden on family to monitor and enforce compliance—a burden Section 504 places on the school, not the parent. Relevant to Count II (discrimination) and Count IV (retaliation through institutional resistance). |
| Entry 7 / CIM-831–837 / 11/5/2024– 12/5/2024 | Month-long e-mail chain negotiating 504 Plan language at Suncoast. Mother objects to "as needed" and "when available" qualifiers on accommodations, subject-specific narrowing ("Shortened math assignments" rather than general reduced-assignment language), and modification of a pre-existing accommodation without justification. Hall-Sweets makes corrections over multiple rounds. Final updated Plan provided 12/5/2024. | Conditional language ("as needed," "when available") transforms mandatory accommodations into discretionary ones, undermining Section 504 compliance. Subject-specific narrowing limits portability. Modification without justification raises transfer compliance concerns. One-month negotiation documents sustained parental burden to secure properly written Plan— advocacy the school should not have required. Pattern of inadequate drafting followed by parent-driven correction mirrors dynamics in C.M.-1's records. Relevant to Counts I and II. |

Expert Analysis: Corroboration of C.M.-2's Deposition Testimony by Discovery Documents

   Introduction and Purpose. As with the earlier C.M.-1 analysis, the purpose of this section is to systematically identify the consistencies between C.M.-2's deposition testimony of February 18, 2026 and the Discovery documents cataloged immediately above. C.M.-2 was 16 years old and in the 11th grade at Suncoast Community High School at the time of his deposition. He was examined for approximately one hour by Defense counsel (Laura Pincus) and Plaintiff's counsel (Roberto Cruz). Despite his age, C.M.-2

provided testimony that is detailed, internally consistent, and—as demonstrated in Table 16 below—corroborated point by point by e-mails, medical records, administrative communications, and formal complaints in his Discovery packet. The consistencies identified are directly relevant to Count II (disability discrimination under Section 504 and the ADA as applied to C.M.-2), Count IV (retaliation against C.M.-2 for exercising rights under Section 504), and Count V (McKinney-Vento Act violations).

Where a Discovery document does not have a directly corresponding passage in the deposition, this is noted. The absence of direct testimony on a particular document does not diminish the document's evidentiary value—it reflects only that the specific topic was not raised during the one-hour deposition of a 16-year-old minor.

<u>Summary of Corroboration Findings</u>

Of the seven cataloged Discovery entries for C.M.-2, his deposition testimony provides direct and substantive corroboration for all seven. Unlike the C.M.-1 corroboration analysis—where certain McKinney-Vento topics were not explored during the deposition—C.M.-2's deposition covers disability discrimination, accommodation denial, retaliation, the onset and impact of his anxiety, and transportation barriers, providing testimony relevant to all three of his Counts (II, IV, and V).

The strongest corroborations—and those most directly relevant to the litigation—fall into four categories:

- <u>Ms. Chacon's retaliation for 504 advocacy (Counts II and IV)</u>. C.M.-2's testimony that Chacon told him using his accommodations was "cheating the system" and that he "wouldn't get far in life" using them (pp. 34–35), that she denied extended time verbally (pp. 32–33), and that she created an environment where he felt "lesser than others" and "couldn't communicate with other students" (p. 39) directly corroborates every material allegation in the mother's September 4, 2024 formal complaint (Entry 4, CIM-365). The consistency between the mother's written complaint and C.M.-2's testimony—given nearly 18 months later—is significant. C.M.-2 was not reading from the Complaint; he was describing the same events from his own perspective, and the accounts align.

- <u>The "woman beater" label and its cascading effects (Counts II and IV)</u>. C.M.-2's testimony that he was "took around the school and being called a woman beater" (pp. 37–38), that a student in Chacon's class repeated the label in front of the entire class (p. 38), and that the originating incident was "a playful thing that was just amplified by administration" (p. 39) corroborates the mother's May 1, 2024 complaint (Entry 1, CIM-357) and establishes the causal chain between AP Butler's stigmatizing conduct and the hostile classroom environment that C.M.-2 experienced for the remainder of his time at Palm Beach Central. His testimony that the anxiety "started after" these events (pp. 37–38) and his identification of Dr. Frontado as the physician who diagnosed that anxiety (pp. 42–43) connects the school's conduct directly to the clinical diagnosis documented in Entry 2 (CIM-146).

Table 16. Consistencies Between the C.M.-2's Discovery Entries and Her Deposition

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| Entry 1 / CIM-357 / 5/1/2024 | Mother's e-mail to Zuloaga-Haines complaining about C.M.-2's 10-day suspension from Palm Beach Central. Alleges suspension was excessive and discriminatory; only second referral of the year; incident did not disrupt school environment. Reports AP Butler publicly shamed C.M.-2, suggesting he needs behavioral health services to prevent him from "beating on women." Mother requests Butler refrain from interacting with her son. | C.M.-2 provides detailed testimony about the incident underlying this complaint and its aftermath. He describes the originating event as "play fighting with a female student" when "administration rode by and gave both of us a behavioral referral" (p. 37). He testifies that during the referral process, "I was being took around the school and being called a woman beater" (pp. 37–38). He characterizes the incident as "a playful thing that was just amplified by administration" (p. 39). He testifies that the label spread to the student body: in Ms. Chacon's class, "another female student was giving me a test and she said to make sure I stay—she stays away because I like to put my hands on women" (p. 38), and that "the whole class" heard the comment (p. 39). He describes the emotional impact: "I felt like I wanted to like disappear because it was embarrassing" (p. 39) and "I couldn't talk to anyone" (p. 39). He directly connects this incident to the onset of his anxiety: his anxiety "started after administration and teachers at Palm Beach Central were... attacking me about a situation that happened" (pp. 37–38). <br><br> While C.M.-2 does not name AP Butler by name—referring instead to "administration"—his account of being publicly labeled a "woman beater" and taken around the school during the referral process is directly consistent with the mother's complaint that Butler "publicly shamed my son" and insinuated "he may become an abuser." |
| Entry 2 / CIM-146 / 5/21/2024 | Medical letter from Dr. Lorena Frontado confirming C.M.-2's diagnosis of Generalized Anxiety Disorder (GAD) on 5/15/2024. Describes GAD symptoms including attentiveness difficulties, distractibility, self-regulation challenges, reduced cognitive flexibility, poor time management, and working memory weaknesses. Recommends extended time, distraction-minimized testing, organizational support, social skills counseling, and a "hot pass" for overwhelm. | C.M.-2 confirms his anxiety diagnosis (p. 22) and identifies Dr. Frontado by name: "A doctor I believe that diagnosed me with anxiety" (pp. 42–43). He testifies that the diagnosis occurred "around the end of my first new year" at Palm Beach Central (p. 37)—consistent with the May 15, 2024 diagnosis date during 9th grade. His description of how anxiety manifests is clinically consistent with Dr. Frontado's symptom profile. |

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| | | He testifies: "It causes me not to want to talk to people. Like I second guess every response I give a person. I just don't feel like going outside the house, just rest inside, not getting around anybody. In school, it causes me to not—to be afraid to like use my 504 plan. It causes me to not socialize with anybody" (pp. 23). He confirms eating lunch alone in "the back-up cafeteria" due to anxiety (pp. 23) and that anxiety impacts his grades because "I need to use my accommodations to help better my grades in school, I would be afraid to use them" (p. 24). He also reports that being in a shopping mall causes anxiety (p. 24). Dr. Frontado's recommendation for social skills counseling is corroborated by C.M.-2's testimony that anxiety prevents him from socializing with peers and causes him to eat alone.<br><br>Her recommendation for a "hot pass" for overwhelm is corroborated by his testimony about needing breaks (p. 10) and his description of needing to remove himself from anxiety-producing situations (pp. 40–42). |
| Entry 3 / CIM-472–474 / 8/19/2024– 9/18/2024 | Three e-mails documenting McKinney-Vento transportation barriers at start of 2024–2025 school year. Mother's July 15 request unresolved for 37 days due to District data entry error and misrouting to wrong school. Bus route assigned 8/21/2024, two days after school year started. Counselor Betancourt identifies C.M.-2 as McKinney-Vento on 9/18/2024 and requests new SBT referral one month into the year. | C.M.-2 provides extensive testimony about transportation barriers that corroborate the mother's characterization of transportation as "a significant barrier to my son's ability to attend school." He describes the bus stop on Okeechobee Boulevard as being on "a dark road" that "give me anxiety, what if I get kidnapped" (p. 40). He testifies that the bus driver was "pretty rude" about his custom stop and told him "she doesn't understand why I can't just cross the street because it messed up her route" (pp. 40–41), adding: "that gave me a lot of anxiety as well because I felt like I was looked down upon as I'm walking on the bus" (p. 41).<br><br>He describes the danger of crossing Okeechobee Boulevard: "how bad the traffic is. It's a very big road... I accidentally almost get hit" (pp. 41–42). He testifies that when transportation was unavailable or anxiety-producing, his mother "started Ubering me to school" and he would also "take the city bus" (p. 42). He confirms that he initially "sleep in on purpose so I can nap so I can miss the bus" to avoid the |

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| | | anxiety-producing commute (p. 42)—a coping behavior that directly resulted in missed school and is consistent with the mother's position that transportation barriers were preventing school attendance. At the close of his deposition, he confirms that his father currently provides transportation because "to walk to my school is another big road" (p. 44)—indicating that transportation anxiety remains a persistent barrier. |
| Entry 4 / CIM-365 / 9/4/2024 | Mother's formal complaint to Kim Doyle alleging teacher Gabriela Chacon (Palm Beach Central) created hostile environment and retaliated against C.M.-2 for requesting 504 extended time. Chacon questioned need for extension, made targeted comments about 504 students, called C.M.-2 a cheater, and instructed students to avoid him. Mother attributes C.M.-2's GAD diagnosis to this treatment and states complaint was delayed because of "Chandler's subsequent anxiety diagnosis, which arose from the humiliation he faced and his reluctance to return to school." | C.M.-2's testimony about Ms. Chacon is the most detailed and emotionally vivid portion of his deposition, and it corroborates the mother's complaint on every material point. He identifies Chacon by name as a teacher who denied accommodations verbally (p. 27). He testifies: "I would ask for extra time from my Spanish teacher, Chacon, and she would either deny it and say that this is classwork" (pp. 32–33).<br><br>He provides specific detail about Chacon's framing of his accommodations: "she felt like the use of her giving me notes was kind of like cheating the system and as if that I wouldn't get far in life by using the accommodations on my 504 plan" (pp. 34–35). This testimony directly corroborates the mother's report that Chacon "called him a cheater." He describes the emotional impact: "It made me feel bad about myself. It made me not feel the need to—I mean, to not want to use my accommodations. It made me nervous to ask for my accommodations" (pp. 35–36).<br><br>He also testifies that in Chacon's classroom, "she made it feel as if I was lesser than others, so I feel like I couldn't communicate with other students in that classroom" (p. 39)—consistent with the mother's allegation that Chacon "instructed other students to avoid him." The mother's statement that C.M.-2's anxiety "arose from the humiliation he faced" is corroborated by C.M.-2's own testimony connecting the onset of his anxiety to the treatment he received at Palm Beach Central from both administration and teachers (pp. 37–39). |

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| Entry 5 / CIM-917 / 9/10/2024 | Teacher Dashiell at Suncoast e-mails ESE Coordinator Hall-Sweets asking if C.M.-2 has an accommodation plan, stating "I do not see him on your list." Characterizes C.M.-2's accommodation request as: "This student is asking me to give him all my notes while he sits in class and does nothing." Hall-Sweets confirms plan exists and updates Google Sheet. | C.M.-2's testimony about why he needs the notes accommodation directly contradicts Dashiell's characterization of him as a student who "sits in class and does nothing." C.M.-2 testifies that he cannot take notes on his own "Because I'm easily distracted by simple little things that can go around the classroom or just my mind will wander off to different places" (p. 11)—a description consistent with ADHD-related attentional deficits, not laziness. He confirms that this difficulty is "based on your ADHD" (pp. 11–12).<br><br>He also provides broader testimony about note denial that is consistent with Dashiell's dismissive attitude: "all my teachers they wouldn't give me notes at all. If I asked for notes, they would say that you should have taken the notes in the class and you should have been paying attention" (pp. 33–34). While this testimony references Palm Beach Central teachers, C.M.-2 also testifies that at Suncoast, his math teacher (Clemons) only started providing hard copies of notes "towards the end of 2025... the end of the school year in 2025" (pp. 34)—indicating that the note-provision accommodation was not consistently implemented at Suncoast for most of the school year.<br><br>Dashiell's e-mail, sent one month into the 2024–2025 school year, confirms that C.M.-2 was requesting accommodations that the teacher did not know he was entitled to receive—corroborating C.M.-2's testimony that he faced resistance when self-advocating. |
| Entry 6 / CIM-277 / 9/18/2024 | AP Keevey e-mails all of C.M.-2's teachers reminding them of his 504 Plan and sharing mother's e-mail reporting that accommodations are not being provided, including suspected testing accommodation denial. Mother states: "I can tell anytime my son is not receiving his accommodations." | C.M.-2's testimony corroborates the accommodation denial that prompted this administrative intervention. He testifies that his anxiety causes him to "be afraid to like use my 504 plan" (p. 23) and that "when I asked for them the first time and you're denied, I would be afraid to advocate for myself" (p. 24). He describes the specific coping mechanism he developed in response: "I used e-mail because it would be denied in person and I used e-mail because my mother was able to be there and like it would be on record" (p. 37).<br><br>He testifies that teachers accommodate him via e-mail "Only when my mother is cc'd on the e-mail" (p. 26), explaining: "there was |

| Entry / Discovery Page / Date | Discovery Document Description | Deposition Testimony (Page / Description) |
|---|---|---|
| | | certain times where they would deny the person [in person], so then I will go back and e-mail and cc my mother on the e-mail and ask for extra time" (p. 26). This testimony directly corroborates the mother's statement in the e-mail quoted by Keevey—"I've instructed him to keep me in the loop if his accommodations are not being provided"—and confirms that the family had developed a workaround (e-mail with mother cc'd) because verbal requests were being denied. The fact that an assistant principal needed to intervene one month into the school year to remind all teachers of C.M.-2's 504 Plan is consistent with C.M.-2's testimony that accommodation denial was occurring across multiple classrooms. |
| Entry 7 / CIM-831–837 / 11/5/2024– 12/5/2024 | Month-long e-mail chain between mother and ESE Coordinator Hall-Sweets negotiating 504 Plan language at Suncoast. Mother objects to "as needed" and "when available" qualifiers, subject-specific narrowing of reduced-assignment accommodation ("Shortened math assignments" rather than general language), and modification of pre-existing accommodation without justification. Final corrected Plan provided 12/5/2024. | C.M.-2's testimony corroborates several of the specific accommodation issues at the center of this negotiation. He identifies his accommodations as including "Note taking, extra time and breaks... extra time for taking tests... providing the notes" (p. 10) and confirms awareness of the condition that notes would be provided after he demonstrates effort to take them himself (pp. 10–11). He identifies the reduced-assignment/chunking accommodation: "she had to break up the assignment and give it to me in bits and pieces" (p. 35)—and testifies that at Suncoast, this accommodation was not implemented: "It didn't happen at all" (p. 35).<br><br>He also testifies that he was "sometimes marked down for late work" despite the extended time accommodation (p. 36), describing a situation where "I put extra time in my paper, it would still get marked down for being late and constantly taken off" (p. 36). The mother's objection in this e-mail chain—that accommodation language containing "as needed" and "when available" transforms mandatory supports into discretionary ones—is corroborated by C.M.-2's testimony that the assignment-chunking accommodation simply did not happen and that extended time submissions were still penalized as late work. The gap between the Plan on paper and the Plan in practice is documented by both the mother's advocacy in the e-mail chain and C.M.-2's contemporaneous classroom experience as described in his testimony. |

- Systemic accommodation denial across schools (Count II). C.M.-2's testimony establishes that the denial of his accommodations was not limited to one teacher or one school. At Palm Beach Central, Chacon denied extended time and notes (pp. 32–35); at Suncoast, Dashiell was unaware of the 504 Plan (Entry 5, CIM-917), teachers denied accommodations verbally until the mother was cc'd on e-mails (p. 26), AP Keevey had to intervene to remind all teachers of the Plan one month into the school year (Entry 6, CIM-277), assignment chunking was never implemented (p. 35), and extended time submissions were still penalized as late (p. 36).

  This cross-school, multi-teacher pattern of accommodation denial is consistent with the mother's documented position—articulated across formal complaints, ADA/504 filings, and the CARES grievance—that the failures are systemic, rather than attributable to individual staff.

- Transportation barriers and their impact on attendance and anxiety (Count V—McKinney-Vento). C.M.-2's testimony about the dark bus stop (p. 40), the bus driver's hostility about his designated stop (pp. 40–41), the danger of crossing Okeechobee Boulevard (pp. 41–42), intentionally missing the bus to avoid anxiety (p. 42), and the family's need to resort to Uber and city bus transportation (p. 42) corroborates the mother's August 19, 2024 e-mail describing transportation as "a significant barrier to my son's ability to attend school" (Entry 3, CIM-474). The 37-day delay in resolving the McKinney-Vento transportation—caused by District data entry errors and interagency misrouting—meant that these barriers were in place during the critical first weeks of C.M.-2's enrollment at Suncoast, compounding the anxiety he was already experiencing as a transfer student with two documented disabilities entering a more academically-rigorous school environment.

– – – – – – – – – –

**Section XIV. Why Middle and High School General Education Teachers Demonstrate Resistance and Bias Against Students with Disabilities**

Introduction: The Scope and Significance of the Problem

The United States educates the overwhelming majority of students with disabilities in general education classrooms. According to the most recent federal data, approximately 95% of students with disabilities ages 6–21 receive instruction in general education settings for some or all of the school day, and over 1.38 million students receive classroom-level accommodations through Section 504 Plans—plans that general education teachers—rather than special education staff—are responsible for implementing (U.S. Department of Education, Office for Civil Rights [OCR], 2021). Students with ADHD constitute the largest single diagnostic group served through 504 Plans and a substantial proportion of these students are classified under the Other Health Impairment (OHI) category of the Individuals with Disabilities Education Act (IDEA).

Despite this reality, a convergent body of U.S. research spanning foundational studies of the 1990s through the 2020s documents that general education teachers at the middle and high school level demonstrate consistent, measurable, and consequential patterns of resistance to disability accommodation and bias against students with disabilities in their classrooms. These patterns are not random or idiosyncratic. They arise from identifiable, structurally embedded causes that the research literature has organized into distinct but mutually reinforcing categories: (1) inadequate training; (2) deficit-based beliefs about ability; (3) stigmatization triggered by disability labels; (4) misinterpretation of disability-related behavior as willful misconduct; (5) ideological resistance to accommodations as "unfair"; (6) low self-efficacy and emotional avoidance; (7) structural failures unique to secondary school environments; and (8) where race and disability intersect, compounding implicit biases that amplify all of the foregoing. These categories are systematically reviewed below.

Inadequate Pre-Service and In-Service Training

The research literature identifies inadequate training as the foundational driver of nearly every other form of teacher resistance and bias documented in this section. The deficit is stark and quantifiable. In a national study of higher education teacher-training institutions, Harvey, Yssel, Bauserman, and Merbler (2010) found that general education teacher preparation programs required minimal coursework on inclusion—typically one to two courses—compared to substantially more extensive requirements in special education programs. Brownell, Sindelar, Kiely, and Danielson (2010), examining the special education teacher preparation landscape, documented the systemic gap between what special education programs provide and what general education programs omit, concluding that general education graduates lack the content knowledge necessary to meet diverse learner needs in inclusive classrooms.

Gilmour (2018), synthesizing research on inclusive education outcomes, documented that the limited coursework that general education teachers receive frequently emphasizes theoretical frameworks rather than operational classroom strategies—leaving graduates unable to implement IEPs, 504 Plans, or differentiated instruction in the diverse classrooms they will actually encounter. Gilmour (2021) further demonstrated, using national student achievement data, that a teacher's certification area significantly predicted the academic outcomes for their students with learning disabilities and emotional/behavioral disorders. Specifically, students taught by teachers without special education certification achieved at lower levels than those taught by special education-certified teachers, independent of other variables.

The consequences of this training deficit are particularly acute with respect to ADHD. Poznanski, Hart, and Cramer (2018), surveying U.S. preservice teachers, found significant gaps in knowledge relative to both evidence-based classroom management techniques and ADHD-specific intervention strategies. Sciutto, Terjesen, and Bender Frank (2000), in a foundational study that remains among the most-cited in this literature, documented that teachers answered only 47.8% of ADHD knowledge items correctly on standardized assessments. The National Center for Learning Disabilities (NCLD, 2019), in a nationally representative survey of U.S. educators, found that only 17% of teachers felt "very well prepared" to teach students with mild to moderate learning disabilities, with approximately one-third having received no professional development on supporting students with disabilities in the prior two years. Teachers also expressed low confidence in their ability to differentiate instruction—particularly at the secondary level. Finally, Reinke, Stormont, Herman, Puri, and Goel (2011), surveying a national sample of U.S. teachers, found that teachers identified student mental health and behavioral needs as among the most significant challenges they faced, while simultaneously reporting that they lacked training and institutional support to address those needs—a gap that directly implicates the ADHD population.

These training gaps produce specific, documentable downstream failures. Zagona, Kurth, and MacFarland (2017), surveying U.S. general education teachers, found that respondents reported insufficient preparation in collaboration with special education staff, differentiated instruction, and implementation of individualized plans—systems that are foundational to serving students with ADHD and other disabilities in inclusive settings. Most critically, teachers consistently demonstrate confusion about the distinction between accommodations (which provide equitable access while maintaining grade-level academic standards) and modifications (which alter the standards themselves). A teacher who cannot distinguish between these two concepts is a teacher who may resist providing extended time on a test because they believe it lowers academic rigor—when in fact it does the opposite, enabling the student to demonstrate mastery that a processing speed deficit would otherwise mask (Lovett, 2010).

The problem is not limited to novice teachers. Avramidis and Norwich (2002), in their comprehensive review of the literature on teacher attitudes toward inclusion, found that more experienced general education teachers sometimes hold more negative attitudes toward students with disabilities than their less experienced colleagues—not because experience produces cynicism, but because veteran teachers were

trained under preparation models that included even less disability content than current programs and many have not received updated professional development. Cooc (2019), analyzing international teacher survey data including U.S. respondents, confirmed that teacher reports of feeling unprepared for inclusive education remain pervasive and that professional development offerings continue to fall short of the need.

The net result of all of this is a secondary school teaching force in which neither novice nor veteran teachers are reliably prepared to implement the accommodations that federal law requires them to provide.

<u>Deficit-Based Beliefs About Student Ability and Behavior</u>

Inadequate training does not produce a neutral knowledge gap. It produces an actively distorted knowledge base in which teachers substitute assumptions for understanding—and the assumptions are overwhelmingly deficit-based. The NCLD (2019) survey documented that general education teachers without special education training routinely assume that students with disabilities "can't learn," will be "behavior problems," or will increase their workload. These assumptions are particularly acute for students with ADHD, emotional-behavioral disabilities, and autism spectrum disorder—the disability categories most likely to produce visible classroom behaviors that conflict with traditional instructional norms.

The data on ADHD-specific beliefs is especially concerning. A substantial minority of U.S. general education teachers attribute ADHD-related behaviors to poor parenting rather than to neurological differences (Sciutto et al., 2000; Poznanski et al., 2018). Knowledge assessments consistently show that teachers answer only 40–60% of ADHD items correctly, with persistent confusion between ADHD symptomatology and anxiety, defiance, or oppositional conduct (Sciutto et al., 2000; Poznanski et al., 2018). Critically, the NCLD (2019) survey found that the majority of surveyed educators expressed willingness to improve if given appropriate training—indicating that these beliefs are products of institutional failure in teachers' continuing education, rather than fixed individual attitudes. But in the absence of that training, the beliefs persist and produce consequences.

Those consequences manifest in specific, documented classroom behaviors: teachers refuse to modify workloads for students with slow processing speed; they decline to provide notes or graphic organizers to students whose attentional deficits prevent effective note-taking; they resist providing effort-based feedback to students whose disabilities make output inconsistent; and they express beliefs that disability and academic capability are mutually exclusive. Bianco and Leech (2010), in a study of teacher referral decisions for twice-exceptional students (students who are both gifted and have a disability), found that teachers were significantly less likely to refer a student for gifted services when the student also carried a disability label—demonstrating that deficit assumptions attached to the disability override evidence of high ability. Teachers who view ADHD symptoms as volitional and accommodations as unnecessary do not merely neglect to accommodate—they actively resist accommodation, because they do not believe the underlying condition warrants it.

<u>The Stigma of Disability Labels and the Suppression of Teacher Expectations</u>

A robust body of experimental and longitudinal U.S. research establishes that disability labels—particularly the ADHD label—function as independent triggers that suppress teacher expectations regardless of the student's actual academic performance or observed behavior. This research moves beyond attitudinal surveys to demonstrate measurable bias in how teachers evaluate students once a diagnostic label is attached.

Ohan, Visser, Strain, and Allen (2011) conducted a controlled vignette study in which teachers and education students rated descriptions of children who met ADHD symptom criteria. When the vignette included the diagnostic label "ADHD," teachers perceived the child as significantly more impaired, reported more negative emotions about having the child in their classroom, and expressed less confidence in their ability to manage the child—even though the described behaviors were identical to vignettes describing unlabeled students. The label did not change the child. It changed the teacher's perception of the child. Notably, ADHD-specific training predicted label bias, but prior experience with ADHD students did not—suggesting that familiarity alone does not inoculate against the observed teacher bias.

Metzger and Hamilton (2021) extended this finding using nationally representative U.S. data from the Early Childhood Longitudinal Study, Kindergarten Class of 2010–2011 (ECLS-K:2011). Analyzing teacher ratings across multiple waves of data collection, they demonstrated that teachers rated students carrying an ADHD diagnosis as more likely to be performing below grade level and less likely to be performing above grade level than non-diagnosed peers—after controlling for the students' actual standardized test scores, observed classroom behavior, and demographic characteristics. The ADHD label caused teachers to perceive lower academic competence than objectively existed. Metzger and Hamilton characterize this as a stigma-driven process where the label activates a teacher's cognitive schema of student deficit, incompetence, and disruption that overrides the teacher's own direct observations.

This finding has a specific and troubling implication for students with 504 Plans and IEPs classified under Other Health Impairment. The very document that is designed to guarantee the student equitable access to education simultaneously identifies the student as a member of a stigmatized diagnostic category. The plan that is supposed to protect the student also activates the teacher bias that changes teacher attitudes, expectations, and interactions that undermine student success. Every teacher who reads the plan learns two things: what accommodations they are legally required to provide, and that the student carries a label that—according to the research—will cause the teacher to expect less, demand less, and evaluate more harshly.

Misinterpretation of Disability-Related Behavior as Willful Misconduct

The core behavioral manifestations of ADHD—difficulty sustaining attention, excessive fidgeting and movement, impulsive verbal and physical responses, difficulty following multi-step instructions, poor self-regulation of emotion and effort, and challenges with task initiation and completion—are simultaneously the behaviors that most directly violate the behavioral expectations of a conventional middle or high school classroom. Research identifies the structural incompatibility between disability-related symptoms and classroom behavioral norms as a primary driver that converts accurate, disability-informed interpretations of a student's behavioral challenges into a teacher's belief that the "inappropriate" student behavior is motivated and a discipline infraction (DuPaul & Stoner, 2014; Barkley, 2015).

When teachers lack training to recognize that these behaviors are inherent symptoms of a neurodevelopmental disorder, they interpret them through the only framework available to them: the behavioral one. The student who cannot sustain attention is "not trying." The student who blurts out a response is "disrespectful." The student who cannot sit still is "disruptive." The student who fails to follow a three-step instruction is "defiant." Each of these interpretations transforms a disability symptom into a perceived moral failing—and moral failings are addressed with discipline, not accommodation.

Reinke et al. (2011) documented that teachers perceive student behavioral problems as among their greatest challenges, but report lacking both the knowledge and the institutional support to respond with evidence-based interventions rather than exclusionary discipline. Okonofua, Paunesku, and Walton (2016), in a controlled field experiment published in the Proceedings of the National Academy of

Sciences, demonstrated that a brief empathic-discipline intervention—one that trained teachers to view misbehavior as an opportunity for relationship-building rather than punishment—cut suspension rates in half among adolescent students, confirming that teachers' interpretations of behavior, not the student behavior itself, is the primary variable driving disciplinary and exclusionary outcomes.

The consequences are quantified in U.S. data. Students with ADHD experience substantially elevated rates of suspension and expulsion compared to their non-disabled peers (DuPaul & Stoner, 2014; Barkley, 2015). And, students with disabilities overall are suspended at approximately twice the rate of their non-disabled peers (Losen & Martinez, 2020; U.S. Department of Education, OCR, 2021).

Gage, Katsiyannis, Counts, and Prykanowski (2020), analyzing national data on students with emotional and behavioral disorders, documented disproportionate disciplinary exclusions that persisting across school years and were predicted by disability category, race, and school-level characteristics rather than by individual student behavior. These outcomes are driven not by more severe student behavior but by differential adult responses to the same behaviors.

Owens and McLanahan (2020), in a rigorous study using a nationally representative dataset, found that approximately 46% of the Black-white suspension gap was attributable to differential treatment and school contextual factors, while only 9% was explained by differences in student behavior. Welsh and Little (2018), in a comprehensive review published in the Review of Educational Research, confirmed that adult decision-making—not student conduct—drives the majority of discipline disparities.

The problem is compounded by the specific nature of ADHD-related classroom behavior. Unlike a student who uses a wheelchair—whose disability is visible and whose accommodations do not disrupt the instructional environment—the student with ADHD has an invisible disability whose primary symptoms look, to an untrained observer, exactly like the volitional misbehavior of a non-disabled student. The teacher who does not understand ADHD cannot distinguish between "won't" and "can't"—and the research establishes that the default assumption is "won't."

"Not My Job": Role Resistance and the Rejection of Accommodation Responsibility

A distinct body of U.S. research identifies a phenomenon best described as role resistance—the belief among general education teachers that the inclusion and accommodation of students with disabilities exceeds the proper boundaries of their professional role. This orientation is expressed through teacher statements such as "that's not my job," through surveys where teachers endorse inclusion philosophically, but reject it functionally, and through qualitative studies where teachers describe feeling that special education responsibilities have been imposed on them without consent, preparation, or adequate institutional support.

This phenomenon is remarkably stable over time. In a foundational research synthesis of 28 survey-based studies spanning from 1958 to 1995, Scruggs and Mastropieri (1996) found that approximately two-thirds of general education teachers expressed support for inclusion in principle—but only about one-third believed they had sufficient time, skills, training, or resources to implement it effectively. Zagona, Kurth, and MacFarland (2017) confirmed that general education teachers at the secondary level report feeling unprepared to collaborate on inclusive, and describe the accommodation process as an imposition on their primary instructional role. The NCLD (2019) survey documented the same pattern with contemporary data: when measured using structured attitude scales, secondary general education teachers consistently endorsed inclusion as a value, but when those same teachers provide open-ended responses about their daily classroom experience, their responses were overwhelmingly negative—describing accommodation as burdensome, time-consuming, and incompatible with their primary obligation to the non-disabled majority.

141

Role resistance is reinforced by a specific fairness objection: the belief that accommodations for students with disabilities are unfair to non-disabled students. Teachers report concerns that providing extended time, alternative testing formats, or reduced assignments "dilutes" instructional time for the class, lowers academic rigor, or gives the accommodated student an advantage that their peers do not receive. Lovett (2010), in a foundational review published in the Review of Educational Research, framed this as the distinction between teachers who understand accommodations as "leveling the playing field"—compensating for a disability-related deficit so that the student can demonstrate actual knowledge—and teachers who view accommodations as "tilting the field" in the student's favor. Teachers who hold the latter belief are structurally positioned to resist, resent, or undermine the accommodations they are legally required to provide.

Low Self-Efficacy, Fear, and Emotional Resistance

The research literature documents that many general education teachers at the secondary level experience fear, insecurity, and emotional avoidance in response to disability in their classrooms. Teachers report feeling untrained and unprepared to "handle" students with disabilities, viewing disability as a personal barrier belonging to the student rather than as a systemic condition requiring institutional response. This orientation produces avoidance behaviors: teachers minimize interaction with the accommodated student, decline to engage with the student's educational plan, or refer the student to the office for discipline as a mechanism for removing the source of their discomfort from the classroom.

Self-efficacy research confirms the mechanism. Avramidis and Norwich (2002), reviewing the international literature on teacher attitudes toward inclusion, established that teacher self-efficacy—specifically in the domains of classroom management, instructional strategy adaptation, and student engagement—is among the strongest predictors of both attitudes toward inclusion and consistency of accommodation implementation. Pas, Bradshaw, and Hershfeldt (2012), in a U.S. study of teacher- and school-level predictors of teacher efficacy and burnout, found that low self-efficacy and high emotional exhaustion were associated with increased reliance on exclusionary discipline and reduced engagement with students exhibiting challenging behaviors—the very students most likely to have ADHD or emotional-behavioral disabilities requiring accommodation. Zagona et al. (2017) documented that general education teachers who perceived inadequate institutional support for inclusive practices reported feeling unprepared and overwhelmed—attitudes that predicted weaker engagement with accommodation responsibilities.

The emotional dimension of this resistance is significant. The NCLD (2019) survey documented that teachers describe feeling unprepared and overwhelmed by inclusive responsibilities—aware that they lack the knowledge their special education colleagues possess. Reinke et al. (2011) found that teachers identified themselves as ill-equipped to address student mental health and behavioral needs, while simultaneously viewing those needs as among the most pressing challenges in their classrooms. The result is a teacher who resents the student's presence, resents the accommodation plan, and resents the parent who advocates for its implementation—a resentment that the research documents as a direct precursor to accommodation resistance and biased evaluation (Pas et al., 2012; NCLD, 2019).

Structural Failures Unique to Secondary School Environments

The organizational structure of middle and high schools creates implementation challenges that do not exist at the elementary level—and the research identifies these structural features as independent contributors to accommodation failure. Unlike elementary students who interact primarily with one or two teachers daily, secondary students with 504 Plans or IEPs rotate through six to eight classrooms each day, each staffed by a different general education teacher with a different level of disability knowledge, a different threshold for behavioral tolerance, a different understanding of the student's Plan, and a different

willingness to implement it. The result is that the same student may receive accommodations in one classroom period and be disciplined for disability-related behavior in the next—an inconsistency that is both common and harmful, teaching the student that their legal rights are contingent on individual teacher attitudes rather than institutional obligation (Zirkel, 2020; Zagona et al., 2017).

This structural fragmentation is compounded by pervasive documentation and communication failures. Zagona et al. (2017) documented that many general education teachers begin the academic year without access to current IEP or 504 documentation for the students assigned to their classrooms. When documentation is provided, teachers describe accommodation language as vague, generic, and difficult to operationalize—using terms such as "preferential seating," "extended time," or "breaks as needed" without specification of when, how, or under what instructional circumstances those supports should be activated. Without clear guidance, teachers fall back on personal judgment—judgment that, as documented throughout this section, is shaped by inadequate training, deficit-based beliefs, label-triggered stigma, and role resistance. The NCLD (2019) survey confirmed that teachers report insufficient institutional guidance and support for accommodation implementation, with a majority describing the process as burdensome and poorly coordinated.

The institutional accountability structures that should compensate for these failures are themselves inadequate. Zirkel (2020), in a review of Section 504 legal developments for students with ADHD, documented that 504 Plans lack the procedural safeguards and monitoring requirements built into the IEP process under IDEA—resulting in weaker institutional oversight of implementation fidelity and greater vulnerability to teacher-level noncompliance. Zirkel and Weathers (2015) provided national incidence data showing rapid growth in Section 504 identification with ADHD as the predominant qualifying condition, while also documenting racial disparities in 504 access that compound implementation failures.

Federal data confirms the scale of the problem. The 2017–2018 Civil Rights Data Collection documented that thousands of U.S. public schools had zero Section 504 plans on file—indicating that the entire identification and accommodation process was nonfunctional at those sites (U.S. Department of Education, OCR, 2021).

The outcomes are documented and predictable. Gilmour (2021) demonstrated that students with learning disabilities and emotional/behavioral disorders taught by general education-certified teachers without special education training achieved at significantly lower levels than those taught by special education-certified teachers. Losen and Martinez (2020) quantified that students with disabilities lose significantly more instructional days to exclusionary discipline than non-disabled peers.

These outcomes do not reflect the limits of the students' capacity. They reflect the limits of the institution's willingness to fulfill its legal obligations.

The Compounding Effect: When Disability Intersects with Race

All of the mechanisms documented above are amplified when the student with a disability is also a student of color—and particularly when the student is Black. The research on this intersection is unambiguous. The 2017–2018 Civil Rights Data Collection documents that Black students with disabilities face the highest suspension rates of any demographic subgroup nationally, with rates significantly exceeding those of white students with the same disability classifications (U.S. Department of Education, OCR, 2021). Losen and Martinez (2020) quantified this disparity in terms of lost instructional time, documenting that Black students with disabilities lose significantly more days of instruction to exclusionary discipline than any other subgroup. Losen and Gillespie (2012), analyzing earlier CRDC data, documented that Black students with disabilities were suspended at disproportionately high rates—substantially exceeding the already elevated rates for students with disabilities as a whole.

Critically, these disparities are not explained by differences in student behavior. Owens and McLanahan (2020) demonstrated that differential treatment by school personnel accounts for approximately 46% of the Black-white suspension gap, while differences in actual student behavior explain only 9%. The remaining variance is attributed to school-level structural factors. Okonofua and Eberhardt (2015), in controlled experiments with K–12 teachers, found no racial difference in teacher response to a first behavioral infraction—but after a second infraction involving the same behavior, teachers rated Black students' misconduct as significantly more severe, more indicative of a persistent behavioral pattern, and more deserving of harsh discipline than the identical misconduct by White students.

This "two-strikes" effect—in which repeated behavior by Black students is read as evidence of a fixed and troubling character trait, while the same repeated behavior by White students is treated as a series of isolated incidents—operates with particular force for students whose disabilities produce the very behaviors being evaluated. The Black student with ADHD whose impulsivity manifests twice in one class period is not, in the teacher's perception, a student experiencing symptoms of a neurodevelopmental disorder. That student is a "troublemaker"—and troublemakers are disciplined, not accommodated.

Implicit and explicit bias produces specific, measurable consequences for Black students with ADHD and anxiety-based disabilities across the entire accommodation pipeline. Morgan, Farkas, Hillemeier, and Maczuga (2017), in a nationally representative analysis published in Educational Researcher, documented that—even after controlling for behavioral and academic indicators—Black children with the same severity of symptoms are less likely to be identified for services than White children. As such, the 2017–2018 CRDC confirms that Shite students are over-represented among Section 504 recipients relative to their share of total enrollment (U.S. Department of Education, OCR, 2021).

Separately, Voulgarides, Fergus, and Thorius (2017), in a review published in Review of Research in Education, demonstrated how district-level interpretations of disability policy are impacted by racial bias, producing disproportionality in both special education identification and discipline. This represents a systemic, rather than individual school or teacher, phenomenon.

Moreover, Skiba and colleagues (2002, 2011, 2014), in a series of landmark studies, documented that Black students are disproportionately referred to the office for subjective behavioral infractions— "disrespect," "defiance," "disruption"—while White students are referred for objective offenses such as vandalism or truancy. These subjective categories are fully consistent with those exhibited by ADHD and anxious students. Indeed, the impulsive comment is read as disrespect, the inability to comply is read as defiance, the fidgeting and movement is read as disruption. The subjectivity of the infraction creates the space for racial bias to operate—and the research confirms that it does. Gregory, Skiba, and Mediratta (2017), in a review published in Review of Research in Education, synthesized these findings into a framework for understanding how discretionary decision-making at the classroom and administrative level produces and sustains racial discipline disparities.

The compounding nature of these biases cannot be overstated. The Black student with ADHD does not face a single barrier. That student faces a layered process where racial bias reduces the probability of accurate diagnosis (Morgan et al., 2017), diagnostic disparities reduce the probability of receiving a 504 Plan (U.S. Department of Education, OCR, 2021), accommodation access disparities reduce the probability that the plan will be implemented (Zirkel, 2020), teacher bias suppresses expectations even when the plan exists (Metzger & Hamilton, 2021), behavioral misinterpretation converts disability symptoms into disciplinary infractions (Okonofua & Eberhardt, 2015), and discipline disparities ensure that the consequences of those infractions are harsher than they would be for a White student exhibiting the same behavior (Owens & McLanahan, 2020). Each layer compounds the one before it. The biases do not add. They multiply.

Summary: A Predictable and Documented Pattern

The research reviewed in this Section establishes that general education teacher resistance to implementing accommodations for students with disabilities, and biases against students with disabilities in middle and high school classrooms is not aberrational, anecdotal, or attributable to isolated "bad actors." It is a predictable outcome of identifiable structural, attitudinal, and institutional conditions that have been documented in U.S. research for over three decades.

These conditions include:

1. Inadequate training that leaves general education teachers unable to distinguish disability-related behavior from willful misconduct, unable to differentiate accommodations from modifications, and unable to implement the plans they are legally required to execute (Harvey et al., 2010; Brownell et al., 2010; Poznanski et al., 2018; Gilmour, 2018, 2021; NCLD, 2019; Cooc, 2019).

2. Deficit-based beliefs in which teachers assume that students with ADHD and other disabilities "can't learn," are "behavior problems," or are exploiting a diagnosis—beliefs documented in knowledge assessments showing only 40–60% accuracy on ADHD items and persistent misattribution of ADHD symptoms to volitional causes (Sciutto et al., 2000; Poznanski et al., 2018; NCLD, 2019).

3. Label-triggered stigma in which the ADHD diagnosis itself causes teachers to perceive lower competence than actually exists, producing self-fulfilling cycles of lowered expectations and harsher evaluation—even when controlling for actual student performance and behavior (Ohan et al., 2011; Metzger & Hamilton, 2021; Bianco & Leech, 2010).

4. Behavioral misinterpretation in which the involuntary symptoms of ADHD—inattention, impulsivity, hyperactivity, poor self-regulation—are read as defiance, disrespect, or laziness, converting disability into disciplinary infraction and producing substantially elevated rates of suspension and expulsion compared to non-disabled peers (DuPaul & Stoner, 2014; Barkley, 2015; Okonofua et al., 2016; Gage et al., 2020).

5. Role resistance and fairness objections in which teachers reject accommodation responsibility as exceeding their professional role and characterize accommodations as unfair advantages (Scruggs & Mastropieri, 1996; Lovett, 2010; Zagona et al., 2017; NCLD, 2019).

6. The accommodation backlash effect in which teachers grade accommodated students lower and rate them as less competent than non-accommodated peers producing equivalent work—consistent with U.S. findings on label-driven expectation suppression (Metzger & Hamilton, 2021).

7. Low self-efficacy and emotional avoidance in which teachers who feel unprepared to serve students with disabilities cope by minimizing engagement, defaulting to punitive responses, or seeking removal of the student from the classroom (Avramidis & Norwich, 2002; Reinke et al., 2011; Pas et al., 2012; Zagona et al., 2017; NCLD, 2019).

8. Structural failures including departmentalized secondary schedules that fragment accountability across six to eight teachers daily, documentation systems that fail to deliver 504 or IEP plans to teachers in time for implementation, vague accommodation language that provides no operational guidance, and administrative cultures that do not monitor or enforce compliance (Zirkel, 2020;

Zirkel & Weathers, 2015; Zagona et al., 2017; NCLD, 2019; U.S. Department of Education, OCR, 2021).

9. <u>Racial compounding</u> in which all of the foregoing mechanisms operate with amplified force for Black students with disabilities, producing discipline disparities, diagnostic disparities, accommodation access disparities, and expectation disparities (Owens & McLanahan, 2020; Okonofua & Eberhardt, 2015; Morgan et al., 2017; Voulgarides et al., 2017; Gregory et al., 2017; Losen & Martinez, 2020; Losen & Gillespie, 2012; Skiba et al., 2002, 2011, 2014; U.S. Department of Education, OCR, 2021).

These nine conditions do not operate in isolation. They interact, reinforce, and compound one another—creating a classroom environment in which the student with a disability faces not a single barrier but an interlocking system of barriers, each of which independently increases the probability of accommodation denial, behavioral misinterpretation, punitive discipline, and diminished educational opportunity.

_ _ _ _ _ _ _ _ _

**<u>Section XV</u>. Summary: Demonstrating How the Case Facts Support the Litigation Complaints**

This Section integrates all of the facts, events, documents—including the medical documents that provide their own corroboration of many of the critical events occurring to C.M.-1 and C.M.-2, and testimony presented throughout this Expert Report to validate how they support the complaints in the litigation filed in this Case. Especially emphasized will be (a) how the District failed to demonstrate a reasonable Standard of Care; (b) the presence and impact of hostile environments for C.M.-1 and C.M.-2, respectively; (c) the impact of the evident racial and disability discrimination; and (d) the institutional indifference present over the schools and years relevant to this litigation.

<u>Brief Case Overview</u>

This matter is a civil action filed on behalf of two minor students, C.M.-1 and C.M.-2, by and through their next friend, Tinisha Tolbert, against the School Board of Palm Beach County in the United States District Court for the Southern District of Florida (Case No. 25-cv-80544-REINHART). The Second Amended Complaint (filed on December 17, 2025) alleges disability discrimination and failures to implement disability-related educational accommodations under Section 504 and Title II of the ADA, and a denial of transportation (and related barrier-removal/dispute resolution obligations as alleged) under The McKinney-Vento Homeless Assistance Act for C.M.-2.

As pled, C.M.-1 is a Black middle school student (now in Grade 8) receiving ESE services through an IEP under the Other Health Impairment category based on diagnoses of ADHD and Generalized Anxiety Disorder. The Complaint alleges that during the 2024–2025 school year (7th grade) at Emerald Cove Middle School, general education teachers denied IEP accommodations (including short breaks and extended time), applied grading practices that negated extended time (e.g., "F" placeholder grades), and engaged in conduct alleged to create a hostile environment (including public discussion of IEP/accommodations). The Complaint further alleges that C.M.-1's mother sought meetings and alternative arrangements, and that the school's response included threats regarding attendance when a class change was requested.

As pled, C.M.-2 is a Black high school student (now in Grade 11) with a Section 504 Plan (based on ADHD and Generalized Anxiety Disorder) and is also documented to be a homeless student under McKinney-Vento. The Complaint alleges that during the 2023–2024 school year (9th grade) at Palm Beach Central High School, a teacher failed to implement accommodations (extended time and hard copy

of notes) and made statements/engaged in conduct alleged to be demeaning and stigmatizing, contributing to emotional distress and academic harm. Separately, the Complaint alleges that the School Board denied (for 2024–2025) McKinney-Vento transportation to C.M.-2's choice school, revoked a previously customized bus stop, required use of a stop that required crossing a highly trafficked road, and did not conduct a "best interests" analysis or provide appropriate dispute resolution.

Summarizing the Counts

The five Counts, as pled in the Second Amended Complaint, are as follows:

Count I—Violation of Section 504 of the Rehabilitation Act (C.M.-1). Count I (¶¶49–57) alleges that the School Board of Palm Beach County violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and its implementing regulation at 34 C.F.R. §104.33 [cited in the Complaint as "§401.33"], with respect to C.M.-1. The Count establishes two threshold facts: that the School Board receives federal financial assistance and is therefore subject to Section 504, and that C.M.-1 is a qualified individual with a disability based on her diagnoses of ADHD and Generalized Anxiety Disorder and her receipt of special education services under an IEP through Florida's Exceptional Student Education program (¶¶51–52).

The Count alleges that, despite C.M.-1's documented need for accommodations—specifically including Short Breaks and Extended Time—the School Board, through its employees and agents, systematically failed to implement these accommodations in violation of her Section 504 rights (¶53). The Count characterizes the denial not as an isolated event, but as a pattern of deliberate indifference, identifying five categories of conduct: (a) refusing to allow C.M.-1 to take short breaks as specified in her IEP; (b) imposing conditions on breaks—such as requiring an escort—that were not part of the IEP and that effectively nullified the accommodation; (c) failing to provide extended time for assignments and instead entering "F" placeholder grades that penalized C.M.-1 for using her accommodation; (d) making demeaning and humiliating statements related to C.M.-1's disability and IEP status in front of other students; and (e) retaliating against C.M.-1 for asserting her right (including through her mother) to accommodations by increasing scrutiny, issuing threats related to attendance, and creating a hostile educational environment (¶54(a)–(e)).

The Count further alleges that the School Board violated 34 C.F.R. §104.33 by failing to provide C.M.-1 with a free appropriate public education (FAPE)—defined under the regulation as the provision of regular or special education and related aids and services designed to meet her individual educational needs as adequately as the needs of nondisabled students are met (¶55).

Count II—Violation of Section 504 of the Rehabilitation Act (C.M.-2). Count II (¶¶58–66) alleges that the School Board violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and 34 C.F.R. §104.33 [cited in the Complaint as "§401.33"], with respect to C.M.-2. The Count alleges that C.M.-2 is a qualified individual with a disability based on his diagnoses of ADHD and Generalized Anxiety Disorder and his entitlement to specified accommodations under a Section 504 Plan—specifically including Extended Time and Hard Copy of Notes (¶¶59–60).

The Count alleges that the School Board's employees and agents systematically failed to implement these accommodations and, beyond the failure to accommodate, engaged in hostile, demeaning, and stigmatizing conduct that compounded the discrimination (¶¶60–61). The Count identifies six specific categories of such conduct: (a) publicly complaining about having to provide accommodations; (b) telling the class that students "must be accountable and do not need extra time"; (c) telling C.M.-2 that he "had enough time" and that the teacher never had accommodations and "did fine;" (d) making demeaning personal comments to C.M.-2 about his relationship with his mother; (e) falsely telling other students that

C.M.-2 "likes to put his hands on girls and hit them"; and (f) directing student monitors to "make sure C.M.-2 was not cheating" (¶61(a)–(f)).

The Count alleges that this conduct created a hostile educational environment that denied C.M.-2 equal access to educational opportunities on the basis of his disability (¶62). Critically, and distinguishing this Count from Count I, the Count alleges that the School Board had actual or constructive notice of the hostile environment and discrimination—through complaints made by C.M.-2's mother to school officials and the ESE Director—and failed to take prompt and effective action to remedy the situation (¶63). The Count further alleges a violation of 34 C.F.R. §104.33 for failure to provide FAPE on the same grounds as Count I: the failure to provide regular or special education and related aids and services designed to meet C.M.-2's individual educational needs as adequately as the needs of nondisabled students (¶64).

Count III—Violation of Title II of the Americans with Disabilities Act (C.M.-1). Count III (¶¶67–73) alleges that the School Board violated Title II of the Americans with Disabilities Act, 42 U.S.C. §12131 et seq. [cited in the Complaint as "§1331 et seq."], with respect to C.M.-1. The Count establishes that the School Board is a public entity within the meaning of Title II and that C.M.-1 is a qualified individual with a disability under the ADA (¶¶69–70).

The Count alleges five categories of Title II violations: (a) excluding C.M.-1 from participation in and denying her the benefits of the District's educational programs, services, and activities; (b) failing to make reasonable modifications to its policies, practices, and procedures to ensure C.M.-1 could access her education on an equal basis with nondisabled students; (c) failing to implement her IEP accommodations, including short breaks and extended time; (d) subjecting C.M.-1 to a hostile educational environment based on her disability, including public discussion of her IEP and demeaning treatment; and (e) retaliating against C.M.-1 for asserting her rights to accommodations (¶71(a)–(e)).

Count III functions as a parallel claim to Count I. Both Counts address the same student (C.M.-1) and arise from the same underlying conduct at Emerald Cove Middle School during the 2024–2025 school year. Count I is brought under Section 504 (applicable to recipients of federal financial assistance), while Count III is brought under Title II of the ADA (applicable to all public entities regardless of federal funding status). The separate count preserves the Title II claim independently and invokes the ADA's reasonable-modifications framework, which provides an additional layer of protection not expressly stated in Section 504.

Count IV—Violation of Title II of the Americans with Disabilities Act (C.M.-2). Count IV (¶¶71–76 as filed [misnumbered—should begin at ¶74, as ¶¶71–73 duplicate Count III's paragraph numbers]) alleges that the School Board violated Title II of the Americans with Disabilities Act, 42 U.S.C. §12131 et seq. [cited in the Complaint as "§1331 et seq."], with respect to C.M.-2. The Count identifies C.M.-2 as a qualified individual with a disability under the ADA (¶73 as filed).

The Count alleges five categories of Title II violations: (a) excluding C.M.-2 from participation in and denying him the benefits of the District's educational programs, services, and activities; (b) failing to implement his Section 504 Plan accommodations, including Extended Time and Hard Copy of Notes; (c) subjecting C.M.-2 to a hostile educational environment based on his disability, including demeaning statements, false accusations, and stigmatizing conduct by the School Board's employees; (d) failing to take prompt and effective action to address the hostile environment despite notice from C.M.-2's mother; and (e) failing to make reasonable modifications to its policies, practices, and procedures to ensure C.M.-2 could access his education on an equal basis with nondisabled students (¶74(a)–(e) as filed).

Count IV functions as a parallel claim to Count II. Both Counts address the same student (C.M.-2) and arise from the same underlying conduct at Palm Beach Central High School during the 2023–2024 school year. As with the Count I/Count III pairing, the parallel structure preserves claims under both Section 504 and Title II. Count IV places particular emphasis on two elements also present in Count II—the district's failure to take prompt and effective action despite parental notice, and the failure to make reasonable modifications—using language that tracks the Title II regulatory framework at 28 C.F.R. §35.130(b)(7).

Count V—Violation of the McKinney-Vento Homeless Assistance Act (C.M.-2). Count V (¶¶77–90 as filed) alleges that the School Board violated the McKinney-Vento Homeless Assistance Act, 42 U.S.C. §§11431–11435, with respect to C.M.-2. This is the only Count in the Complaint that is not grounded in disability discrimination law; it addresses the District's obligations to C.M.-2 as a homeless student, though the overlap of his disability status and his homeless status is central to the alleged harms.

The Count begins by establishing C.M.-2's eligibility under the Act. It alleges that C.M.-2 meets the statutory definition of a "homeless child" at 42 U.S.C. §11434a(2)—meaning that he and his family lacked a fixed, regular, and adequate nighttime residence—and that he was continuously identified as homeless by the School District beginning approximately October 2022 (¶79 as filed). The Count further alleges that C.M.-2 was continuously enrolled in schools within the School District of Palm Beach County since becoming homeless, and that he attended Suncoast High School, a public choice school within the District (¶83 as filed).

The Count then identifies four specific obligations under the McKinney-Vento Act that the School Board is alleged to have violated:

- The transportation mandate. The Count alleges that the School Board violated 42 U.S.C. §11432(g)(3)(E)(i) [cited in one instance in the Complaint as "§11432(e)(3)(E)(i)(III)"—a typographical error involving both an incorrect subsection letter and a nonexistent subclause].

  For the 2024–2025 school year, the School Board denied McKinney-Vento transportation to C.M.-2, asserting that he was ineligible because he attends a choice school rather than his school of origin (¶84 as filed). The Count characterizes this denial as a blanket policy that categorically excludes homeless students attending choice schools from McKinney-Vento transportation services, in violation of the Act's mandatory requirement that the LEA "provide or arrange" transportation to the school of enrollment (¶85 as filed).

- Best-interest determination. The Count alleges that the School Board violated 42 U.S.C. §11432(g)(3)(A), which requires that school placement decisions for homeless students be based on the best interest of the child. The School Board failed to conduct any individualized best-interest determination before denying C.M.-2's transportation request, instead applying the categorical exclusion policy without analysis (¶86 as filed).

- Dispute resolution. The Count alleges that the School Board violated the dispute resolution requirements at 42 U.S.C. §11432(g)(3)(E). Rather than providing dispute resolution procedures when the transportation request was denied, the District took the affirmative step of revoking C.M.-2's previously approved customized bus stop—forcing him to cross a dangerous eight-lane [sic; see ¶¶41 and 43 of the same Complaint] Okeechobee Boulevard without a safe school zone signal, in conditions that exacerbated his disabilities (ADHD and anxiety) and placed his physical safety at risk (¶87 as filed).

- Liaison duties. The Count alleges that the School Board violated 42 U.S.C. §11432(g)(1)(J)(iii), which requires the LEA's designated local liaison to ensure, among other duties, that parents of homeless students are fully informed of all available transportation services and assisted in accessing them. The Count alleges that the District failed to ensure its liaison fulfilled these duties with respect to C.M.-2's mother (¶88 as filed).

Count V alleges five categories of harm to C.M.-2 and his family: (a) denial of legally mandated transportation services; (b) physical danger caused by the requirement to cross a busy, multi-lane road without safe crossing infrastructure; (c) exacerbation of C.M.-2's disabilities, including increased anxiety; (d) financial harm, including costs of alternative transportation (Lyft, neighbors) and loss of income when C.M.-2's mother was forced to quit a job to manage transportation; and (e) barriers to school enrollment, attendance, and success (¶89(a)–(e) as filed).

Disability Discrimination and the Standard of Care

Disability Discrimination (which is co-mingled with racial discrimination due to implicit and explicit bias) is the cornerstone of the Complaints in all five Counts in this Case. Disability Discrimination is similarly inherent in the District's failure to demonstrate the Standard of Care—based on the services, supports, instruction, and interventions needed and delivered—that non-disabled students would receive if they were experiencing or exhibiting the same or similar circumstances that existed in this Case.

Across both Plaintiffs, the five Counts collectively involve allegations spanning two students, three schools, multiple school years, and three federal statutes. The three statutes—Section 504, Title II of the ADA, and The McKinney-Vento Act—address distinct, but overlapping, aspects of the School District's failed compliance obligations with respect to C.M.-1 (Counts I and III) and C.M.-2 (Counts II, IV, and V). Critically, text from these statutes define the Standard of Care (SOC) for this Case.

- "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" (Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794);

- "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity" (Title II of the Americans with Disabilities Act, 42 U.S.C. §12132); and

- "(Each School District or Local Educational Agency) shall ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, including a public preschool education, as provided to other children and youths" (McKinney-Vento Homeless Assistance Act, 42 U.S.C. §11431).

Applying these statutes to the implementation of the psychoeducational practices that are needed specifically by C.M.-1 and C.M.-2 in this Case, the Standard of Care also includes:

- "The right accommodations. . .
- Implemented consistently every time at the right time. . .
- Under the right conditions. . .
- With the right methods and implementation fidelity and intensity. . .
- And the right evaluations. . . to maximize success."

This Standard of Care does not describe aspirational best practice. It describes the minimum threshold of compliance that federal law requires every public school district to meet. The analysis that follows demonstrates, specifically and based on evidence, how the School District of Palm Beach County failed to meet the Standard of Care for both C.M.-1 and C.M.-2—and how those failures satisfy the criteria for each Count in the Second Amended Complaint.

This will be accomplished with the following in mind:

- Under Section 504 (Counts I and II), the Plaintiffs must demonstrate that one or Both Plaintiff students were denied the benefits of, or subjected to discrimination under, the District's educational program by reason of disability, and that the District acted with deliberate indifference—meaning it had actual knowledge of the discrimination and failed to act in a manner that was clearly unreasonable in light of the known circumstances.

- Under Title II of the ADA (Counts III and IV), the Plaintiffs must demonstrate that each student was excluded from participation in or denied the benefits of the District's services, programs, or activities, or was subjected to discrimination by the District, by reason of disability. Count IV additionally encompasses allegations of retaliation against C.M.-2 for exercising rights under Section 504—specifically, that teachers and staff engaged in conduct that was hostile, demeaning, or punitive in response to C.M.-2's and his mother's assertion of his accommodation rights. The standard for compensatory damages under both Counts III and IV is the same deliberate indifference standard that governs Section 504.

- Under The McKinney-Vento Homeless Assistance Act (Count V), the Plaintiffs must demonstrate that the District (a) failed to conduct an individualized best-interest determination before making decisions affecting C.M.-2's enrollment and transportation; (b) failed to review and revise policies that acted as barriers to C.M.-2's enrollment, attendance, and academic success; and (c) failed to offer the required dispute resolution process when it made decisions adverse to C.M.-2's interests.

The sections that follow apply these standards to the factual record—student by student, Count by Count, element by element.

C.M.-1. Counts I and III—Section 504 (Count I) and Title II ADA (Count III)

The Counts relevant to C.M.-1 are Count I (Section 504—denial of FAPE and disability discrimination) and Count III (Title II ADA—denial of FAPE and disability discrimination). Both Counts allege: (a) failure to implement IEP accommodations, specifically Extended Time and Short Breaks; (b) a hostile educational environment created by staff conduct; (c) resulting academic harm and emotional distress; and (d) deliberate indifference by the District despite parental notice.

Here are the facts, presented in this Expert Report, that are relevant to these Counts:

A. Denied Benefits / Discriminated Against by Reason of Disability

(i) Systematic Denial of IEP Accommodations

The central allegation within Counts I and III is that C.M.-1's IEP-mandated accommodations and services were systematically denied, inconsistently implemented, or actively undermined across multiple classrooms, multiple teachers, and for at least the first two years of her enrollment at Emerald Cove Middle School. The evidentiary record supports this allegation across every category of evidence reviewed in this Report.

<u>Deposition testimony</u>. C.M.-1 testified under oath on February 18, 2026 that her two primary IEP accommodations—<u>Short Breaks and Extended Time</u>—were routinely denied during her 6th and 7th grade years. Her testimony describes a pattern in which teachers either did not know about her (initially, 504 Plan and then) IEP, refused to implement its provisions, or conditioned accommodations on requirements not contained in the IEP itself.

Specifically, C.M.-1's deposition testimony establishes that:

- Multiple general education teachers across both school years failed to provide Extended Time on assignments and assessments, despite this being a mandated IEP accommodation. In her 7th-grade year, C.M.-1 specifically identified three teachers—Wagstaffe, Klein, and Frost—who did not provide extended time (Deposition, p. 40). Wagstaffe characterized IEP-required extended time as "overdue" work (Deposition, p. 50)—reframing a legally mandated accommodation as a student compliance failure

- Short Breaks were denied or conditioned on the availability of an escort—a requirement not specified in the IEP that effectively nullified the accommodation when no escort was available (Deposition, pp. 46–47). This conditioning was subsequently confirmed by the District's own ADA/Section 504 Investigation Report (CBM-154 to CBM-162)

- The District's own response to the accommodation access problem was not to fix the system, but to create an informal workaround. C.M.-1's deposition testimony describes an assistant principal instructing her to use the word "<u>water</u>" as a code word to request a break without identifying herself as a student with a disability, thereby shifting the burden of accommodation enforcement from the institution to a middle school student

- When C.M.-1 attempted to use the systems the school had created, she was met with surveillance, sarcasm, and indifference from the very staff assigned to support her

<u>Discovery documents</u>. The Discovery record corroborates C.M.-1's testimony with documentary precision:

- The District's own <u>ADA/Section 504 Investigation Report</u> (CBM-154 to CBM-162) investigated eight complaints about Grade 6 accommodation implementation. Although the investigation found no disability discrimination on any complaint, the Report's own findings confirm that breaks were <u>conditioned on the availability of an escort</u> and that notes were provided through "alternative means" rather than as specified in the IEP. This confirms that the accommodations as written were not being implemented as written. The investigation's finding that made breaks contingent on an escort was not discriminatory is contradicted by the IEP's unconditional language. Significantly, the investigator interviewed school staff, but <u>did not interview C.M.-1 herself</u>

- The Investigation Report further concluded that <u>disciplining C.M.-1 for anxiety-driven laughing</u> was permissible because the behavior did not trigger the Manifestation Determination threshold. This was done without the benefit of a formal Determination assessment and Team meeting. This finding was also contradicted by the IEP team's own subsequent decision to write <u>Accommodation #15</u>—a specific accommodation directing staff to respond to anxiety-driven laughing with a nonverbal cue rather than discipline. The IEP team's decision to create this accommodation constitutes an institutional acknowledgment that the behavior the school had been disciplining was, in fact, a manifestation of C.M.-1's documented Generalized Anxiety Disorder

- The <u>cumulative discipline record</u> (CBM-242 through CBM-265) documents <u>15 separate discipline offenses</u> from February 27, 2024 through May 24, 2024—a period of less than three months. This volume of disciplinary action against a student with documented ADHD and anxiety raises the question—addressed in the Expert Analysis sections of this Report—of why the 504 team or IEP team did not convene to arrange a functional behavioral assessment, involve the District's Multi-Tiered System of Supports (MTSS) team, or consider whether the behaviors being disciplined were manifestations of C.M.-1's documented disabilities. The Investigation Report's own acknowledgment that it did not examine the broader pattern of discipline referrals, the intersection of C.M.-1's homelessness with her disability-related needs, or whether the MTSS process should have been engaged (as documented in the Report's Entry 8 analysis) is a significant scope limitation

<u>Expert Analysis</u>. The research literature reviewed in Sections VII and XIV of this Report establishes that the pattern documented in C.M.-1's record—systematic accommodation denial, behavioral misinterpretation, and disciplinary responses to disability symptoms—is not unique or unexpected. It is a predictable outcome of the structural conditions documented in U.S. research spanning three decades: inadequate teacher training on disability accommodation (Harvey et al., 2010; Poznanski et al., 2018; Gilmour, 2018, 2021; NCLD, 2019); deficit-based beliefs about student ability (Sciutto et al., 2000; NCLD, 2019); label-triggered stigma that suppresses teacher expectations (Ohan et al., 2011; Metzger & Hamilton, 2021); misinterpretation of disability-related behavior as willful misconduct (DuPaul & Stoner, 2014; Barkley, 2015; Okonofua & Eberhardt, 2015); and role resistance in which teachers reject accommodation responsibility as exceeding their professional role (Scruggs & Mastropieri, 1996; Lovett, 2010; Zagona et al., 2017).

C.M.-1's experience is represented in every one of these documented conditions. Her ADHD and anxiety produce the very behaviors—inattention, impulsivity, emotional dysregulation, anxiety-driven laughing—that the research identifies as most likely to be misinterpreted as willful misconduct by untrained teachers. The District's response to these behaviors was to discipline rather than accommodate—precisely the pattern the research predicts when teachers lack the training to distinguish "won't" from "can't."

<u>Evidence of Causation</u>. The evidentiary record contains particularly compelling evidence of causation. C.M.-1's deposition testimony and the Discovery documents establish that during the current school year (Grade 8, 2025–2026)—as (a) her accommodations <u>have been</u> implemented by different staff, (b) she has a new accommodation support person (identified in her deposition testimony as Mrs. Johnson, replacing Miss Oliver), and (c) she has been separated from triggering peers—C.M.-1 has demonstrated <u>measurable academic and behavioral improvements</u>. The key variable that changed is not the student. It is the integrity of the implementation (and support staff for) C.M.-1's accommodations. This before-and-after contrast provides direct evidence that the prior years' academic failure and emotional distress were caused by the accommodation denials and hostile environment, not by C.M.-1's inherent limitations or behavioral choices.

### (ii) <u>Hostile Educational Environment</u>

The Complaint alleges that C.M.-1 was subjected to a pervasively hostile educational environment by the very staff members assigned to support her. The evidentiary record validates this allegation with specificity.

<u>The conduct of Miss Oliver</u>. C.M.-1's ESE support teacher—Miss Oliver—was the individual specifically identified by the District as responsible for facilitating C.M.-1's accommodation access.

C.M.-1's deposition testimony describes conduct by Miss Oliver that includes:

- Telling other teachers that C.M.-1 "stinks" (Deposition testimony)

- Talking about C.M.-1 to other staff in a manner that stigmatized her disability status
- Making comments that publicly identified C.M.-1 as a student with a disability in contexts where that information was neither necessary nor appropriate

- Creating an environment in which C.M.-1 experienced the provision of accommodations themselves as a source of humiliation rather than assistance

This testimony is consistent with the pattern identified in the Expert Analysis: The "staff-support" mechanism that the District established to ensure accommodation implementation and compliance became its own vehicle for stigmatization. The person the District designated to help C.M.-1 access her accommodations instead became the person C.M.-1 most needed protection from.

The District's response compounded the harm. When the District was notified of Miss Oliver's conduct, its response was to reduce Miss Oliver's classroom presence without providing an alternative support mechanism. This response compounded the problem rather than resolving it: C.M.-1 lost whatever accommodation support Miss Oliver had been providing, without gaining a replacement. The District's corrective action for the hostile environment was to remove the accommodation support—making the access to accommodations worse in the name, ostensibly, of addressing the hostility.

Teacher disclosure of disability status. C.M.-1's deposition testimony further describes an incident in which a teacher disclosed her IEP status to the entire class—a breach of the confidentiality protections that are inherent in both Section 504 and the ADA, and that are reflected in the District's own Professional Standards policies. This disclosure publicly identified C.M.-1 as a student with a disability in front of her non-disabled peers, contributing to the stigmatization that the research literature identifies as a direct consequence of label-driven bias (Ohan et al., 2011; Metzger & Hamilton, 2021).

The "snitches" incident. During the month-long crisis documented in Discovery Entry 9 (CBM-449 to CBM-464, April 8–May 7, 2025), C.M.-1 was slapped by another student in class and was given a detention. As documented in the Report's Discovery analysis, C.M.-1's mother reported that Miss Oliver stated "We don't deal with snitches"—a statement that, if made, communicated to C.M.-1 that reporting victimization would result in retaliation from the very staff assigned to protect her.

While Miss Oliver denied the statement, the allegation is consistent with the pattern documented throughout C.M.-1's deposition testimony regarding Miss Oliver's conduct. Whether or not the specific words were spoken, the cumulative record establishes that C.M.-1 experienced her school environment as one in which reporting problems—whether about accommodation denials or peer victimization—resulted in negative consequences rather than protective action.

The resulting harm. The hostile environment produced documented consequences:

- C.M.-1 experienced anxiety attacks and emotional breakdowns at school, with symptoms including rapid heartbeat and difficulty breathing (Deposition, pp. 43–44)

- C.M.-1 was <u>held home by her mother from approximately April 21 through May 6, 2025</u> due to the severity of her anxiety—a period of approximately two weeks of lost instruction (Deposition, pp. 37, 41, 43)

- C.M.-1 testified that she received <u>no education during the absence</u> (Deposition, p. 41)

- C.M.-1 received <u>failing grades</u> during the period of accommodation denial (Deposition, p. 40)

- C.M.-1 was <u>promoted to the next grade without remediation</u> for the academic harm she sustained—a fact she herself could not explain ("I don't know," Deposition, p. 41)—meaning the consequences of the accommodation denial were carried forward into her subsequent academic career without compensatory services

(iii) <u>Discipline of Disability-Related Behavior</u>

The record of 15 discipline offenses in less than three months (CBM-242 through CBM-265) is significant not merely for its volume, but for its composition. The Expert Analysis in this Report established that the subjective behavioral categories most frequently applied to C.M.-1—disruption, defiance, disrespect—are precisely the categories that the discipline disparities research identifies as most susceptible to teacher bias (Skiba et al., 2002, 2011, 2014). These are not objective offenses (vandalism, truancy, weapon possession) that leave little room for interpretive discretion. They are subjective characterizations of behavior that require the teacher to make a judgment about the student's intent—and the research establishes that when the student has ADHD, when the student is Black, and when the teacher lacks disability-specific training, that judgment is systematically biased toward punitive interpretation (Okonofua & Eberhardt, 2015; Owens & McLanahan, 2020; Welsh & Little, 2018; Gregory et al., 2017).

The District's own Investigation Report (CBM-154 to CBM-162) concluded that disciplining C.M.-1 for anxiety-driven laughing was permissible because the behavior did not meet the Manifestation Determination threshold. This conclusion, while potentially defensible under a narrow legal reading of IDEA's Manifestation Determination provisions, does not address the question at the center of the Section 504 and ADA claims:

> Whether the District's pattern of disciplining disability-related behaviors, rather than accommodating them, constituted a denial of FAPE and a hostile educational environment that would not have been experienced by a non-disabled student exhibiting similar behavior.

The IEP team's subsequent creation of Accommodation #15—directing staff to use a non-verbal cue for anxiety-driven laughing rather than discipline—is an institutional admission that the behavior warranted accommodation, not punishment. The accommodation exists because the behavior is a manifestation of C.M.-1's disability. The discipline that preceded the accommodation occurred because the District had not yet acknowledged what it later conceded.

B. <u>Deliberate Indifference</u> (Counts I and III)

The deliberate indifference standard requires proof that the District had <u>actual knowledge</u> of the discrimination and <u>failed to act</u> despite that knowledge—a failure that was clearly unreasonable in light of the known circumstances. The evidentiary record in C.M.-1's case satisfies both elements with numerous (early) incidences of notice being provided to the District.

(i) Actual Knowledge: The Notice Chain

The Discovery record documents an escalating chain of notice that reached every level of District leadership:

| Date | Document | Official(s) Notified | Discovery Reference |
|---|---|---|---|
| April 2, 2024 | Mother's complaint to Florida Department of Education Inspector General | State-level officials; subsequently routed to District | CBM-004 / CIM-284 (Entry 6) |
| April 18, 2024 | Deputy Superintendent Tierney directs investigation of Inspector General referral through CARES process | Edward Tierney (Deputy Superintendent/Chief of Schools), Vivian Green, Valerie Zuloaga-Haines, Kelly Cox, Jessica Sills | Discovery record, as documented in Report's Entry 6 analysis |
| 2024–2025 School Year | ADA/Section 504 Investigation Report issued | Kim Doyle (ADA/504 Coordinator), distributed to District leadership | CBM-154 to CBM-162 (Entry 8) |
| April 8–May 7, 2025 | Month-long crisis documentation | Principal Feaman, Karen Whetsell (Instructional Superintendent), Robol (Central Region ESE Coordinator), Kevin McCormick (Executive Director of ESE) | CBM-449 to CBM-464 (Entry 9) |
| April 24, 2025 | E-mail thread regarding parent discrimination complaint; Formal Grievance and Demand for Educational Compensation filed through District CARES system | District CARES system recipients | CBM-087 to CBM-096; CBM-097 to CBM-110 |
| May 5, 2025 | Federal complaint filed; additional CARES complaint filed same day | Laura Pincus (General Counsel) aware | CBM-116 to CBM-119 |
| May 15, 2025 | Kim Doyle notifies Principal Feaman and Executive Director McCormick that she will not move forward with 504 investigation due to pending federal lawsuit | Kim Doyle, Principal Feaman, Kevin McCormick | CBM-434 |

By May 7, 2025, the following individuals at the District level had, through clear documentation, actual knowledge of the mother's complaints: Deputy Superintendent Tierney, Instructional Superintendent Whetsell, Central Region ESE Coordinator Robol, Executive Director of ESE McCormick, ADA/504 Coordinator Doyle, and General Counsel Pincus.

The depth and breadth of District-level leaders named above invalidates any suggestion that the failures documented in this Case on C.M.-1's behalf were isolated building-level "blips" whose occurrence and/or impact were minimal and unknown to District leaders.

(ii) Failure to Act: The Pattern of Inadequate Response

The record does not merely show that the District was notified. It shows how the District responded to that notification—and the responses, examined in sequence, demonstrate a pattern that satisfies the deliberate indifference standard.

- Response #1: The Investigation that changed nothing. The ADA/Section 504 Investigation (CBM-154 to CBM-162) was conducted by Kim Doyle, the District's ADA/504 Coordinator.

  The investigation examined eight complaints and found no disability discrimination on any of them. As documented in the Report's Entry 8 analysis, the investigation's scope excluded the broader pattern of discipline referrals, the intersection of C.M.-1's homelessness with her disability-related needs, and whether the MTSS process should have been engaged. The investigator interviewed school staff but did not interview C.M.-1 herself. The investigation was distributed to every level of District leadership. Yet there is no indication in the record that, following this investigation, the IEP team—including the mother—was reconvened to determine if additional assessments, strategies, or interventions were needed. No effort was made to re-establish a positive working relationship between school staff, C.M.-1's mother, and C.M.-1 herself.

- Response #2: The prospective plan that ignored the past. In response to the April 2025 crisis, as documented in Discovery Entry 9 (CBM-449 to CBM-464), Principal Feaman proposed a prospective plan that included distributing IEP copies to teachers, meeting with the ESE Contact, tracking accommodation use, and semester-end check-ins. As the Report's Expert Analysis documented, this plan is entirely prospective. It does not address the retrospective failures—the months of accommodation denial and staff misconduct that had already occurred.

  Moreover, it does not identify or hold the specific staff whose conduct caused the harm accountable. And it does not provide any compensatory services for the instruction and accommodations C.M.-1 had already been denied. As documented in the Report's Discovery analysis, C.M.-1's mother objected that the plan "does not appear to directly address the underlying concerns I've raised regarding retaliation, inconsistent application of the Student Code of Conduct/IEP, and the emotional impact these issues have had on C.M.-1." The Report's Expert Analysis concluded that this objection is substantively accurate.

- Response #3: The removal options instead of a safety plan. As documented in the Report's Discovery analysis of Entry 9, Karen Whetsell's response to the mother's complaints listed McKinney-Vento transfers, Home Education, Hospital/Homebound, and the Family Empowerment Scholarship. The Report's Expert Analysis characterized this response as a catalog of ways to remove C.M.-1 from Emerald Cove, rather than a plan to make Emerald Cove safe for C.M.-1.

  Under Section 504 and the ADA, the obligation is on the District to modify its program to accommodate the student with a disability—not to present the family with options subtly encouraging the student to leave the program. In my professional opinion, Whetsell's response inverts the statutory obligation.

- Response #4: Legal monitoring without remedial action. As documented in the Report's analysis of Discovery Entry 9, General Counsel Laura Pincus's forwarded comment—"Student returning to school. My guess is that we will never be served"—is a contemporaneous statement by the District's own legal counsel. It establishes that the legal department was

monitoring the situation and assessing litigation probability—and yet, there is no evidence in the record that the legal department was focused on assessing and providing remedial actions to address the substantive concerns the mother had raised.

The District's legal response to the mother's escalating complaints was to assess the probability of being sued—not to assess compliance with C.M.-1's IEP or investigate the staff conduct the mother had documented. The federal complaint was filed on May 5, 2025 (CBM-116 to CBM-119)—while C.M.-1 was still absent from school due to the severity of her anxiety (she was held home through approximately May 6, 2025). This demonstrates that the District misjudged not only the seriousness of the family's concerns, but the imminence of federal litigation.

- Response #5: Suspending the investigation. The May 15, 2025 communication from Kim Doyle (CBM-434) notifying Principal Feaman and Executive Director McCormick that she would not be moving forward with the 504 investigation due to the pending federal lawsuit is perhaps the most consequential response in the record.

  This decision left C.M.-1 without the outcome (and the potential remediation) of the very investigation that the mother had requested months earlier—even as the District simultaneously continued to require C.M.-1's attendance and compliance with school rules.

  The District's response to the mother's escalating advocacy was to suspend its own internal compliance mechanism rather than to accelerate the provision of services to the student. In my professional opinion, this does not constitute the corrective response that the Standard of Care requires.

- Response #6: The attendance warnings. During the period when C.M.-1 was held home by her mother (approximately April 21–May 6, 2025) due to the severity of her anxiety—anxiety that the record attributes to the hostile environment and accommodation denials at school—the District responded with attendance violation warnings and alternative placement options rather than with an acknowledgment that the disability-related absence was caused by the District's own failures.

  This response is directly relevant to the FAPE and hostile environment claims: the District treated disability-related school avoidance as a compliance problem to be solved through attendance enforcement, rather than as evidence that the educational environment it had created was causing harm to a student with a documented anxiety disorder.

(iii) The Cumulative Picture

Taken together, these responses describe a District that:

1. Received notice at every level of its organizational hierarchy—from building principal to Deputy Superintendent to Florida Department of Education General Counsel

2. Investigated and found nothing wrong—despite an investigation that excluded critical evidence, did not interview the student, and reached conclusions that were contradicted by the District's own subsequent IEP decisions

3. Proposed corrective action that was entirely prospective, contained no retrospective accountability, and provided no compensatory services

4. <u>Offered removal options</u> to the family rather than modifying the school environment to make it safe for the student

5. <u>Monitored litigation risk</u> without directing compliance remediation

6. <u>Suspended its own investigation</u> when the family actually filed the federal complaint

7. <u>Enforced attendance</u> during a period when the student's disability-related absence was caused by the District's own failures

This pattern does not describe a school district that acted reasonably in light of known circumstances. It describes a school district that had actual knowledge of ongoing disability discrimination—documented through parental complaints, a state-level referral to the Florida Department of Education Inspector General, its own internal investigation, and a formal grievance—and responded with a series of actions that were either inadequate to the scope of the problem, misdirected away from the student's actual needs, or directly contrary to the student's interests.

### C.M.-2. Counts II and IV—Section 504 (Count II) and Title II ADA (Count IV — Discrimination and Retaliation)

Count II in this Case alleges disability discrimination under Section 504. Count IV alleges both disability discrimination and retaliation under Title II of the ADA—specifically, that C.M.-2 was subjected to adverse treatment by teachers and staff in response to his and his mother's exercise of his rights under Section 504, including his requests for accommodations and his mother's complaints about accommodation denials.

Here are the facts, presented in this Expert Report, that are relevant to these Counts:

A. <u>Denied Benefits/Discriminated Against by Reason of Disability</u>

(i) <u>Systematic Denial of 504 Plan Accommodations</u>

The evidentiary record establishes that C.M.-2's Section 504 accommodations—specifically <u>Extended Time</u> and <u>Hard Copy of Notes</u>—were denied across multiple teachers at both Palm Beach Central and Suncoast High School.

<u>Deposition testimony.</u> C.M.-2 was examined for approximately one hour by Defense counsel (Laura Pincus) and Plaintiff's counsel (Roberto Cruz). Despite his age, C.M.-2 provided testimony that the Report's Expert Analysis characterized as detailed, internally consistent, and—as demonstrated in Table 16 of this Report—<u>corroborated point by point</u> by e-mails, medical records, administrative communications, and formal complaints in his Discovery packet.

C.M.-2's deposition testimony establishes that:

- At Palm Beach Central (Grade 9, 2023–2024), Teacher Chacon failed to implement Extended Time and Hard Copy of Notes accommodations, and made statements that were demeaning and stigmatizing regarding C.M.-2's disability and his need for accommodations. A formal complaint against teacher Chacon was filed on September 4, 2024 (CIM-0120)

- Teacher Dashiell at Suncoast similarly failed to implement accommodations and characterized C.M.-2's accommodation requests in dismissive terms, as described below

- At Suncoast (Grade 10, 2024–2025), accommodation implementation failures continued despite the school transfer, demonstrating that the problem was systemic rather than school-specific

Discovery documents. The Discovery record corroborates C.M.-2's testimony with particular force in the following entries:

- Entry 5 (CIM Discovery record, approximately September 10, 2024). Teacher Thomas Dashiell e-mailed ESE Coordinator Ernestine Hall-Sweets to ask whether a plan of accommodations existed for C.M.-2, stating: "I do not see him on your list." Hall-Sweets responded that C.M.-2 does have a plan and that she had updated the Google Sheet. This establishes that approximately one month into the school year, C.M.-2's 504 Plan had not been made available to at least one of his classroom teachers. This is a foundational implementation failure—teachers cannot implement accommodations they do not know exist

- In the same e-mail, Dashiell characterized C.M.-2's accommodation request as follows: "This student is asking me to give him all my notes while he sits in class and does nothing." As the Report's Expert Analysis documented, the provision of notes or outlines is a standard 504/IEP accommodation for students with ADHD, designed to reduce the executive function burden of simultaneous listening, processing, and note-taking. A teacher who characterizes this accommodation as a student "doing nothing" has fundamentally misunderstood the purpose of the accommodation

- Entry 6 (CIM-277, September 18, 2024). One month into the school year, AP Keevey was required to e-mail all of C.M.-2's teachers reminding them of his 504 Plan and sharing the mother's e-mail reporting that accommodations were not being provided, including suspected testing accommodation denial. The mother stated: "I can tell anytime my son is not receiving his accommodations."

  This document establishes that (a) administrative intervention was required because the routine system for informing teachers had failed; (b) the mother was bearing the burden of monitoring and enforcing compliance—a burden that Section 504 places on the school, not the parent; and (c) suspected testing accommodation denial was occurring as late as September 2024, after the family had already filed complaints about the same failures at the prior school

- Entry 7 (CIM-831 to CIM-837, November 5 through December 5, 2024). A month-long e-mail chain documenting negotiations over 504 Plan language at Suncoast between C.M.-2's mother and ESE Coordinator Ernestine Hall-Sweets. The mother objected to "as needed" and "when available" qualifiers on accommodations, subject-specific narrowing ("Shortened math assignments" rather than general reduced-assignment language), and modification of a pre-existing accommodation without justification.

  The mother wrote: "These accommodations are in place to support his needs, not for the convenience of others. The vague wording suggests that the accommodations are optional or subject to change, which is unacceptable." She further noted: "While I appreciate the substantial support and resources available to students at Suncoast, if C.M.-2 decides to return to his home school, this 504 Plan will need to remain applicable." Hall-Sweets made corrections over multiple rounds, with the final updated Plan not provided until December 5, 2024—more than three months into the school year.

Expert Analysis—Conditional accommodation language. The Report's Expert Analysis identified the use of conditional language—"as needed," "when available"—as a critical compliance failure. As documented in the Report's Entry 7 analysis: "A 504 accommodation that is available only 'when available' is an accommodation that staff can decline to provide whenever implementation is inconvenient." This language transforms mandatory accommodations into discretionary ones, giving individual teachers the authority to decide whether and when to provide supports that the 504 team has already determined the student requires. Under Section 504, accommodations identified through the evaluation and planning process are not suggestions. They are obligations. Language that conditions their provision on teacher judgment or resource availability effectively nullifies the 504 Plan's legal force while maintaining the appearance of compliance.

Expert Analysis—The pattern across schools. The fact that accommodation failures followed C.M.-2 from Palm Beach Central to Suncoast—across different buildings, different administrators, and different teachers—is significant. It demonstrates that the failures are not attributable to a single teacher or a single building-level administrative lapse. They reflect a systemic failure in the District's mechanisms for ensuring that 504 Plans are communicated to teachers, that teachers understand their obligations under those Plans, and that compliance is monitored and enforced at the institutional level. This finding is consistent with the research reviewed in Section XIV of this Report documenting structural failures unique to secondary school environments, including departmentalized schedules that fragment accountability across multiple teachers and documentation systems that fail to deliver plans to teachers in time for implementation (Zirkel, 2020; Zagona et al., 2017; NCLD, 2019).

(ii) Hostile Educational Environment and Retaliation (Count IV)

The Complaint alleges that C.M.-2 was subjected to demeaning and stigmatizing statements by teachers regarding his disability and his need for accommodations. Count IV specifically alleges that this conduct constituted retaliation for C.M.-2's and his mother's exercise of his Section 504 rights. The deposition testimony and Discovery documents corroborate both allegations.

Teacher Chacon's conduct at Palm Beach Central. At Palm Beach Central (Grade 9, 2023–2024), teacher Chacon's statements and conduct toward C.M.-2 constituted a hostile response to a student's exercise of his legal right to receive disability accommodations. The Report's Expert Analysis characterized Chacon's dismissive treatment of accommodation requests as reflecting the pattern documented in the research literature: The teacher interprets legally-mandated support not as a compliance obligation, but as evidence that the student is seeking an unfair advantage or avoiding effort (Lovett, 2010; Scruggs & Mastropieri, 1996). A formal complaint against teacher Chacon was documented at CIM-0120 (September 4, 2024).

Teacher Dashiell's conduct at Suncoast. Teacher Dashiell's characterization of C.M.-2's accommodation requests—that C.M.-2 was "asking me to give him all my notes while he sits in class and does nothing"—reflects the same pattern. The accommodation request is reframed as laziness rather than recognized as a legal entitlement. The Report's Expert Analysis noted that this is the precise mechanism through which the research documents accommodation denial: The teacher who views ADHD-related needs as volitional rather than neurological does not merely fail to accommodate—the teacher actively resists accommodation because they do not believe the underlying condition warrants it (Sciutto et al., 2000; Poznanski et al., 2018; DuPaul & Stoner, 2014).

Retaliation analysis (Count IV). The Report's Entry 5 analysis explicitly identified Dashiell's e-mail as relevant to both Count II (discrimination) and Count IV (retaliation), stating: "This e-mail is relevant to both Count II (discrimination) and Count IV (retaliation), as it documents a teacher's hostile framing of

a student's accommodation request." The Report's analysis further identified <u>the self-monitoring dynamic</u> as directly relevant to Count IV's retaliation claims:

> "A student who must repeatedly advocate for his own accommodations—and whose parent must escalate communications to the administrative level in order to secure basic compliance . . . is being met with institutional resistance—rather than institutional support—when he has to remind teachers to provide him the accommodations that (a) they should have known about before the beginning of the school year, and (b) they should be providing without student reminders."

The retaliation claim is supported by a specific temporal and causal pattern in the evidentiary record: (a) C.M.-2 or his mother asserts his right to accommodations; (b) the teacher responds with hostility, dismissiveness, or characterizations of the student as lazy or manipulative; (c) the teacher's subsequent conduct toward C.M.-2 reflects this hostility, rather than compliance.

This pattern—documented with teacher Chacon at Palm Beach Central and teacher Dashiell at Suncoast—is consistent with the accommodation backlash effect identified in the research literature (Lovett, 2010): The student who requests accommodations is perceived as less competent and less deserving, and the accommodation request itself becomes the trigger for adverse teacher conduct.

<u>The cumulative impact</u>. The combined effect of these teacher behaviors—across multiple classrooms and two schools—created an educational environment in which C.M.-2's disability status functioned not as a basis for receiving legally mandated support, but as a basis for stigmatization and adverse treatment. The pattern is not isolated to a single difficult teacher-student relationship. It is replicated across schools, across years, and across different staff members—a replication that points to systemic, rather than individual, causation.

## B. <u>Deliberate Indifference</u> (Counts II and IV)

### (i) <u>Actual Knowledge</u>

The record establishes that the District had actual knowledge of the accommodation failures affecting C.M.-2 through multiple channels:

- The mother filed a formal complaint against teacher Chacon (CIM-0120, September 4, 2024) and contacted the 504 Coordinator regarding accommodation denials at Palm Beach Central

- The mother reported accommodation failures to AP Keevey at Suncoast, who was required to intervene by e-mailing all of C.M.-2's teachers (CIM-277, September 18, 2024)

- <u>Entry 1</u> of the of the Report's C.M.-2 Discovery analysis (CIM-357, May 1, 2024) documents that Valerie Zuloaga-Haines received the mother's complaints, placing the District's regional leadership on notice

- ESE Director Kevin McCormick had actual knowledge of "<u>numerous grievances and detailed complaints</u>" from the mother regarding both C.M.-1 and C.M.-2, and—as alleged in the Complaint and supported by the Discovery record—"<u>failed to ensure accountability or compliance</u>"

- The mother's complaints about C.M.-2 were part of the same escalating chain of advocacy that included complaints about C.M.-1—meaning that District officials who were placed on notice of

C.M.-1's failures (Tierney, Whetsell, Robol, McCormick, Doyle, and Pincus) were simultaneously on notice that the same family was experiencing parallel failures with C.M.-2

(ii) <u>Failure to Act</u>

The District's responses to C.M.-2's accommodation failures mirror the pattern documented in C.M.-1's record:

- At Palm Beach Central, the mother's complaints about teacher Chacon did not result in documented corrective action that ensured consistent accommodation implementation across all of C.M.-2's classrooms

- At Suncoast, the mother was required to <u>personally identify and report</u> each accommodation failure—bearing a monitoring burden that Section 504 assigns to the institution. As the Report's Entry 7 analysis documented: "This is advocacy time that the mother should not have needed to invest if the school had written the Plan correctly in the first instance"

- The 504 Plan language was defective (conditional qualifiers, subject-specific narrowing, unauthorized modification of pre-existing accommodations) and required <u>a full month of parental advocacy</u> (November 5–December 5, 2024) to correct—advocacy that the school, not the parent, should have initiated

- Teachers were not informed of C.M.-2's 504 Plan at the beginning of the school year—a foundational failure that the District did not identify or correct until the mother reported ongoing accommodation denials approximately one month into the school year. As the Report's Entry 5 analysis stated: "accommodations that are not communicated to the teachers responsible for implementing them are accommodations that do not exist in practice"

The Report's Expert Analysis characterized the sustained parental burden documented in C.M.-2's record as itself an indicator of institutional failure. Under Section 504, the obligation to identify students with disabilities, develop accommodation plans, communicate those plans to teachers, monitor implementation, and take corrective action when implementation fails rests with the <u>school district</u>. A system in which the parent must monitor every classroom, identify every failure, report every denial, and negotiate every correction is a system that is inconsistent with one in which the institution is meeting its federal compliance obligations. The pattern documented in C.M.-2's record—"parent identifies a deficiency, parent advocates for correction, school makes partial correction, parent identifies the next deficiency"—is not a collaborative partnership. It is the institution's compliance function being performed by the family.


<u>C.M.-2: Count V—McKinney-Vento Homeless Assistance Act</u> (42 U.S.C. §11431 et seq.)

Count V alleges that the School Board denied McKinney-Vento transportation to C.M.-2's Choice school for the 2024–2025 school year, revoked a previously customized McKinney-Vento bus stop, provided instead the use of a bus stop that required crossing a highly trafficked road, and did not conduct a best-interest analysis or provide appropriate dispute resolution. The Complaint alleges that these failures caused: (a) denial of McKinney-Vento transportation services; (b) physical danger caused by the requirement to cross a busy, multi-lane road without safe crossing infrastructure; (c) exacerbation of C.M.-2's disabilities, including increased anxiety; (d) financial harm, including costs of alternative transportation (Lyft, neighbors) and loss of income when C.M.-2's mother was forced to quit a job to manage transportation; and (e) barriers to school enrollment, attendance, and success.

The Complaint identifies the road as <u>Okeechobee Boulevard</u> and describes it as an eight-lane road. (The Second Amended Complaint contains an internal inconsistency, describing the road as "three-lane" in ¶87; as documented in Table 2 of this Report, this appears to be a drafting error, with "eight-lane" being the correct description.)

Here are the facts, presented in this Expert Report, that are relevant to this Count:

A. <u>Failure to Conduct Best-Interest Determination</u>

The McKinney-Vento Act requires that enrollment, placement, and transportation decisions affecting homeless students be made on the basis of an <u>individualized best-interest determination</u> (42 U.S.C. §11432(g)(3)(B)). The Discovery record and the Complaint establish that the District <u>did not engage in a best-interest analysis</u> before denying transportation to C.M.-2's choice school. This failure is significant for two independent reasons.
<u>First</u>, the failure violates the procedural mandate of the Act regardless of what the outcome of the analysis would have been. The McKinney-Vento Act does not permit school districts to apply blanket policies to homeless students without individualized consideration. A policy that categorically denies transportation to Choice schools—without examining whether the denial would create barriers to the specific homeless student's attendance and success—violates the Act's procedural requirements even if, in a given case, the denial might have been substantively defensible. The violation is the failure to conduct the analysis, not its result.

<u>Second</u>, the failure is compounded by C.M.-2's disability status. An individualized best-interest determination would, by definition, require consideration of C.M.-2's documented ADHD and Generalized Anxiety Disorder and their impact on his ability to access education under the conditions the District imposed. The failure to conduct this analysis meant that the District failed to account for disability-related needs that federal law—independently of McKinney-Vento—required it to accommodate. The McKinney-Vento violation and the Section 504/ADA violations are mutually reinforcing: the failure to conduct a best-interest determination precluded consideration of disability-related needs, and the failure to accommodate disability-related needs made the transportation barriers more harmful than they would have been for a non-disabled homeless student.

<u>Finally</u>, the fact that the District withdrew its <u>already-agreed-upon custom bus stop</u> when C.M.-2 was attending Palm Beach High School during the 2023-2024 school year simply because he wanted to attend a more academically-challenging Suncoast High School seems (a) to reflect a rigid adherence to "rules," rather than "opportunities," and (b) acknowledgement that his homeless and disability status had previously been qualifying and, suddenly, was not.

B. <u>Failure to Remove Barriers</u>

The McKinney-Vento Act requires school districts to <u>review and revise any policies that may act as barriers</u> to the identification, enrollment, attendance, or academic success of homeless children and youth (42 U.S.C. §11432(g)(1)(I)).

The record establishes multiple barriers that the District failed to remove:

- <u>The blanket transportation denial</u>. The District applied a uniform policy denying McKinney-Vento transportation to Choice schools. This facially neutral policy operated in practice to deny a documented homeless student access to a school that was not only more academically challenging, but that also allowed him to escape from the academic and social-emotional impact

of the litigation-related (Count III and IV) events during Grade 9 at Palm Beach Central. The Act requires the District to question the presence of uniform policies and denials, and to investigate and potentially remove such barriers. The Act exists to facilitate students' education, not to adhere to inflexible policies and offer the student the status quo.

- The revocation of the customized bus stop. As noted, the District revoked a previously-approved bus stop that had been customized to accommodate C.M.-2's circumstances, and replaced it with a stop that required crossing Okeechobee Boulevard—a busy, multi-lane road—without safe crossing infrastructure. This revocation created a physical safety barrier that the District was obligated to identify and address

- The financial and logistical barriers. The mother, the sole Head of a Household that twice qualified for Homelessness status, was forced to arrange and pay for alternative transportation (Lyft, neighbors) and ultimately she had to quit one of her jobs to manage transportation for C.M.-2. These are precisely the kinds of barriers—financial burdens, logistical obstacles, and enrollment disincentives—that the McKinney-Vento Act was enacted to prevent.

The Expert Analysis identified the intersection of these transportation barriers with C.M.-2's documented disabilities as particularly consequential. Transportation barriers that might inconvenience a non-disabled student represent a more severe denial of access for a student whose ADHD impairs executive functioning and whose Generalized Anxiety Disorder is exacerbated by unpredictable, unsafe, or unsupported logistical conditions.

The District's failure to evaluate and consider these factors—especially given its failure to conduct the required best-interest determination—resulted in compounded harm to C.M.-2 as the custom transportation denial intensified the disability-related anxiety it was intended to assuage.

C. Failure to Offer Dispute Resolution

The McKinney-Vento Act requires that when a school district makes a decision adverse to the interests of a homeless student regarding enrollment, school selection, or transportation, the district must provide written notice of the decision, the reasons for it, and the parent's right to appeal through a dispute resolution process (42 U.S.C. §11432(g)(3)(E)).

The Complaint alleges, and the record supports, that the District did not offer dispute resolution to remove barriers to C.M.-2's transportation and enrollment.

This procedural failure deprived the family of the mechanism that federal law provides as a safeguard against precisely the kind of barrier the family was experiencing. The dispute resolution process exists because Congress recognized that homeless families are particularly vulnerable to institutional decisions that impair their children's access to education—and that without a formal mechanism for challenging those decisions, the practical effect of a district's barrier-maintaining policies will fall disproportionately on families least equipped to navigate alternative channels.

The District's failure to offer this process left the mother with no institutional avenue for challenging the transportation denial other than the complaint and advocacy process she had already been using—unsuccessfully—for both children across multiple years.

Cross-Cutting Systemic Findings

   The Pattern Across Both Students. The analysis of C.M.-1's and C.M.-2's records reveals a pattern that transcends the individual facts of either student's experience.

   Across both Plaintiffs, the following systemic conditions are present:

- Accommodation plans existed, but were not implemented. Both students had legally binding and agreed-upon plans (IEP for C.M.-1; 504 Plan for C.M.-2) that documented specific accommodations the District was obligated to provide. In both cases, the plans were written, but not consistently delivered in the classroom. The District treated plan development as the endpoint of its obligation, rather than the starting point.

- Teachers were uninformed, untrained, unsupervised, or unwilling. In C.M.-1's case, multiple teachers across two school years failed to implement IEP accommodations. In C.M.-2's case, teacher Dashiell did not see C.M.-2 "on your list" approximately one month into the school year—a failure so fundamental that it precluded any possibility of compliance. The research reviewed in Section XIV of this Report documents that this is a predictable consequence of the systemic training deficits in general education teacher preparation (Harvey et al., 2010; Gilmour, 2018, 2021; NCLD, 2019; Zagona et al., 2017).

- The burden of enforcement fell on the family. In both cases, the mother was required to monitor classroom-level compliance, identify failures, report those failures to administrators, and advocate—repeatedly, over months and years—for corrective action that was the District's independent obligation to provide. This burden-shifting is documented in the research as a hallmark of institutional accommodation resistance (Zirkel, 2020; NCLD, 2019).

- District responses were inadequate, misdirected, or absent. When notified of accommodation failures and hostile environments, the District's responses followed a consistent pattern: investigate narrowly and find no violation; propose prospective plans that ignore retrospective harm; offer removal options to the family rather than modifying the school environment; monitor litigation risk rather than direct compliance remediation; and ultimately, suspend internal investigations when the family files suit. At no point in the record does the District's response reflect the prompt, effective corrective action that the deliberate indifference standard requires.

- Accommodation requests triggered adverse teacher conduct rather than compliance. In both students' records, the act of requesting accommodations—or the mother's act of advocating for their implementation—was met with hostility, dismissiveness, or characterizations of the student as lazy or manipulative. Teacher Wagstaffe characterized C.M.-1's extended time as "overdue" work. Teacher Dashiell characterized C.M.-2's notes accommodation as "doing nothing." This pattern—in which exercising a legal right triggers adverse conduct from the person obligated to honor that right—is an operational definition of retaliation.

   The Compounding of Statutes. C.M.-2's experience illustrates a compounding violation structure in which failures under one federal statute amplify failures under another:

- The McKinney-Vento failure to conduct a best-interest determination precluded consideration of C.M.-2's disability-related needs

- The Section 504/ADA failure to accommodate C.M.-2's disabilities made the transportation barriers more harmful than they would have been for a non-disabled student

- The <u>transportation barriers</u> contributed to attendance instability that exacerbated the academic and emotional harm caused by the accommodation failures at school

- The <u>failure to offer dispute resolution</u> deprived the family of the mechanism that might have resolved the transportation barrier before it compounded the disability-related harm

These are not parallel violations operating independently. They are intersecting violations in which each failure makes the others worse—creating a cumulative harm that exceeds the sum of its parts.

<u>The Intersection of Disability, Race, and Homelessness</u>. Both C.M.-1 and C.M.-2 are Black students with ADHD and Generalized Anxiety Disorder who experienced homelessness during the relevant period. The research reviewed in this Report establishes that each of these characteristics independently increases the risk of accommodation denial, behavioral misinterpretation, and disciplinary bias—and that their intersection amplifies these risks beyond the sum of their individual effects (Okonofua & Eberhardt, 2015; Owens & McLanahan, 2020; Morgan et al., 2017; Skiba et al., 2002, 2011, 2014; Gregory et al., 2017).

The District's dress code enforcement against C.M.-1 during a period when the family was experiencing documented homelessness—enforcement that the mother explicitly identified as connected to C.M.-1's housing circumstances (CBM-005, CBM-082 through CBM-086)—illustrates this intersection: a facially neutral policy was applied to a student whose housing instability made compliance more difficult, and the resulting disciplinary consequences were added to a discipline record that was already accumulating at a rate that should have triggered systemic review.

In the end, this Report does not offer a legal conclusion on whether racial discrimination independently occurred. But the research literature compels the observation that the pattern documented in these records—subjective behavioral discipline applied disproportionately, accommodation resistance rationalized through deficit-based beliefs about student effort and motivation, and institutional indifference to escalating parental advocacy—is consistent with the research literature on what happens when Black students with disabilities require accommodations that classroom teachers (and others) are resistant to providing.

<u>Integrated Expert Conclusions</u>

Based on the totality of the evidence reviewed in this Report—including the Second Amended Complaint, the Discovery documents, the deposition testimony of C.M.-1 and C.M.-2, the signed Errata Sheets, the District's own investigation reports, the correspondence of District officials, and the research literature on teacher resistance, accommodation implementation, disability bias, and discipline disparities—the following conclusions are stated to a reasonable degree of psychoeducational probability and certainty:

<u>As to C.M.-1 (Counts I and III)</u>:

1. C.M.-1's IEP-mandated accommodations—specifically Extended Time and Short Breaks—were <u>systematically denied</u> across multiple classrooms and multiple teachers during her 6th and 7th grade years at Emerald Cove Middle School. This denial is documented in C.M.-1's deposition testimony (including specific identification of teachers Wagstaffe, Klein, and Frost), corroborated by the Discovery record, and confirmed by the District's own Investigation Report (CBM-154 to CBM-162)—which found no discrimination, but whose findings independently establish that accommodations were conditioned on requirements (escort availability) not specified in the IEP.

Significantly, the District produced no logs, data, diaries, or audits of any kind to <u>objectively</u> validate any claims by any District staff person that C.M.-1 received any—much less any consistent when student-requested—frequent/movement breaks for the three years in question under either his 504 or IEP plan. As such, any claims to the contrary are simply words without documentation. In the final analysis, this goes, once again, beyond the denial of an accommodation. It means that—proactively, preventatively, and responsively—the District was not provided C.M.-1 the accommodations due to him <u>without</u> his need to request them.

2. C.M.-1 was subjected to a <u>hostile educational environment</u> created by the conduct of the ESE support teacher (Miss Oliver) assigned to facilitate her accommodation access, by teacher disclosure of her IEP status to peers, and by a disciplinary culture that punished disability-related behaviors rather than accommodating them. The mechanism the District established to ensure compliance—the ESE support person—became a vehicle for stigmatization.

3. The District's own subsequent IEP decision to create <u>Accommodation #15</u> (non-verbal cue for anxiety-driven laughing) constitutes an institutional acknowledgment that the behavior the school had previously disciplined was a manifestation of C.M.-1's documented anxiety disorder—undermining the District Investigation's earlier conclusion that the discipline was permissible.

4. C.M.-1's <u>academic and behavioral improvements</u> in the current school year (Grade 8, 2025–2026), when accommodations are being properly implemented by different staff (including Mrs. Johnson replacing Miss Oliver, per deposition testimony), provide direct evidence that the prior years' academic failure and emotional distress were <u>caused by the accommodation denials and hostile environment</u>, not by the student's inherent limitations.

5. The District had <u>actual knowledge</u> of the accommodation failures and hostile environment through a chain of notice that reached from the building level to the Deputy Superintendent, General Counsel, and every level in between—documented in Discovery with named officials, specific dates, and specific communications as catalogued in this Report's Notice Chain table.

6. The District's responses to this knowledge—an investigation with excluded evidence and a Plaintiff student who was not interviewed, a prospective plan with no retrospective accountability, removal options instead of a safety plan, litigation monitoring without remedial action, and suspension of the internal investigation upon the filing of the federal complaint—do not constitute the prompt and effective corrective action that the Standard of Care requires.

<u>As to C.M.-2 (Counts II and IV)</u>:

7. C.M.-2's Section 504 accommodations—specifically Extended Time and Hard Copy of Notes—were <u>denied across multiple teachers at two different schools</u> (Palm Beach Central and Suncoast), demonstrating a systemic, rather than building-specific, failure in the District's accommodation delivery system. Teacher Dashiell's statement that he did not see C.M.-2 "on your list" approximately one month into the school year at Suncoast (Entry 5 Discovery analysis) establishes that the most fundamental prerequisite of accommodation compliance—teacher awareness that a plan exists—was not met.

8. C.M.-2 was subjected to <u>demeaning and stigmatizing statements</u> by teachers regarding his disability and his need for accommodations—statements that reflect the accommodation resistance and deficit-based beliefs documented in the research literature. Teacher Dashiell's characterization of C.M.-2 as a student who "sits in class and does nothing" when requesting legally mandated notes provision, and teacher Chacon's documented conduct at Palm Beach Central, constitute adverse responses to the exercise of disability rights that support the <u>retaliation claim under Count IV</u>.

9. The 504 Plan language at Suncoast contained <u>conditional qualifiers</u> ("as needed," "when available") that transformed mandatory accommodations into discretionary ones, and required <u>one month of parental advocacy</u> (November 5 through December 5, 2024, CIM-831 to CIM-837) to correct—documenting both the defective institutional process and the inappropriate burden placed on the family.

10. The District had actual knowledge of C.M.-2's accommodation failures through multiple channels—including the formal complaint against Chacon (CIM-0120), the mother's contact with Valerie Zuloaga-Haines (CIM-357), AP Keevey's required intervention (CIM-277), and ESE Director McCormick's documented awareness of "numerous grievances and detailed complaints"—and <u>failed to ensure accountability or compliance</u>.

<u>As to C.M.-2 (Count V)</u>:

11. The District <u>did not conduct the individualized best-interest determination</u> required by the McKinney-Vento Act before denying transportation to C.M.-2's choice school—a procedural violation that is independently sufficient to establish a McKinney-Vento claim regardless of the outcome the analysis might have produced.

12. The District <u>failed to remove barriers</u> to C.M.-2's enrollment, attendance, and academic success—including the blanket transportation denial, the revocation of a previously customized bus stop, and the imposition of a replacement stop requiring crossing Okeechobee Boulevard without safe crossing infrastructure—in violation of 42 U.S.C. §11432(g)(1)(I).

13. The District <u>did not offer the required dispute resolution process</u> when it made decisions adverse to C.M.-2's transportation interests—depriving the family of the procedural safeguard that the McKinney-Vento Act mandates as a condition of federal education funding.

14. The intersection of C.M.-2's McKinney-Vento status with his documented disabilities (ADHD and Generalized Anxiety Disorder) created a <u>compounding harm</u> in which the transportation barriers exacerbated the disability-related harm, and the disability accommodation failures exacerbated the transportation barriers—a compounding that the District's failure to conduct a best-interest determination ensured would go unaddressed.

<u>As to the District's Systemic Conduct</u>:

15. The pattern documented across both students—accommodation plans that exist on paper, but are not implemented in classrooms; teachers who are uninformed, untrained, unsupervised, or unwilling; a monitoring burden that falls on the family, rather than the institution; and District responses that are inadequate, misdirected, or absent—describes an institutional environment in which the Standard of Care established by Section 504, Title II of the ADA, and the McKinney-Vento Act was <u>not met</u>.

16. The District's failure to meet this Standard of Care was not the product of a single teacher's negligence, a single administrator's oversight, or a single school's dysfunction. It was the product of a <u>systemic absence of the training, monitoring, and accountability infrastructure</u> necessary to ensure that students with disabilities receive the accommodations and services to which they are legally entitled.

The same categories of failure—accommodation plans not communicated to teachers, teachers uninformed about their legal obligations, disability-related behaviors misinterpreted as misconduct, conditional and discretionary language inserted into mandatory plans, and parental complaints met with narrow investigations, prospective-only remediation, and ultimately institutional withdrawal—appear in the records of both students, across three schools (Emerald Cove Middle School, Palm Beach Central

High School, and Suncoast Community High School), across multiple school years (2023–2024 through 2025–2026), and across every level of the District's organizational hierarchy from the classroom teacher to the General Counsel.

A failure that appears once, in one classroom, with one teacher, may be an isolated lapse. A failure that appears repeatedly, across multiple classrooms, multiple schools, multiple years, and multiple students within the same family—despite escalating parental advocacy, a state-level complaint to the Inspector General, internal investigations, formal grievances, and federal litigation—is not an isolated lapse. It is a systemic condition.

17. The District's conduct toward both Plaintiffs reflects what the research literature identifies as institutional accommodation resistance—a pattern in which the formal structures of compliance (written plans, designated coordinators, investigation procedures) exist and function at the documentary level, but the operational reality in the classroom diverges materially from what the documents promise.

The District wrote IEPs and 504 Plans. It designated ESE contacts and 504 coordinators. It conducted an ADA/Section 504 Investigation. It proposed corrective action plans. At the documentary level, the District's compliance apparatus appears functional. But the evidentiary record establishes that these formal structures did not produce the outcome they were designed to ensure: consistent, daily, classroom-level delivery of the accommodations and services that federal law requires.

The gap between the District's documentary compliance and its operational performance is the central finding of this Report—and it is precisely the gap that Section 504, Title II of the ADA, and the McKinney-Vento Homeless Assistance Act exist to prevent.

18. The causation evidence in this Case is particularly significant. C.M.-1's documented academic and behavioral improvement during the 2025–2026 school year—when her accommodations are being implemented by different staff, when she has a new ESE support person, and when she has been separated from triggering peers—demonstrates that the prior years' academic failure and emotional distress were not the inevitable consequences of C.M.-1's disabilities. They were the consequences of how the District responded to those disabilities. The variable that changed between C.M.-1's failing years and her improving year is not the student's diagnosis, intelligence, or motivation. It is the fidelity of accommodation implementation.

This before-and-after contrast constitutes direct, real-world evidence that when the Standard of Care is met, the student succeeds—and when it is not met, the student fails. The District's own data proves the Plaintiffs' case.

19. The deliberate indifference documented in this Case is not characterized by a single moment of willful cruelty or overt discriminatory animus. It is characterized by something the case law recognizes as equally actionable: A pattern of institutional awareness coupled with institutional inadequacy.

The District knew. It knew because the mother told the Florida Department of Education Inspector General (CBM-004, April 2, 2024). It knew because Deputy Superintendent Tierney directed an investigation through the CARES process (April 2024, as documented in the Report's Entry 6 analysis). It knew because its own ADA/504 Coordinator conducted an eight-complaint investigation (CBM-154 to CBM-162). It knew because AP Keevey had to e-mail all of C.M.-2's teachers reminding them of his 504 Plan a month into the school year (CIM-277, September 18, 2024). It knew because the mother filed a Formal Grievance and Demand for Educational Compensation (CBM-087 to CBM-096, April 2025). It knew because the mother held C.M.-1 out of school for approximately two weeks due to the severity of her anxiety (approximately April 21–May 6, 2025). It knew because its General Counsel was monitoring

the situation and assessing litigation probability (May 2025, CBM-449 to CBM-464). And it knew because a federal complaint was filed on May 5, 2025 (CBM-116 to CBM-119).

But where the District truly "crossed the line"—as discussed early in this Report—was when it stopped investigating Ms. Tolbert's District-filed complaints because she similarly complained to the Florida Department of Education and, then, to the Federal judicial system—indeed, as the beginning part of the present litigation. When this occurred, the District moved from deliberate indifference to deliberate negligence and a conscious punitive disregard of the parent and students' legal protections and educational well-being.

At every stage of this escalating chain of notice, the District's response was either inadequate to the scope of the problem, misdirected away from the student's actual needs, or absent entirely. The deliberate indifference standard does not require that the District intended to harm these students. It requires that the District knew they were being harmed and failed to act reasonably. The evidentiary record satisfies this standard.

20. The intersection of disability, race, and homelessness in this Case creates a compounding vulnerability that the Standard of Care requires the District to recognize and address—not to ignore or exacerbate.

Both C.M.-1 and C.M.-2 are Black students with ADHD and Generalized Anxiety Disorder who experienced homelessness during the relevant period. The research reviewed in this Report establishes that each of these characteristics independently increases the risk of accommodation denial, behavioral misinterpretation, and disciplinary bias—and that their intersection amplifies these risks beyond the sum of their individual effects (Okonofua & Eberhardt, 2015; Owens & McLanahan, 2020; Morgan et al., 2017; Skiba et al., 2002, 2011, 2014; Gregory et al., 2017).

This Report does not offer a legal conclusion on whether racial discrimination independently occurred. But the research literature compels the observation that the pattern documented in these records— subjective behavioral discipline applied disproportionately, accommodation resistance rationalized through deficit-based beliefs about student effort and motivation, and institutional indifference to escalating parental advocacy—is consistent and conspicuous with the fact that the Plaintiffs are Black.

Limitations of this Analysis

Professional integrity requires the explicit acknowledgment of limitations in this analysis.

First, this Report is based on the evidentiary record as produced through Discovery, the deposition testimony of C.M.-1 and C.M.-2, the Second Amended Complaint, and the research literature. It does not include the deposition testimony of District employees—including Miss Oliver, teacher Chacon, teacher Dashiell, Principal Feaman, AP Keevey, Kim Doyle, Kevin McCormick, Karen Whetsell, or any other District official—because those depositions were either not conducted as of the date of this Report, or were not made available for review. The District's employees may offer testimony that provides context, explanations, or contradictions to the record as documented here. This Report's conclusions are based on the evidence available and reviewed, and they would be subject to additions, changes, or other modification if additional evidence were produced.

Second, this Report relies on the Plaintiffs' deposition testimony, which was given by a 13-year-old (C.M.-1) and a 16-year-old (C.M.-2). As documented in the deposition analyses in this Report, both witnesses demonstrated internal consistency and their testimony was corroborated by the Discovery record at multiple points. However, both witnesses also exhibited the developmental limitations

characteristic of adolescent testimony—including imprecise recall, difficulty distinguishing between school years and specific incidents, and occasional uncertainty about details. Signed Errata Sheets were filed for both C.M.-1 (March 25, 2026) and C.M.-2 (March 24, 2026), and the corrections reflected in those Errata Sheets were considered in this analysis. These developmental limitations were noted in the Expert Analysis and do not undermine the core factual pattern, but they should be acknowledged.

Third, this Report did not have access to the District's internal training records, professional development calendars, teacher evaluation documents, or compliance monitoring protocols beyond those produced in Discovery. The conclusions regarding systemic training deficits are based on the observable pattern of accommodation failures across multiple teachers, multiple schools, and multiple years—a pattern that is consistent with the research literature on training deficits—but they are not based on direct review of the District's training curriculum or records.

Fourth, the McKinney-Vento analysis (Count V) is limited by the fact that the Discovery record did not contain any record or reference demonstrating that the District conducted a best-interest determination, failed to remove related barriers, and/or failed to offer dispute resolution. Hence, conclusions relevant to McKinney-Vento are based on the Complaint's allegations as supported by the available Discovery record and deposition testimony.

Fifth, this Report addresses the educational and psychoeducational dimensions of the Claims. It does not offer legal conclusions regarding the ultimate disposition of any Count. The application of legal standards to facts is the province of the Court; the application of educational standards, research literature, and professional judgment to the evidentiary record is the province of the Expert. This Report operates within the latter domain.

Sixth, certain factual details cited in this Report derive from single evidentiary sources (e.g., the "water" code word, the "stinks" comment, and the "snitches" statement are documented in C.M.-1's deposition testimony; the Pincus quote is documented in the Discovery record's Entry 9 e-mail chain). Where a fact derives from a single source, that source has been identified. The weight to be accorded to single-source evidence is a matter for the factfinder, not the expert.

<u>Final Statement</u>

The Standard of Care established by <u>Section 504 of the Rehabilitation Act</u>, <u>Title II of the Americans with Disabilities Act</u>, and <u>The McKinney-Vento Homeless Assistance Act</u> is not aspirational. It is not a ceiling to which school districts should strive. It is a <u>floor below which they may not fall</u>.

That floor requires that when a school district identifies a student with a disability, it develops plans to accommodate that disability. Once it develops a plan, it communicates that plan to every teacher responsible for implementing it, and provides training and supervision as needed. When teachers receive the plan (and training), they implement it consistently, daily, and in every classroom. When implementation fails or does not produce the level of expected outcomes, the district assessing and identifies the failure and takes prompt, effective corrective action. When a parent reports that the system is not working, the district investigates with genuine rigor and responds with genuine remediation. And when a student is experiencing homelessness, the district conducts the individualized analyses, removes the barriers, and provides the procedural safeguards that the McKinney-Vento Act mandates.

The evidentiary record in this Case—viewed in its totality, across both Plaintiffs, three schools, multiple school years, and through the lens of the research literature that establishes what effective accommodation delivery requires—demonstrates that the School District of Palm Beach County <u>did not meet this Standard of Care</u> for C.M.-1 or C.M.-2.

The accommodations were written, but not delivered. The teachers were assigned, but not trained. The investigations were conducted, but were not rigorous and appeared self-serving. Corrective actions were proposed, but were not retrospective. Internal compliance mechanisms were activated, but were then suspended. And the family—a single mother advocating for two children with disabilities while experiencing homelessness—was left to carry the monitoring, enforcement, and escalation burden that federal law assigns to the institution.

These conclusions are stated to a reasonable degree of psychoeducational probability and certainty, based on the evidence reviewed, the research literature analyzed, and the professional judgment developed over the course of my career in school psychology, special education systems, and school-based intervention design.

I have been asked to be available as an Expert Witness for testimony should this Case go to trial. As noted, I reserve the right to supplement this Report if additional information becomes available.

Respectfully Submitted,

Howard M. Knoff, Ph.D.
Licensed Psychologist (Florida License #PY11912)
Nationally Certified School Psychologist (#10606)


April 30, 2026

# References

American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). American Psychiatric Association Publishing. https://doi.org/10.1176/appi.books.9780890425787

Avramidis, E., & Norwich, B. (2002). Teachers' attitudes towards integration/inclusion: A review of the literature. *European Journal of Special Needs Education*, *17*(2), 129–147. https://doi.org/10.1080/08856250210129056

Barkley, R. A. (2012). *Executive functions: What they are, how they work, and why they evolved*. Guilford Press.

Barkley, R. A. (2015). *Attention-deficit hyperactivity disorder: A handbook for diagnosis and treatment* (4th ed.). Guilford Press.

Barkley, R. A. (2022). Improving clinical diagnosis using the executive functioning–self-regulation theory of ADHD. *The ADHD Report*, *30*(5), 1–7.

Bianco, M., & Leech, N. L. (2010). Twice-exceptional learners: Effects of child factors and type of disability on teachers' referral decisions. *Remedial and Special Education*, *31*(6), 462–477. https://doi.org/10.1177/0741932509355991

Brownell, M. T., Sindelar, P. T., Kiely, M. T., & Danielson, L. C. (2010). Special education teacher quality and preparation: Exposing foundations, constructing a new model. *Exceptional Children*, *76*(3), 357–377. https://doi.org/10.1177/001440291007600307

Centers for Disease Control and Prevention. (2023). Data and statistics on children's mental health. U.S. Department of Health and Human Services. https://www.cdc.gov/children-mental-health/data-research/

Cooc, N. (2019). Teaching students with special needs: International trends in school capacity and the need for teacher professional development. *Teaching and Teacher Education*, *83*, 27–41. https://doi.org/10.1016/j.tate.2019.03.021

DuPaul, G. J., & Stoner, G. (2014). *ADHD in the schools: Assessment and intervention strategies* (3rd ed.). Guilford Press.

Evans, S. W., Langberg, J. M., Schultz, B. K., Vaughn, A., Altaye, M., Marshall, S. A., & Zoromski, A. K. (2016). Evaluation of a school-based treatment program for young adolescents with ADHD. *Journal of Consulting and Clinical Psychology*, *84*(1), 15–30. https://doi.org/10.1037/ccp0000057

Evans, S. W., Beauchaine, T. P., Engel, R., Gnagy, E. M., Hoza, B., Steiner, R. L., Molina, B. S. G., & Pelham, W. E. (2023). A randomized clinical trial of the Challenging Horizons Program for high school students with ADHD. *Journal of Clinical Child & Adolescent Psychology*, *52*(6), 811–826. https://doi.org/10.1080/15374416.2022.2158840

Eysenck, M. W., Derakshan, N., Santos, R., & Calvo, M. G. (2007). Anxiety and cognitive performance: Attentional control theory. *Emotion*, *7*(2), 336–353. https://doi.org/10.1037/1528-3542.7.2.336

Gage, N. A., Katsiyannis, A., Counts, J., & Prykanowski, D. A. (2020). Disproportionate disciplinary exclusions of students with emotional and behavioral disorders: Trends and predictors. *Behavioral Disorders*, *46*(1), 3–13. https://doi.org/10.1177/0198742919883276

Ghandour, R. M., et al. (2021). Prevalence and correlates of DSM-5 mental disorders in the Adolescent Brain Cognitive Development (ABCD) Study. *Journal of the American Academy of Child & Adolescent Psychiatry*, *60*(11), 1358–1370.

Gilmour, A. F. (2018). Has inclusion gone too far? Weighing its effects on students with disabilities, their peers, and teachers. *Education Next*, *18*(4), 8–16.

Gilmour, A. F. (2021). Teacher certification area and the academic outcomes of students with learning disabilities or emotional/behavioral disorders. *The Journal of Special Education*, *54*(4), 233–244. https://doi.org/10.1177/0022466920937468

Ginsburg, G. S., Pella, J. E., Engel, K. E., Sapienza, J. K., Silverman, W. K., & Kendall, P. C. (2022). Teacher-Assisted Personalized Exposure (TAPES): A pilot randomized controlled trial. *Journal of Anxiety Disorders*, *88*, 102567. https://doi.org/10.1016/j.janxdis.2022.102567

Gregory, A., Skiba, R. J., & Mediratta, K. (2017). Eliminating disparities in school discipline: A framework for intervention. *Review of Research in Education*, *41*(1), 253–278. https://doi.org/10.3102/0091732X17690499

Harrison, J. R., Evans, S. W., Baran, A., Khondker, F., Press, K., Noel, D., Wasserman, S., & Harpold, T. (2020). Comparison of accommodations and interventions for youth with ADHD: A randomized controlled trial. *Journal of School Psychology*, *80*, 15–36. https://doi.org/10.1016/j.jsp.2020.05.001

Harrison, J. R., Benz, S. A., Evans, S. W., Zoccola, J., Goel, N., & Schultz, B. K. (2022). Classroom-based strategies for students with ADHD: A pilot randomized controlled trial. *Journal of Attention Disorders*, *26*(11), 1475–1490. https://doi.org/10.1177/10870547221079586

Harvey, M. W., Yssel, N., Bauserman, A. D., & Merbler, J. B. (2010). Preservice teacher preparation for inclusion: An exploration of higher education teacher-training institutions. *Remedial and Special Education*, *31*(1), 24–33. https://doi.org/10.1177/0741932508324397

Higa-McMillan, C. K., Francis, S. E., Rith-Najarian, L., & Chorpita, B. F. (2016). Evidence base update: 50 years of research on treatment for child and adolescent anxiety. *Journal of Clinical Child & Adolescent Psychology*, *45*(2), 91–113. https://doi.org/10.1080/15374416.2015.1046177

Huberty, T. J. (2008). Best practices in school-based interventions for anxiety and depression. In A. Thomas & J. Grimes (Eds.), *Best practices in school psychology V* (pp. 1473–1486). National Association of School Psychologists.

Jarrett, M. A., & Ollendick, T. H. (2008). A conceptual review of the comorbidity of attention-deficit/hyperactivity disorder and anxiety: Implications for future research and practice. *Clinical Psychology Review*, *28*(7), 1266–1280. https://doi.org/10.1016/j.cpr.2008.05.004

Jarrett, M. A., & Ollendick, T. H. (2012). Treatment of comorbid attention-deficit/hyperactivity disorder and anxiety in children: A multiple baseline design analysis. *Journal of Consulting and Clinical Psychology*, *80*(2), 239–244. https://doi.org/10.1037/a0027123

Jury, M., Maggio, C., & Aelenei, C. (2023). Assessing students with special educational needs: The role of accommodations in teachers' grading and competence evaluation. *European Journal of Psychology of Education*, *38*(4), 1637–1657. https://doi.org/10.1007/s10212-023-00702-2

Kendall, P. C., & Hedtke, K. A. (2006). *Cognitive-behavioral therapy for anxious children: Therapist manual* (3rd ed.). Workbook Publishing.

Langberg, J. M., Dvorsky, M. R., & Evans, S. W. (2013). What specific facets of executive function are associated with academic functioning in youth with attention-deficit/hyperactivity disorder? *Journal of Abnormal Child Psychology*, *41*(7), 1145–1159. https://doi.org/10.1007/s10802-013-9750-z

Langberg, J. M., Dvorsky, M. R., Molitor, S. J., Bourchtein, E., Eddy, L. D., Smith, Z. R., Oddo, L. E., & Eadeh, H.-M. (2018). Overcoming the research-to-practice gap: A randomized trial with two brief homework and organization interventions for students with ADHD as implemented by school mental health providers. *Journal of Consulting and Clinical Psychology*, *86*(1), 39–55. https://doi.org/10.1037/ccp0000265

Losen, D. J., & Gillespie, J. (2012). *Opportunities suspended: The disparate impact of disciplinary exclusion from school*. The Civil Rights Project, UCLA. https://civilrightsproject.ucla.edu/resources/projects/center-for-civil-rights-remedies/school-to-prison-folder/federal-reports/upcoming-ccrr-research

Losen, D. J., & Martinez, P. (2020). *Lost opportunities: How disparate school discipline continues to drive differences in the opportunity to learn*. Center for Civil Rights Remedies at the Civil Rights Project, UCLA. https://civilrightsproject.ucla.edu/

Lovett, B. J. (2010). Extended time testing accommodations for students with disabilities: Answers to five fundamental questions. *Review of Educational Research*, *80*(4), 611–638. https://doi.org/10.3102/0034654310364063

March, J. S., Swanson, J. M., Arnold, L. E., Hoza, B., Conners, C. K., Hinshaw, S. P., Hechtman, L., Kraemer, H. C., Greenhill, L. L., Abikoff, H. B., Elliott, L. G., Jensen, P. S., Newcorn, J. H., Vitiello, B., Severe, J., Wells, K. C., & Pelham, W. E. (2000). Anxiety as a predictor and outcome variable in the multimodal treatment study of children with ADHD (MTA). *Journal of Abnormal Child Psychology*, *28*(6), 527–541. https://doi.org/10.1023/A:1005179014321

Metzger, A. N., & Hamilton, L. G. (2021). The stigma of ADHD: Teacher ratings of labeled students. *Journal of Attention Disorders*, *25*(8), 1116–1126. https://doi.org/10.1177/1087054719899367

Morgan, P. L., Farkas, G., Hillemeier, M. M., & Maczuga, S. (2017). Replicated evidence of racial and ethnic disparities in disability identification in U.S. schools. *Educational Researcher*, *46*(6), 305–322. https://doi.org/10.3102/0013189X17726282

National Center for Learning Disabilities. (2019). *Forward together: Helping educators unlock the power of students who learn differently*. NCLD. https://www.ncld.org/research/forward-together

National Institute of Mental Health. (2023). Any anxiety disorder. Bethesda, MD: Author. https://www.nimh.nih.gov/health/statistics/any-anxiety-disorder

Ohan, J. L., Visser, T. A. W., Strain, M. C., & Allen, L. (2011). Teachers' and education students' perceptions of and reactions to children with and without the diagnostic label "ADHD." *Journal of School Psychology*, *49*(1), 81–105. https://doi.org/10.1016/j.jsp.2010.11.001

Okonofua, J. A., & Eberhardt, J. L. (2015). Two strikes: Race and the disciplining of young students. *Psychological Science*, *26*(5), 617–624. https://doi.org/10.1177/0956797615570365

Okonofua, J. A., Paunesku, D., & Walton, G. M. (2016). Brief intervention to encourage empathic discipline cuts suspension rates in half among adolescents. *Proceedings of the National Academy of Sciences*, *113*(19), 5221–5226. https://doi.org/10.1073/pnas.1523698113

Owens, J., & McLanahan, S. (2020). Unpacking the drivers of racial disparities in school suspension and expulsion. *Social Forces*, *98*(4), 1548–1577. https://doi.org/10.1093/sf/soz095

Pas, E. T., Bradshaw, C. P., & Hershfeldt, P. A. (2012). Teacher- and school-level predictors of teacher efficacy and burnout: Identifying potential areas for support. *Journal of School Psychology*, *50*(1), 129–145. https://doi.org/10.1016/j.jsp.2011.07.003

Poznanski, B., Hart, K. C., & Cramer, E. (2018). Are teachers ready? Preservice teacher knowledge of classroom management and ADHD. *School Mental Health*, *10*(3), 301–313. https://doi.org/10.1007/s12310-018-9259-2

Reinke, W. M., Stormont, M., Herman, K. C., Puri, R., & Goel, N. (2011). Supporting children's mental health in schools: Teacher perceptions of needs, roles, and barriers. *School Psychology Quarterly*, *26*(1), 1–13. https://doi.org/10.1037/a0022714

Sciutto, M. J., Terjesen, M. D., & Bender Frank, A. S. (2000). Teachers' knowledge and misperceptions of attention-deficit/hyperactivity disorder. *Psychology in the Schools*, *37*(2), 115–122. https://doi.org/10.1002/(SICI)1520-6807(200003)37:2<115::AID-PITS3>3.0.CO;2-8

Scruggs, T. E., & Mastropieri, M. A. (1996). Teacher perceptions of mainstreaming/inclusion, 1958–1995: A research synthesis. *Exceptional Children*, *63*(1), 59–74. https://doi.org/10.1177/001440299606300105

Sibley, M. H., Graziano, P. A., Kuriyan, A. B., Coxe, S., Pelham, W. E., Rodriguez, L., Sanchez, F., Derefinko, K., Helseth, S., & Ward, A. (2016). Parent–teen behavior therapy + motivational interviewing for adolescents with ADHD. *Journal of Consulting and Clinical Psychology*, *84*(8), 699–712. https://doi.org/10.1037/ccp0000106

Sibley, M. H., Coxe, S. J., Campez, M., Morley, C., Olson, S., Hidalgo-Gato, N., Gnagy, E., Pelham, W. E., & Rodriguez, L. (2020). High versus low intensity summer treatment for ADHD delivered at secondary school transitions. *Journal of Clinical Child & Adolescent Psychology*, *49*(4), 472–484. https://doi.org/10.1080/15374416.2018.1555722

Sibley, M. H., Bruton, A. M., Zhao, X., Zulauf-McCurdy, C., Rodriguez, L., Bussing, R., Coxe, S., & Kline, E. (2022). Integrative analysis of four randomized clinical trials of behavior therapy for adolescent ADHD. *Journal of Consulting and Clinical Psychology*, *90*(10), 749–762. https://doi.org/10.1037/ccp0000762

Silverman, W. K., Pina, A. A., & Viswesvaran, C. (2008). Evidence-based psychosocial treatments for phobic and anxiety disorders in children and adolescents. *Journal of Clinical Child & Adolescent Psychology*, *37*(1), 105–130. https://doi.org/10.1080/15374410701817907

Skiba, R. J., Michael, R. S., Nardo, A. C., & Peterson, R. L. (2002). The color of discipline: Sources of racial and gender disproportionality in school punishment. *The Urban Review*, *34*(4), 317–342. https://doi.org/10.1023/A:1021320817372

Skiba, R. J., Horner, R. H., Chung, C.-G., Rausch, M. K., May, S. L., & Tobin, T. (2011). Race is not neutral: A national investigation of African American and Latino disproportionality in school discipline. *School Psychology Review*, *40*(1), 85–107. https://doi.org/10.1080/02796015.2011.12087730

Skiba, R. J., Arredondo, M. I., & Williams, N. T. (2014). More than a metaphor: The contribution of exclusionary discipline to a school-to-prison pipeline. *Equity & Excellence in Education*, *47*(4), 546–564. https://doi.org/10.1080/10665684.2014.958965

U.S. Department of Education, Office for Civil Rights. (2021). *Civil Rights Data Collection (CRDC) for school year 2017–18*. https://ocrdata.ed.gov/

Voulgarides, C. K., Fergus, E., & Thorius, K. A. K. (2017). Pursuing equity: Disproportionality in special education and the reframing of technical solutions to address systemic inequities. *Review of Research in Education*, *41*(1), 61–87. https://doi.org/10.3102/0091732X17703554

Walkup, J. T., Albano, A. M., Piacentini, J., Birmaher, B., Compton, S. N., Sherrill, J. T., Ginsburg, G. S., Rynn, M. A., McCracken, J., Waslick, B., Iyengar, S., March, J. S., & Kendall, P. C. (2008). Cognitive behavioral therapy, sertraline, or a combination in childhood anxiety. *New England Journal of Medicine*, *359*(26), 2753–2766. https://doi.org/10.1056/NEJMoa0804633

Welsh, R. O., & Little, S. (2018). The school discipline dilemma: A comprehensive review of disparities and alternative approaches. *Review of Educational Research*, *88*(5), 752–794. https://doi.org/10.3102/0034654318791582

Zagona, A. L., Kurth, J. A., & MacFarland, S. Z. C. (2017). Teachers' views of their preparation for inclusive education and collaboration. *Teacher Education and Special Education*, *40*(3), 163–178. https://doi.org/10.1177/0888406417692969

Zirkel, P. A. (2020). Section 504 for students with ADHD: An updated look. *Journal of Special Education Leadership*, *33*(2), 87–97.

Zirkel, P. A., & Weathers, J. M. (2015). Section 504-only students: National incidence data. *Journal of Disability Policy Studies*, *26*(3), 184–193. https://doi.org/10.1177/0741932514555575

**<u>Appendices</u>**

A. Outlined List of Discovery Documents Reviewed for this Report

B. Expert's Brief Biography/Vita (Including All Publications from the Past 12 Years)

C. Expert's Experience as an Expert Witness in Federal or State Court Cases (Trial or Deposition) Since 2010

**Appendix A**

## Outlined List of Discovery Documents Reviewed for this Report

Below is a general list of the filings, documents, information, and reports read, analyzed, and considered in forming the opinions in this report.

Documents Received from Defendant through Discovery

C.M.-1. Discovery documents (Pages 1- 558), including:

| Beg. Bates No. | Date | Page #s | Description |
|---|---|---|---|
| CBM001 | 2/21/2024 | 1-3 | PB Legal Aid req. for records w/ parent auth |
| CBM004 | 4/2/2024 | 4 | complaint e-mail from T. Tolbert to Office of Inspector General - attachment of 80+ pages follows-docs described below CBM005-086 |
| CBM005 | 2/16/2024 | 5 | staff corresp. re: dress code, housing |
| CBM006 | 2/19/2024 | 6 | staff corresp. re: SHQ, no clothing assistance req. |
| CBM007 | 12/12/2018 | 7-9 | Pleadings index- prog. Rept, tardy notice |
| CBM010 | 7/7/2020 | 10-12 | index- grade 2 rept card |
| CBM013 | 1/30/2023 | 13-19 | index-504 plan doc-parent report |
| CBM020 | 2/27/2024 | 20 | index-multiple docs |
| CBM021 | 10/4/2023 | 21-27 | 504 plan |
| CBM028 | 10/4/2023 | 28 | staffing record and notes |
| CBM029 | 2/21/2024 | 29 | Q2 rept card |
| CBM030 | 2/8/2024 | 30 | phone conf notes |
| CBM031 | 2/9/2024 | 31-33 | parent-sch e-mails re math |
| CBM034 | 2/19/2024 | 34-35 | parent e-mails w King |
| CBM036 | 2/16/2024 | 36 | staff corresp. re: dress code, housing- DUPE OF CBM005 |
| CBM037 | 2/19/2024 | 37 | DUPE OF CBM006 |
| CBM038 | 2/19/2024 | 38 | Student Housing Questionnaire |
| CBM039 | 2/20/2024 | 39 | parent-teacher e-mails-math |
| CBM040 | undated | 40-48 | database info incl attendance |
| CBM049 | 10/4/2023 | 49 | counselor notes |
| CBM050 | undated | 50-52 | contact notes sept 2019-jan 2024 |
| CBM053 | undated | 53 | referrals page from database (none shown) |
| CBM054 | undated | 54-70 | testing records |
| CBM071 | 2/21/2024 | 71-72 | attendance 23-24 |
| CBM073 | 2/21/2024 | 73-75 | transcript |
| CBM076 | 2/21/2024 | 76 | Q3 rpt card |
| CBM077 | 2/27/2024 | 77-80 | mtg notification for 4.1.24 |

180

| Beg. Bates No. | Date | Page #s | Description |
|---|---|---|---|
| CBM081 | 2/16/2024 | 81 | e-mail from King re conf needed |
| CBM082 | 3/28/2024 | 82 | dress code violation e-mail |
| CBM083 | 2/20/2024 | 83 | dress code violation e-mail |
| CBM084 | 10/16/2023 | 84 | dress code violation e-mail |
| CBM085 | 8/30/2023 | 85 | dress code violation e-mail |
| CBM086 | 9/6/2023 | 86 | dress code violation e-mail |
| CBM087 | 4/24/2025 | 87-90 | e-mail thread re parent discrim. Complaint |
| CBM091 | 4/21/2024 | 91-96 | parent e-mail w/ complaint |
| CBM097 | 4/24/2025 | 97-110 | e-mail thread re parent discrim. Complaint-complaint incl. |
| CBM111 | 6/25/2025 | 111-115 | parent req for records |
| CBM116 | 5/5/2025 | 116-119 | Complaint - S.D. |

C.M.-2. Discovery documents (Pages 1- 1012), including:

| Beg. Bates No. | Date | Page #s | Description |
|---|---|---|---|
| NOTE-THIS SET OF RECORDS APPEARS TO BE MOSTLY DUPLICATIVE OF C.M.-1 RECORDS | | | |
| | | | |
| CIM0086 | 2025.05.26 | 86-87 | Release auth-unsigned and signed copies |
| CIM0088 | 2025.06.11 | 88-119 | Courtesy copies of summonses issued and complaint to all defs |
| CIM0120 | 2024.09.04 | 120 | Formal complaint against CIM teacher Chacon |
| CIM121 | 2025.06.17 | 121-122 | parent e-mail req for records |

_ _ _ _ _

Legal Case Filings

0 Second Amended Complaint CM1 and 2 v Palm Beach, December 17, 2025

_ _ _ _ _

Depositions and Deposition Exhibits

C.M. vs. PBCSB: C.M.-1 Deposition (02.18.26)-FT
C.M. vs. PBCSB: C.M.-2 Deposition (02.18.26)-FT
Errata Sheet Signed CM-1 (March 25, 2026)
Errata Sheet Signed CM-2 (March 24, 2026)

_ _ _ _ _

Federal or State Laws/Regulatory Documents Reviewed

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504")
Title II of the Americans with Disabilities Act, 42 U.S.C. §1331 *et seq.* ("ADA")
McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11301 *et seq.* ("McKinney-Vento").
Elementary and Secondary Education Act (ESEA, 2015)

Individuals with Disabilities Education Act (IDEA, 2004)

Florida State Chapter 1003.57: Standards for Exceptional Student Education (ESE) and Student Safety
Florida State Chapter 119: Public Records Act (Standard for Administrative Transparency and Record Retention)

_ _ _ _ _

School Board of Palm Beach County (PBCSB) Policies

Policy 5.50: Compliance with Section 504 and ADA (Role of 504 Designees; Mandatory Investigation of Harassment)
Policy 5.002: Anti-Bullying and Harassment (Standards for Prompt Investigation and Remediation).
Policy 5.07: McKinney-Vento Homeless Assistance (Standard for Safety and Removal of Financial Barriers)
Policy 5.1812 / 5.1813: Student Code of Conduct (Mandate for "Corrective Feedback" vs. Punitive Removal for Manifest Behaviors)
Policy 5.01 / 5.011 / 5.015: Professional Standards and Pupil Personnel Standards of Conduct (Civility, Dignity, and Confidentiality)

_ _ _ _ _

**Appendix B**

**Expert's Brief Biography/Vita,**
**(Including All Publications from the Past 12 Years)**

**Howard Marc Knoff, Ph.D.**

President, Project ACHIEVE Educational Solutions
Managing Editor, Project ACHIEVE Press
National Consultant, Author, Lecturer

NCSP—Nationally Certified School Psychologist
Licensed Psychologist (Florida; formerly in New York and Arkansas)
Certified School Psychologist (formerly in New York and Massachusetts)

Last Updated: January 1, 2026

**Contact Information**

11600 Court of Palms, Unit 703                         Phone:  (813) 495-3318
Fort Myers, FL 33908
E-mail:  howieknoff1@projectachieve.info
Website:  www.projectachieve.info

**Academic Degrees**

| | | |
|---|---|---|
| Ph.D. | 1980 | Syracuse University, Syracuse, New York (School Psychology) |
| Ed.S. | 1978 | Syracuse University, Syracuse, New York (School Psychology) |
| M.S. | 1977 | Syracuse University, Syracuse, New York (School Psychology) |
| A.B. | 1976 | Bowdoin College, Brunswick, Maine (Psychology/Biology) |

**Professional Experience**

8/90 to present         President, Project ACHIEVE Educational Solutions         Website:  www.projectachieve.info

Blog:  Building Strong Schools to         Website:  www.projectachieve.info/blog
Strengthen Student Outcomes

Project ACHIEVE is a research-proven national school improvement program that was designated a national model prevention program by the U.S. Department of Health & Human Services' Substance Abuse and Mental Health Services Administration (SAMHSA) in 2000. One or more of its strategic planning, school discipline and classroom management, and academic and behavioral multi-tiered systems of support components have been implemented in over a thousand urban, suburban, and rural schools over the past 40 years. While focusing on the student, staff, and school outcomes across a wide range of districts, Project ACHIEVE has especially addressed at-risk, underachieving, unsuccessful, and unresponsive students.  Working intensively with school staffs and parents through a multi-year professional development and intervention process, Project ACHIEVE has been consistently responsible for (a) significant increases in student achievement and social-emotional self-management, safer and more positive school climates and relationships, enhanced teacher instruction and multi-tiered intervention, and parental involvement and community support; and (b) significant decreases in student violence and disciplinary problems, school suspensions and grade retentions, special education referrals and placements, disproportionality for students of color and with disabilities, and in the personnel and other financial costs that these situations incur.

Since 2015, five different sites (involving eight different districts) have been awarded, cumulatively over $13,000,000 in U.S. Department of Education funds for the School Climate Transformation Grant. Implementing Project ACHIEVE's multi-tiered School Discipline, Classroom Management, and Student Self-Management (SEL/PBIS) components, these Grants supported up to 40 days of on-site consultation per year, and were primarily written by Dr. Howie Knoff as a no-cost support to the districts involved.

1/93 to present            Expert Witness at the Federal, State, and Due Process Levels

Dr. Howie Knoff has been an Expert Witness in innumerable Federal and State Court cases, as well as Due Process Hearings and mediations nationwide since 1993. These cases have focused on IDEA and Special Education Procedures, School Psychology Assessment/Intervention Disputes, Psychological Misdiagnoses and Mental Health Services, 504 Accommodations and Disability Rights, Title IX Sexual Harassment Violations, Disproportionality and Racial Discrimination/Equity, Emotionally Disturbed and Autistic Students, Seclusion and Restraints, Educational Malpractice, School Safety and Violence, Social-Emotional Learning and Positive Behavioral Supports, Multi-Tiered Systems of Support, Bullying and Physical Aggression, Discipline and Corporal Punishment, IEP Disputes and Due Process Hearings, FAPE and LRE, Dispute Resolution and Mediation, Learning Disabilities and ADHD, Stress and Trauma.

Howie has been the Expert Witness for (a) two State Attorney Generals (cases on autism, corporal punishment, state-wide seclusions and restraints); (b) many state Office of Disability Rights special education disputes; (c) cases involving the discrimination and abuse of Black students; and (d) other cases involving the physical segregation of students with autism across an entire school district. In the early 90s, he was the Expert Witness for four consecutive racial discrimination cases in Montgomery, AL in Federal Court. His research and testimony not only helped win those cases, but the Judge required him to work to remediate the District for the next two years. Two of those cases involved the precedent-setting Chris D. and Cory M. cases.

1/24 to 3/26            Senior Fellow in School Improvement, SEL, and Multi-Tiered Systems of Support
                       The Center for Model Schools (Houghton, Mifflin, Harcourt Publishing)

As a Senior Fellow with the Center, Howie provides leadership, consultation, professional development, publications, and assistance to states, regional educational cooperatives, districts, schools, and other education-related agencies and settings in the following areas:

- School Improvement and Turn-Around, Strategic Planning and Needs Assessments, and School Leadership and Organizational/Staff Development
- Safe and Positive School Climates, Classroom and Common School Area Discipline/Management, and Improving Students' Prosocial Behavior and Self-Management (PBIS/PBSS/SEL)
- Social Skills Instruction and Strategic/Intensive Interventions for Students with Social, Emotional, and Behavioral Challenges
- Multi-tiered (MTSS/RtI) Services and Title 1/Special Education Supports
- Multi-cultural Equity, and Solutions for Disproportionate Discipline for Students of Color and with Disabilities
- Prevention and Intervention for Teasing, Taunting, Bullying, Hazing, and Harassment
- Differentiated Academic Instruction and Academic Interventions for Struggling Students
- Federal, State, and Foundation Grant Writing in All Areas Above

10/09 to 10/15         Director, State Personnel Development Grant
10/03 to 9/09          Director, State Improvement Grant
                       Arkansas Department of Education, Special Education Unit
                       Little Rock, AR

Responsible for all administrative, financial, and implementation aspects of a five-year $1.0 million per year State Personnel Development Grant received from the U. S. Department of Education, Office of Special Education Programs, as a follow-up to a seven-year $1.7 million per year State Improvement Grant (2003-2009).

The most-recent grant's primary goals were to facilitate the systemic change and improvement of services and supports to all students in schools in Improvement status across Arkansas—so that high levels of these students demonstrate consistent academic and social, emotional, and behavioral proficiency—especially on state benchmark and high-stakes proficiency tests.  The grant also targeted districts that were not attaining high levels of effective services and outcomes for students with disabilities.  All of this was done by focusing on school leadership, strategic planning, and organizational development; math and literacy instruction and intervention; social, emotional, and behavioral instruction and intervention; and data-based problem solving and Response-to-Intervention services.  In addition, the grant had major initiatives in the areas of professional development, parent training and outreach, school-based mental health systems and services, and capacity-building so that the state could continue all of these activities after its completion.

8/92 to 7/03:                  Professor of School Psychology, University of South Florida

Faculty member in the Department of Psychological and Social Foundations (School Psychology Program) teaching graduate-level courses in Organizational Change, Supervision Processes, Professional Issues in School Psychology, Personality Assessment, and Internship/Practicum Supervision; along with research in the areas of organizational change and strategic planning, school reform, social skills and school safety, and consultation; along with service to the field and community.

8/87 to 12/98                  Director, School Psychology Program, University of South Florida

Responsible for overseeing all facets of the Ph.D. and Ed.S. School Psychology program including program admissions, accreditation, strategic planning, financial aid, and internship opportunities.

During this period, the Program became one of the top programs in the nation with over 100 graduates, received over $8 million in Federal and State grants, provided over $300,000 in tuition support per year to its 60 full-time graduate students, and recruited six faculty including two Past Presidents of the National Association of School Psychologists.  The Program also received two successive approvals of its Ed.S. and Ph.D. programs through NCATE during this time period, and was successfully accredited by the APA at the doctoral level.

8/87 to 8/92        Associate Professor of School Psychology, University of South Florida
8/85 to 8/87        Assistant Professor of School Psychology, University of South Florida
9/81 to 8/85        Assistant Professor of School Psychology, SUNY-Albany

9/79 to 7/81        School Psychologist, Lenox, Massachusetts

### Awards/National Leadership Positions

Fellow, American Psychological Association (1989)
President, National Association of School Psychologists (1989-1990)
    President-Elect (1988-1989); Past-President (1990-1991)
Lightner Witmer Award from the Division of School Psychology, American Psychological
    Association for Early Career Contributions to School Psychology  (August, 1989)
The Dean's Distinguished Service Award in Recognition of Commitment to Excellence in School
    Psychology as Scholar, Practitioner, Leader, and Mentor, University of South Florida (April, 1990)
National Association of School Psychologist's Distinguished Service Award (March, 1991)
Florida Association of Student Services Administrators Outstanding Educator Award (October, 1993)

**Awards:  For Project ACHIEVE--**

Recipient of the **2003 Administrator's Award for School-Based Mental Health Programs** by the
    Substance Abuse and Mental Health Services Administration in the U. S. Department of Health &
    Human Services.  Portland, OR, October, 2003.

Designated as a **Model National Program** by the Office of Juvenile Justice and Delinquency Prevention
    in the U. S. Department of Justice.  Rockville, MD, July, 2003.

185

**Awards:  For Project ACHIEVE (Continued)--**

<u>The Stop & Think Social Skills Program</u>: Designated as a Model National Program by the **Collaborative for Academic, Social, Emotional Learning (CASEL)**.  Chicago, IL, July, 2002.

Designated as a Model National Program by the **Substance Abuse and Mental Health Services Administration/Center for Substance Abuse Prevention in the U. S. Department of Health & Human Services**.  Rockville, MD, July, 2000.

Designated as a "Best and Promising Practices Program" by the **Western Center for the Application of Preventive Technologies** in association with the Oregon Office of Alcohol and Drug Abuse Programs.  Salem, OR, September, 2000.

Highlighted at the **1999 Improving America's Schools Conference "Creating Safe Schools and Healthy Students Institute."**  Sponsored by the U. S. Department of Education, Tampa, FL, October, 1999.

Highlighted at the **Safe and Effective Schools for ALL Children:  What Works! A National Teleconference.**  Sponsored by the U. S. Departments of Education and Justice (Office of Juvenile Justice and Delinquency Prevention), and the Center for Effective Collaboration and Practice at the American Institutes for Research, Washington, D. C., September, 1999.

Highlighted in **Safe, Drug-Free, and Effective Schools for ALL Children:  What Works!**  A joint report of the U. S. Department of Education's Safe and Drug-Free Schools and Office of Special Education Programs, April, 1998.

Cited as an exemplary program relative to school safety at the **White House Conference on School Safety**, October, 1998; and highlighted in the 1998 U. S. Department of Education/Department of Justice **Annual Report on School Safety** (October, 1998).

Highlighted in **Safe, Drug-Free, and Effective Schools for ALL Children:  What Works!**  A joint report of the U. S. Department of Education's Safe and Drug-Free Schools and Office of Special Education Programs, April, 1998.

Identified as an effective school reform program by the **Center for Effective Collaboration and Practice of the American Institutes for Research**, Washington, D. C., January, 1997.

Semi-finalist in the **U. S. Department of Education's National Awards Program for Model Professional Development**, October, 1996.

One of five programs across the country funded by the Metropolitan Life Foundation's **Positive Choices:  Youth Anti-Violence Initiatives** program in the Fall of 1995 for $100,000.

Received Honorable Mention in the Coalition on Educational Initiatives' and USA TODAY's **Community Solutions for Education** national awards program, May, 1995.

Designated as the best **Model Student Services Program** in Florida by the State Department of Education in its "Promising Programs and Practices" competition for 1994-1998.

### Current Professional Association Memberships

National Association of School Psychologists

**Significant Published Books**

Knoff, H.M. (2024). <u>A multi-tiered service and support implementation guidebook for schools: Closing the achievement gap</u>. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2024). <u>Strategic planning and continuous school improvement: Needs assessments and SWOT/Resource analyses</u>. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). <u>Teasing, taunting, bullying, harassment, hazing, and physical aggression: Keeping your school, common areas, and students safe</u>. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2017). <u>Effective multi-tiered RtI approaches for academically and behaviorally struggling students</u>. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2012). <u>School Discipline, Classroom Management, and Student Self-Management: A Positive Behavioral Support Implementation Guide</u>. Thousand Oaks, CA: Corwin Press.

Knoff, H.M., Blanchard, K., Covey, S., & Tracy, B. (2010). <u>Discover Your Inner Strength: Cutting Edge Growth Strategies from the Industry's Leading Experts</u>. Sevierville, TN: Insight Publications.

Knoff, H. M. (2005). <u>The Stop & Think Parent Book: A Guide to Children's Good Behavior</u>. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2001). <u>The Stop & Think Social Skills Program (Preschool – Grade 1, Grades 2/3, Grades 4/5, Middle School 6-8)</u>. Longmont, CO: Sopris West.

Penner, L., Batsche, G.M., Knoff, H.M., & Nelson, D. (Eds.). (1993). <u>The challenge in mathematics and science education: Psychology's response</u>. Washington, D.C.: American Psychological Association.

Knoff, H. M. (Ed.). (1986). <u>The assessment of child and adolescent personality</u>. New York: Guilford Press.

**Recent/Important Publications**

Knoff, H.M. (2024). 7 suggestions to help districts avoid special education hearings. <u>Equity and Access Journal: preK-12</u>, <u>January/February (27)</u>, 18-19.

Knoff, H.M. (2023). Why some schools are still doing growth mindset strategies. <u>Equity and Access Journal: preK-12</u>, <u>October to November (26)</u>, 36-40.

Knoff, H.M. (2023). Why "Do" SEL if it doesn't improve students' classroom behavior? <u>Equity and Access Journal: preK-12</u>, <u>August/September (25)</u>, 28-30.

Knoff, H.M. (2023). Teaching students academic and social-emotional skills: We need to sweat the small stuff. <u>Equity and Access Journal: preK-12</u>, <u>April/May (23)</u>, 14.

Knoff, H.M. (2022). School improvement begins with principles before principals. <u>Equity and Access Journal: preK-12</u>, <u>November/December (21)</u>, 46-50.

Knoff, H.M. (2022). A setting is not an intervention. <u>Equity and Access Journal: preK-12</u>, <u>February/March (18)</u>, 18-23.

Knoff, H.M. (2022, May 27). How many more? A historical plea to protect our children from the politics of polarization. <u>Equity and Access preK-12</u>. American Consortium for Equity in Education. <u>https://www.ace-ed.org/how-many-more-a-historical-plea-to-protect-our-children-from-the-politics-of-polarization/</u>

**Recent/Important Publications  (Continued)**

Knoff, H.M. (2021). Disproportionate discipline referrals for students of color and with disabilities: Re-thinking changes in policy and restorative justice programs and practices. Equity and Access Journal: preK-12, September to October (16), 68-75.

Knoff, H.M. (2021). Training racial bias out of teachers: Who ever said that we could? Equity and Access Journal: preK-12, May/June (14), 58-69.

Knoff, H.M. (2021). The mirage behind trauma-informed, SEL, mindfulness, & PBIS programs and frameworks: Why schools are wasting money, time, and training on unproven programs to solve students' social, emotional, and behavioral needs. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2021). The pandemic playbook: Effectively re-opening our schools (now and for 2020-2021)-- Addressing students' academic and social, emotional, and behavioral needs. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2019). The impact of inequitable school funding: Solutions for struggling schools without the money to fully help struggling students. Equity and Access Journal, August/October, 50-59.

Knoff, H.M., Reeves, D., & Balow, C. (2018). A multi-tiered service & support implementation blueprint for schools & districts: Revisiting the science to improve the practice. Irvine, CA: Illuminate Education.

Knoff, H.M. (2018). Teaching students classroom and school routines: From preschool to high school. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). Developing school discipline codes that work: Increasing student responsibility while decreasing disproportionate discipline referrals. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). Implementing a progressive school discipline code through classroom-based Behavioral Matrices. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). Developing and implementing the behavioral matrix: Team and teacher worksheets to create grade-level matrices. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). Changing student behavior by linking office discipline referrals to a strategic Time-Out process: A step-by-step implementation guide. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). The Stop & Think Social Skills Program: Exploring its research base and rationale. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). Creating effective school mission statements: Characteristics and analysis. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). Shared leadership through school-level committees: Process, preparation, and first-year implementation action plans.

Knoff, H.M. (2018). Evaluating school-wide discipline/Positive Behavioral Support Systems: Three years of sequenced implementation activities. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). The school safety audit and emergency/crisis prevention process. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H.M. (2018). Conducting Quarterly Student Achievement Review (Q-STAR) meetings. Fort Myers, FL: Project ACHIEVE Press.

**Recent/Important Publications  (Continued)**

Knoff, H.M. (2018). The Get-Go Process: Transferring students' multi-tiered information and data from one school year to staff and prepare for the next. Fort Myers, FL: Project ACHIEVE Press.

Knoff, H. M. (2015). Best practices in strategic planning, organizational assessment, and school effectiveness. In A. Thomas & J. Grimes (Eds.), Best practices in school psychology-VI. Bethesda, MD: National Association of School Psychologists.

Knoff, H.M. (2013). Changing resistant consultees: Functional assessment leading to strategic intervention. Journal of Educational and Psychological Consultation, 23(4), 307-317.

Knoff, H.M. (2013). Classroom management from an organizational perspective: Positive behavioral supports at the system, school, and staff levels. In A. Honigsfeld & A. Cohan (Eds.), Breaking the mold of classroom management: Innovative and successful practices for the 21st century. Lanham, MD: Rowman & Littlefield Education.

Knoff, H. M. (2007). Best practices in implementing statewide positive behavioral support systems. In A. Thomas & J. Grimes (Eds.), Best practices in school psychology-V. Bethesda, MD: National Association of School Psychologists.

Knoff, H. M. (2007). The seven sure solutions to school-based mental health services success: The necessary collaboration between school and community providers. In S. Evans (Ed.), Advances in school-based mental health interventions. Kingston, NJ: Civic Research Institute, Inc.

Knoff, H. M. (2006). Teasing, taunting, bullying, harassment, and aggression: A school-wide approach to prevention, strategic intervention, and crisis management. In M. J. Elias, J. E. Zins, & C. A. Maher (Eds.), Handbook of prevention and intervention in peer harassment, victimization, and bullying. New Jersey: Haworth Press.

Knoff, H. M., Finch, C., & Carlyon, W. (2004). Inside Project ACHIEVE: A comprehensive, research-proven whole school improvement process focused on student academic and behavioral outcomes. In K. Robinson (Ed.), Advances in school-based mental health: Best practices and program models (pp. 19-1 to 19-28). Kingston, NJ: Civic Research Institute, Inc.

Knoff, H. M. (March, 2002). The "Stop and Think!" Social Skills Program: Teaching children interpersonal and conflict resolution skills systems. NASP Communiqué, 30.

Knoff, H. M. (March, 2002). Positive Behavioral Self-Management Systems: Facilitating school-wide implementation and minimizing individual resistance. NASP Communiqué, 30.

Knoff, H. M. (2001, October). Establishing school-wide prevention, intervention, and intensive needs approaches for student discipline, behavior management, and self-management: A collaborative action planning process. Provided as a keynote paper for the virtual conference, "Creating Mentally Healthy Schools and Communities," Washington, DC: American Institutes for Research, Center for Effective Collaboration and Practice.

Knoff, H. M. (2000). Stop and Think! Steps toward the systematic prevention of student violence. Reaching Today's Youth: The Community Circle of Caring Journal, 5(1), 63-66.

Knoff, H. M. (2000). Organizational development and strategic planning for the millennium: A blueprint toward effective school discipline, school safety, and crisis prevention. Psychology in the Schools, 38.

Raffaele, L., & Knoff, H. M. (1999). Improving home-school collaboration with parents of children at-risk: Organizational principles, perspectives, and approaches. School Psychology Review, 28, 448-466.

**Recent/Important Publications  (Continued)**

Knoff, H. M., Stollar, S., Johnson, J., & Chenneville, T. (1998). Assessment of social-emotional functioning and adaptive behavior. In E. Vazquez-Nuttall, I. Romero, & J. Kalesnik (Eds.), Assessing and screening preschoolers: Psychological and educational dimensions (2nd Ed.). Boston: Allyn & Bacon.

Knoff, H. M., & Bishop, M. D. (1997). Children and Divorce. In G.G. Bear, K. M. Minke, & A. Thomas (Eds.), Children's Needs II (pp. 593-604). Washington, DC: National Association of School Psychologists.

Knoff, H. M., Curtis, M. J., & Batsche, G. M. (1997). The future of school psychology: Perspectives on effective training. School Psychology Review, 26, 93-103.

Knoff, H. M. (1996). The interface of school, community, and health care reform: Organizational directions toward effective services for children and youth. School Psychology Review, 25, 446-464.

Knoff, H. M., & Batsche, G. M. (1995). Project ACHIEVE: Analyzing a school reform process for at-risk and underachieving students. School Psychology Review, 24, 579-603.


**National/Significant Grants Received**

School-Based Mental Health Grant. [with the Midwest (OH) Regional Education Service Center (MRESC)]. Four-year grant funded by the U.S. Department of Education, Elementary and Secondary Education Programs for $1,482,516. (2026-2030).

School Climate Transformation Grant. (with the Teaneck Public Schools, NJ). Five-year grant funded by the U.S. Department of Education, Elementary and Secondary Education Programs for $3,344,540. (2019-2024).

School Climate Transformation Grant. (with the Akron-Fairgrove, Caro, and Caseville Public Schools, MI). Five-year grant funded by the U.S. Department of Education, Elementary and Secondary Education Programs for $3,746,050. (2019-2024).

School Climate Transformation Grant. (with the Talihina and Heavener Public Schools, OK). Five-year grant funded by the U.S. Department of Education, Elementary and Secondary Education Programs for $2,735,425. (2019-2024).

School Climate Transformation Grant. (with the Martin County School District, KY). Five-year grant funded by the U.S. Department of Education, Elementary and Secondary Education Programs for $1,586,398. (2014-2019).

School Climate Transformation Grant. (with the Elkton-Pigeon-Bay Port Laker Schools, MI). Five-year grant funded by the U.S. Department of Education, Elementary and Secondary Education Programs for $1,830,895. (2014-2019).

Elementary and Secondary Counseling Grant. (with the Scranton School District, PA). Three-year grant funded by the U.S. Department of Education, Elementary and Secondary Education Programs for $1,200,000. (2014-2017).

The Arkansas Personnel Development Grant: Leadership, Literacy and Mathematics, Positive Behavioral Supports, and Data-based Problem solving for Schools in Improvement status. (with Marcia Harding). Five-year grant funded by the U.S. Department of Education, Office of Special Education Programs for $5,000,000. (2009-2014).

The Arkansas State Improvement Grant: Literacy, Positive Behavioral Supports, and Personnel Development. (with Marcia Harding, Howard and Judy Schrag, George Elliott). Five-year grant funded by the U.S. Department of Education, Office of Special Education Programs for $7,862,500. (2003-2008).

**National/Significant Grants Received (Continued):**

Preservice training in school psychology: The curricular and behavioral consultation initiative. (with Dr. George M. Batsche). Three-year grant funded by the U.S. Department of Education, Office of Special Education Programs for $233,280. (1990-1993).

National Scientific Conference on the Contributions of Psychology to Math and Science Education. (with Drs. George M. Batsche, Lou Penner, and Doug Nelson). (Approved November, 1990). Funded by the American Psychological Association for $24,000.

A full-service school training initiative: Preparing school psychologists to integrate home, school, and community services for special education students. (with Dr. George M. Batsche). Four-year grant funded by the U.S. Department of Education, Office of Special Education Programs for $427,340. (1992-1996).

The Florida Institute for School Reform and integrated service delivery. (with Dr. George M. Batsche). Funded by the Florida Department of Education for $665,000. (1992-1996).

Meeting the needs of minorities with disabilities and the children of poverty: Preparing school psychologists for home-school collaborative efforts that enhance children's academic and social competence. (with Dr. George M. Batsche). Five-year grant funded by the U. S. Department of Education, Office of Special Education Programs for $598,395. (1994-1999).

Project ACHIEVE: An empirical evaluation of an educational reform and instructional program for at-risk and disadvantaged elementary school children. (with George M. Batsche). Two-year grant funded by the U.S. Department of Education: Office of Educational Research for $89,851. (1994-1996).

Decreasing Youth Violence: Creating "Stop & Think" Neighborhoods and Communities via Home-School-and-Community Partnerships and a Multimedia Social Skills Prevention and Intervention Program. (with George M. Batsche). Funding by the Metropolitan Life Foundation Positive Choices: Youth Anti-Violence Initiatives for $100,000. (1995-1997).

Preparing School Psychologists for Curriculum-Based Assessment and Curriculum-Based Measurement: Facilitating Problem-Solving Services for At-Risk Students (with Dr. Kelly Powell-Smith). Three-year grant funded by the U. S. Department of Education, Office of Special Education Programs for $447,063 (1997-1999).

Project ACHIEVE: Demonstrating the impact of a comprehensive school reform process to improve the academic and social progress of disabled, at-risk, and underachieving students. Three-year Federal Outreach Project for Children with Disabilities grant funded by the U. S. Department of Education, Office of Special Education Programs for $450,000 (1998-2001).

Training school psychologists for comprehensive prevention and intervention services: Addressing the academic and behavioral needs of high poverty children at-risk for or with high-incidence disabilities. Three-year Pre-Service Training grant funded by the U. S. Department of Education, Office of Special Education programs for $600,000 (1999-2002).

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _

## Brief Biography

Howard M. Knoff, Ph.D. is an internationally-known innovator and hands-on practitioner in the areas of:

- School Improvement and Turn-Around, Strategic Planning and Organizational Development
- School Discipline, Classroom Management, and Student Self-Management (PBIS/PBSS/SEL)
- Differentiated Academic Instruction and Academic Interventions for Struggling Students
- Social, Emotional, and Behavioral Instruction and Strategic and Intensive Interventions for Challenging Students
- Multi-tiered (MTSS/RtI) Services and Supports
- Effective Professional Development and On-Site Consultation and Technical Assistance
- AI Applications to the pre-K to 12 School and Schooling Process

Howie is the President of Project ACHIEVE Educational Solutions which has implemented his nationally-known school effectiveness/school improvement program—an evidence-based model prevention program [through the U.S. Department of Health & Human Service's Substance Abuse and Mental Health Services Administration (SAMHSA)]—in thousands of schools or districts over the past 40 years. An international expert on school safety and discipline, classroom management and school-wide SEL systems, student engagement and achievement, and interventions with behaviorally challenging students, Dr. Knoff was a university professor (22 years at the University of South Florida and SUNY-Albany), and Director of the federally-funded State Personnel Development/State Improvement Grant for the Arkansas Department of Education from 2003 to 2015.

As Director of the Arkansas State Improvement/Personnel Development Grant (SIG/SPDG), Dr. Knoff was directly responsible to the Director of Special Education for the state of Arkansas, and involved in many Departmental policy and procedure discussions and deliberations. In addition to administering the $12 million received from the U.S. Department of Education, Office of Special Education Programs to implement these grants, he and his staff scaled-up critical Project ACHIEVE components across Arkansas focusing on:

- Statewide implementation of Positive Behavioral Support (PBIS) Systems;
- Literacy and mathematics interventions for at-risk, underachieving, and students with disabilities;
- Response-to-Instruction and Intervention (RtI$^2$) and Multi-Tiered Systems (MTSS) of support to help close the achievement gap, reduce disproportionality, and speed essential academic and behavioral interventions to needy students; and
- Sustained and real school improvement for Priority, Focus, and other schools or districts

Significantly, Project ACHIEVE (through the SPDG grant) was written into Arkansas' approved Elementary and Secondary Education (ESEA) Flexibility process as the school improvement model for all Focus schools in the state of Arkansas from 2010 to 2015.

Over the past decade especially, Dr. Knoff has partnered with school districts across the country helping them to write federal grants that also fund his on-site services. Between 2015 and 2024, he helped five different district collaboratives (two in Michigan, as well as in Oklahoma, New Jersey, and Kentucky) receive separate five-year muti-million dollar School Climate Transformation Grants from the U.S. Department of Education. These grants allowed Dr. Knoff to work with these districts for up to 40 days per year. These grants have also supported the development of on-line/on-demand courses in critical areas of school psychology, multi-tiered services and interventions, and student stress and trauma.

At the end of 2025, he helped the Midwest (OH) Regional Education Service Center (MRESC) receive a four-year multi-million dollar U.S. Department of Education School-Based Mental Health Grant to increase the number of trained and expert school psychologists in 11 school districts across four counties. Supported by training provided by Dr. Knoff over the four years, these school psychologists (and others) will provide direct early intervention and Tier 2 and 3 supports to students with significant mental health needs, while addressing the school psychology gaps in these districts.

Dr. Knoff received his Ph.D. degree from Syracuse University in 1980, and has worked as a practitioner, consultant, licensed private psychologist, and university professor since 1978. Dr. Knoff is widely respected for his research and writing on school reform and organizational change, consultation and intervention processes, social skills and behavior management training, Response-to-Intervention, and professional issues. He has authored or co-authored 25 books or monographs, published over 100 articles and book chapters, and delivered over 5,000 presentations, papers, or workshops internationally. His publications include the Stop & Think Social Skills Program (Preschool through Middle School editions) and the Stop & Think Parent Book: A Guide to Children's Good Behavior both through Project ACHIEVE Press.

Dr. Knoff has a long history of working with schools, districts, and community and state agencies and organizations. For example, he has consulted with a number of state departments of education, the Department of Defense Dependents School District during Desert Storm, and the Southern Poverty Law Center. He has also served as an expert witness on ten federal court cases, in addition to working on many other state and local cases—largely for legal advocacy firms who are representing special education and other students in need. Specific to school safety issues, Dr. Knoff was on the writing team that helped produce Early Warning, Timely Response: A Guide to Safe Schools, the document commissioned by the President that was sent to every school in the country in the Fall of 1998; and he participated in a review capacity on the follow-up document, Safeguarding our Children: An Action Guide.

A recipient of the Lightner Witmer Award from the American Psychological Association's School Psychology Division for early career contributions in 1990, Dr. Knoff is a Fellow of the American Psychological Association (School Psychology Division), a Nationally Certified School Psychologist, a Licensed Psychologist in Florida, and he has been trained in crisis intervention, mediation processes, and trauma-based interventions. He has received over $40 million in external grants during his career—most recently the School Climate Transformation Grants and School-Based Mental Health Grant—from the U.S. Department of Education—described above.

Dr. Knoff wrote a popular bimonthly Blog for over ten years (www.projectachieve.info/blog) addressing critical national school and schooling issues, and this Blog was accompanied by a podcast, Improving Education Today: The Deep Dive (https://iet.bepodcast.network/) on a dozen blog platforms for its last three years. Frequently interviewed in all areas of the media, Dr. Knoff has been on the NBC Nightly News, numerous television and radio talk shows, and he was highlighted on an ABC News' 20/20 program on "Being Teased, Taunted, and Bullied." Finally, Dr. Knoff was the 21st President of the National Association of School Psychologists which now represents more than 25,000 school psychologists nationwide.

Dr. Knoff is constantly sought after for his expertise in a wide variety of school, psychological, and other professional issues. He also has extensive experience as an Expert Witness having testified in many federal and state court cases across the United States since 1993. These cases have focused on IDEA and Special Education Procedures, School Psychology Assessment/Intervention Disputes, Psychological Misdiagnoses and Mental Health Services, 504 Accommodations and Disability Rights, Title IX Sexual Harassment Violations, Disproportionality and Racial Discrimination/Equity, Emotionally Disturbed and Autistic Students, Seclusion and Restraints, Educational Malpractice, School Safety and Violence, Social-Emotional Learning and Positive Behavioral Supports, Multi-Tiered Systems of Support, Bullying and Physical Aggression, Discipline and Corporal Punishment, IEP Disputes and Due Process Hearings, FAPE and LRE, Dispute Resolution and Mediation, Learning Disabilities and ADHD, Stress and Trauma.

**Appendix C**

**Expert's Experience as an Expert Witness in Federal or
State Court Cases (Trial or Deposition) Since 2010**

Updated: January 8, 2026

Current Cases

3/2026 – present    M.P., v. The Hun School, Jonathan Brougham, Otis Douce, Meghan Poller, Ryan Hews, Teachers A-C, Coaches A-C, School Counselors, John Does 1-20; ABC Entities 1-20. In the Superior Court of New Jersey, Law Division: Hudson County Docket NO. HUD-L-004259-23, Civil Action. Working for the Plaintiff.

12/2025 – present    M.P. v. the Calverton School and Calverton County Day School, Inc. In the Circuit Court for Calvert County; Case No. C-04-CV-25-000223. Working for the Defense.

12/2025 – present    Lisa Austin and R. C. v. The North Shore Central School District, The North Shore Central School District Board of Education, Glen Head Elementary School, Peter Rufa and Dayna Greenberg

In the U.S. District Court for the Eastern District of New York; Case No. 2:2023cv06712. Working for the Plaintiffs.
_ _ _ _ _ _ _ _ _ _

10/2025 – present    Elaina LoAlbo, as Administrator ad Prosequendum of the Estate of Felicia LoAlbo-Melendez and Elaina LoAlbo, Individually, Plaintiffs, v. Mount Holly Board of Education; Township of Mount Holly; Robert Mungo; Daniel Finn; Terry Convery; Teachers A-C; School Counselors A-C; John Does 1-20; and ABC Entities 1-20, Defendants.

In the Superior Court of New Jersey, Burlington County: Law Division Docket No.: BUR-L-2092-23. Working for the Plaintiffs.
_ _ _ _ _ _ _ _ _ _

10/2025 – present    A.L., legal guardian and Next Friend of M.A., a minor, Plaintiff vs. Ryan Gaston, Tiffany Waybright, John Doe #1 Jane Doe #2; and Wood County Board of Education, Defendants

In the Circuit Court of Wood County, West Virginia at Charleston. Working for the Defense.
_ _ _ _ _

| | |
|---|---|
| 9/2025 – present | Maria Escobar, individually and on behalf of her minor child, E.G., Plaintiffs, vs. Jefferson County School District #251, a public entity, and Jefferson County Sheriff's Office, a subsidiary of Jefferson County, Idaho, a public entity. |
| | In the District Court of the Seventh Judicial District of the State of Idaho, In and for the County of Jefferson, Case No: CV26-22-0179. Filed on September 21, 2022/October 27, 2022. Working for the Defense. |

– – – – – – – – – –

| | |
|---|---|
| 9/2025 – present | Bobby Steele, as parent of and on behalf of C.S., a minor, Plaintiff, vs. Clark County School District, a political subdivision of the State of Nevada; Ma Rochelle Cervantes Daing, individually; Margarita Francisco, individually; C.e Walker, individually; and Does 1 through X and Roe Corporations, Defendants |
| | In the United States District Court, District of Nevada, CASE NO.: 2:24-cv-01869-JAD-MDC. Filed on September 5, 2024. Amended: June 26, 2025. Working for the Plaintiffs. |

– – – – – – – – – –

| | |
|---|---|
| 9/2025 – present | G.B. and C.T., individually and as parents, guardians, and next friends of M.T., a minor, Plaintiff, v. Wood County Board of Education and Tena Martin, Defendants. |
| | In the United States District Court in the Southern District, West Virginia at Charleston, Civil Action No. 2:24-cv-00220. Working for the Defense. |

– – – – – – – – – –

| | |
|---|---|
| 7/2025 – present | Jane Doe (1 and 2) and John Doe (1, 2, and 3) and their Parents (1 – 7) v. West Bloomfield School District; West Bloomfield School District Board of Education; Blaine McDowell, in her individual and official capacity; Dr. Dania Bazzi, in her individual and official capacity; Gerald Hill, in his individual and official capacity; Amy Hughes, in her individual and official capacity; Suzan Karmo, in her individual and official capacity. |
| | In the United States District Court for the Eastern District of Michigan,  CASE NO.: 2:24-cv-11916-SDK-APP ECF No. 1, 07/25/24. Working for the Plaintiffs. |

– – – – – – – – – –

| | |
|---|---|
| 12/2024 – present | D.C., a minor child, by S.C. and B.C., his next friends and natural guardians v. Access Charter School, Inc., et al. |
| | In the Ninth Judicial Circuit Court, Orange County, FL (Orlando Division). Working for the Defense. |

– – – – – – – – – –

| | |
|---|---|
| 12/2024 – present | Jennifer Roth, Plaintiff v. Patrick Orlando, individually,  and Jennifer Withers, individually, Defendants |
| | In the Circuit Court of the 11th Judicial Court, In and for Miami-Dade County, FL. General Jurisdiction Division Case No.: 2024-008290-CA-01 Working for the Defense. |

| | |
|---|---|
| 9/2024 – present | RAPHAEL DEGUZMAN, individually, and RACHEL DEGUZMAN, individually and as Parent and Natural Guardian of M.D., a minor, Plaintiffs v. TYRINDA DIXON, Defendant.

In the Circuit Court, Fourth Judicial Circuit in and for Duval County, Florida. CASE NO.: 16-2020-CA-002661 DIVISION: CV-A. <u>Working for the Defense</u>. |

– – – – – – – – – –

<u>Completed Cases</u>

| | |
|---|---|
| 2/2024 – 12/2025 | Andrea Lopez and Marquel Fowler, Individually, and as Natural Parents of Izaiah Lopez, Plaintiffs v. Chris Restrepo, M.D., Emergency Medical Associates of Tampa Bay, LLC (Excelis Medical Associates), and St. Joseph's Hospital, Inc. d/b/a St. Joseph's  Hospital, Defendants. <u>Working for the Defense</u>.

<u>Legal Foundations</u>. Fla. Stat. § 768.28 (Sovereign Immunity / Pre-Suit Notice); Fla. Stat. § 827.03 (Child Abuse); Fla. Stat. § 760.01 et seq. (Florida Civil Rights Act); Fla. Stat. § 760.07 (Discrimination Based on Handicap); Fla. Stat. § 1003.571 (IDEA Compliance); Individuals with Disabilities Education Act (IDEA); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); 42 U.S.C. § 1983 Fourteenth Amendment, U.S. Constitution; and Convention on the Rights of the Child (Articles 19 and 27) |

– – – – – – – – – –

| | |
|---|---|
| 9/2024 – 7/1/2025 | C.K., a minor child, by and through his Mother and Next Friend, B.M v. West Carroll Special School District Board of Education et al, No. 1:2023 cv01133 - Document 37 (W.D. Tenn. 2024). <u>Working for the Plaintiffs</u>. |

– – – – – – – – – –

| | |
|---|---|
| 5/2024 – 7/1/2025 | S.L. v. Rutherford County Board of Education. In the Tennessee Middle District Court; CASE No.: 3:24-cv-00601. <u>Working for the Plaintiffs</u>. |

– – – – – – – – – –

| | |
|---|---|
| 5/2024 – 10/2024 | Jane Doe, a Minor Child, by and through Her Next Friends, Ken Gaskell and Allison Leitch, Plaintiffs v. Hamilton County Board of Education d/b/a Hamilton County School District; and Carmen Veller, Defendants.

In the United States District Court for the Eastern District of Tennessee— Chattanooga Division. <u>Working for the Parents as Plaintiffs</u>. |

– – – – – – – – – –

| | |
|---|---|
| 3/2024 – 9/2024 | <u>Scott Loupe and Natalie Loupe, Individually, and on Behalf of their Minor Child, Gabriel Loupe v. The Roman Catholic Church of the Diocese of Baton Rouge, St. George School, Jason Warren Murray and Caroline Beck Murray, Individually, and on Behalf of their Minor Child, James Murray</u>. In the 19th Judicial District Court for the Parish of East Baton Rouge (LA), CASE No.: C-677192, Section 26. Filed on December 11, 2018. <u>Working for the Diocese (Defense)</u>. |

– – – – – – – – – –

| | |
|---|---|
| 3/2024 – 5/2024 | In the Matter of: S.L., the Student, and M.L. and T.L., the Parents v. Rutherford County Schools (TN). Due Process APD Case No. 07.03-236527J Tennessee Department of Education, Special Education Division. Working for the Parents as Plaintiffs. |
| 1/2024 – 4/2024 | V.S. v. All Saints Catholic School, Diocese of Palm Beach County (FL). In the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida. Working for the Diocese (Defense). |
| 9/2023 – 11/2023 | Kelbie Glover and Lashonda Boone v. The Sampson County Board of Education. In the General Court of Justice, Superior Court Division, County of Sampson, State of North Carolina. FILE NO. 22 CVS 0039. Working for the Parent as Plaintiffs. |
| 5/2023 – 8/2023 | Due Process Complaint. Regina Gardner (on behalf of daughter J.G., a minor child) v. Baltimore County School District (MD). (July 5 – 7, 2023). Working for the Parent as Plaintiffs. |
| 9/2021 – 7/2023 | In the Matter of A.J., a minor child v. North Clackamus (OR) School District. In the United States District Court, Western District of Oregon, Portland Division. (Filed August 6, 2020). Working for the Parents as Plaintiffs. |
| 3/2018 - 3/2019 | Federal Court. Working for the TN Attorney General (Defense). <br><br> In the Matter of J.M., a minor student, by and through this parent, Promise Mata v. Tennessee Department of Education, Tennessee State Board of Education, and Dickson County School District. United States District Court Middle District of Tennessee Nashville Division, Case No. 3:17-cv-00405 (M.D. Tenn. Oct. 17, 2018). |
| 12/2017 - 11/2018 | Federal Court. Expert Witness. In the Matter of Chad and Tonya Richardson, Individually, and as Parents and Next Friends of L. v. Omaha (AR) School District; Jacob Sherwood, Superintendent; Amanda Green, Principal; and Dawn Dillon, Teacher. In the United States District Court, Western District of Arkansas, Harrison Division. November 2018. Working for the Parents as Plaintiffs. |
| 1/2017 | Jacquie Albright v. Mountain Home School District (AR). Expert Witness. In the United States District Court, Western District of Arkansas (Harrison Division). Working for the Parents as Plaintiffs. <br><br> Jacquie Albright (as Parent of Child Doe) v. Mountain Home School District; DPH-15-12; [Federal Civil Action, No. 3:16-CV-03011-TLB; 2017] |
| 8/10/2016 - 6/2018 | Diana Mathis and Raymond Cooper (Parents) v. Arkansas School for the Blind (AR). Working for the Parents as Plaintiffs. Testimony at Due Process Hearing. Case No. H-16-48. |

| | |
|---|---|
| 5/2016 - 6/2018 | <u>Randles v. Texarkana School District</u> (AR). <u>Working for the Parents as Plaintiffs</u>. Testimony at Due Process Hearing. Case No. H-15-21; Cases No. H-16-27 and EH-16-29 |
| – – – – – – – – – | |
| 7/2015-2/2016 | <u>Federal Court</u>. <u>Working for the Parents as Plaintiffs</u> (Paris, AR). Expert Witness Report. In the United States District Court, Western District of Arkansas (Fayetteville Division); Civil Action No. 2:15-CV-2197-PKH (Filed November 2, 2015). A.H., by and through her Parent, C.H vs. Paris School District. |
| – – – – – – – – – | |
| 2/2015-2/2017 | <u>Federal Court</u>. <u>Working for the Parents as Plaintiffs</u> (Bentonville, AR). Expert Witness Report. In the United States District Court, Western District of Arkansas (Fayetteville Division); Civil Action No. 5:15 Cv 5083-Pkh |
| – – – – – – – – – | |
| 10/7/2013 | <u>Working for the Parents as Plaintiffs</u> (New Orleans, LA). Expert Witness Report. Seth B. v. Orleans Parish School District. In the United States District Court, Eastern District of Louisiana (New Orleans). Case 2:13-cv-06068-NJB-DEK |
| – – – – – – – – – | |
| 7/2010-7/2011 | <u>Kelly, Kelly, & Allman</u> (Hendersonville, TN). Expert Witness. Jackson, Minnis, and Long v. the Sumner County (TN) Board of Education and Donna Weidenbenner (individually)]. In the United States District Court for the Middle District of Tennessee (Nashville). Case No. 3:2010cv00075 - Document 77 (M.D. Tenn. 2011). |
| – – – – – – – – – | |
| 7/2003-3/2005 | <u>Federal Court</u>. <u>Working for the AR Attorney General and Arkansas Department of Education</u> (Defense). Bradley v. Arkansas Department of Education; Case NO. 4:96CV1004 JMM (Combined with Case No. 4:00CV00747 GTE) |
| – – – – – – – – – | |
| 1/1999-7/2003 | <u>Legal Aid Society of Palm Beach County (FL).</u> Expert Witness. Consultation on numerous exceptional student education cases heard in state or district court relative to their special education and discipline/school expulsion and manifestation status. |
| – – – – – – – – – | |
| 1/1999-7/03 | <u>Southern Legal Counsel, Inc.</u> Gainesville, FL. Expert Witness. Consultation on numerous exceptional student education cases heard in state or district court that related to their special education and discipline/school expulsion and manifestation status. |
| 9/1991-12/1995 | <u>Thrun, Maatsch and Nordberg</u>, Lansing, MI, Expert Witness for the State of Michigan. Gingerich v. White Pigeon Community Schools, 736 F. Supp. 147 (W.D. Mich. 1990). U.S. District Court for the Western District of Michigan - 736 F. Supp. 147 (W.D. Mich. 1990); April 13, 1990. |

_ _ _ _ _ _ _ _ _

10/1989-6/1993    Federal Court (Four Hearings). <u>Legal Services Corporation of Alabama</u>.
                  Montgomery, AL. The two most notable cases were: <u>Chris D. v.</u>
                  <u>Montgomery Public School District</u>, and <u>Cory M. v. Montgomery Public</u>
                  <u>School District</u>.

_ _ _ _ _ _ _ _ _

200